# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9<br><br>        Plaintiff,<br><br>    v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201<br><br>        and<br><br>ANDREW VON ESCHENBACH<br>Acting Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. _____ |

## APOTEX INC.'S MOTION FOR TEMPORARY
## RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Pursuant to Rules 65(a) and (b) of the Federal Rules of Civil Procedure, Apotex

Inc. ("Apotex") hereby moves for a temporary restraining order and/or preliminary injunction

requiring the Food and Drug Administration; Michael O. Leavitt, Secretary of Health and

Human Services; and Andrew von Eschenbach, Acting Commissioner of Food and Drugs

(collectively, the "Federal Defendants") to:

(a)     set aside FDA's November 3, 2006 administrative decision as arbitrary, capricious and contrary to law;

(b)     refrain from awarding any 180-day exclusivity for ondansetron tablet ANDAs;

(c)     approve Apotex's abbreviated new drug application ("ANDA") No. 77-306 for ondansetron tablets upon the expiration of GlaxoSmithKline's pediatric exclusivity on December 24, 2006; and

(d)     refrain from approving any other ondansetron tablet ANDA until this determination is made and final approval is granted to Apotex.

In the event the Court denies such relief, Apotex respectfully moves for an injunction preserving the *status quo* and staying all ondansetron tablet approvals pending an appeal of this matter to the D.C. Circuit, in order to prevent devastating and irreparable harm to Apotex. The grounds for this motion are fully set forth in the accompanying memorandum, Declaration of Arthur Y. Tsien, and Declaration of Tammy McIntire, filed contemporaneously herewith.

As indicated in the accompanying Certification pursuant to Local Civil Rule 65.1(a), in advance of this filing, Apotex informed Federal Defendants of its intention to seek a temporary restraining order and/or preliminary injunction in this matter, as well as the time of the making of the application, and has provided the Federal Defendants with copies of this motion and all supporting papers, including the proposed order. The Federal Defendants have declined to consent to entry of the requested temporary restraining order and/or preliminary injunction, and consultation pursuant to Local Civil Rule 7(m) has failed to narrow the areas of disagreement.

2

Dated:  November 6, 2006.                    Respectfully submitted,

                                             APOTEX INC.

                                   By: _____
                                             Arthur Y. Tsien, D.C. Bar No. 411579
                                             OLSSON, FRANK AND WEEDA, P.C.
                                             1400 16th Street, N.W., Suite 400
                                             Washington, D.C. 20036-2220
                                             (202) 789-1212
                                             (202) 234-3550 (facsimile)

                                             *Counsel for Apotex Inc.*


Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) Case No. _____ |
| v. | )<br>) |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857 | )<br>)<br>)<br>) |
| MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201 | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| ANDREW VON ESCHENBACH<br>Acting Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM IN SUPPORT OF APOTEX INC.'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212

Dated:  November 6, 2006

*Counsel for Apotex Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.  Statutory Background. ........................................................................................... 3

    A.  Brand Drugs – NDAs. ................................................................................ 3

    B.  Generic Drugs – ANDAs. ........................................................................... 3

    C.  180-Day Generic Marketing Exclusivity. .................................................. 6

    D.  FDA's April 11, 2006 Administrative Ruling Interpreting The Court
    Decision Trigger Of § 355(j)(5)(B)(iv)(II). ............................................... 7

II.  Factual Background. .............................................................................................. 8

    A.  The Reference-Listed Drug And Orange Book Patents. .............................. 8

    B.  Apotex's ANDA No. 77-306 For Ondansetron Hydrochloride Tablets 4
    mg And 8 mg. ............................................................................................ 9

    C.  Other Ondansetron Hydrochloride ANDAs. ............................................... 9

    D.  Apotex Obtains A "Decision Of A Court" That Triggers Any 180-Day
    Exclusivity For Ondansetron Hydrochloride Tablets With Respect To The
    '658 Patent. ............................................................................................... 10

    E.  FDA's Unlawful Refusal To Find That Generic Exclusivity For
    Ondansetron Tablets Has Expired. ........................................................... 11

ARGUMENT .................................................................................................................. 13

I.  The Harm To Apotex Is Substantial And Irreparable. ........................................ 14

II.  The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate
Injunctive Relief. ................................................................................................ 15

III.  Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its
Claims. ................................................................................................................ 15

    A.  The Order Ending GSK's Patent Infringement Suit Against Apotex, Based
    Upon GSK's Express Concession Of Non-Infringement, Is A "Court
    Decision" Under § 355(j)(5)(B)(iv)(II). ................................................... 16

i

B.    If The Order Ending GSK's Patent Infringement Suit Against Apotex Does Not Qualify As A "Court Decision" Under FDA's April 11, 2006 Letter Ruling, The Agency's Ruling Is Impermissible And Must Be Set Aside As Unlawful........................................................................................ 19

    1.    The May 2005 *GSK* Order Is As Much A "Merits" Ruling As The *Granutec* Order, Which FDA Found To Be A Triggering Court Decision. ........................................................................................... 19

    2.    FDA's Refusal To Recognize The *GSK* Order As A "Court Decision" Is Inconsistent With The Agency's Treatment Of That Same Order As Sufficient To Terminate The 30-Month Stay Of ANDA Approval. ................................................................................. 23

    3.    FDA's Interpretation Is Unreasonable Because It Effectively Nullifies The Court Decision Trigger And Gives Brand Companies The Power To Manipulate The Hatch-Waxman Process........................... 25

IV.    An Injunction Would Further The Public Interest. ........................................... 30

CONCLUSION......................................................................................................... 31

# TABLE OF AUTHORITIES

## Federal Cases

*Apotex Inc. v. FDA,*
  449 F.3d 1249 (D.C. Cir. 2006) ............................................................. *passim*

*Apotex, Inc. v. Shalala,*
  53 F. Supp. 2d 454 (D.D.C. 1999) ........................................................ 24, 26

*Asiana Airlines v. FAA,*
  134 F.3d 393 (D.C. Cir. 1998) .............................................................. 23, 25

*Blackman v. District of Columbia,*
  277 F. Supp. 2d 71 (D.D.C. 2003) .............................................................. 13

*Bracco Diagnostics, Inc. v. Shalala,*
  963 F. Supp. 20 (D.D.C. 1997) .................................................................... 20

*Bush-Quayle '92 Primary Comm. v. FEC,*
  104 F.3d 448 (D.C. Cir. 1997) ..................................................................... 21

*C.F. Comms. Corp. v. FCC,*
  128 F.3d 735 (D.C. Cir. 1997) .............................................................. 24, 25

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ...................................................... 23, 24, 26, 28

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS,*
  300 F. Supp. 2d 32 (D.D.C. 2004) .............................................................. 20

*First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.,*
  90 F.3d 525 (D.C. Cir. 1996) ....................................................................... 26

*Granutec, Inc. v. Shalala,*
  139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) ....................... 7, 19

*Greater Boston Tel. Corp. v. FCC,*
  444 F.2d 841 (D.C. Cir. 1970) ..................................................................... 21

*In re Barr Labs.,*
  930 F.2d 72 (D.C. Cir. 1991) ....................................................... 3, 24, 26, 28

*Ind. Mich. Power Co. v. Dep't of Energy,*
  88 F.3d 1272 (D.C. Cir. 1996) ..................................................................... 28

---

\* Authorities upon which Apotex chiefly
relies are marked with an asterisk.

*Indep. Petroleum Ass'n of Am. v. Babbitt,*
    92 F.3d 1248 (D.C. Cir. 1996) ........................................................................ 20

*Minn. Mining & Mfg. Co. v. Barr Labs., Inc.,*
    289 F.3d 775 (Fed. Cir. 2002) ............................................................... 6, 7, 25

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ............................................................. *passim*

*Nat'l Treasury Employees Union v. FLRA,*
    392 F.3d 498 (D.C. Cir. 2004) ....................................................................... 26

*Omar v. Harvey,*
    416 F. Supp. 2d 19 (D.D.C. 2006) ................................................................. 13

*Pharm. Research & Mfrs. of Am. v. Thompson,*
    251 F.3d 219 (D.C. Cir. 2001) ....................................................................... 26

*Pub. Citizen Health Research Group v. FDA,*
    704 F.2d 1280 (D.C. Cir. 1983) ................................................................ 23, 25

*Raymen v. United Senior Ass'n,*
    No. 05-486(RBW), 2005 WL 607916 (D.D.C. Mar. 16, 2005) ................. 12, 13

*SmithKline Beecham Corp. v. Apotex Corp.,*
    247 F. Supp. 2d 1011 (N.D. Ill. 2003) ............................................................ 4

*Teva Pharms. USA v. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) ............................................................. *passim*

*Teva Pharms. USA, Inc. v. FDA,*
    254 F.3d 316, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ........................... 7

*Teva Pharms. USA, Inc. v. FDA,*
    441 F.3d 1 (D.C. Cir. 2006) ............................................................................ 7

*Teva Pharms. USA, Inc. v. FDA,*
    No. 99-67, 1999 WL 1042743 (D.D.C. 1999) ................................................. 7

*Transactive Corp. v. United States,*
    91 F.3d 232 (D.C. Cir. 1996) ........................................................................ 21

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977) ....................................................................... 13

**Federal Statutes**

21 U.S.C. § 355(b)(1) ............................................................................................ 3

21 U.S.C. § 355(c)(2) .................................................................................................... 3

21 U.S.C. § 355(j) .......................................................................................................... 10

21 U.S.C. § 355(j)(2)(A) ................................................................................................ 4

21 U.S.C. § 355(j)(2)(A)(vii) ........................................................................................ 4

21 U.S.C. § 355(j)(2)(B) ............................................................................................. 5, 9

21 U.S.C. § 355(j)(5)(B) ................................................................................................ 5

21 U.S.C. § 355(j)(5)(B)(ii) ........................................................................................... 4

21 U.S.C. § 355(j)(5)(B)(iii) ...................................................................................... 5, 21

21 U.S.C. § 355(j)(5)(B)(iii)(I) ............................................................................ 5, 22, 23

21 U.S.C. § 355(j)(5)(B)(iv) ................................................................................... *passim*

21 U.S.C. § 355(j)(5)(B)(iv)(II) ............................................................................. *passim*

35 U.S.C. § 271 ............................................................................................................. 10

## Federal Regulations

21 C.F.R. § 314.107(e) .................................................................................................. 11

21 C.F.R. § 314.53(e) ..................................................................................................... 3

## Other Authorities

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-173 § 1101(c)(1), 117 Stat. 2006, 2460 (2003) ............................ 5

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-173, § 1102(b)(3), 117 Stat. 2066, 2460 (2003) ........................... 6

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-703, 117 Stat. 2066 (2003) .......................................................... 5

Apotex respectfully submits this memorandum in support of its motion for a temporary restraining order and/or preliminary injunction requiring FDA to: (a) set aside its November 3, 2006 administrative decision as arbitrary, capricious, and contrary to law; (b) refrain from awarding 180-day exclusivity for ondansetron tablets to the owner of any abbreviated new drug application ("ANDA") for that product; (c) approve Apotex's ondansetron tablet ANDA on December 24, 2006 without delay due to any generic exclusivity awarded pursuant to 21 U.S.C. § 355(j)(5)(B)(iv); and (d) refrain from approving any other ondansetron tablet ANDA until this determination is made and final approval is granted to Apotex. In the event the Court denies such relief, Apotex respectfully moves for an injunction preserving the *status quo* and staying all ondansetron tablet ANDA approvals pending an appeal of this matter to the D.C. Circuit, in order to prevent devastating and irreparable harm to Apotex.

## **INTRODUCTION**

The only remaining exclusivity for ondansetron hydrochloride tablets expires on December 24, 2006. At that point, Apotex and all other eligible ANDA applicants have the legal right to begin marketing their respective generic ondansetron tablet products. But this will not happen because FDA has adopted an unlawful interpretation of the Federal Food, Drug, and Cosmetic Act ("FFDCA") – one that will deny Apotex access to the market and award another ANDA applicant a 180-day period of generic marketing exclusivity to which that company is not entitled.

In addition to filing a paragraph III certification to GlaxoSmithKline's ("GSK") U.S. Patent No. 4,753,789 ("the '789 patent"), Apotex and other companies also submitted paragraph IV certifications to another GSK patent, U.S. Patent No. 5,344,658 ("the '658 patent"). By submitting a paragraph IV certification, Apotex and the other applicants indicated their intent to begin marketing their respective generic products prior to expiration of the '658

1

patent. Under the Hatch-Waxman Amendments to the FFDCA, the first company to submit a paragraph IV certification obtains the right to 180 days of generic marketing exclusivity for its generic ondansetron product, pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Significantly, however, the statute does not guarantee that such a company will be able to market its generic product during this 180-day period. Indeed, the generic exclusivity period can, and has, expired before the so-called "first-filer" began marketing its generic. This is one such case.

Under 21 U.S.C. § 355(j)(5)(B)(iv)(II), the start of the 180-day generic exclusivity period is triggered by "a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." Here, any generic exclusivity attaching to the '658 patent expired long ago, as a result of a district court order ending GSK's patent infringement case against Apotex based upon GSK's express concession that Apotex's ANDA products do not infringe any claim of the '658 patent. More specifically, GSK sued Apotex for allegedly infringing the '658 patent. But as the litigation progressed, GSK realized that Apotex's ANDA products do not, in fact, infringe that patent. GSK provided Apotex with a covenant not to sue on the '658 patent and the district court entered a dismissal order based on GSK's express concession that Apotex's ANDA products do not infringe the '658 patent. The patent court's May 25, 2005 order constitutes a triggering court decision under § 355(j)(5)(B)(iv)(II) and, consequently, any 180-day exclusivity with respect to the '658 patent expired no later than December 20, 2005.

Because FDA cannot lawfully withhold final approval of Apotex's ANDA based upon any generic exclusivity period awarded under § 355(j)(5)(B)(iv), its refusal to grant that approval upon expiration of the '789 patent is arbitrary and capricious and contrary to law, and thus cannot stand. As a result, Apotex has demonstrated a strong likelihood of success on the

2

merits. At the very least, Apotex has demonstrated that an injunction temporarily preserving the *status quo* until the merits of FDA's position can be fully briefed and heard should be issued. This is particularly true in light of the fact that Apotex has suffered, and will continue to suffer, irreparable harm absent the requested injunctive relief, while FDA will not suffer any harm if the requested relief is granted. And, of course, the public plainly benefits from full generic competition as quickly as possible. This Court should, therefore, enter an order providing Apotex with immediate injunctive relief sought herein.

## BACKGROUND

### I.    Statutory Background.

This action arises under the 1984 Hatch-Waxman Amendments, which amended the FFDCA and the patent laws "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

### A.    Brand Drugs – NDAs.

A company that seeks to sell a new drug must file with FDA a New Drug Application ("NDA"). The applicant must include in its NDA, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results establishing its safety and effectiveness, and labeling describing the use for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The applicant also must submit information to FDA with respect to any patent that "claims the drug for which the application was submitted or which claims a method of using such drug . . . ." 21 U.S.C. § 355(c)(2); *see also id.* § 355(b)(1). FDA publishes all such patent information in the "Orange Book." *See* 21 C.F.R. § 314.53(e).

### B.    Generic Drugs – ANDAs.

Before 1984, a company seeking to market a generic version of an FDA-approved drug had to complete expensive and time-consuming safety and efficacy studies on the drug,

even though the NDA-holder already had established the drug's safety and efficacy. *See SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1018 (N.D. Ill. 2003). In 1984, Congress simplified the procedure for obtaining approval of generic drugs with the Hatch-Waxman Amendments to the FFDCA. Under Hatch-Waxman, "an abbreviated new drug application ["ANDA"] process allows applicants ... to proceed more quickly to the marketplace." *Teva Pharms. USA v. FDA*, 182 F.3d 1003, 1004 (D.C. Cir. 1999) ("*Teva I*").

An ANDA applicant must establish that its generic drug product is bioequivalent to the NDA drug. *See* 21 U.S.C. § 355(j)(2)(A). The ANDA also must include a "certification" to any properly-listed Orange Book patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The statute provides four certification options, of which only two are relevant here: the so-called "paragraph III" certification, where the applicant seeks approval upon patent expiration, and the so-called "paragraph IV" certification, where the applicant seeks immediate approval because the listed patent is invalid and/or not infringed by the proposed ANDA product. *Id.*

The timing of ANDA approval is tied to the type of certification contained in the ANDA. The statute mandates that the Agency "shall" approve a paragraph III ANDA on the date set forth in the certification, *i.e.*, on the date that the relevant patent expires. *See id.* § 355(j)(5)(B)(ii). For paragraph IV ANDAs, the timing of approval depends upon two things.

First, the timing of approval depends upon whether the brand company brings an infringement action within 45 days of learning of the paragraph IV ANDA filing. More specifically, where an ANDA applicant submits a paragraph IV certification, it must notify the patentee and NDA-holder of the factual and legal bases for that certification. *See id.* § 355(j)(2)(B). If the patentee or NDA-holder does not bring suit against the ANDA applicant within 45 days of receiving the notice letter, the statute mandates that FDA "shall" approve the

ANDA immediately, once FDA's approval requirements have been satisfied. *See id.* § 355(j)(5)(B)(iii). If, however, the brand company brings suit within 45-days, FDA "shall" approve the ANDA immediately upon expiration of the 30-month stay referenced in the statute. *See id.* The 30-month statutory stay period is, however, immediately terminated if the court finds that patent-in-suit to be invalid or not infringed prior to expiration of that automatic stay period:

> (I) if before the expiration of such [30-month] period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--
>
> (aa) the date on which the court enters judgment reflecting the decision; or
>
> (bb) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

21 U.S.C. § 355(j)(5)(B)(iii)(I) (2004).[1]

Second, the timing of approval for paragraph IV ANDAs also depends upon whether the company seeking approval filed the first paragraph IV ANDA. As discussed below, the first company to file an ANDA containing a paragraph IV certification to a listed patent obtains 180 days of generic marketing exclusivity.[2]

---

[1] In 2003, Congress amended the FFDCA. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-703, 117 Stat. 2066 (2003) ("the MMA"). Under § 1101(c)(1), the statutory language quoted herein controls approval of Apotex's ANDA. *See* Pub. L. No. 108-173 § 1101(c)(1), 117 Stat. 2006, 2460 (2003).

[2] If an ANDA contains multiple patent certifications, FDA evaluates each patent certification separately. *See* 21 U.S.C. § 355(j)(5)(B) (introductory sentence). ANDA approval is effective on the latest date, in light of the relevant patent certifications. *See id.*

**C.    180-Day Generic Marketing Exclusivity.**

Congress created the 180-day generic marketing exclusivity period by preventing

FDA from approving competing generic products until 180 days after the earlier of two so-called

"triggering" events:

> (iv) If the application contains a certification described in subclause (IV)
> of paragraph (2)(A)(vii) and is for a drug for which a previous application
> has been submitted under this subsection continuing [*sic*] such a
> certification, the application shall be made effective not earlier than one
> hundred and eighty days after—
>
> (I)    the date the Secretary receives notice from the applicant under
> the previous application of the first commercial marketing of the
> drug under the previous application, or
>
> (II)    *the date of a decision of a court in an action described in clause
> (iii) holding the patent which is the subject of the certification to
> be invalid or not infringed.*

21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added).[3]  In other words, 180-day exclusivity is

triggered by the earlier of:  (1) the first-filer's commercial marketing ("the commercial

marketing trigger"); or (2) relevant to this case, a final, unappealable court decision that the

patent is invalid or not infringed ("the court decision trigger").  *Id.*[4]

Significantly, while Congress created the 180-day exclusivity period to encourage

challenges to brand-name drug patents, it never intended first-filers to delay all subsequent

generic entrants indefinitely. *See Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775,

780 (Fed. Cir. 2002) ("*3M*").  Accordingly, courts have interpreted the court decision trigger

broadly. *See id.* at 786 (Gajarsa, J., concurring).  For instance, the court decision trigger includes

---

[3]  The first paragraph IV ANDA for ondansetron tablets was filed prior to the December 8, 2003
enactment of the MMA.  Accordingly, the cited statutory language governs in this case.

[4]  Under Title XI of the MMA, which in relevant part amended the FFDCA for all pending
ANDAs, a triggering court decision must be a final decision from which no appeal has been or
can be taken. *See* Pub. L. No. 108-173, § 1102(b)(3), 117 Stat. 2066, 2460 (2003).

*any* court decision on the patent that is the subject of the paragraph IV certification, regardless of whether the first paragraph IV filer is involved in that particular litigation. *See Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410, at \*5 (4th Cir. Apr. 3, 1998) (finding exclusivity triggered by a court decision involving a subsequent applicant); *see also 3M*, 289 F.3d at 780 (same); *Teva I*, 182 F.3d at 1005 n.3 (same). The court decision trigger also encompasses a broad spectrum of decisions, including decisions of patent unenforceability, despite the absence of this ground in the express language of the statute (*Teva I*, 182 F.3d at 1009), and grants of partial summary judgment based on the patent holder's admission of non-infringement (*id.* at 1010; *Granutec*, 1998 WL 153410, at \*5).

### D. FDA's April 11, 2006 Administrative Ruling Interpreting The Court Decision Trigger Of § 355(j)(5)(B)(iv)(II).

The proper interpretation of the court decision trigger has been the subject of much litigation over the years. *See Teva I*, 182 F.3d 1003; *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 WL 1042743, at \*7 (D.D.C. Aug. 19, 1999) ("*Teva I Remand*"); *Teva Pharms. USA, Inc. v. FDA*, 254 F.3d 316, 2000 WL 1838303, at \*2 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"); *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) ("*Teva III*"); *Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006). While litigation on this issue stretches back nearly seven years, FDA did not issue a written administrative interpretation of the court decision trigger until April 11, 2006. (*See* Tsien Decl. Ex. A, 4/11/06 FDA Letter to Apotex. Corp.).[5] Each of these rulings considered whether an order issued in a declaratory judgment suit, brought by the ANDA applicant against the brand company, constituted a triggering court decision under § 355(j)(5)(B)(iv)(II). *None specifically considered the impact of an order issued in a patent infringement action brought by the brand company against a paragraph IV ANDA applicant.*

---

[5] All references to "Tsien Decl." are to the Declaration of Arthur Y. Tsien, submitted concurrently herewith.

Nevertheless, as discussed *infra*, FDA apparently believes that its April 11, 2006 ruling has relevance to the instant dispute.[6]

According to FDA, it interprets "the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable." (*Id.* at 6 (emphasis in original)). This interpretation, FDA claims, "follows most readily from the statutory language." (*Id.*). FDA apparently relies on Black's Law Dictionary definitions of the term "holding" as a "court's determination of a matter of law pivotal to its decision; a principal drawn from such a decision," and the term "merits" as the "elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points." (*Id.* at 7 (citing *Black's Law Dictionary* at 737, 1003 (7th ed. 1999))). Based on these definitions, FDA concludes that "[u]nder the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability." (*Id.* at 7).

## II.     Factual Background.

### A.     The Reference-Listed Drug And Orange Book Patents.

The reference-listed drug upon which Apotex based its ANDA is GSK's prescription drug Zofran® (ondansetron hydrochloride) Tablets 4 mg, 8 mg, and 24 mg. FDA

---

[6] Apotex challenged the lawfulness of FDA's April 11, 2006 administrative ruling in connection with the drug pravastatin. The district court denied Apotex's motion for preliminary injunctive relief and the D.C. Circuit affirmed that denial. *See Apotex*, 449 F.3d 1249. Because the generic exclusivity period at issue in that case was set to expire as to all but one of strength of the product at issue, Apotex dismissed claims as to those strengths with prejudice. Apotex dismissed its claims as to the 80 mg strength of pravastatin without prejudice because Apotex continues to believe that FDA's ruling sets forth an improper and unlawfully narrow interpretation of the court decision trigger.

first approved that drug under NDA No. 20-103 on December 31, 1992. GSK has submitted

information on four patents for listing in the Orange Book in connection with its NDA No. 20-

103:

- U.S. Patent No. 4,695,578, which *expired* on January 25, 2005 (with pediatric exclusivity expired on July 25, 2005);

- U.S. Patent No. 5,578,628, which *expired* on February 16, 2005 (with pediatric exclusivity expired on August 16, 2005);

- U.S. Patent No. 4,753,789, which *expired* on June 24, 2006 (with pediatric exclusivity expiring on December 24, 2006); and

- U.S. Patent No. 5,344,658, which expires on September 6, 2011 (with pediatric exclusivity expiring on March 6, 2012).

(Tsien Decl. Ex. B, 8/31/05 Letter from Apotex to FDA, at 3 (emphasis added)).

**B.    Apotex's ANDA No. 77-306 For Ondansetron Hydrochloride Tablets 4 mg And 8 mg.**

On September 30, 2004, Apotex submitted ANDA No. 77-306 for generic

ondansetron hydrochloride tablets 4 mg and 8 mg. (*Id.*). For all tablet strengths, Apotex's

ANDA contains a paragraph III certification to the '578, '628, and '789 patents, thus signifying

that Apotex does not intend to market its ondansetron hydrochloride products until after the

expiration of those patents and their corresponding pediatric exclusivities. (*Id.*). Apotex

submitted a paragraph IV certification to the '658 patent. (*Id.*). As required by 21 U.S.C.

§ 355(j)(2)(B), Apotex provided the requisite notice of its ANDA and paragraph IV certification,

together with the factual and legal bases for that certification, to GSK. (*Id.*).

**C.    Other Ondansetron Hydrochloride ANDAs.**

Based on publicly-available information, other applicants apparently have

submitted ANDAs for ondansetron hydrochloride tablets with paragraph IV certifications to

some or all of the listed patents in the Orange Book. (*Id.*). From publicly-available information,

FDA apparently considers Dr. Reddy's Laboratories ("DRL") to be the first company to submit a paragraph IV ANDA for the 4 mg, 8 mg, and 24 mg strength ondansetron hydrochloride tablets to all four of the Orange-Book listed patents.[7] (*Id.* at 3-4). As a result of its paragraph IV ANDA submission, FDA considers DRL to be eligible for 180-day exclusivity periods for those drug products pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). (*Id.* at 4).

> D.   **Apotex Obtains A "Decision Of A Court" That Triggers Any 180-Day Exclusivity For Ondansetron Hydrochloride Tablets With Respect To The '658 Patent.**

On January 14, 2005, after receiving Apotex's statutorily-required notice letter, GSK filed an action against Apotex in the U.S. District Court for the District of New Jersey, pursuant to 21 U.S.C. § 355(j) and 35 U.S.C. § 271. (*Id.* at Ex. A thereto). GSK's complaint alleged that Apotex's ANDA products would, if marketed, infringe the '658 patent. On March 22, 2005, Apotex answered GSK's complaint and counterclaimed for invalidity and non-infringement of the '658 patent. (*Id.* at Ex. B thereto). On April 11, 2005, GSK responded to Apotex's counterclaims by denying invalidity and non-infringement. (*Id.* at Ex. C thereto).

At some point during the litigation, GSK concluded that Apotex's ANDA products would not infringe the '658 patent. After being apprised of GSK's position, the parties entered into a Covenant Not to Sue and Stipulation of Non-Infringement. (*Id.* at Ex. D thereto). In light of GSK's express concession of non-infringement, the parties submitted to the court hearing GSK's infringement case an order of dismissal with prejudice. That dismissal order provides, in pertinent part:

---

[7] Apotex believes, from public statements, that FDA considers DRL to be the first-filer for ondansetron tablets. Whether some other company turns out to have filed the first paragraph IV ANDA is irrelevant to the legal issue presented here because the Agency does not consider Apotex to be the first-filer. Consequently, absent relief from this Court, FDA will unlawfully withhold final approval of Apotex's ANDA, thus giving another company an improper marketing advantage.

Pursuant to the parties' ***Covenant Not to Sue and Stipulation of Non-infringement*** (the "Agreement"), ***incorporated by reference herein***, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:

WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 ***do not infringe***, and if imported, manufactured, used, sold or offered for sale in the United States ***would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent")***; and

WHEREAS, ***GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent*** based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

*     *     *

***THEREFORE based on the referenced Agreement***, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims ***with prejudice***.

(*Id.* at Ex. E thereto (emphasis added)). By June 24, 2005, the court's May 25, 2005 Order became a final decision from which no appeal has been, or can be, taken. On June 1, 2005, in accordance with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to FDA.

The court's order triggered any exclusivity for ondansetron hydrochloride tablets arising out of the '658 patent. Consequently, such exclusivity expired no later than December 20, 2005, thus leaving no barrier to final approval for Apotex upon expiration of the pediatric exclusivity period for the '789 patent.

**E.    FDA's Unlawful Refusal To Find That Generic Exclusivity For Ondansetron Tablets Has Expired.**

On August 31, 2005, Apotex sent a letter to FDA seeking confirmation that the May 25, 2005 Order triggered any 180-day generic exclusivity that would be awarded for ondansetron, and that Apotex's ANDA No. 77-306 would be eligible for final approval on December 24, 2006, upon expiration of the pediatric exclusivity for the '789 patent. (Tsien Decl.

11

Ex. B). FDA never responded to Apotex's August 31, 2005 letter, which Apotex re-sent to the Agency in December 2005.

On August 29, 2006, or almost one full year after its initial letter, Apotex sent another letter to FDA, again seeking confirmation that the May 25, 2005 Order triggered any 180-day exclusivity that would be awarded for ondansetron, and that Apotex's ANDA No. 77-306 would be eligible for final approval on December 24, 2006, upon expiration of the pediatric exclusivity for the '789 patent. (Tsien Decl. Ex. C). Apotex requested the courtesy of a response from the Agency no later than September 14, 2006, given the upcoming expiration of pediatric exclusivity for the '789 patent. FDA did not respond by this date. Apotex re-sent its August 29, 2006 letter to the Agency on September 23, 2006.

During late September and the month of October, Apotex had numerous oral discussions with FDA regarding Apotex's request for approval. FDA, however, refuses to properly apply the law. On November 3, 2006, FDA sent Apotex's counsel a letter in which the Agency refused to recognize the May 2005 *GSK* order as a triggering court decision. (*See* Tsien Decl. Ex. L, 11/3/06 FDA Letter). FDA's letter fails to mention, let alone substantively address, many of the arguments that Apotex made in support of its request for final approval. As discussed below, that letter ruling cannot lawfully stand because, *inter alia*, it runs afoul of the plain language of the statute, runs contrary to Congress' express intent, and leads to absurd results that Congress never intended.

If FDA issues final approval that permits DRL (and/or other ANDA applicants) to launch generic ondansetron tablet products with 180-day generic exclusivity, Apotex will suffer further, substantial and irreparable harm. Because any such result would be arbitrary, capricious and contrary to law, this Court should grant the requested injunctive relief.

## ARGUMENT

Courts must weigh four factors in deciding whether to grant a preliminary injunction or temporary restraining order: (1) the prospect of irreparable injury to the moving party if relief is withheld; (2) the possibility of harm to other parties if relief is granted; (3) the likelihood that the moving party will prevail on the merits; and (4) the public interest. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Raymen v. United Senior Ass'n*, No. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). The movant "need not prevail on each factor in order to receive injunctive relief." *Raymen*, 2005 WL 607916, at *2. "Rather ... the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (internal quotations and citation omitted) (granting preliminary injunction).

"[I]ssuing an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Raymen*, 2005 WL 607916, at *2 (quoting *Blackman*, 277 F. Supp. 2d at 78). Moreover, "[i]n cases that raise questions 'going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground ... for more deliberative investigation,' ... courts should eschew an 'exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Omar v. Harvey*, 416 F. Supp. 2d 19, 22 (D.D.C. 2006) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

Apotex satisfies this standard. Apotex indisputably will be irreparably harmed if another company is allowed a 180-day head-start in the ondansetron tablet market; the balance of harms tips decidedly in favor of granting injunctive relief; Apotex has a strong likelihood of

prevailing on the merits; and the public will benefit from an order that allows for faithful application of the laws and full generic competition, as Congress intended. Consequently, this Court should enter an order granting Apotex the injunctive relief sought herein.

## I.    The Harm To Apotex Is Substantial And Irreparable.

As an initial matter, the continued harm to Apotex could not be more substantial or imminent. FDA cannot seriously argue otherwise.

FDA's November 3 administrative ruling refuses to acknowledge that the Order ending GSK's patent infringement suit against Apotex triggered any generic exclusivity that would be awarded for ondansetron tablets. As a result, the Agency unlawfully will allow DRL (and/or other ANDA applicants) to receive final ANDA approval when the pediatric exclusivity for the '789 patent expires on December 24, 2006. If given this head start, DRL will have the opportunity to tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-term. (See Tsien Decl. Ex. D, McIntire Decl. ¶¶ 4, 16, 21).[8] Apotex, on the other hand, will forever lose the opportunity to effectively compete in the lucrative ondansetron market. (Id. ¶¶ 5-6, 16-18, 20-21). Thus, absent emergency injunctive relief, FDA's actions will deny Apotex access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails in this action. As the D.C. Circuit found in Teva I, this alone constitutes irreparable harm. 182 F.3d at 1012 n.8; see also Mova, 140 F.3d at 1066 n.6.

Apotex conservatively estimates that an unwarranted 180-day head start for DRL would result in over $11.7 million in lost sales for Apotex in the first year alone. (Tsien Decl.

---

[8] All references to "McIntire Decl." are to the Declaration of Tammy McIntire, submitted concurrently herewith as Exhibit D to the Tsien Declaration.

Ex. D, McIntire Decl. ¶¶ 17-18, 22). Even if Apotex ultimately were to prevail in this case, the harm will have been done – Apotex will never be able to recover its development and manufacturing costs, not to mention its lost revenues, profits, and market share. (*Id.* ¶¶ 9, 16, 19-20). In short, Apotex's ondansetron products will be a total and unrecoverable loss.

In addition, Apotex will suffer unquantifiable, intangible losses for ondansetron and other product lines. Apotex, for example, will lose critical access to major customers and the opportunity for long-term contracts. (*Id.* ¶¶ 4-5, 22-24.) These losses, in turn, would adversely affect Apotex's sales opportunities across all of its product lines. (*Id.*) Such lost opportunities would continue to harm Apotex long after DRL's exclusivity expires. (*Id.* ¶¶ 6, 21-23). Such losses are irreparable in every sense of the term and thus warrant emergency injunctive relief. *See Teva I*, 182 F.3d at 1011 n.8. Apotex, therefore, has satisfied its burden of establishing the existence of irreparable harm absent immediate injunctive relief.

## II.    The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate Injunctive Relief.

FDA admittedly has no commercial stake in the outcome of this dispute. Moreover, as a governmental agency, FDA's interests are aligned with the public's interest which, as discussed below, strongly favors injunctive relief. Yet, absent injunctive relief, Apotex stands to lose millions of dollars, goodwill with its customers, and other significant tangible and intangible benefits. As a result, the balance of harms tips decidedly in favor of granting Apotex's request for a temporary restraining order and/or preliminary injunction. *See Mova*, 140 F.3d at 1066.

## III.    Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its Claims.

FDA refuses to approve Apotex's ondansetron tablet ANDA on the ground that the Order ending GSK's patent infringement case does not satisfy the court decision trigger

provision of § 355(j)(5)(B)(iv)(II), as FDA interprets that provision in its April 11, 2006 letter ruling. (*See* Tsien Decl. Ex. L). FDA's decision is arbitrary, capricious and contrary to law. As such, it cannot stand.

A. **The Order Ending GSK's Patent Infringement Suit Against Apotex, Based Upon GSK's Express Concession Of Non-Infringement, Is A "Court Decision" Under § 355(j)(5)(B)(iv)(II).**

Contrary to FDA's November 3 letter ruling, the May 2005 *GSK* Order qualifies as a triggering court decision under the Agency's April 11, 2006 interpretation of that statutory provision. As such, the Agency cannot lawfully refuse to approve Apotex's ANDA upon expiration of GSK's pediatric exclusivity on the '789 patent.

FDA's April 11, 2006 interpretation of the court decision trigger stated that the Agency will not look to the preclusive effect that a particular court ruling might have when deciding whether an order is sufficient to trigger the 180-day exclusivity period pursuant to 21 U.S.C. § 355(j)(5)(B)(iv)(II). (Tsien Decl. Ex. A). In the words of the D.C. Circuit: "the agency will never look beyond the face of a court order to ascertain whether it qualified as a triggering court decision." *Apotex*, 449 F.3d at 1250. Rather, the Agency will only look to the face of the order to see if it expressly states that the patent at issue is invalid, unenforceable, and/or not infringed. (*See* Tsien Decl. Ex. A at 2). *See also Apotex*, 449 F.3d at 1250. Even under this unduly restrictive view of the court decision trigger, the May 25, 2005 Order in *Glaxo Group Ltd. et al. v. Apotex Inc.*, No. 05-307 (D.N.J.), qualifies as a triggering court decision.[9]

GSK's patent litigation against Apotex did not start as a declaratory judgment action by an ANDA applicant against the patentee, nor did it end with a dismissal for lack of

---

[9] As previously noted, Apotex vigorously disputes the legality of FDA's April 11, 2006 administrative ruling, which unlawfully restricts what types of orders are sufficient to trigger the start of the 180-day exclusivity period under 21 U.S.C. § 355(j)(5)(B)(iv)(II). For present purposes only, Apotex applies that decision to the facts of 180-day generic exclusivity for ondansetron tablets ANDAs.

subject matter jurisdiction. Instead, GSK sued Apotex for patent infringement within 45 days of receiving Apotex's notice letter on the '658 patent. During the course of that litigation – litigation which triggered an automatic 30-month stay of Apotex's ANDA approval – GSK concluded Apotex's ANDA products would not infringe the '658 patent. GSK thus offered Apotex a covenant not to sue and the parties subsequently executed a Covenant Not to Sue and Stipulation of Non-Infringement. (Tsien Decl. Ex. B, Exs. D and E thereto). On May 24, 2005, the district court presiding over GSK's infringement case signed and "so ordered" a dismissal with prejudice expressly acknowledging that Apotex's ANDA products do not infringe the '658 patent. That dismissal order provides, again, in pertinent part:

> Pursuant to the parties' *Covenant Not to Sue and Stipulation of Non-infringement* (the "Agreement"), *incorporated by reference herein*, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:
>
> WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent")*; and
>
> WHEREAS, *GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent* based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;
>
>                *           *           *
>
> *THEREFORE based on the referenced Agreement*, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims *with prejudice*.

(Tsien Decl. Ex. B, Ex. E thereto (emphasis added)). The district court entered the order on May 25, 2005. By June 24, 2005, that Order became a final decision from which no appeal has been, or can be, taken.

Even if FDA "never look[s] beyond the face of a court order to ascertain whether it qualifie[s] as a triggering court decision" (*Apotex*, 449 F.3d at 1250), any exclusivity with respect to the '658 patent has been triggered and expired long ago because that Order, on its face, states:

- that "the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*" the '658 patent";

- that "the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 ... if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of [the '658 patent]*";

- that GSK gave Apotex a "Covenant Not to Sue and *Stipulation of Non-Infringement*", which was incorporated by referenced into the May 2005 Order;

- that "[GSK] has represented that *it will not sue Apotex for infringement* of the '658 patent"; and

- that, based on GSK's concession of non-infringement, the court dismissed GSK's infringement claims against Apotex "*with prejudice*".

(Tsien Decl. Ex. B, Ex. E thereto (emphasis added)). Again, the district court signed and "so ordered" these findings.

Accordingly, under the Agency's own April 11, 2006 letter ruling, the May 2005 *GSK* Order qualifies as a court decision under § 355(j)(5)(B)(iv)(II). FDA's refusal to so find is arbitrary and capricious and contrary to law. Apotex has, therefore, demonstrated a substantial likelihood of succeeding on the merits of its challenge to the Agency's decision that approval of Apotex's ondansetron tablet ANDA can be withheld as the result of generic exclusivity attaching to the '658 patent.

**B.    If The Order Ending GSK's Patent Infringement Suit Against Apotex Does Not Qualify As A "Court Decision" Under FDA's April 11, 2006 Letter Ruling, The Agency's Ruling Is Impermissible And Must Be Set Aside As Unlawful.**

If the May 2005 Order ending GSK's Hatch-Waxman patent infringement suit against Apotex does not qualify as a "court decision" under FDA's April 11, 2006 letter ruling, that ruling is impermissible as applied to the facts of this dispute, and must therefore be set aside, along with the November 3 letter ruling challenged here.  This necessarily is true for any of the independent reasons set forth below.

**1.    The May 2005 *GSK* Order Is As Much A "Merits" Ruling As The *Granutec* Order, Which FDA Found To Be A Triggering Court Decision.**

In refusing to recognize the May 2005 *GSK* Order as a triggering court decision, FDA stated: "It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim." (Tsien Decl. Ex. L at 4).  According to FDA, the May 2005 *GSK* Order does not reflect a substantive determination on the merits of GSK's infringement claim and thus is not a triggering court decision  (*Id.*).  FDA cannot lawfully take this position, and its decision must be set aside. While presented to the patent court in the form of a dismissal order, the May 2005 *GSK* Order is as much of a ruling on the merits of that infringement suit as another order that the Agency repeatedly has found to constitute a triggering court decision.  Thus, FDA's refusal to recognize the *GSK* Order as a triggering decision is arbitrary, capricious and contrary to law.

The *Granutec* litigation involved an APA action that included a challenge to, among other things, FDA's decision to treat the grant of partial summary judgment as a triggering court decision even though the first paragraph IV ANDA filer was not a party to that litigation. *See Granutec*, 1998 WL 153410.  More specifically, the Agency recognized a grant of

partial summary judgment rendered in *Glaxo Inc. et al. v. Boehringer Ingelheim et al.*, No. 95-1342 (D. Conn.) as a triggering court decision and a party challenged that determination. *Id.* at *5. FDA prevailed on that issue and, in subsequent APA challenges, has explained why it considers the *Granutec* order to be a triggering court decision.

According to FDA's April 11, 2006 letter ruling, the Agency treated the *Granutec* order as a triggering court decision because the partial summary judgment order was a "holding on the merits of patent noninfringement," calling it "a memorandum decision." (Tsien Decl. Ex. A at 12). From FDA's description, this Court might have the impression that this partial summary judgment ruling was a long and detailed memorandum opinion, wherein the patent court thoroughly and carefully analyzed the parties' respective arguments and, after doing so, resolved a dispute regarding whether or not the ANDA product infringed the patents at issue. Any such impression would, however, be incorrect. The "memorandum decision"/"holding on the merits of patent noninfringement" to which FDA refers is a three-sentence order stating, *in toto*, as follows:

> Defendants have moved for partial summary judgment (doc. #135) as to Plaintiffs' claim that Defendants' ranitidine hydrochloride product infringes Plaintiffs' patents nos. 4,521,431 (the '431 patent) and 4,672,133 (the '133 patent). ***Based on Plaintiffs' express concession that Defendants' product does not infringe these patents, Defendants' Motion for Partial Summary Judgment on this claim is GRANTED. SO ORDERED.***"

(Tsien Decl. Ex. E, 10/7/96 Order in *Glaxo Inc. et al. v. Boehringer Ingelheim et al.*, No. 95-1342 (D. Conn.) (emphasis added) (underline in original)). Nothing on the face of this order indicates that the court made a substantive determination on the merits of the patent claim, or conducted any independent analysis of the parties' respective merits positions. Indeed, nothing on the face of this order indicates that the court actually carried out any substantive analysis

whatsoever of the infringement claim. Just the opposite is true. On its face, the *Granutec* order states that the court based its "holding on the merits," as FDA has deemed it, *solely and exclusively on the patentee's express concession that the ANDA products did not infringe the patents-in-suit.*

Thus, nothing on the face of the *Granutec* order indicates that the court hearing that infringement action made any more of a "merits" ruling or rendered any more of a "holding" than did the court hearing GSK's patent infringement action against Apotex. Both courts "so ordered" their dispositions based solely upon an express concession by the patentee that the ANDA product at issue did not infringe the asserted patent. The *GSK* court "so ordered" the dismissal with prejudice based upon the patentee's express concession that "that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe,* and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of GlaxoSmithKline's ['658 patent]."* (Tsien Decl. Ex. B, Ex. E thereto (emphasis added)). The *Granutec* court "so ordered" partial summary judgment solely *"[b]ased on Plaintiffs' express concession that Defendants' product does not infringe these patents".* (Tsien Decl. Ex. E (emphasis added) (underline in original)). In short, if the *Granutec* order reflects "a substantive determination on the merits of the patent claim" (Tsien Decl. Ex. L at 4), so does the May 2005 *GSK* Order. And because FDA repeatedly has found the *Granutec* order to constitute a triggering court decision, it must reach the same conclusion with respect to the May 2005 *GSK* Order. To hold otherwise is arbitrary, capricious, and contrary to law.

During its discussions with FDA, Apotex provided the Agency with a copy of the *Granutec* order and argued, as it does here, that the May 2005 *GSK* Order is as much a holding-on-the-merits as the *Granutec* order. FDA's November 3 letter ruling does not address this

issue, except to call it "not . . . pertinent" to resolving Apotex's request. (Tsien Decl. Ex. L at 4 n.5). The Agency is wrong. Its treatment of the *Granutec* order is highly pertinent to determining whether the May 2005 *GSK* Order constitutes a triggering court decision, as the discussion above amply demonstrates. FDA's refusal to consider this issue when ruling on Apotex's request alone renders its November 3 letter ruling arbitrary and capricious.

The fact is that FDA does not address the *Granutec* order because it cannot justify treating that order as a triggering court decision, while refusing to give the same treatment to the May 2005 *GSK* Order. The Agency cannot justify this inconsistent treatment because no lawful reason exists. FDA's failure to treat the *GSK* Order as a triggering decision is unlawful and cannot stand. *See Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) (stating that an agency must afford similar treatment to comparable cases); *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 42 (D.D.C. 2004) (finding HHS's denial of coverage was arbitrary and capricious due to agency's inconsistent treatment of similarly situated parties); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997) (granting injunctive relief based on FDA's disparate treatment of one product as a device and another product as a drug); *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (stating that should an agency change its course, it "must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored") (quoting *Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (finding Treasury acted arbitrarily for not conforming its electronic benefits transfer policies to its existing regulations nor offering a 'reasoned analysis' for the difference).

2.    **FDA's Refusal To Recognize The *GSK* Order As A "Court Decision" Is Inconsistent With The Agency's Treatment Of That Same Order As Sufficient To Terminate The 30-Month Stay Of ANDA Approval.**

FDA's refusal to recognize the *GSK* Order as a triggering court decision also must fail because it is inconsistent with the Agency's treatment of that same order as being sufficient to terminate the 30-month stay of ANDA approval. Specifically, FDA routinely treats the dismissal of a Hatch-Waxman case as sufficient to terminate the 30-month statutory stay under § 355(j)(5)(B)(iii).[10] Given the relevant statutory language, FDA cannot then turn around and refuse to find such orders to be sufficient to constitute a triggering court decision.

As previously discussed, if the brand company/patentee sues a paragraph IV ANDA applicant within 45 days of receiving notice of that filing, FDA cannot approve the ANDA for 30 months absent a court order otherwise prior to expiration of that automatic stay period:

> (I) *if before the expiration of such [30-month] period the district court decides that the patent is invalid or not infringed* (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

---

[10] FDA simply cannot deny that it treats the dismissal of a Hatch-Waxman case brought by a brand/patentee against a paragraph IV ANDA filer to be a court decision sufficient to terminate the 30-month stay of ANDA approval, regardless of whether that dismissal is with or without prejudice. For example, Organon sued Barr Laboratories for patent infringement after receiving Barr's notice letter in connection with its orally-disintegrating mirtazapine tablet ANDA. Organon sued Barr on May 2, 2002, meaning that the 30-month stay of Barr's ANDA approval would have run through approximately September 2004. (Tsien Decl. Ex. F at Docket Entry No. 1). Organon dismissed its infringement claim on April 23, 2003. (*Id.* at Docket Entry No. 21). FDA granted Barr's ANDA products final agency approval on December 17, 2003. (Tsien Decl. Ex. G). Thus, FDA necessarily found Organon's dismissal to be sufficient to terminate the 30-month stay of Barr's ANDA approval.

Similarly, on April 15, 2005, Novartis sued Apotex within 45 days of receiving notice of Apotex's paragraph IV ANDA filing for ketotifen fumarate product. (Tsien Decl. Ex. H at Docket Entry No. 1). Novartis dismissed its infringement against Apotex a few months later, on August 16, 2005. (Tsien Decl. Ex. I). FDA approved Apotex's ANDA a few months after that, on May 9, 2006. (Tsien Decl. Ex. J). FDA's approval letter expressly states: "As a result of the dismissal, your ANDA is eligible for full approval." (*Id.* at 2). The Agency so concluded despite the fact that the dismissal order says nothing about non-infringement or invalidity.

(aa) the date on which the court enters judgment reflecting the decision; or

(bb) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed; . . . .

21 U.S.C. § 355(j)(5)(B)(iii)(I) (2004) (emphasis added). The start of the 180-day generic exclusivity period is triggered under the court decision trigger on *"the date of a decision of a court in an action described in clause (iii) [i.e., § 355(j)(5)(B)(iii)] holding the patent which is the subject of the certification to be invalid or not infringed."* 21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added). Thus, under the plain language of the statute, a court decision sufficient to terminate the 30-month stay under § 355(j)(5)(B)(iii)(I) is necessarily a triggering court decision under § 355(j)(5)(B)(iv)(II).

Significantly, FDA refused to consider this issue when issuing its November 3, 2006 letter ruling, except to call it "not . . . pertinent" to resolving Apotex's request. (Tsien Decl. Ex. L at 4 n.5). But, once again, the Agency is wrong because its interpretation of court decisions under § 355(j)(5)(B)(iii) is relevant to its interpretation of the court decision trigger of § 355(j)(5)(B)(iv) given the controlling statutory language. Indeed, this is particularly true given that FDA itself previously has acknowledged that a court decision that ends the 30-month stay of final ANDA approval also triggers 180-day exclusivity where (as here) the court decision has not been, or cannot be, appealed:

Thus, if it is otherwise ready for approval, the ANDA in this question [*i.e.*, an ANDA found not to infringe by the district court] can be approved at the time of the district court's decision. However, . . . as a result of the MMA, 180-day exclusivity for ANDAs filed before December 8, 2003, can now be triggered by a court decision only if it is a decision that has not been, or can not be, appealed. . . . Before enactment of the MMA, a district court decision finding a listed patent invalid or not infringed would have *both* terminated a 30-month stay and, in the case of an ANDA that qualified for 180-day exclusivity, triggered the start of such

exclusivity as to that patent (if the exclusivity was not already triggered by commercial marketing).

(Tsien Decl. Ex. K at 6, *Guidance for Industry: Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2) Applications Under Hatch-Waxman, as Amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Questions and Answers* (Oct. 2004)).

Under the plain language of the FFDCA, FDA cannot lawfully treat a dismissal order as sufficient to terminate a 30-month stay of approval under § 355(j)(5)(B)(iii)(I), but insufficient to constitute a triggering court decision under § 355(j)(5)(B)(iv)(II).   And the Agency simply cannot ignore or otherwise disregard the plain language of the statute at issue in this case. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).   For this independent reason, FDA's refusal to treat the May 2005 *GSK* Order as a triggering court decision is arbitrary, capricious and contrary to law. *See id.*   Thus, Apotex has a strong likelihood of succeeding on the merits of its claim because the Agency's April 11 and November 3 letter rulings cannot stand.

### 3.    FDA's Interpretation Is Unreasonable Because It Effectively Nullifies The Court Decision Trigger And Gives Brand Companies The Power To Manipulate The Hatch-Waxman Process.

"A cardinal principle of interpretation requires [the courts] to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (internal quotations and citations omitted); *see also Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1285 (D.C. Cir. 1983) (rejecting FDA's interpretation of the Freedom of Information Act for rendering superfluous a major aspect of a "companion provision" of the same act); *C.F. Comms. Corp. v. FCC*, 128 F.3d 735, 739 (D.C. Cir. 1997) (rejecting FCC's interpretation of its own rule on grounds that it "violates the

familiar principle of statutory interpretation 'so that no provision is rendered inoperative or superfluous, void or insignificant'" (citation omitted)).

Here, FDA's statutory interpretation violates this cardinal principle by effectively nullifying the court decision trigger of the 180-day generic exclusivity provision. More specifically, FDA's interpretation virtually guarantees that later-filers, like Apotex, cannot obtain a triggering court decision. In the process, the Agency unlawfully allows brand companies to manipulate the Hatch-Waxman system to delay generic market entry, a result that runs directly contrary to Congress' purpose for this important legislation.

Congress enacted Hatch-Waxman to expedite generic market entry. *See In re Barr Labs*, 930 F.2d at 76; *Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454, 461 (D.D.C. 1999) ("[T]he purpose of the exclusivity incentive and the entire ANDA regime is to make available more low cost generic drugs.") (citation and quotations omitted). And, of course, FDA must interpret Hatch-Waxman in light of Congress' intent when enacting this legislation. *See Chevron*, 467 U.S. at 842-43 & n.9; *Teva I*, 182 F.3d at 1011 ("FDA must interpret the [FFDCA] to avoid absurd results and further congressional intent.").

By including the "court decision trigger" as a means for starting the 180-day generic exclusivity period, Congress expressly provided the means for later ANDA filers (typically companies, like Apotex, that have successfully designed around a patent) to prevent the first-filer from "parking" its exclusivity and creating a "bottleneck" that indefinitely delays approval of all other generic products. The courts, too, have concluded that later ANDA filers must have the ability to trigger the start of generic exclusivity because "'it would be contrary to the very purpose of the Act to allow the first filer to block market entry of other generic manufacturers because the first filer is involved in protracted litigation.'" *3M*, 289 F.3d at 780

(citation omitted); *accord Mova*, 140 F.3d at 1073. But FDA's refusal to treat dismissals of Hatch-Waxman patent infringement cases as triggering decisions, even when they contain express concessions of non-infringement, effectively eliminates the court decision trigger. This is particularly true when the Agency's interpretation is coupled with its refusal to treat the dismissal of declaratory judgment suits brought by ANDA applicants as triggering court decisions, even when the dismissal has preclusive effect. *See Apotex*, 449 F.3d 1249.

FDA simply does not have the authority to re-write the statute in a way that renders a key provision inoperable. *See Asiana Airlines*, 134 F.3d at 398; *see also Pub. Citizen*, 704 F.2d at 1285; *C.F. Comms.*, 128 F.3d at 739. Indeed, the D.C. Circuit previously struck down FDA's interpretation of another aspect of the 180-day generic exclusivity provision based, in part, on the fact that it effectively read the commercial marketing trigger out of the statute. *See Mova*, 140 F.3d at 1069-70.

Furthermore, the D.C. Circuit has cautioned that Hatch-Waxman cannot be interpreted in a way that allows the brand company to "manipulate the system in order to block or delay generic competition" – a result directly contrary to the purpose of the court decision trigger. *Teva I*, 182 F.3d at 1009; *id.* at 1011. But FDA's refusal to recognize the *GSK* Order as a triggering event does precisely this. Specifically, the brand company/patentee often has an incentive not to trigger the start of the generic exclusivity period so that it can enjoy a period of 180 days with only one generic competitor. If FDA does not recognize dismissals of Hatch-Waxman suits brought by the patentee against the ANDA application as triggering decisions, even when they contain an express concession of non-infringement on their face, the brand company/patentee unilaterally can prevent triggering generic exclusivity. Such a result would be

precisely contrary to the statutory intent and absurd. Consequently, such an interpretation cannot stand.

### 4. Failing To Recognize The *GSK* Order As A "Court Decision" Is Unlawful Because It Produces Absurd Results – Results That Conflict With Congressional Intent And Hatch-Waxman's Legislative History.

As previously discussed, no one can dispute that Congress designed Hatch-Waxman "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, 930 F.2d at 76; *see also Apotex*, 53 F. Supp. 2d at 461. Nor can anyone reasonably dispute that Hatch-Waxman must be construed in light of this purpose. *See Chevron*, 467 U.S. at 842; *Teva I*, 182 F.3d at 1011; *see also Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224-25 (D.C. Cir. 2001) (reversing agency's broad, dictionary-based interpretation of term "payment" because statutory purpose required narrower meaning); *Nat'l Treasury Employees Union v. FLRA*, 392 F.3d 498, 500-01 (D.C. Cir. 2004) (reversing agency's statutory interpretation because it conflicted with congressional intent and purpose); *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.*, 90 F.3d 525, 530 (D.C. Cir. 1996) (same).

Yet, failing to recognize the *GSK* Order as a "court decision" produces absurd results that conflict with Congress' express intent when enacting Hatch-Waxman. Thus, FDA's April 11, 2006 and November 3, 2006 rulings cannot lawfully stand if they fail to recognize the *GSK* Order as a triggering "court decision."

FDA's refusal to recognize the dismissal with prejudice of a Hatch-Waxman patent infringement suit, one containing an express concession of non-infringement, as a triggering court decision undeniably delays generic competition in direct contravention of Congress' express intent. This case amply demonstrates the absurdity of FDA's position.

Any generic exclusivity awarded to DRL for ondansetron tablets should have expired long ago. But the Agency's decision to nevertheless reward DRL with such exclusivity

creates an improper regulatory blockade that *delays*, rather than expedites, full generic competition.

DRL cannot commercially market a product until expiration of the '789 patent on December 24, 2006 (with pediatric exclusivity) at the earliest. FDA's unlawful refusal to recognize that DRL's exclusivity has been triggered and has expired means that full generic competition would be delayed until mid-2007 *at the earliest*. Sadly, the delay could be longer, much longer. If, for example, DRL is not eligible for approval on December 24, 2006 because of some problem with its ANDA, the Agency's impermissible grant of exclusivity would delay generic market entry indefinitely. Even if DRL obtains final approval on December 24, 2006, it has no obligation to immediately launch its generic ondansetron tablet products.

The only way to prevent inevitable delays such as these is by using the court decision trigger to start the running of that exclusivity period. But no subsequent ANDA applicant can use the court decision trigger to trigger the start of this exclusivity period because FDA unlawfully refuses to find the with-prejudice dismissal of a patent infringement suit brought by the brand company/patentee against the generic, based upon an express concession of non-infringement, to be a triggering court decision. And the brand company, of course, always has the power to prevent any other type of decision from being entered. Specifically, the patentee always is free to concede non-infringement or to provide the ANDA applicant with a covenant not to sue, at which point a case or controversy no longer exists. Thus, FDA's improper interpretation of the court decision trigger not only prevents full generic competition upon expiration of the '789 patent, but also gives the brand company complete control over whether a generic company gets and keeps the 180-day generic exclusivity period. When it

passed Hatch-Waxman, a statute expressly designed to *encourage and expedite* generic market entry, Congress most assuredly did not intend this result. *In re Barr Labs.*, 930 F.2d at 76.

While Congress has authorized FDA to implement Hatch-Waxman's provisions, FDA has no authority to rewrite the statute, as it has unlawfully done here. FDA's refusal to treat the May 2005 *GSK* Order as a triggering court decision is arbitrary, capricious, and contrary to law and should be set aside for this additional, independent reason. *See Chevron*, 467 U.S. at 844; *see also Mova*, 140 F.3d at 1068 (finding that, although FDA has the power to interpret the FFDCA, it "does not thereby obtain a license to rewrite the statute"); *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) (rejecting agency's "treatment of th[e] statute" because it "is not an interpretation but a rewrite" and "destroys the *quid pro quo* created by Congress").

## IV.  An Injunction Would Further The Public Interest.

The public interest is best served by granting the requested injunctive relief. First, the public's interest lies in the "faithful application of the laws" (*Mova*, 140 F.3d at 1066), which, here, is served by requiring the Agency to apply the governing statute in a manner that is consistent with FDA's prior rulings and the controlling statutory language. Second, injunctive relief comports with the purpose of the statute and, in particular, the triggering court-decision provision, which seeks to expedite full generic competition and prevent patentee from "manipulat[ing] the system in order to block or delay generic competition." *Teva I*, 182 F.3d at 1009. Any other result will undermine the balance struck in Hatch-Waxman and ultimately harm the consuming public. And third, if Apotex ultimately prevails on the merits, the public will benefit from the fullest possible generic competition for ondansetron tablets at the earliest possible date.

## CONCLUSION

Apotex will, without question, suffer devastating and irreparable harm absent the requested injunction. FDA, on the other hand, would suffer no harm. Moreover, Apotex has, at the very least, demonstrated a substantial likelihood of success on the merits of its challenge to FDA's statutory interpretation and refusal to approve Apotex's ANDA. For all of these reasons, the Court should enter an order requiring FDA to: (a) set aside its November 3, 2006 administrative decision as arbitrary, capricious, and contrary to law; (b) refrain from awarding any 180-day exclusivity for ondansetron tablet ANDAs; (c) approve Apotex's ondansetron tablet ANDA on December 24, 2006 without delay due to any generic exclusivity awarded pursuant to 21 U.S.C. § 355(j)(5)(B)(iv); and (d) refrain from approving any other ondansetron tablet ANDA until this determination is made and final approval is granted to Apotex. In the event the Court denies such relief, Apotex respectfully moves for an injunction preserving the *status quo* and staying all ondansetron tablet ANDA approvals pending an appeal of this matter to the D.C. Circuit, in order to prevent devastating and irreparable harm to Apotex. A proposed order seeking such relief is submitted herewith.

Dated:  November 6, 2006.

Respectfully submitted,

APOTEX INC.

By: _____

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3550 (facsimile)

<u>Of Counsel</u>:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APOTEX INC.                                                  )
150 Signet Drive                                            )
Weston, Ontario, Canada  M9L 1T9                            )
                                                            )
            Plaintiff,                                       )          Case No. _____
                                                            )
      v.                                                     )
                                                            )
FOOD AND DRUG ADMINISTRATION                                )
5600 Fishers Lane                                           )
Rockville, MD  20857                                        )
                                                            )
MICHAEL O. LEAVITT                                          )
Secretary of Health and Human Services                      )
200 Independence Avenue, SW                                  )
Washington, D.C.  20201                                     )
                                                            )
            and                                             )
                                                            )
ANDREW VON ESCHENBACH                                       )
Acting Commissioner of Food and Drugs                       )
5600 Fishers Lane                                           )
Rockville, MD  20857                                        )
                                                            )
            Defendants.                                     )
                                                            )

## DECLARATION OF ARTHUR Y. TSIEN

I, ARTHUR Y. TSIEN, declare as follows:

1.      I am a partner in the law firm of OLSSON, FRANK AND WEEDA, P.C., counsel

for Apotex Inc. ("Apotex").

2.      I am a practicing attorney and member in good standing of the Bar of the District

of Columbia, and am admitted to practice before the United States District Court for the District

of Columbia and before the United States Court of Appeals for the District of Columbia Circuit.

3.      I submit this Declaration in support of Apotex Inc.'s Motion For Temporary Restraining Order And/Or Preliminary Injunction.

4.      I have personal knowledge of the facts stated in this Declaration and am competent to testify to the same.

5.      Attached hereto as Exhibit A is a true and accurate copy of FDA's April 11, 2006 Letter to Tammy McIntire at Apotex Corporation.

6.      Attached hereto as Exhibit B is a true and accurate copy of Apotex Inc.'s August 31, 2005 Letter to FDA, including the exhibits A-E attached thereto.

7.      Attached hereto as Exhibit C is a true and accurate copy of Apotex Inc.'s August 29, 2006 Letter to FDA, including the exhibit A attached thereto.

8.      Attached hereto as Exhibit D is the supporting Declaration of Tammy McIntire, dated October 20, 2006.

9.      Attached hereto as Exhibit E is a true and correct copy of the 10/7/96 Order in *Glaxo Inc. et al. v. Boehringer Ingelheim et al.*, No. 95-1342 (D. Conn.).

10.     Attached hereto as Exhibit F is a true and correct copy of the docket sheet for *Organon Inc. et al. v. Barr Laboratories, Inc.*, No. 02-2124 (D.N.J.).

11.     Attached hereto as Exhibit G is a true and correct copy of the approval history for Barr Laboratories, Inc.'s orally-disintegrating mirtazapine tablet ANDA No. 76-307, as printed from FDA's website.

12.     Attached hereto as Exhibit H is a true and correct copy of the docket sheet for *Novartis AG et al v. Apotex Inc.*, No. 05-3855 (S.D.N.Y).

13.     Attached hereto as Exhibit I is a true and correct copy of the dismissal order in *Novartis AG et al v. Apotex Inc.*, No. 05-3855 (S.D.N.Y).

2

14.     Attached hereto as Exhibit J is a true and correct copy of the final approval letter for Apotex, Inc.'s ketotifen fumarate ANDA No. 77-354.

15.     Attached hereto as Exhibit K is a true and correct copy of FDA's *Guidance for Industry:  Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2) Applications Under Hatch-Waxman, as Amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Questions and Answers* (Oct. 2004).

16.     Attached hereto as Exhibit L is a true and accurate copy of FDA's November 3, 2006 Letter to Christine J. Siwik and William A. Rakoczy.

17.     The foregoing facts are true and correct as I verify and believe.

Dated:  November 6, 2006


I, ARTHUR Y. TSIEN, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_____
ARTHUR Y. TSIEN

3

# EXHIBIT A

## Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

---

ANDA 76-341                                                   Food and Drug Administration
                                                             Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.      Statutory and Procedural Background

        A.      180-Day Exclusivity and the Court Decision Trigger

        Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

        A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

        An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
> (I)     the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman,* 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

    B.    The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

C.     FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.     *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.     FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision of a court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision of a court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

2.    FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6]  In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.     FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.      FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.     Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability.  The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding.  FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

# EXHIBIT B

## Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*



RAKOCZY
MOLINO
MAZZOCHI
SIWIK LLP

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

Christine J. Siwik
312.222.6304 telephone
312.222.6324 facsimile
csiwik@rmmslegal.com

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

August 31, 2005

**CONFIDENTIAL ANDA DOCUMENT—
NOT TO BE DISCLOSED OUTSIDE FDA**

<u>**VIA FedEx® and E-Mail**</u>
Mr. Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

Re:    **Apotex Inc.'s ANDA No. 77-306 for Ondansetron Hydrochloride Tablets
4 mg and 8 mg**

Dear Mr. Buehler:

On behalf of Apotex Inc., we respectfully request that the Agency confirm the following:

- Subject to all other substantive requirements for approval, Apotex will be eligible for, and receive, immediate final approval of its ANDA No. 77-306 for Ondansetron Hydrochloride Tablets 4 mg and 8 mg when U.S. Patent No. 4,753,789 ("the '789 patent") expires;

- Apotex's final approval will not be delayed by any unexpired 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv) for these drug products; and

- The May 25, 2005, Order (Ex. E) dismissing the lawsuit brought by Glaxo Group Limited and SmithKline Beecham Corporation (collectively, "GSK") alleging infringement of U.S. Patent No. 5,344,658 ("the '658 patent") constitutes a "decision of a court" under 21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered any exclusivity arising out of that patent as of June 24, 2005.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 2

Apotex requests the courtesy of a response by the end of business on November 1, 2005. If we do not hear from the Agency by then, Apotex will assume that its request has been denied and take appropriate action to protect its rights.

## I.    INTRODUCTION

Apotex and several other applicants have filed ANDAs for generic ondansetron hydrochloride tablets with paragraph IV certifications to some or all of the Orange-Book listed patents for Zofran®, the reference-listed drug at issue here. Based on public statements, an applicant other than Apotex claims to have 180-day generic exclusivity by virtue of having filed a paragraph IV certification to the '658 patent. If such exclusivity exists, the dismissal, with prejudice, of GSK's patent infringement action against Apotex triggered that exclusivity with respect to the '658 patent.

As detailed below, GSK filed suit against Apotex alleging infringement of the '658 patent. The parties ultimately stipulated to the dismissal of that action on May 18, 2004, after GSK stipulated to non-infringement and covenanted not to sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of, and described in, Apotex's ANDA No. 77-306. The dismissal of GSK's infringement action was with prejudice and contained GSK's express acknowledgement that Apotex's ANDA products do not infringe the '658 patent. The court entered the dismissal order on May 25, 2005.

Under 21 U.S.C. § 355(j)(5)(B)(iv)(II), generic exclusivity is triggered by "a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." The court's May 25, 2005 dismissal order is such a court decision. Indeed, even if someone erroneously believed that dismissal order did not fall within plain language of statute (which it does), in light of GSK's covenant not to sue and the terms of the dismissal order, which is final and unappealable, GSK is precluded from suing Apotex on the '658 patent. Under the D.C. Circuit's decisions in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharmaceuticals, USA, Inc. v. FDA*, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), this dismissal order constitutes a court decision sufficient to trigger the running of any exclusivity that might have existed for the '658 patent as of June 24, 2005, at the latest.

Accordingly, any exclusivity awarded based upon a paragraph IV certification to the '658 patent will expire no later than December 20, 2005, and cannot delay Apotex's approval beyond the expiration date of the '789 patent. Apotex seeks confirmation of this fact from the Agency.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 3


## II.    BACKGROUND

### A.    Reference-Listed Drug And Orange Book Patents.

The reference-listed drug upon which Apotex based its ANDA is GSK's prescription drug Zofran® (ondansetron hydrochloride) Tablets 4 mg, 8 mg, and 24 mg. FDA first approved that drug under New Drug Application (NDA) No. 20-103 on December 31, 1992.

GSK has submitted information on four patents for listing in the Orange Book in connection with Zofran® (ondansetron hydrochloride) tablets and NDA No. 20-103. Those patents are:

- U.S. Patent No. 4,695,578, which expired on January 25, 2005 (with pediatric exclusivity expired on July 25, 2005);

- U.S. Patent No. 5,578,628, which expired on February 16, 2005 (with pediatric exclusivity expired on August 16, 2005);

- U.S. Patent No. 4,753,789, which expires on June 24, 2006 (with pediatric exclusivity expiring on December 24, 2006); and

- U.S. Patent No. 5,344,658, which expires on September 6, 2011 (with pediatric exclusivity expiring on March 6, 2012).

### B.    Apotex's ANDA No. 77-306 For Ondansetron Hydrochloride Tablets 4 mg And 8 mg.

On September 30, 2004, Apotex submitted ANDA No. 77-306 for generic ondansetron hydrochloride tablets 4 mg and 8 mg. For all tablet strengths, Apotex's ANDA contains a paragraph III certification under 21 U.S.C. § 355(j)(2)(A)(vii)(III) to the '578, '628, and '789 patents, thus signifying that Apotex does not intend to market its ondansetron hydrochloride products until after the expiration of those patents and their corresponding pediatric exclusivities. Apotex submitted a paragraph IV certification, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to the '658 patent. As required by 21 U.S.C. §§ 355(j)(2)(B)(i)-(ii), Apotex provided the requisite notice of its ANDA and paragraph IV certification, together with the factual and legal bases for that certification, to GSK, the patentee and NDA-holder.

### B.    Other Ondansetron Hydrochloride ANDAs.

Based on publicly available information, Apotex believes that several other applicants apparently have submitted ANDAs for ondansetron hydrochloride tablets with paragraph IV certifications to some or all of the listed patents in the Orange Book. Further, one

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 4

or more of the other ANDAs with paragraph IV certifications to the '658 patent may have been submitted before Apotex's ANDA. We understand, for example, that FDA considers Dr. Reddy's Laboratories (DRL) to be the first applicant to submit a paragraph IV ANDA (No. 76-183) for the 4 mg, 8 mg, and 24 mg strength ondansetron hydrochloride tablets to all four of the Orange-Book listed patents. (As we understand it, DRL subsequently amended its application to contain a paragraph III certification to the '578 patent.)

By virtue of these purportedly previous ANDAs, FDA may consider DRL (or perhaps others) to be eligible for 180-day exclusivity periods for those drug products pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Such exclusivity could delay approval of all subsequent paragraph IV ANDA-filers until 180 days after either first commercial marketing of each drug product by the first-filer or a court decision on the listed patents, whichever is earlier.

C. **Apotex Obtains A "Decision Of A Court" That Triggers Any 180-Day Exclusivity For Ondansetron Hydrochloride Tablets With Respect To The '658 Patent.**

On January 14, 2005, after receiving Apotex's statutorily-required notice letter, GSK filed an action against Apotex in the U.S. District Court for the District of New Jersey, pursuant to 21 U.S.C. § 355(j) and 35 U.S.C. § 271. (Ex. A). GSK's complaint alleged that Apotex's ANDA products would, if marketed, infringe the '658 patent. On March 22, 2005, Apotex answered GSK's complaint and counterclaimed for invalidity and non-infringement of the '658 patent. (Ex. B). On April 11, 2005, GSK responded to Apotex's counterclaims by denying invalidity and non-infringement. (Ex. C).

As part of the litigation, Apotex produced to GSK a copy of Apotex's ANDA No. 77-306. Upon reviewing Apotex's ANDA, GSK concluded that Apotex's ANDA products would not infringe the '658 patent. After being apprised of GSK's position, the parties entered into a Covenant Not to Sue and Stipulation of Non-Infringement. (Ex. D). The parties also submitted to the court hearing GSK's infringement case a stipulation of dismissal with prejudice. That dismissal order provides, in pertinent part:

> WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent")*; and

> WHEREAS, *GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent* based on the importation, manufacture, use, sale

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 5

> or offer for sale of ondansetron hydrochloride tablets that are the subject of and
> described in ANDA No. 77-306;
>
>                         *         *         *
>
> THEREFORE based on the referenced Agreement, the parties, by their
> undersigned attorneys, hereby stipulate and agree to the dismissal of the parties'
> respective claims and counterclaims *with prejudice*.

(Ex. E (emphasis added).) The May 25, 2005, Order became a final decision from which no
appeal has been, or can be, taken on June 24, 2005, at the latest. On June 1, 2005, in accordance
with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to OGD.

         The court's order triggered any exclusivity for ondansetron hydrochloride tablets
arising out of the '658 patent. Consequently, such exclusivity will expire no later than December
20, 2005, thus leaving no barrier to final approval for Apotex upon expiration of the '789 patent.

## III.   ANALYSIS

       A.    **Under The Plain Language Of The Statute, The Dismissal Of GSK's
Infringement Action Against Apotex Triggers Any Exclusivity Attaching To
The '658 Patent.**

         The first company to file an ANDA containing a paragraph IV certification to an
Orange Book-listed patent is eligible to receive 180 days of generic exclusivity:

> (iv) If the application contains a certification described in subclause (IV) of
> paragraph (2)(A)(vii) and is for a drug for which a previous application has been
> submitted under this subsection continuing [*sic*] such a certification, the
> application shall be made effective not earlier than one hundred and eighty days
> after--
>
> > (I) the date the Secretary receives notice from the applicant under the previous
> > application of the first commercial marketing of the drug under the previous
> > application [the "commercial marketing trigger"], or
> >
> > (II) the date of a decision of a court in an action described in clause (iii)
> > holding the patent which is the subject of the certification to be invalid or not
> > infringed [the "court decision trigger"],
>
> whichever is earlier.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 6

21 U.S.C. § 355(j)(5)(B)(iv).[1]

       Here, GSK filed a patent infringement suit against Apotex and the court has entered a dismissal order stating that Apotex's ANDA products "do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of" GSK's '658 patent. The order constitutes a "decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." In other words, this order constitutes an adjudication on the merits of the patent dispute.

       Consequently, Apotex's May 25, 2005, court decision satisfies the court decision trigger, and triggers any exclusivity awarded for the '658 patent. Accordingly, Apotex should, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA immediately upon expiration of the '789 patent.

**B.     Under Controlling D.C. Circuit Case Law, A Dismissal Order With Preclusive Effect Triggers Generic Exclusivity.**

       Even if one could argue that the dismissal of a patent infringement action with prejudice is not a "decision" or a "holding" of a court finding the patent invalid or not infringed, such a dismissal order does constitute "a decision of a court" under § 355(j)(5)(B)(iv)(II), so long as it has preclusive effect. Controlling D.C. Circuit precedent so holds.

**1.     The D.C. Circuit's Controlling Authority.**

       The dismissal of GSK's patent infringement action here constitutes a "decision of a court" under § 355(j)(5)(B)(iv). The D.C. Circuit's decisions in *Teva I* and *Teva II* require this result.

       The D.C. Circuit has explicitly held that the dismissal of a declaratory judgment action for lack of subject matter jurisdiction constitutes a "court decision" sufficient to trigger the 180-day exclusivity, so long as it has estoppel effect under the patent laws. *See Teva I*, 182 F.3d at 1008; *Teva II*, 2000 WL 1838303. The facts and reasoning of the *Teva* decisions control here, and require FDA to treat the dismissal of GSK's patent infringement action as a triggering court decision under § 355(j)(5)(B)(iv)(II).

---

[1]  The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), changed the 180-day exclusivity provision of the 1984 Hatch-Waxman Amendments (formally known as the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271)). Those changes are not applicable here, however, because, as we understand it, Dr. Reddy's Laboratories' ANDA No. 76-183, which FDA considers to be the first ANDA submitted containing paragraph IV certifications to the relevant Orange Book-listed patents, was filed on or before December 8, 2003.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 7

In the *Teva* cases, Apotex (then known as TorPharm) submitted the first paragraph IV ANDA for a generic version of Hoffman-La Roche's prescription drug ticlopidine (brand-name Ticlid®). The patentee, Syntex, did not sue Apotex or any subsequent ANDA applicants for infringement. By virtue of submitting the first paragraph IV ANDA, FDA awarded Apotex sole 180-day exclusivity for generic ticlopidine, which delayed the approval of all subsequent applicants until 180 days after first commercial marketing or a court decision of non-infringement, whichever is earlier.

Apotex's competitor, Teva, while awaiting ANDA approval, filed a declaratory judgment action against Syntex seeking a declaratory judgment of noninfringement of Syntex's listed patent. *See Teva I*, 182 F.3d at 1006. Teva did so in order to obtain a court decision that would trigger Apotex's 180-day exclusivity period, thereby allowing Teva to market its generic drug. *Id.* at 1004. The same day Teva sued, Syntex sent Teva a letter stating: "We will make no claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the formulation you have disclosed to us." *Id.* at 1006. Syntex then moved to dismiss the complaint for lack of subject matter jurisdiction, explaining:

> Given Syntex's express assurance that it would not bring suit against Teva on the '592 patent, Teva can have no reasonable apprehension that it will face a lawsuit for infringement of the '592 patent. Without such reasonable apprehension, no actual case or controversy exists of sufficient immediacy or reality to base jurisdiction over Teva's declaratory judgment claim.

*Id.* The district court granted Syntex's motion, holding that Teva "lacks a reasonable apprehension of suit by Syntex for infringement" of the patent at issue and, therefore, there was "no justiciable case or controversy between the parties concerning any infringement by Teva of the '592 Patent." *Id.*

FDA subsequently refused, without explanation, to recognize the dismissal of Teva's declaratory judgment action as a triggering court decision. Among other things, FDA refused to explain why the Agency had previously recognized as a triggering decision the grant of partial summary judgment based on the patentee's admission of noninfringement, but declined to give similar effect to Teva's dismissal based on a finding of no reasonable apprehension of suit arising from the patentee's stated intention not to sue.

Teva challenged the Agency's refusal to recognize the dismissal as a triggering court decision. The district court sided with FDA, holding that the dismissal order did not fall within the plain language of the statute, which requires "nothing less than a decision on the merits." *See id.* at 1007. On appeal, however, the D.C. Circuit reversed, holding that: (1) FDA's interpretation refusing to recognize Teva's dismissal as a court decision is not entitled to *Chevron* deference; (2) FDA "cannot avoid the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement under § 355(j)(5)(B)(iv)(II)"; and (3) FDA's

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 8

response was arbitrary and capricious. *Id.* In reaching these conclusions, the court made two separate findings that are applicable here.

*First,* the D.C. Circuit determined that the Agency's refusal to recognize the dismissal as a triggering court decision is not compelled by the statutory language, which merely requires a "decision of a court holding the patent . . . invalid or not infringed." *See id.* at 1007. Such a "decision," the court explained, can take many forms and "the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement." *Id.* at 1009; *see also id.* at 1007. Where estoppel exists, the dismissal constitutes a court decision.

The D.C. Circuit noted that "Syntex's declaration and conduct eliminated the need for a declaratory judgment because Syntex would be estopped from challenging Teva's marketing of its generic drug on the ground of patent infringement." *Id.* at 1008. The court further explained:

> The conclusion that the California dismissal has estoppel effect is supported by the decisions of the United States Court of Appeals for the Federal Circuit. That court has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect.
>
>       *      \*      \**
>
> Put otherwise, the California dismissal appears to meet the requirements of a triggering "court decision" because that court had to make a predicate finding with respect to whether Syntex would ever sue Teva for infringement in order to conclude that there was no case or controversy between the parties.
>
>       *      \*      \**
>
> Although the dismissal was not a judgment on the merits after consideration of evidence presented by the parties, there was no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement. This is the result that appears to be the purpose of the triggering "court decision" provision. A contrary view, as Teva contends, means that the patent holder could manipulate the system in order to block or delay generic competition by stating that the patent holder will not enforce its patent against the Paragraph IV challenger. For these reasons, the California dismissal would appear to meet the requirements of a "court decision" under § 355(j)(5)(B)(iv)(II).

*Id.* at 1008-09 (citations omitted).

*Second,* the D.C. Circuit held that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Id.* at 1009. In reaching this conclusion, the court noted that

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 9

both FDA and the Federal Circuit recognize that a decision that a patent is "unenforceable" also suffices as a court decision, even though the statute says only if the patent is "invalid" or "will not be infringed." *Id.* FDA included "unenforceability" because, in its own words, it would lead to absurd results otherwise. *Id.* As such, the court rejected as "unpersuasive" any attempt by FDA to treat unenforceability, which is included in the regulation, any differently than estoppel for purposes of § 355(j)(5)(B)(iv)(II). *Id.* The court explained:

> As the FDA and [Apotex] concede, Syntex cannot sue Teva for patent infringement as a result of the California dismissal. In its regulations, the FDA added 'unenforceability' to the list of what qualifies as a 'court decision' because it concluded that implementing the statute in any other way would be contrary to Congress' intent and produce absurd results . . . . However, the situation presented here appears no less absurd because Teva can never be sued by Syntex for patent infringement, but the FDA has nevertheless concluded that the California dismissal cannot satisfy the 'court decision' requirement of the statute. Thus, the FDA's application of the statute to this case runs counter to its explanation for permitting unenforceability to qualify as a 'court decision.'

*Id.* at 1010 (citations omitted.)

The D.C. Circuit reversed and remanded the district court's decision to afford FDA the opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement . . . ." *Teva II*, 2000 WL 1838303, at *1. On remand, FDA repeated "its claim that the California dismissal did not state on its face that the underlying patent was not infringed and that refusing to look beyond the face of the order served goals of administrative convenience." *Id.* The district court flatly rejected this explanation. On appeal, the D.C. Circuit agreed, holding that the "judgment of the agency fails for want of reasoned decisionmaking," and stating that the Agency had failed to provide any meaningful basis for departing from its past interpretation and precedent. *Id.* at *2.

The *Teva I* and *II* rulings remain the controlling rule of law on determining what will and will not constitute a court decision sufficient to trigger under § 355(j)(5)(B)(iv)(II).[2] Under this rule of law, so long as a dismissal has preclusive effect, it constitutes a triggering court decision.

---

[2]  FDA considered a proposed rule under which such a dismissal would not constitute a court decision trigger. *See* 64 Fed. Reg. 42873, 42881 (Aug. 6, 1999). However, after reconsidering the *Teva* decisions and comments, FDA rejected and formally withdrew its proposed rule in November 2002, and continues to regulate directly from the statute, just as it had done before *Teva*. *See* 67 Fed. Reg. 66593, 66594 (Nov. 1, 2002).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 10

2.    **The Dismissal Of GSK's Action Triggers Any 180-Day Exclusivity On The '658 Patent And Entitles Apotex To Final ANDA Approval Immediately Upon Expiration Of The '789 Patent.**

The controlling test for a triggering court decision under § 355(j)(5)(B)(iv), as articulated by the D.C. Circuit, is whether the decision estops or precludes the patentee "from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*, 182 F.3d at 1009. If so, it is a triggering court decision under the statute. As applied here, the dismissal of GSK's patent infringement suit against Apotex, with prejudice, precludes future litigation between the parties on the '658 patent.

The May 25, 2005, dismissal order here explicitly is based on, *inter alia*, GSK's covenant not to sue Apotex and its admission that Apotex's ANDA products do not infringe the '658 patent. FDA need not look beyond the face of the order and covenant to confirm this fact. The order dismisses GSK's infringement action based upon its covenant not to sue and its representations that: (1) Apotex ANDA products "do not infringe" the '658 patent; and (2) it "will not sue Apotex for infringement of the '658 patent based on the manufacture, use, sale, offer for sale or importation of Apotex's generic ondansetron hydrochloride tablet product that are the subject of ANDA No. 77-306." (Ex. E).

Plainly, GSK has disavowed any intent to sue Apotex. As the D.C. Circuit acknowledged, the Federal Circuit "has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *See Teva I*, 182 F.3d at 1008 (citing *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991) (holding that by filing with the district court a covenant not to sue the declaratory judgment plaintiff for infringement of the patent-in-suit, the patentee was "forever estopped from asserting the . . . patent claims against the [declaratory judgment plaintiff]")); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (holding that patentee "is forever estopped by its counsel's statement of nonliability, on its face and as explained during oral argument before this court, from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994. This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case."); *see also Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998) (discussing *Super Sack* and *Spectronics*).

Thus, the dismissal order precludes GSK's from asserting the '658 patent against Apotex in the future. As in *Teva*, the dismissal meets all the requirements of a "decision of a court" under § 355(j)(5)(B)(iv)(II). Accordingly, there can be no barriers to final approval of Apotex's ANDA once the '789 patent expires. Any 180-day exclusivity for ondansetron hydrochloride tablets arising out of the '658 patent was triggered, at the latest, on June 24, 2005, and will have expired, at the latest, by December 20, 2005. Subject to all other substantive

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 11

requirements for approval, Apotex is entitled to immediate final approval on expiration of the '789 patent.

## IV.    CONCLUSION

For all these reasons, Apotex requests, and is entitled to, confirmation that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA upon expiration of the '789 patent; (2) its final approval will not be delayed by any unexpired 180-day exclusivity on the '658 patent; and (3) any 180-day exclusivity on the '658 patent was triggered by the dismissal of GSK's patent infringement action. We look forward to receiving the Agency's response by November 1, 2005.

Should you have any questions, please do not hesitate to contact us.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

Christine J. Siwik

William A. Rakoczy

Enclosures
cc (*via e-mail*):        Elizabeth Dickinson, *Office of Chief Counsel*

# EXHIBIT A

Feb-18-05  .15:06    From-                                    T-458  P.004/012  F-039

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
-----------------------------------------x
GLAXO GROUP LIMITED and                  :
SMITHKLINE BEECHAM CORPORATION,          :
                                         :
              Plaintiffs,                :      CIVIL ACTION NO.
                                         :
     v.                                  :
                                         :
APOTEX INC.,                             :
                                         :
              Defendant.                 :
-----------------------------------------x
```

## COMPLAINT

Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation, for their Complaint against defendant Apotex Inc., aver and allege as follows:

### JURISDICTION AND PARTIES

1.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 et seq. and 21 U.S.C. § 355.

2.     Plaintiff Glaxo Group Limited is an English corporation having a registered office at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 ONN, Middlesex, England.

3.     Plaintiff SmithKline Beecham Corporation is a Pennsylvania corporation having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102.  Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation shall hereinafter be referred to jointly as "GlaxoSmithKline."

I-PR/1280871.1

4.      Defendant Apotex Inc. ("Apotex") is a privately held Canadian corporation having its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9. Novex Pharma is a division of Apotex, Inc. having its principal place of business at 380 Elgin Hills Road East, Richmond Hill, Ontario, Canada L4C 5H2. Upon information and belief, Apotex Inc. conducts continuous and systematic business activities within the State of New Jersey, and, alternatively, intends to market and sell the accused drug product in the State of New Jersey.

5.      This Court has jurisdiction pursuant to the patent laws of the United States, Title 35 U.S.C. and 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this district pursuant to 28. U.S.C. §§1391 and 1400(b).

## FIRST CAUSE OF ACTION
## INFRINGEMENT OF UNITED STATES PATENT NO. 5,344,658

6.      On September 6, 1994, United States Patent No. 5,344,658 ("the '658 patent") entitled "PROCESS AND COMPOSITION USING ONDANSETRON" was duly and legally issued to David T. Collin. Since its issuance, Glaxo Group Limited has been the assignee and owner of the '658 patent. SmithKline Beecham Corporation is the exclusive licensee of the '658 patent. A true and correct copy of the '658 patent is attached to this Complaint as Exhibit A.

7.      GlaxoSmithKline is the holder of approved New Drug Applications (hereinafter "NDAs") under Section 505(b) of the Federal Food, Drug and Cosmetic Act (hereinafter the "Act"), 21 U.S.C. § 355(b), for ondansetron hydrochloride tablets covered by the '658 patent.

8.      On or about December 7, 2004, GlaxoSmithKline received a written Notice of Patent Certification from Apotex stating that Apotex has filed Abbreviated New Drug Application (hereinafter "ANDA") No. 77-306 seeking approval from the FDA to market ondansetron hydrochloride tablets pursuant to Section 505(j) of the Act, 21 U.S.C. § 355(j), prior

to expiration of the '658 patent, and alleging that the '658 patent is not infringed and/or that the

patent is invalid.

9.    Pursuant to 35 U.S.C. § 271(e)(2), Apotex's filing of this ANDA is an actual act

of infringement.

10.    As such, Defendants Apotex have infringed the '658 patent and such infringement

will continue unless enjoined by this Court.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray for Judgment:

1.    Finding that defendants have infringed United States Patent No. 5,344,658;

2.    Ordering that the effective date of any approval of defendants' application under

Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), for ondansetron

hydrochloride tablets and their use be not earlier than the expiration dates of United States

Patents Nos. 5,344,658;

3.    Awarding plaintiffs preliminary and final injunctions enjoining defendants and

their officers, agents, servants, employees and privies from continued infringement of United

States Patents Nos. 5,344,658; and

4.    Awarding plaintiffs their reasonable attorneys' fees, interest and costs of this

action, and such other and further relief as this Court may deem just and proper.

Dated: January 14, 2005

Robert A. White, (RW-6063)
MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
(609) 919-6600 (Telephone)
(609) 919-6639 (Facsimile)

Attorneys for Plaintiffs
Glaxo Group Limited and
SmithKline Beecham Corporation

1-PR/1280871.1                                    3

Feb-18-05    15:06    From-                                    T-458    P.007/012    F-039

Of Counsel
Dennis J. Mondolino
Lisa M. Ferri
Richard C. Pettus
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000

Feb-18-05    15:07    From-                                           T-458   P.008/012   F-038

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
US005344658A

## United States Patent [19]

### Collin

| | |
|---|---|
| [11] | Patent Number: **5,344,658** |
| [45] | Date of Patent: **Sep. 6, 1994** |

[54] **PROCESS AND COMPOSITION USING ONDANSETRON**

[75] Inventor: David T. Collin, Ware, England

[73] Assignee: Glaxo Group Limited, London, England

[21] Appl. No.: 5,736

[22] Filed: Jan. 19, 1993

#### Related U.S. Application Data

[63] Continuation of Ser. No. 755,716, Sep. 6, 1991, abandoned, which is a continuation of Ser. No. 544,644, Jan. 27, 1990, abandoned.

[30] **Foreign Application Priority Data**

Jun. 28, 1989 [GB] United Kingdom ............ 89148043

[51] Int. Cl.⁵ ...................................... A61K 9/14
[52] U.S. Cl. ................................. 424/489; 424/484;
            424/464; 424/465
[58] Field of Search ............. 424/484, 464, 465, 489

[56] **References Cited**

#### PUBLICATIONS

Sekiguchi et al., Chem. Pharm. Bull., 16(12), 2495–2502, 1968.
Pikal et al., Chemical Abstracts, 100:144884x, 1984.
Shirotani et al., Chemical Abstracts, 96:57633v, 1982.

*Primary Examiner*—Paul R. Michl
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Bacon & Thomas

[57] **ABSTRACT**

The invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent to a size which is suitable for effective distribution in a tablet blend, in particular 100% less that 250 μm. The ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated.

**10 Claims, No Drawings**

5,344,658

1

## PROCESS AND COMPOSITION USING ONDANSETRON

This application is a continuation of application Ser. No. 07/755,736, filed Sep. 6, 1991 now abandoned, which is a continuation of application Ser. No. 07/544,644, filed Jun. 27, 1990, now abandoned.

This invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate. More particularly the process involves desolvation and resolution.

Reduction of crystal size through solvation and desolvation has been described previously, for instance for the compound griseofulvin (K. Sekiguchi et al., Chem. Pharm. Bull., 1968, 16, 2495–2502). Various techniques may be employed to effect desolvation such as drying at an elevated temperature and under vacuum, drying at an elevated temperature and at atmospheric pressure, drying at ambient temperature under a high vacuum, freeze-drying, or drying over a desiccant. However, the precise conditions of desolvation considerably affect the efficiency of the reduction in crystal size.

Ondansetron, the approved name for 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one, is a highly selective and potent antagonist of 5-hydroxytryptamine (5-HT) at 5-HT₃ receptors. Ondansetron, together with its physiologically acceptable salts and solvates, is described and claimed in British Patent No. 2153821B, and may be used in the treatment of a variety of conditions, including the nausea and vomiting induced by cancer chemotherapy and radiotherapy (as described, for example, in European Patent Specification No. 226266A).

The preferred form of ondansetron for pharmaceutical formulation is the hydrochloride dihydrate. Ondansetron hydrochloride dihydrate may be presented in a variety of formulations, one of which is as tablets for oral administration, where particularly suitable unit doses of the drug substance for the treatment of emesis are 5 mg and 10 mg.

In the tablet manufacturing process, ondansetron hydrochloride dihydrate is blended with suitable excipients, and the blend is then compressed into tablets.

Since a low dose of drug substance per tablet is required, for example, 5 mg of ondansetron hydrochloride dihydrate in a tablet of 125 mg compression weight, the distribution of the drug substance in the blend is critical in obtaining individual tablets with the correct drug content. Uniform drug distribution in the tablet blend may be achieved using drug substance of appropriate particle size. However, the ondansetron hydrochloride dihydrate obtained by methods described in the art, i.e. that obtained by simple crystallisation from an aqueous solvent mixture with subsequent drying at ambient temperature and pressure contains particles which are too large (i.e. >250 μm) to give an homogeneous distribution of the drug substance in the tablet blend. Indeed if crystalline ondansetron hydrochloride dihydrate produced by such conventional methods were used in tablet manufacture, the tablets so produced would not possess an acceptable drug content which, for a 5 mg tablet, is 5 mg±0.25 mg of ondansetron hydrochloride dihydrate.

Attempts to mill crystals of ondansetron hydrochloride dihydrate to reduce their particle size have proved unsuccessful, for example, comminution milling of on-

2

dansetron hydrochloride dihydrate caused screen blockage of coarse and fine screens. Furthermore, although ondansetron hydrochloride dihydrate of particle size <250 μm can be obtained by passing the substance through a 60 mesh sieve (as described, for example, in UK Patent No. 2153821B), this method is not commercially viable.

We have now found a process which reduces the crystal size of ondansetron hydrochloride dihydrate produced by simple crystallisation from solvent (more particularly aqueous solvent mixtures) to a size which is suitable for effective distribution of the drug substance in the tablet blend.

Thus the invention provides a process for reducing the crystal size of ondansetron hydrochloride dihydrate obtained by simple crystallisation from solvent, more particularly an aqueous solvent mixture, to a size which is suitable for effective distribution in a tablet blend, which comprises desolvating the said drug substance by drying at an elevated temperature and reduced or atmospheric pressure, and then rehydrating the ondansetron hydrochloride so formed.

It is possible by means of the process according to the invention to reduce the crystal size of ondansetron hydrochloride dihydrate to the extent that the entire drug substance consists of particles of a sufficiently small size (i.e. less than 250 μm, of which typically about 80% by weight are less than 63 μm) to give an homogeneous distribution of the drug substance in the tablet blend.

Preferably, the ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at a temperature greater than 40° C. (e.g. 50° C.) and at reduced pressure (e.g. 200 torr or less) for more than 8 hours. Alternatively, the ondansetron hydrochloride dihydrate obtained by crystallisation may be desolvated at ambient pressure by heating at a temperature of 50° C. or above (more preferably 100° C.).

Most preferably, ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at 50° C. at a pressure of 100 torr for 24 hours.

The desolvation process may be carried out with or without mechanical agitation.

The resultant ondansetron hydrochloride of reduced crystal size is then rehydrated, for example, by placing it in a humidified atmosphere of, for example, air or nitrogen, at ambient temperature. Rehydration will generally be continued until there is no further gain in weight.

According to another aspect, the invention provides crystalline ondansetron hydrochloride dihydrate characterised in that 100% of the crystals have a size of less than 250μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis).

According to a yet further aspect, the invention provides a pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient characterised in that 100% of the ondansetron hydrochloride dihydrate crystals have a size less than 250 μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis). Generally the composition will contain at least one physiologically acceptable carrier or excipient.

The invention is illustrated by the following examples. Temperatures are in ° C. Crystal size was measured by air-jet sieve analysis.

5,344,658

3

## EXAMPLE 1

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 µm

A solution of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one (147 g) in a mixture of isopropanol (670 ml), water (250 ml) and glacial acetic acid (76 ml) at ca. 60° was clarified by filtration and diluted with more water (61 ml) and isopropanol (650 ml). The solution was treated at 70° with 36%w/w hydrochloric acid (46 ml) and cooled to ca. 5°. The resulting suspension was filtered and the filtered solid was washed by displacement with isopropanol (600 ml) to give a solvent wet solid (269 g). A portion of this solid (91 g) was dried at ca. 50° and 200 torr for ca. 16h to give a solid (55 g).

A portion of the dried solid (26 g) was placed in a current of humidified air at ambient temperature until there was no further gain in weight and the title compound (29 g) was obtained.

Particle Size Distribution of Title Compound

| Size (µm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 43.6 |
| 63 | 83.7 |
| 90 | 97.6 |
| 125 | 98.6 |
| 180 | 99.6 |
| 250 | 100.0 |

## EXAMPLE 2

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 µm

The previous preparation was repeated except that after collection by filtration the solid was dried at ambient temperature and pressure to give large crystals (>45% by weight of crystals greater than 250 µm) of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate.

Particle Size Distribution of "Large Crystals"

| Size (µm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 5.2 |
| 63 | 9.6 |
| 90 | 20.8 |
| 125 | 26.7 |
| 180 | 37.2 |
| 250 | 52.6 |
| 355 | 71.5 |
| 500 | 93.9 |
| 710 | 98.4 |
| 1000 | 98.6 |

A sample of this solid (26.9 g) was dried at ambient pressure and 100° for ca. 17h during which period the weight of the sample was reduced to 24.3 g. The sample was then exposed to ambient temperatures and humidities until it had regained its original weight to afford the title compound.

Particle Size Distribution of Title Compound

4

| Size (µm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 47.6 |
| 63 | 94.8 |
| 90 | 100.0 |

## EXAMPLE 3

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 µm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 52° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (µm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 44.3 |
| 63 | 83.2 |
| 90 | 97.0 |
| 125 | 98.8 |
| 180 | 99.8 |
| 250 | 100.0 |

## EXAMPLE 4

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 90 µm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 48° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (µm) | Cumulative % Undersize |
|---|---|
| 45 | 47.0 |
| 63 | 97.4 |
| 90 | 100.0 |

I claim:

1. A process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent, in which said ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated, wherein the resulting crystals are suitable for homogeneous distribution in a tablet blend, and wherein 100% of the resulting crystals have a size of less than 250 µm and at least about 80% by weight of the crystals have a size of less than 63 µm.

2. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is prepared by crystallisation from an aqueous solvent mixture.

3. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature greater than 40° C. and at reduced pressure for more than 8 hours.

4. A process according to claim 3, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of about 50° C. at a pressure of about 100 torr for about 24 hours.

5                                                5,344,658                                              6

5. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of 50° C. or above at ambient pressure.

6. A process according to claim 5, in which said temperature is about 100° C.

7. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is rehydrated in a humidified atmosphere at ambient temperature.

8. Crystalline ondansetron hydrochloride dihydrate in which 100% of the crystals have a size of less than 250 µm and at least about 80% by weight of the crystals have a size of less than 63 µm.

9. A pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient, in which 100% of said ondansetron hydrochloride dihydrate crystals have a size less than 250 µm and at least about 80% by weight of said crystals have a size less than 63 µm.

10. A pharmaceutical composition according to claim 9, in which each tablet has a nominal content of active ingredient which is 5 mg or 10 mg.

* * * * *

# EXHIBIT B

BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road
P.O. Box 244
Montvale, NJ 07645
(201) 573-1810
John R. Holsinger (JH0281)
jholsinger@beattielaw.com
Vanessa R. Elliott (VE4752)
velliott@beattielaw.com
David L. Blank (DB1671)
dblank@beattielaw.com

And

RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
William A. Rakoczy, Esq. (*Pro Hac Vice* Pending)
wrakoczy@mmslegal.com
Christine J. Siwik, Esq. (*Pro Hac Vice* Pending)
csiwik@mmslegal.com
Jane J. Jaang, Esq. (*Pro Hac Vice* Pending)
jjaang@mmslegal.com
Attorneys for Defendant Apotex, Inc.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GLAXO GROUP LIMITED and SMITHKLINE BEECHAM CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 05-307 (JLL) |
| APOTEX, INC., | ) ) ) | (Document Electronically Filed) |
| Defendant. | ) ) | |

### ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM,
### AND DEMAND FOR JURY TRIAL

Defendant, Apotex Inc. ( "Apotex"), for its Answer, Affirmative Defenses, Counterclaim,

and Demand for Jury Trial to the Complaint of Plaintiff Glaxo Group Ltd. and SmithKline

Beecham Corporation (collectively, "Plaintiffs"), in which all averments not expressly admitted are denied, states as follows:

## JURISDICTION AND PARTIES

1.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 et seq. and 21 U.S.C. § 355.

**RESPONSE**: Apotex admits only that this action purports to be one for alleged patent infringement, and denies the remaining averments of Paragraph 1.

2.     Plaintiff Glaxo Group Limited is an English corporation having a registered office at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 ONN, Middlesex, England.

**RESPONSE**: Apotex lacks knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2 and denies those averments on that basis.

3.     Plaintiff SmithKline Beecham Corporation is a Pennsylvania corporation having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102. Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation shall hereinafter be referred to jointly as "GlaxoSmithKline."

**RESPONSE**: Apotex lacks knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 3 and denies those averments on that basis.

4.     Defendant Apotex Inc. ("Apotex") is a privately held Canadian corporation having its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9. Novex Pharma is a division of Apotex, Inc. having its principal place of business at 380 Elgin Hills Road East, Richmond Hill, Ontario, Canada L4C 5H2. Upon information and belief, Apotex Inc. conducts continuous and systematic business activities within the State of New Jersey, and, alternatively, intends to market and sell the accused drug product in the State of New Jersey.

**RESPONSE**: Apotex admits the averments in the first sentence of Paragraph 4. Apotex denies the remaining averments of Paragraph 4.

5.     This Court has jurisdiction pursuant to the patent laws of the United States, Title 35 U.S.C. and 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**RESPONSE**: Apotex admits the averments in the first sentence of Paragraph 5. Apotex further admits that venue is proper in this District. Apotex denies the remaining averments of Paragraph 5.

     6.    On September 6, 1994, United States Patent No. 5,344,658 ("the '658 patent") entitled "PROCESS AND COMPOSITION USING ONDANSETRON" was duly and legally issued to David T. Collin. Since its issuance, Glaxo Group Limited has been the assignee and owner of the '658 patent. SmithKline Beecham Corporation is the exclusive licensee of the '658 patent. A true and correct copy of the '658 patent is attached to this Complaint as Exhibit A.

**RESPONSE**: Apotex admits only that U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "PROCESS AND COMPOSITION USING ONDANSETRON," issued on September 6, 1994; that on its face the '658 patent names David T. Collin as inventor and Glaxo Group Limited as assignee; and that what appears to be a copy of the '658 patent is attached to the Complaint. Apotex denies that the '658 patent "was duly and legally issued." Apotex lacks knowledge or information sufficient to form a belief as to the truth of the remaining averments of Paragraph 6 and denies those averments on that basis.

## FIRST CAUSE OF ACTION
## INFRINGEMENT OF UNITED STATES PATENT NO. 5,344,658

     7.    GlaxoSmithKline is the holder of approved New Drug Applications (hereinafter "NDAs") under Section 505(b) of the Federal Food, Drug and Cosmetic Act (hereinafter the "Act"), 21 U.S.C. § 355(b), for ondansetron hydrochloride tablets covered by the '658 patent.

**RESPONSE**: Apotex lacks knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 7 and on that basis denies those averments.

     8.    On or about December 7, 2004, GlaxoSmithKline received a written Notice of Patent Certification from Apotex stating that Apotex has filed Abbreviated New Drug Application (hereinafter "ANDA") No. 77-306 seeking approval from the FDA to market ondansetron hydrochloride tablets pursuant to Section 505(j) of the Act, 21 U.S.C. § 355(j), prior to expiration of the '658 patent, and alleging that the '658 patent is not infringed and/or that the patent is invalid.

**RESPONSE**: Apotex admits only that, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), Apotex sent a notice of certification to Plaintiffs, dated November 29, 2004, stating, *inter alia*, that

Apotex submitted ANDA No. 77-306 for Ondansetron Hydrochloride Tablets 4 mg and 8 mg, and that Apotex's ANDA contains a "paragraph IV certification," pursuant to 21 U.S.C. § 355 (j)(2)(A)(vii)(IV), stating that Apotex's proposed tablets will not infringe the '658 patent and/or that such patent is invalid. Apotex lacks knowledge or information sufficient to form a belief as to the truth of the remaining averments of Paragraph 8 and on that basis denies those averments.

9.      Pursuant to 35 U.S.C. § 271(e)(2), Apotex's filing of this ANDA is an actual act of infringement.

**RESPONSE:** Apotex denies the averments of Paragraph 9.

10.      As such, Defendants [sic] Apotex have infringed the '658 patent and such infringement will continue unless enjoined by this Court.

**RESPONSE:** Apotex denies the averments of Paragraph 10.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment:

1.      Finding that defendants have infringed United States Patent No. 5,344,658;

2.      Ordering that the effective date of any approval of defendants' [sic] application under Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), for ondansetron hydrochloride tablets and their use be not earlier than the expiration dates of United States Patents Nos. [sic] 5,344,658;

3.      Awarding plaintiffs preliminary and final injunctions enjoining defendants [sic] and their officers, agents, servants, employees, and privies from continued infringement of United States Patents Nos. [sic] 5,344,658; and

4.      Awarding plaintiffs their reasonable attorneys' fees, interests and costs of this action, and such other and further relief as this Court may deem just and proper.

**RESPONSE:** Apotex denies that Plaintiffs are entitled to the relief requested or to any relief whatsoever, and prays for judgment in its favor dismissing this action with prejudice and awarding Apotex its reasonable attorneys' fees pursuant to 35 U.S.C. § 285, interest, and costs of this action, and such other and further relief as this Court may deem just and proper.

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in its Answer, without admitting any averments of the Complaint not otherwise admitted, and without undertaking any of the burdens imposed by law on the Plaintiffs, the Defendant, Apotex Inc. ("Apotex"), avers and asserts the following Affirmative Defenses to the Complaint:

### First Affirmative Defense

The manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of United States Patent No. 5,344,658 ("the '658 patent").

### Second Affirmative Defense

The claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

\*        \*        \*

Apotex reserves the right to amend this pleading to assert additional affirmative defenses in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

## COUNTERCLAIM

Defendant/Counterclaim-Plaintiff, Apotex Inc. ("Apotex"), for its Counterclaim against Plaintiffs/Counterclaim-Defendants Glaxo Group Ltd. ("Glaxo"), and SmithKline Beecham Corporation ("SmithKline"; collectively, "Plaintiffs" or "Counterclaim-Defendants") alleges as follows:

## The Parties

1.     Counterclaim-Plaintiff Apotex Inc. is a corporation organized and existing under the laws of Canada and having places of business at 150 Signet Drive, Weston, Ontario, Canada M9L 1T9, and 50 Steinway Boulevard, Etobicoke, Ontario, Canada M9W 6Y3.  Apotex Inc. develops and manufactures generic drugs.

2.     Apotex has submitted Abbreviated New Drug Application ("ANDA") No. 77-306, to the U.S. Food and Drug Administration seeking approval to market Ondansetron Hydrochloride Tablets 4 mg and 8 mg.

3.     Upon information and belief, Glaxo is a company organized and existing under the law of England, having an office and place of business at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 0NN, United Kingdom.

4.     Upon information and belief, SmithKline is a Pennsylvania corporation having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102.

## Jurisdiction and Venue

5.     This Counterclaim arises under, *inter alia*, the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

6.     This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1338.

7.     This Court has personal jurisdiction over Counterclaim-Defendants by virtue of those parties having submitted to and invoked the jurisdiction of this Court by filing the Complaint against Apotex.

8.    Upon information and belief, this Court also has personal jurisdiction over Counterclaim-Defendants because they conduct substantial business in this District, and by virtue of their regular and systematic contact with this District.

9.    Venue is proper in this District under 28 U.S.C. § 1391.

### The Patent-In-Suit

10.    On or about January 19, 1993, the U.S. Patent and Trademark Office issued U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "PROCESS AND COMPOSITION USING ONDANSETRON."

11.    Glaxo purports and claims to be the owner of the '658 patent by assignment.

12.    SmithKline purports and claims to be the exclusive licensee of the '658 patent.

13.    On or about January 19, 2005, Counterclaim-Defendants sued Apotex in this District alleging infringement of the '658 patent under 35 U.S.C. § 271 (e)(2)(A).

### First Cause Of Action
### (Non-Infringement Of The '658 Patent)

14.    Apotex repeats, realleges, and incorporates by reference paragraphs 1 through 13 as though set forth fully herein.

15.    There is an actual, substantial, and continuing justiciable case and controversy between Apotex and Counterclaim-Defendants regarding noninfringement of the '658 patent.

16.    The manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent.

17.    Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of

ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent.

## Second Cause Of Action
### (Invalidity Of The '658 Patent)

18.    Apotex repeats, realleges, and incorporates by reference paragraphs 1 through 17 as though set forth fully herein.

19.    There is an actual, substantial, and continuing justiciable case and controversy between Apotex and Counterclaim-Defendants regarding the invalidity of the '658 patent.

20.    The claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

21.    Apotex is entitled to a judicial declaration that the claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

WHEREFORE, Apotex respectfully prays for judgment in its favor and against Counterclaim-Defendants:

(a)    Declaring that the manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent; and

(b)    Declaring that the claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

(c)    Ordering that the Complaint be dismissed with prejudice and

judgment entered in favor of Apotex; and

(d)    Awarding Apotex its reasonable attorneys' fees and costs of this

Counterclaim under 35 U.S.C. § 285; and,

(e)    Awarding Apotex such other and further relief as the Court may

deem just and proper.

## JURY DEMAND

The Defendant/Counterclaim-Plaintiff, Apotex Inc., hereby demands a trial by jury of all

issues so triable on its Counterclaim, Affirmative Defenses, and Plaintiffs' Complaint.

BEATTIE PADOVANO, LLC
Attorneys for Defendant Apotex Inc.

s/ Vanessa R. Elliott (VE4752)

Dated:  March 22, 2005

## CERTIFICATION PURSUANT TO L.R. 11.2

I certify that to my knowledge the matter in controversy is not the subject of any other

action pending in any court, or of any pending arbitration or administrative proceeding.

BEATTIE PADOVANO, LLC
Attorneys for Defendant Apotex Inc.

s/ Vanessa R. Elliott (VE4752)

Dated:  March 22, 2005

-9-

# EXHIBIT C

MORGAN, LEWIS & BOCKIUS, LLP
(A Pennsylvania Limited Liability Partnership)
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6600
By:    Robert A. White (RW-6063)

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
By:    Dennis J. Mondolino
        Lisa M. Ferri
        Richard C. Pettus
Attorneys for Plaintiffs and Counterdefendants Glaxo
Group Limited & SmithKline Beecham Corporation


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED, and SMITHKLINE BEECHAM CORPORATION <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX, INC., <br><br> Defendant. | Civil Action No. 05-307 (JLL) <br><br> Honorable Jose L. Linares, U.S.D.J. <br> Honorable Ronald J. Hedges, U.S.M.J. <br><br> **REPLY TO ANSWER AND COUNTERCLAIMS** |

Plaintiffs and Counterdefendants GLAXO GROUP LIMITED and SMITHKLINE

BEECHAM CORP. (collectively "GSK") hereby respond to the allegations of the

Answer and Counterclaims filed on or about March 22, 2005 by Defendant Apotex, Inc.

(referred to hereinafter as "Defendant" or "Apotex") in like-numbered paragraphs, as

follows:

APR. 11. 2005  5:14PM    BEATTIE PADOVANO, LLC    NO. 5328    P. 5

## REPLY TO COUNTERCLAIMS

### THE PARTIES

1.    Upon information and belief, GSK admits the allegations of Paragraph 1 with respect to the place of business at 150 Signet Drive. GSK lacks sufficient knowledge or information to admit or deny the allegations of Paragraph 1 and therefore denies the allegations.

2.    Upon information and belief, GSK admits the allegations of Paragraph 2.

3.    GSK admits the allegations of Paragraph 3.

4.    GSK admits the allegations of Paragraph 4.

### JURISDICTION AND VENUE

5.    GSK admits the allegations of Paragraph 5.

6.    GSK admits the allegations of Paragraph 6.

7.    GSK admits that it is subject to this Court's jurisdiction for this matter.

8.    GSK admits the allegations of Paragraph 8

9.    GSK admits the allegations of Paragraph 9

### THE PATENT-IN-SUIT

10.    GSK denies this paragraph, but admits that on or about September 6, 1994, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,344,658 ("the '658 patent").

11.    GSK admits that Glaxo Group Limited is the owner of the '658 patent by assignment.

12.    GSK admits that SmithKline Beecham Corporation is the exclusive licensee of the '658 patent.

13.    GSK admits the allegations of Paragraph 13.

<u>FIRST CAUSE OF ACTION</u>
(Non-Infringement of the '658 Patent)

14.    In reply to Paragraph 14, GSK repeats Paragraphs 1 – 13 of this Reply as if set forth fully herein.

15.    GSK admits the allegations of Paragraph 15 regarding the infringement of the '658 patent.

16.    GSK denies the allegations of Paragraph 16.

17.    GSK denies the allegations of Paragraph 17.

<u>SECOND CAUSE OF ACTION</u>
(Invalidity of the '658 Patent)

18.    In reply to Paragraph 18, GSK repeats Paragraphs 1 – 17 of this Reply as if set forth fully herein.

19.    GSK admits the allegations of Paragraph 19.

20.    GSK denies the allegations of Paragraph 20.

21.    GSK denies the allegations of Paragraph 21.

## CONCLUSION

WHEREFORE, GSK requests judgment as follows:

A.    Granting all of the relief requested in the Complaint;

B.    Dismissing Apotex' Counterclaims with prejudice; and

C.    Awarding GSK such other and further relief as the Court may deem just and

proper.

Dated: April 11, 2005

                                          MORGAN, LEWIS & BOCKIUS, LLP
                                          Attorneys for Plaintiffs

                                          By: _____
                                               Robert A. White (RW-6063)


OF COUNSEL:
Dennis J. Mondolino
Lisa M. Ferri
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, New York 10178-0600
(212)309-6000

I hereby certify that the following **REPLY TO DEFENDANTS' ANSWER** and

**COUNTERCLAIMS** was caused to be served this 11th day of March, 2005, upon the

following:

**One Copy - Via E-Mail & Federal Express**

Vanessa R. Elliott
Beattie Padovano, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645

Dated April 11, 2005

Robert A. White

# EXHIBIT D

COVENANT NOT TO SUE
and
STIPULATION OF NON-INFRINGEMENT
OF U.S. PATENT NO. 5,344,658

This covenant and stipulation ("Agreement") is made and effective as of May 18, 2005 by Glaxo Group Limited and SmithKline Beecham Corporation, on behalf of themselves, their parents, subsidiaries, affiliates, successors and assigns (collectively "GlaxoSmithKline") with Apotex, Inc., its parents, subsidiaries, affiliates, successors and assigns (collectively "Apotex").

WHEREAS, Glaxo Group Limited is the owner by assignment and SmithKline Beecham Corporation is the exclusive licensee of U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "Process and Composition Using Ondansetron," relating to pharmaceutical compositions containing ondansetron and processes for preparing those compositions; and

WHEREAS, GlaxoSmithKline is the holder of record of NDA 20-103 for marketing ondansetron hydrochloride tablets, 4 mg, 8 mg and 24 mg; and

WHEREAS, Apotex submitted ANDA No. 77-306 to the FDA on September 30, 2004, seeking approval to market ondansetron hydrochloride tablets, 4 mg and 8 mg; and

WHEREAS, Apotex filed a certification in ANDA No. 77-306 pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) with respect to the '658 patent ("the Paragraph IV certification") and gave GlaxoSmithKline Notice of the Paragraph IV certification, along with a statement of the factual and legal bases of the Paragraph IV certification; and

WHEREAS, GlaxoSmithKline filed a civil action, captioned *Glaxo Group Limited and SmithKline Beecham Corporation v. Apotex, Inc.*, Case No. 2:05-CV-00307 (D.N.J.), on January 14, 2005, alleging that the product described in Apotex's ANDA No. 77-306 infringes the '658 patent; and

WHEREAS, Apotex filed an Answer, Affirmative Defenses, Counterclaim and Demand for Jury Trial to Plaintiffs' Complaint on March 22, 2005, seeking a declaratory judgment of non-infringement and invalidity of the '658 patent; and

WHEREAS, GlaxoSmithKline filed a Reply to Apotex's Counterclaims on April 11, 2005, seeking the relief requested in GlaxoSmithKline's Complaint and dismissal of Apotex's Counterclaim with prejudice; and

WHEREAS, on November 29, 2004, in response to GlaxoSmithKline's request, Apotex, through its attorneys, provided to GlaxoSmithKline's attorneys a copy of ANDA No. 77-306 as submitted to the FDA on September 30, 2004 and bates-stamped APO/OND 000001-002130 ("Apotex's ANDA") on a confidential "outside attorneys eyes only" basis; and

WHEREAS, from review of this documentation, GlaxoSmithKline maintains that there is no actual, justiciable controversy between the parties, as the ondansetron hydrochloride tablets that are the subject of and described in Apotex's ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of the '658 patent;

NOW, THEREFORE, in consideration of the covenants and promises set forth herein, GlaxoSmithKline and Apotex agree as follows:

1.      GlaxoSmithKline and Apotex consent to entry of a Stipulation of Dismissal, in the form attached hereto, dismissing with prejudice the parties' respective claims and counterclaims of the above-referenced action.

2.      GlaxoSmithKline will not sue Apotex, as defined herein, or its distributors or customers for infringement of the '658 patent based on the importation, manufacture, use, sale or

2

offer for sale of ondansetron hydrochloride tablets that are the subject of and described in Apotex's ANDA as defined above.

3.    Apotex agrees that it will not seek a declaratory judgment declaring claims of the '658 patent to be invalid unless GlaxoSmithKline asserts a claim against Apotex for allegedly infringing one or more claims of the '658 patent, in which case Apotex retains the right to assert any and all invalidity defenses and claims it has with respect to the '658 patent, as well as its right to raise this Agreement as a defense in response to any such infringement action by GlaxoSmithKline.

4.    Nothing in this Agreement shall be construed as a license of any kind under or to any GlaxoSmithKline patents or other forms of intellectual property including, but not limited to, the '658 patent.

5.    This Agreement extends only to Apotex as defined herein and is not transferable.

6.    The covenant not to sue expressed in paragraph 2 becomes valid upon (i) the execution of this Agreement and (ii) the execution and filing of the Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41 attached hereto.

7.    Each party shall bear its own attorneys' fees, costs and expenses.

8.    This Agreement may be executed in multiple counterparts.

9.    This constitutes the entire and only agreement between the parties relating to the subject matter hereof.

GLAXO GROUP LIMITED

By: _____

Name: Charles E. Dadswell
      Vice President, US Intellectual
Title: Property

3

SMITHKLINE BEECHAM CORP.

By: _____

Name: Charles E. Dadswell _____

Title: Vice President, US Intellectual
Property _____

APOTEX, INC.

By: _____

Name: B Sherman _____

Title: Chairman _____

4

# EXHIBIT E

CLOSED

MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
(609) 919-6600
Robert A. White (RW-6063)
rwhite@morganlewis.com

AND

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Dennis J. Mondolino
dmondolino@morganlewis.com
Lisa M. Ferri
lferri@morganlewis.com

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED, and SMITHKLINE BEECHAM CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX, INC.,<br><br>Defendant. | Civil Action No. 05-307 (JLL)<br><br>Honorable Jose L. Linares, U.S.D.J.<br>Honorable Ronald J. Hedges, U.S.M.J. |

## STIPULATION OF DISMISSAL PURSUANT TO FED.R.CIV.P. 41

Pursuant to the parties' Covenant Not to Sue and Stipulation of Non-infringement (the "Agreement"), incorporated by reference herein, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:

WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

WHEREAS, GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306; and

WHEREAS, Apotex agrees that it will not seek a declaratory judgment declaring claims of the '658 patent to be invalid unless GlaxoSmithKline asserts a claim against Apotex for allegedly infringing one or more claims of the '658 patent, in which case Apotex retains the right to assert any and all invalidity defenses and claims it has with respect to the '658 patent, as well as its right to raise this Agreement as a defense in response to any such infringement action by GlaxoSmithKline;

THEREFORE, based on the referenced Agreement, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims with prejudice. Each party shall bear its own costs, expenses and attorneys' fees.

Dated: May 18, 2005

Robert A. White (RW-6063)
MORGAN, LEWIS & BOCKIUS, LLP

Dated: May 18, 2005

John Holsinger (JH-0281)
Vanessa R. Elliott (VE-4752)

2

SO ORDERED:
DATED: _____ 2/27/08

(A Pennsylvania Limited Liability
Partnership)
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6600

Dennis J. Mondolino
Lisa M. Ferri
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Attorneys for Plaintiffs and
Counterdefendants
Glaxo Group Limited & SmithKline
Beecham Corporation

David L. Blank (DB-1671)
BEATTIE PADOVANO LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
(201) 799-2120

William A. Rakoczy
Christine J. Siwik
Jane J. Jaang
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Chicago, IL 60610
(312) 222-6301
Attorneys for Defendant and Counter-Plaintiff
Apotex Inc.

3

# EXHIBIT C

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*



6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

Christine J. Siwik
312.222.6304 Direct Phone
312.222.6324 Direct Fax
csiwik@rmmslegal.com

William A. Rakoczy
312.222.6301 Direct Phone
312.222.6321 Direct Fax
wrakoczy@rmmslegal.com

August 29, 2006

**VIA ELECTRONIC TRANSMISSION
AND OVERNIGHT DELIVERY**

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
7500 Standish Place
Rockville, MD 20855

**PRIVILEGED AND CONFIDENTIAL
ANDA COMMUNICATION, ANDA NO. 77-306**

Re:    Apotex Inc.'s ANDA No. 77-306 for Ondansetron Hydrochloride
        Tablets 4 mg and 8 mg

Dear Mr. Buehler:

By letter dated August 31, 2005, we requested that the Agency confirm that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's final approval will not be delayed by any unexpired period of 180-day exclusivity associated with U.S. Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the '658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against Apotex Inc. We have not heard from the Agency in response to our request. If we do not receive a satisfactory response by September 14, 2006, Apotex will have no choice but to consider immediate judicial action in order to protect its right to timely launch its ondansetron products.

As explained in our original correspondence, of the four patents originally submitted by GSK in connection with its Zofran® (ondansetron hydrochloride) Tablets, only two are relevant here: (1) the '789 patent, to which Apotex submitted a paragraph III certification and which prevents FDA from granting Apotex's ANDA final approval until patent expiration on June 24, 2006 (with pediatric exclusivity to December 24, 2006); and (2) the '658 patent, to

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 2

PRIVILEGED AND CONFIDENTIAL
ANDA COMMUNICATION, ANDA NO. 77-306

which Apotex submitted a paragraph IV certification. Because GSK's patent infringement litigation against Apotex over the '658 patent has been dismissed based upon an express concession by GSK of non-infringement, any remaining 180-day exclusivity for the '658 patent that could potentially delay the approval of Apotex's ondansetron ANDA has been triggered and expired. Thus, we again request that FDA confirm that Apotex's ANDA will receive final approval upon expiration of the '789 patent.

On April 11, 2006, FDA issued an administrative decision in connection with exclusivity relating to the drug pravastatin.[1] In this ruling, FDA stated that it will not look to the preclusive effect that a ruling might have when deciding whether an order is sufficient to trigger the 180-day exclusivity period pursuant to 21 U.S.C. § 355(j)(5)(B)(iv)(II). In the words of the D.C. Circuit: "the agency will never look beyond the face of a court order to ascertain whether it qualified as a triggering court decision." *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1250 (D.C. Cir. 2006). Rather, the Agency will only look to the face of the order to see if it expressly states that the patent at issue is invalid, unenforceable, and/or not infringed. (*See* April 11, 2006 Pravastatin Exclusivity Ruling at 2, Ex. A hereto). Even under this unduly restrictive view of the court decision trigger, the May 25, 2005 order in *Glaxo Group Ltd. v. Apotex Inc.* qualifies as a triggering court decision.

The Glaxo-Apotex patent litigation did not start as a declaratory judgment action by an ANDA applicant against the patentee. Instead, GSK sued Apotex for patent infringement within 45 days of receiving Apotex's notice letter on the '658 patent. During the course of that litigation, GSK concluded that Apotex's ANDA products would not infringe the '658 patent. After being apprised of GSK's position, the parties entered into a Covenant Not to Sue and Stipulation of Non-Infringement. (Ex. D to Apotex's 8/31/05 Submission). On May 24, 2005, the district court presiding over GSK's infringement case signed a dismissal order expressly acknowledging that Apotex's ANDA products do not infringe the '658 patent. That dismissal order provides, in pertinent part:

> Pursuant to the parties' *Covenant Not to Sue and Stipulation of Non-infringement* (the "Agreement"), *incorporated by reference herein*, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:

---

[1] As the Agency is aware, Apotex vigorously disputes the legality of FDA's April 11, 2006 administrative ruling, which unlawfully restricts what types of orders are sufficient to trigger the start of the 180-day exclusivity period under 35 U.S.C. § 355(j)(5)(B)(iv)(II). For present purposes, however, Apotex will apply that decision to the facts of the exclusivity situation surrounding ondansetron tablets. Even under the Agency's April 11, 2006 ruling, any exclusivity attaching to the '658 patent has been triggered and has expired.

Gary Buehler                                    PRIVILEGED AND CONFIDENTIAL
Director, Office of Generic Drugs          ANDA COMMUNICATION, ANDA NO. 77-306
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 3

> WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent")*; and

> WHEREAS, *GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent* based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;
>
>                 \*       \*      \*

> THEREFORE based on the referenced Agreement, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims *with prejudice.*

(Ex. E to Apotex's 8/31/05 Submission (emphasis added)). The district court entered the order on May 25, 2005. The Order became a final decision from which no appeal has been, or can be, taken on June 24, 2005, at the latest. On June 1, 2005, in accordance with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to OGD.

       Thus, even if FDA does nothing but look at the face of this order, any exclusivity with respect to the '658 patent has been triggered. The Order states on its face, *inter alia*, that GSK "stipulate[s] and agree[s] that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of [the '658 patent]*." (8/31/05 Letter, Ex. E). The Order further states that "[GSK] has represented that it will not sue Apotex for infringement of the '658 patent . . . ." (*Id.*).

       Accordingly, Apotex again asks that FDA confirm that any exclusivity attaching to the '658 patent was triggered by the May 25, 2005 order in *Glaxo v. Apotex* and that such exclusivity has now expired. Any other result would run contrary to the Agency's April 11, 2006 administrative decision, thus constituting arbitrary, capricious, and unlawful agency action.

                            \*   \*   \*

       Given the upcoming expiration of the '789 patent, if we do not receive a satisfactory response from the Agency by September 14, 2006, Apotex will have no choice but to consider immediate judicial action in order to protect its right to timely launch its ondansetron

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 4

PRIVILEGED AND CONFIDENTIAL
ANDA COMMUNICATION, ANDA NO. 77-306

products.    Apotex obviously would prefer to avoid any litigation over this issue, particularly given the clear language of the judicial order at issue.

Please do not hesitate to contact us should you request any additional information. We look forward to the Agency's response.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

Christine J. Siwik

William A. Rakoczy

Enclosures
cc (*via e-mail*):        Elizabeth Dickinson, *Office of Chief Counsel*

# Exhibit A



DEPARTMENT OF HEALTH & HUMAN SERVICES                Public Health Service

ANDA 76-341                                                    Food and Drug Administration
                                                              Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention:  Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL  33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004.  Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin").  FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*").  Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court.  *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005).  On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings.  The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*."  *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12.  In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA.  *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.      Statutory and Procedural Background

        A.      180-Day Exclusivity and the Court Decision Trigger

Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2.

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
> (I)    the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." See, e.g., Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. See The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period:  (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II).  Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable.  21 C.F.R. § 314.107(c)(1)(ii).  In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results.  59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

B.    The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine.  *Teva I*, 182 F.3d at 1006-07.  FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute.  *Id.*  On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10.  The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant.").  The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA.  *See id.* § 1102(b)(1).  The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken.  *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006. [3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355n.

5

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court . . . holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.     FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.     FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

7

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estoped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Tava I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

        2.    FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.  FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec.*" *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.     FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

### C.     Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like ... bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" ....

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

# EXHIBIT D

## Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| APOTEX INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. \_\_\_\_\_ |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF TAMMY MCINTIRE

I, TAMMY MCINTIRE, declare as follows:

1.      I am the President of Apotex Corp., which is located in Weston, Florida.  Apotex

Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based

pharmaceutical company that develops and manufactures affordable generic medicines.  For

convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this

Declaration as "Apotex."

2.      I have personal knowledge of the facts set forth herein, or believe them to be true

based on my experience in the pharmaceutical industry and information I have received in the

course of my duties, and am competent to testify to the same.

3.      I submit this Declaration in support of Apotex's motion for temporary restraining

order and/or preliminary injunction.

4.      In my current position, I am personally involved in the introduction and

promotion of new generic drug products for the United States market.  I am familiar with the

considerable benefits and advantages of so-called "180-day exclusivity," which generally allows

one generic company to market and sell its product without other generic competition for 180

days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5.    I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company. These losses include, but are not limited to:  significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6.    In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage. That is precisely the irreparable harm that Apotex will suffer if Doctor Reddy's Laboratories ("DRL") or another applicant is able to launch its ondansetron product before this dispute is decided and thus enjoy a period of exclusivity to which it may not be entitled.

## Zofran® (ondansetron hydrochloride)

7.    GlaxoSmithKline    ("GSK")    currently    markets    Zofran®    (ondansetron hydrochloride) tablets, in 4 mg, 8 mg, and 24 mg strengths, in the United States for the prevention of nausea and vomiting associated with chemotherapy.

8.    Zofran® is a very lucrative drug for GSK, with worldwide sales from September 2004 to September 2005 exceeding $712 million (USD). According to IMS Health, an industry-recognized source in the pharmaceutical market, GSK's total Zofran® sales for 2005 in the United States alone were $630,359,000 (USD).

2

**Apotex's Ondansetron Tablet ANDA**

9.     Apotex has spent considerable sums developing a generic ondansetron hydrochloride tablet product for eventual sale in the United States, including compiling the information required to submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA"). Apotex's ANDA contains a "Paragraph IV" certification, stating that Apotex's product will not infringe GSK's U.S. Patent No. 5,344,658, or that the patent is invalid or unenforceable. It is my understanding that Apotex has manufactured and/or purchased ondansetron active pharmaceutical ingredient ("API") for a commercial launch of its product. It is also my understanding that Apotex has already manufactured ondansetron tablets in anticipation of a commercial launch of its product.

**Other Generic Ondansetron Tablet ANDAs**

10.     Based on publicly available information, it is my understanding at least eight (8) other companies have filed ANDAs seeking approval to market a generic versions of Zofran® tablets. It is also my understanding that at least two (2) of these companies, including Apotex and DRL, have filed ANDAs containing a Paragraph IV certification to the '658 patent. To date, FDA has not approved any generic ondansetron tablet ANDAs.

11.     It is my understanding that DRL or another applicant claims to have 180-day exclusivity as to ondansetron tablets arising out of a Paragraph IV certification to the '658 patent. It further is my understanding that FDA cannot grant final approval of any ondansetron tablet ANDA until at least December 24, 2006, when the pediatric exclusivity for GSK's U.S. Patent No. 4,753,789 expires.

12.     GSK sued Apotex for infringement of the '658 patent in the U.S. District Court for the District of New Jersey. It is my understanding that on May 25, 2005, the Court issued a

3

decision dismissing the case with prejudice based on GSK's concession that Apotex's ANDA product would not infringe the '658 patent.

13.    It also is my understanding that Apotex contacted FDA to confirm that this decision triggered any generic exclusivity that would be awarded for ondansetron tablets, and that Apotex's ANDA would be eligible for final approval when the pediatric exclusivity expires for the '789 patent expires on December 24, 2006.  I further understand that, by letter dated November 3, 2006, FDA denied Apotex's request, stating that the May 25, 2005 order did not trigger any 180-day exclusivity for ondansetron that may arise from another ANDA applicant's paragraph IV certification to the '658 patent.

14.    It is my understanding that, according to FDA's decision, if another Paragraph IV applicant receives generic exclusivity, Apotex will not be eligible for approval when the pediatric exclusivity expires for the '789 patent on December 24, 2006.

### Irreparable Harm to Apotex

15.    As an initial matter, if Apotex is delayed and DRL or another applicant is permitted to launch its product with 180-day exclusivity, the long-term financial losses to Apotex will be substantial and unrecoverable, even if Apotex is successful on the merits of this litigation.

16.    My experience with other drug products has shown that there are considerable— often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market.  The first-mover (such as DRL, here) establishes market dominance that is nearly impossible for other, subsequent entrants like Apotex to overcome.  The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products. Conversely, subsequent entrants to the market, like Apotex here, find it difficult to find

4

prospective customers, much less recoup product investments and obtain any significant market share.

17.     I have analyzed the potential market share for generic ondansetron tablets during the first 12 months of competition with Zofran® based on IMS data showing Zofran®'s U.S. sales from 2004 and 2005.  If Apotex were allowed to launch as soon as the period of pediatric exclusivity expires on December 24, 2006, Apotex projects that it will earn at least $12.28 million in net sales in the first 12 months of generic ondansetron competition, assuming a simultaneous launch by the other tentatively approved applicants.

18.     On the other hand, if DRL or another applicant is allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex projects that it will earn no more than approximately $486,679 in net sales in the first 12 months of generic ondansetron competition.  This translates into a total and unrecoverable loss of at least $ 11.7 million in net sales.

19.     Apotex Inc. already has ordered ondansetron API in order to produce and formulate the necessary amount of ondansetron tablets required for a product launch.  In the event DRL or another applicant is allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex would not recoup its development and API investments and costs associated with the product.

20.     It is my understanding that Apotex has no remedy against FDA to recover Apotex's losses, including Apotex's investments and projected lost sales, if another applicant is allowed to commercially launch with exclusivity while this litigation is still pending.  This is true even if Apotex prevails on the merits.

5

21.    Furthermore, the effects of an exclusive launch extends well beyond the unrecoverable loss of sales, market share, profits, and investments. This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-approved generic product. This occurs because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with most, if not all, of the major customers. In other words, if DRL or another applicant is first to hit the market alone, it will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss of access to major customers would still foreclose Apotex from effectively competing in the ondansetron tablet market.

22.    Apart from the lost opportunity for ondansetron tablet sales (at least $ 11.7 million during the first year of generic ondansetron sales alone) and decreased access to major customers, Apotex also would lose sales across all of its other generic product lines. When companies have the opportunity to exclusively launch a unique blockbuster drug such as a generic equivalent to Zofran® tablets, they have significant leverage to sell other products that they manufacture. The presence of an exclusive blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines. Conversely, subsequent entrants to the market like Apotex have no such leverage. This leads to a loss of market share across all products, which is also irreparable.

23.    Apotex's ondansetron tablet products are significant not only for Apotex, but for its customers. Apotex's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important medicines, such as ondansetron tablets, to the market. If Apotex is forced to delay the sale of its

6

ondansetron tablet products, Apotex would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Apotex sells to its customers today and in the future.

24.    It is also imperative that Apotex obtain the relief it seeks as soon as possible.  It is my understanding that other applicants who claim to have exclusivity are already pre-selling and marketing their generic products to major customers on the basis that they will be the only available generic products on December 24, 2006.  Apotex, too, needs to be able top pre-sell and pre-market its products as well before all major customers and distribution channels are tied up, and there is no appreciable market share left.

## Conclusion

25.    In sum, if an applicant exclusively launches its ondansetron tablet product before this dispute is decided, Apotex will irreparably lose sales of at least $ 11.7 million, significant market share for this and other products, and indeed its entire ondansetron investment, as well as customer goodwill and access to major customers.  It would also irreparably damage Apotex's ability to compete in the ultra-competitive U.S. market.

Dated:  November 6, 2006

I, TAMMY MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

TAMMY MCINTIRE

# EXHIBIT E

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

OCT 9  12 34 FM '96

U.S. DIST.
BRIDGEP...

------------------------------------------X

GLAXO, INC., GLAXO GROUP LIMITED,      :
and ALLEN AND HANBURYS LIMITED,
                                       :
            Plaintiffs                 :

         -against-                     :   No. 3: 95-CV-01342(GLG)

BOEHRINGER INGELHEIM CORPORATION,      :   Memorandum Decision
and BOEHRINGER INGELHEIM
CHEMICALS, INC.,                       :

            Defendants.                :

------------------------------------------X

     Defendants have moved for partial summary judgment (doc. #
135) as to Plaintiffs' claim that Defendants' ranitidine
hydrochloride product infringes Plaintiffs' patents nos. 4,521,431
(the '431 patent) and 4,672,133 (the '133 patent).  Based on
Plaintiffs' express concession that Defendants' product does not
infringe these patents, Defendants' Motion for Partial Summary
Judgment on this claim is GRANTED.


                         SO ORDERED.


Dated:    October 7 , 1996.
          Bridgeport, Connecticut.



                              _____
                              GERARD L. GOETTEL
                              U.S.D.J.




                         JA 346

# EXHIBIT F

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

12BF, CLOSED, RULE16

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
### CIVIL DOCKET FOR CASE #: 2:02-cv-02124-FSH

ORGANON INC., et al v. BARR LABORATORIES, I      Date Filed: 05/02/2002
Assigned to: Judge Faith S. Hochberg      Jury Demand: Defendant
Demand: $0      Nature of Suit: 830 Patent
Cause: 35:271 Patent Infringement      Jurisdiction: Federal Question

**Plaintiff**
**ORGANON INC.**      represented by   **KEVIN J. MCKENNA**
     GIBBONS, DEL DEO, DOLAN,
     GRIFFINGER & VECCHIONE, PC
     ONE RIVERFRONT PLAZA
     NEWARK, NJ 07102
     (973) 560-0643
     Email: kmckenna@gibbonslaw.com
     *ATTORNEY TO BE NOTICED*

**Plaintiff**
**AKZO NOBEL N.V.**      represented by   **KEVIN J. MCKENNA**
     (See above for address)
     *LEAD ATTORNEY*
     *ATTORNEY TO BE NOTICED*

V.

**Defendant**
**BARR LABORATORIES, INC.**      represented by   **BRIAN J. MCCARTHY**
     WINSTON & STRAWN LLP
     ONE GATEWAY CENTER
     NEWARK, NJ 07102-5398
     (973) 621-2230
     *LEAD ATTORNEY*
     *ATTORNEY TO BE NOTICED*

**Counter Claimant**
**BARR LABORATORIES, INC.**      represented by   **BRIAN J. MCCARTHY**
     (See above for address)
     *LEAD ATTORNEY*
     *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**BARR LABORATORIES, INC.**        represented by  **BRIAN J. MCCARTHY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/02/2002 | 1 | COMPLAINT filed FILING FEE $ 150.00 RECEIPT # 307814 (dc) Modified on 05/08/2002 (Entered: 05/07/2002) |
| 05/07/2002 | 2 | NOTICE of Allocation and Assignment filed. Magistrate Judge Stanley R. Chesler (NM) (dc) (Entered: 05/07/2002) |
| 05/07/2002 | | SUMMONS(ES) issued for BARR LABORATORIES, I ( 20 Days) (Mailed to Counsel) (dc) (Entered: 05/07/2002) |
| 05/30/2002 | 3 | ANSWER to Complaint; jury demand and COUNTERCLAIMS by BARR LABORATORIES, I against plts. (JB) Additional attachment(s) added on 4/4/2005 (ev, ). (Entered: 06/03/2002) |
| 06/11/2002 | 4 | RETURN OF SERVICE executed as to BARR LABORATORIES, I 5/10/02 Answer due 5/30/02. (ar) (Entered: 06/13/2002) |
| 06/12/2002 | 5 | APPLICATION by ORGANON INC., AKZO NOBEL N.V. and Clerk's Order extending time to answer Counterclaims. (ar) (Entered: 06/14/2002) |
| 07/03/2002 | 6 | ANSWER by ORGANON INC. to [3-2] counter claim (ar) (Entered: 07/10/2002) |
| 07/03/2002 | 7 | Notice of MOTION to dismiss by ORGANON INC., Motion set for 9/9/02 on [7-1] motion w/cert svc. (Brief/PO Subm) (ar) (Entered: 07/10/2002) |
| 07/03/2002 | 8 | DECLARATION of CHRISTOPHER P. ISAAC on behalf of ORGANON INC. Re: [7-1] motion to dismiss (ar) (Entered: 07/10/2002) |
| 08/16/2002 | 9 | DECLARATION of BRIAN J. MC CARTHY on behalf of BARR LABORATORIES, I Re: in support of application to admit George C. Lombardi, Christine J. Siwik and Gregory A. Duff pro hac vice. (ar) (Entered: 08/20/2002) |
| 08/16/2002 | 10 | AFFIDAVIT of GREGORY A. DUFF on behalf of BARR LABORATORIES, I Re: in support of applic for pro hac vice admission (ar) (Entered: 08/20/2002) |
| 08/16/2002 | 11 | AFFIDAVIT of GEORGE C. LOMBARDI on behalf of BARR LABORATORIES, I Re: in support of his applic for pro hac vice admission (ar) (Entered: 08/20/2002) |
| 08/16/2002 | 12 | AFFIDAVIT of CHRISTINE J. SWIK on behalf of BARR LABORATORIES, I Re: in support of her applic for pro hac vice admission. (ar) (Entered: 08/20/2002) |

CM/ECF LIVE - U.S. District Court for the District of New Jersey - Docket Report    Page 3 of 4

| 08/16/2002 | 13 | ORDER GRANTING deft Barr's application to admit George C. Lombardi, Christine J. Siwik and Gregory A. Duff pro hac vice. ( signed by Mag. Judge Stanley R. Chesler ) (NM) (ar) (Entered: 08/20/2002) |
| 08/16/2002 | 14 | CERTIFICATION of KEVIN J. MCKENNA on behalf of ORGANON INC., AKZO NOBEL N.V. Re: in support of appl to admit Basil J. Lewris, Robert D. Litowitz, Linda A. Wadler, Liam O'Grady and Christopher P. Isaac pro hac vice. (ar) (Entered: 08/20/2002) |
| 08/16/2002 | 15 | ORDER GRANTING plas' application to admit Lewris, Litowitz, Wadler, O'Grady and Isaac pro hac vice. ( signed by Mag. Judge Stanley R. Chesler ) (NM) (ar) (Entered: 08/20/2002) |
| 09/10/2002 | 16 | LETTER ORDER extending time for Organon Inc. etc. to submit reply to 9/16/02 and resetting motion hearing on [7-1] motion to dismiss by ORGANON INC. for <date not set> ( signed by Judge Faith S. Hochberg ) (NM) (ar) (Entered: 09/11/2002) |
| 09/12/2002 | 17 | Minute entry: Proceedings recorded by Ct-Reporter: none; Minutes of: 9/9/02; The following actions were taken, [7-1] motion to dismiss taken under advisement - RULE 78. By Judge Faith S. Hochberg (ar) (Entered: 09/18/2002) |
| 01/27/2003 | 18 | LETTER ORDER in response to plas' [7-1] motion to dismiss deft's declaratory jgm Counterclaims for lack of subject matter juris or for expedited discovery on infringement taken under advisement etc. ( signed by Judge Faith S. Hochberg ) (NM) (ar) (Entered: 01/29/2003) |
| 02/05/2003 | 19 | Notice of MOTION to dismiss by ORGANON INC., AKZO NOBEL N.V., Motion set for 3/10/03 on [19-1] motion w/cert svc. (Brief/PO Subm) (ar) (Entered: 02/11/2003) |
| 03/10/2003 | 20 | Minute entry: Proceedings recorded by Ct-Reporter: none; Minutes of: 3/10/03; The following actions were taken, [19-1] motion to dismiss taken under advisement RULE 78 By Judge Faith S. Hochberg (ar) (Entered: 03/12/2003) |
| 04/23/2003 | 21 | STIPULATION and ORDER, dismissing all claims brought by Organon for infringement of the ;099 patent are voluntarily dismissed w/prejudice. Proceedings shall continue w/respect to Barr's remaining Counterclaims IV-VI in accordance w/parties' agreement reflect in the February 5, 2003. letter from Kevin J. McKenna, Esq. to the Honoralbe Faith S. Hochberg. etc. ( signed by Judge Faith S. Hochberg ) (NM) (JB) (Entered: 04/29/2003) |
| 09/24/2003 | 22 | SCHEDULING ORDER settting scheduling conference for 1:30 10/22/03. (signed by Magistrate Judge Patty Shwartz ) (NM) (DS) (Entered: 09/25/2003) |
| 09/29/2003 | 23 | Minute entry: Proceedings recorded by Crt-Reporter: John Stone; Minutes of: 9/29/03; The following actions were taken, [19-1] motion to dismiss decision reserved. By Judge Faith S. Hochberg (DS) (Entered: 10/01/2003) |

| 09/30/2003 | 24 | Minute entry: Proceedings recorded by Ct-Reporter: JOHN STONE; Minutes of: 9/30/03; The following actions were taken, granting [19-1] motion to dismiss granting. By Judge Faith S. Hochberg (DS) (Entered: 10/02/2003) |
|---|---|---|
| 09/30/2003 | 25 | ORDER granting [19-1] motion to dismiss; dismissing dft's declaratory judgment counterclaims no. IV,V, &VI w/out prejudice. ( signed by Judge Faith S. Hochberg ) (NM) (DS) (Entered: 10/02/2003) |
| 10/02/2003 | | Case closed (DS) (Entered: 10/02/2003) |
| 03/13/2006 | 26 | TRANSCRIPT of Proceedings held on 9/30/03 before JUDGE FAITH S. HOCHBERG. Court Reporter: JOHN K. STONE. PLEASE NOTE: The complete transcript of these proceedings is maintained in paper format on file in the Clerks Office. To request copies of this transcript, contact the Official Court Reporter or Transcription Service who prepared the transcript. (DD, ) (Entered: 03/14/2006) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/22/2006 16:17:33 | | | |
| PACER Login: | rm1794 | Client Code: | 0108-0031 |
| Description: | Docket Report | Search Criteria: | 2:02-cv-02124-FSH Start date: 1/1/1970 End date: 10/23/2006 |
| Billable Pages: | 2 | Cost: | 0.16 |

# EXHIBIT G

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

 

# U.S. Food and Drug Administration

### CENTER FOR DRUG EVALUATION AND RESEARCH



**Drugs@FDA**          FAQ | Instructions | Glossary | Contact Us | CDER H...

Drugs@FDA Demo | What's New in Drugs@FDA

**Start Over**    **Back to Search Results**    **Back to Overview**    **Back to De...**

## Label and Approval History

| | |
|---|---|
| **Drug Name(s)** | MIRTAZAPINE (Generic Drug) |
| **FDA Application No.** | (ANDA) 076307 |
| **Active Ingredient(s)** | MIRTAZAPINE |
| **Company** | BARR |

Go to Approval Hist...

### Label Information

**What information does a label include?**
Note: Not all labels are available in electronic format from FDA.

**Labels are not available on this site for MIRTAZAPINE, ANDA no. 076307**

### Approval History

Note: Not all reviews are available in electronic format from FDA.
Older labels are for historical information only, and should not be used for clinical purposes.
Action dates can only be verified from 1984 to the present.

| Action Date | Supplement Number | Approval Type | Letters, Reviews, Labels, Patient Package Insert | Note |
|---|---|---|---|---|
| 02/28/2006 | 007 | Chemistry New Strength | | Label is not available on this site. |
| 02/28/2006 | 006 | Chemistry New Strength | | Label is not available on this site. |
| 02/28/2006 | 005 | Chemistry New Strength | | Label is not available on this site. |
| 02/28/2006 | 002 | Chemistry New Strength | | Label is not available on this site. |
| 02/28/2006 | 001 | Chemistry New Strength | | Label is not available on this site. |
| 12/17/2003 | 000 | Approval | | Label is not available on this site. |

PDF files, marked with an icon ⬆, require the free Adobe Acrobat Reader.

- **Therapeutic Equivalents**     • **Other Important Information from FD**

Back to Top | Back to Previous Page | Start Over

Disclaimer

CDER Home Page | CDER Site Info | Contact CDER | What's New @ CDER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA/Center for Drug Evaluation and Research
Office of Training and Communications
Division of Library and Information Services
Update Frequency: Daily

# EXHIBIT H

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

CLOSED, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:05-cv-03855-PKC

Novartis AG et al v. Apotex Inc. et al                    Date Filed: 04/15/2005
Assigned to: Judge P. Kevin Castel                        Jury Demand: None
Cause: 35:271 Patent Infringement                         Nature of Suit: 830 Patent
                                                          Jurisdiction: Federal Question

**Plaintiff**

**Novartis AG**                    represented by    **Diego Scambia**
                                                     Fitzpatrick, Cella, Harper & Scinto
                                                     30 Rockefeller Plaza
                                                     New York, NY 10112
                                                     212-218-2202
                                                     Fax: (212)-218-2200
                                                     Email: dscambia@fchs.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Nicholas Nicholas Kallas**
                                                     Fitzpatrick, Cella, Harper & Scinto
                                                     30 Rockefeller Plaza
                                                     New York, NY 10112
                                                     212-218-2243
                                                     Fax: 212-218-2200
                                                     Email: nkallas@fchs.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Nina . Shreve**
                                                     Fitzpatrick, Cella, Harper & Scinto
                                                     30 Rockefeller Plaza
                                                     New York, NY 10112
                                                     (212) 218-2100
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Robert Louis Baechtold**
                                                     Fitzpatrick, Cella, Harper & Scinto
                                                     30 Rockefeller Plaza
                                                     New York, NY 10112
                                                     212 218-2213
                                                     Fax: 212 218-2200
                                                     Email: rbaechtold@fchs.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Novartis Pharmaceuticals**          represented by   **Diego Scambia**
**Corporation**                                        (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nina . Shreve**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nicholas Nicholas Kallas**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert Louis Baechtold**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Novartis Ophthalmics Inc.**         represented by   **Diego Scambia**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nina . Shreve**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nicholas Nicholas Kallas**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Robert Louis Baechtold**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Novartis Pharma AG**                represented by   **Diego Scambia**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nina . Shreve**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                             **Nicholas Nicholas Kallas**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

                                             **Robert Louis Baechtold**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Novartis International**         represented by **Diego Scambia**
**Pharmaceuticals Ltd.**                           (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Nina . Shreve**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Nicholas Nicholas Kallas**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

                                             **Robert Louis Baechtold**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Apotex Inc.**                    represented by **Anthony F Lo Cicero**
                                             Amster, Rothstein & Ebenstein LLC
                                             90 Park Avenue
                                             New York, NY 10016
                                             212-336-8810
                                             Fax: 212-336-8001
                                             Email: alocicero@arelaw.com
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

                                             **Lynn Marie Terrebonne**
                                             Caesar, Rivise, Bernstein, Cohen &
                                             Pokotilow, Ltd.
                                             1635 Market Street, 11th Floor
                                             Philadelphia, PA 19103
                                             (215)-567-2010
                                             Fax: (215)-751-1142
                                             Email: lmterrebonne@crbcp.com
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Robert S. Silver**
Caesar, Rivise, Bernstein, Cohen &
Pokotilow, Ltd.
1635 Market Street
12th Floor
Philadelphia, PA 19103
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Castillo**
Caesar, Rivise, Bernstein, Cohen &
Pokotilow, Ltd.
1635 Market Street, 11th Floor
Philadelphia, PA 19103
(215)-567-2010
Fax: (215)-751-1142
Email: wjcastillo@crbcp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Youngblood**
Ceasar, Revise, Bernstein, Cohen &
Pokotilow, Ltd.
Seven Penn Center
11th Floor
1635 Market Street
Philadelphia, PA 19103
(215) 567-2010
Fax: (215) 751-1142
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jill Bernstein**
Amster, Rothstein & Ebenstein LLC
90 Park Avenue
New York, NY 10016
212-336-8123
Fax: 212 336-8001
Email: kjbernstein@arelaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Apotex Corporation**            represented by  **Anthony F Lo Cicero**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Marie Terrebonne**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert S. Silver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Castillo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Youngblood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jill Bernstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cross Defendant**

**Novartis International
Pharmaceuticals Ltd.**

**Cross Defendant**

**Novartis AG**

**Cross Defendant**

**Novartis Pharmaceuticals
Corporation**

**Cross Defendant**

**Novartis Ophthalmics Inc.**

**Cross Defendant**

**Novartis Pharma AG**

**Counter Claimant**

**Apotex Inc.**                    represented by  **Anthony F Lo Cicero**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Lynn Marie Terrebonne**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Robert S. Silver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Castillo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Youngblood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jill Bernstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Apotex Corporation**                  represented by  **Anthony F Lo Cicero**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Marie Terrebonne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert S. Silver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Joseph Castillo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William C. Youngblood**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jill Bernstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

Novartis International
Pharmaceuticals Ltd.

**Counter Defendant**

Novartis AG

**Counter Defendant**

Novartis Pharmaceuticals
Corporation

**Counter Defendant**

Novartis Ophthalmics Inc.

**Counter Defendant**

Novartis Pharma AG

**Counter Claimant**

Apotex Inc.

**Counter Claimant**

Apotex Corporation

V.

**Counter Defendant**

Novartis International
Pharmaceuticals Ltd.

**Counter Defendant**

Novartis AG

**Counter Defendant**

Novartis Pharmaceuticals
Corporation

**Counter Defendant**

Novartis Ophthalmics Inc.

**Counter Defendant**

Novartis Pharma AG

| Date Filed | # | Docket Text |
|---|---|---|
| 04/15/2005 | 1 | COMPLAINT against Apotex Inc., Apotex Corporation. (Filing Fee $ 250.00, Receipt Number 540847)Document filed by Novartis |

| | | |
|---|---|---|
| | | International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG.(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | | SUMMONS ISSUED as to Apotex Inc., Apotex Corporation. (jog, ) (Entered: 04/19/2005) |
| 04/15/2005 | | Magistrate Judge Gabriel W. Gorenstein is so designated. (jog, ) (Entered: 04/19/2005) |
| 04/15/2005 | 2 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Novartis AG.(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | 3 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Novartis Pharmaceuticals Corporation.(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | 4 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Novartis Ophthalmics Inc..(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | 5 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Novartis Pharma AG.(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | 6 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Novartis International Pharmaceuticals Ltd..(jog, ) Additional attachment(s) added on 4/22/2005 (tr, ). (Entered: 04/19/2005) |
| 04/15/2005 | | Case Designated ECF. (jog, ) (Entered: 04/19/2005) |
| 04/15/2005 | | Mailed notice to Commissioner of Patents and Trademarks to report the filing of this action. (jog, ) (Entered: 04/19/2005) |
| 04/26/2005 | 7 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE: Counsel for all parties are directed to appear before the undersigned for an initial pretrial conference, in accordance with Rule 16 of the Federal Rules of Civil Procedure on June 24, 2005 at 10:45 a.m. in Courtroom 12C at the United States Courthouse, 500 Pearl Street, New York, New York. COUNSEL FOR PLAINTIFF IS DIRECTED TO IMMEDIATELY SEND A COPY OF THIS NOTICE TO ALL PARTIES. Principal trial counsel must appear at this and all subsequent conferences.This case has been designated an electronic case and has been assigned to me for all purposes. By the date of the initial pretrial conference counsel for all parties are required to register as filing users in accordance with the Procedures for Electronic Case Filing.The parties are directed to submit a joint letter five business days prior to the conference addressing the following in separate paragraphs: (1) a brief description of the case, including the factual and legal bases for the claim(s) and defense(s); (2) any contemplated motions; and (3) the prospect for settlement. The parties are directed to consult the undersigned's |

|  |  |  |
|---|---|---|
|  |  | Individual Practices and to confer on a Case Management Plan. See the Court's internet site: www.nysd.uscourts.gov/judges/USDJ/castel.htm. The jointly proposed Case Management Plan should be submitted in writing to the Court at the conference. Requests for adjournment of the conference will be considered only if made in writing and otherwise in accordance with the undersigned's Individual Practices. Initial Conference set for 6/24/2005 10:45 AM before P. Kevin Castel. (Signed by Judge P. Kevin Castel on 4/26/2005) (D'Agostino, Andrew) (Entered: 04/26/2005) |
| 05/11/2005 | 8 | AFFIDAVIT OF SERVICE of Summons and Complaint,. Apotex Inc. served on 4/25/2005, answer due 5/16/2005; Apotex Corporation served on 4/25/2005, answer due 5/16/2005. Service was made by mail. Document filed by Novartis International Pharmaceuticals Ltd.; Novartis AG; Novartis Pharmaceuticals Corporation; Novartis Ophthalmics Inc.; Novartis Pharma AG. (Kallas, Nicholas) (Entered: 05/11/2005) |
| 05/26/2005 | 9 | STIPULATION AND ORDER extending time for the defendants to answer, move, or otherwise plead to the complaint, Apotex Inc. answer due 6/24/2005; Apotex Corporation answer due 6/24/2005. (Signed by Judge P. Kevin Castel on 5/25/2005) (D'Agostino, Andrew) (Entered: 05/26/2005) |
| 06/15/2005 | 10 | NOTICE of Pro Hac Vice. Document filed by Apotex Inc., Apotex Corporation. (Castillo, William) (Entered: 06/15/2005) |
| 06/15/2005 | 11 | NOTICE of Pro Hac Vice. Document filed by Apotex Inc., Apotex Corporation. (Castillo, William) (Entered: 06/15/2005) |
| 06/15/2005 | 12 | NOTICE of Pro Hac Vice-SILVER. Document filed by Apotex Inc., Apotex Corporation. (Castillo, William) (Entered: 06/15/2005) |
| 06/16/2005 | 13 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Apotex Inc., Apotex Corporation.(Castillo, William) (Entered: 06/16/2005) |
| 06/16/2005 | 14 | ANSWER to Complaint., CROSSCLAIM against all plaintiffs., COUNTERCLAIM against all plaintiffs. Document filed by Apotex Inc., Apotex Corporation.(Castillo, William) (Entered: 06/16/2005) |
| 06/16/2005 | 15 | NOTICE of Appearance by Karen Jill Bernstein on behalf of Apotex Inc., Apotex Corporation, Apotex Inc., Apotex Corporation (Bernstein, Karen) (Entered: 06/16/2005) |
| 06/16/2005 | 16 | CERTIFICATE OF SERVICE of Notice of Appearance served on Plaintiffs on June 16, 2005. Service was made by Mail. Document filed by Apotex Inc., Apotex Corporation, Apotex Inc., Apotex Corporation. (Bernstein, Karen) (Entered: 06/16/2005) |
| 06/16/2005 | 17 | NOTICE of Appearance by Anthony F Lo Cicero on behalf of Apotex Inc., Apotex Corporation, Apotex Inc., Apotex Corporation (Lo Cicero, Anthony) (Entered: 06/16/2005) |
| 06/16/2005 | 18 | CERTIFICATE OF SERVICE of Notice of Appearance served on Plaintiffs on June 16, 2005. Service was made by Mail. Document filed |

| | | |
|---|---|---|
| | | by Apotex Inc., Apotex Corporation, Apotex Inc., Apotex Corporation. (Lo Cicero, Anthony) (Entered: 06/16/2005) |
| 06/20/2005 | 19 | ENDORSED LETTER addressed to Judge Castel from William J. Castillo dated 6/16/2005 re: Requesting a premotion conference to discuss the filing of a motion to strike portions of plaintiff's complaint pursuant to F.R.Civ.P. 12(f).Premotion conference is scheduled for June 24, 2005 at 10:45 a.m. Plaintiff should respond to Mr. Castillo's letter within five days of this order. (Signed by Judge P. Kevin Castel on 6/20/2005) (D'Agostino, Andrew) (Entered: 06/20/2005) |
| 06/20/2005 | 20 | NOTICE of Appearance by William Joseph Castillo on behalf of Apotex Inc., Apotex Corporation, Apotex Inc., Apotex Corporation (Castillo, William) (Entered: 06/20/2005) |
| 06/20/2005 | 21 | ORDER ADMITTING ATTORNEY Manny D. Pokotilow PRO HAC VICE for deft Apotex. (Signed by Judge P. Kevin Castel on 6/20/05) (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | | Transmission to Attorney Admissions Clerk. Transmitted re: 21 Order Admitting Attorney Pro Hac Vice, to the Attorney Admissions Clerk for updating of Attorney Information. (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | 22 | ORDER ADMITTING ATTORNEY Robert S. Silver PRO HAC VICE for deft Apotex. (Signed by Judge P. Kevin Castel on 6/20/05) (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | | Transmission to Attorney Admissions Clerk. Transmitted re: 22 Order Admitting Attorney Pro Hac Vice, to the Attorney Admissions Clerk for updating of Attorney Information. (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | 23 | ORDER ADMITTING ATTORNEY William C. Youngblodd PRO HAC VICE for defts Apotex. (Signed by Judge P. Kevin Castel on 6/20/05) (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | | Transmission to Attorney Admissions Clerk. Transmitted re: 23 Order Admitting Attorney Pro Hac Vice, to the Attorney Admissions Clerk for updating of Attorney Information. (cd, ) (Entered: 06/21/2005) |
| 06/20/2005 | 24 | MOTION for Manny D. Pokotilow to Appear Pro Hac Vicew/ attch. declaration in support. Document filed by Apotex Inc., Apotex Corporation. (pl, ) (Entered: 06/22/2005) |
| 06/20/2005 | 25 | MOTION for Robert S. Silver to Appear Pro Hac Vice. Document filed by Apotex Inc., Apotex Corporation. (kw, ) (Entered: 06/22/2005) |
| 06/20/2005 | 26 | MOTION for William C. Youngblood to Appear Pro Hac Vice. Document filed by Apotex Inc., Apotex Corporation. (kw, ) (Entered: 06/22/2005) |
| 06/23/2005 | 27 | NOTICE of Appearance by Nina Shreve on behalf of Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Opthalmics, Inc., Novartis Pharma AG, and Novartis International Pharmaceuticals Ltd.. Document filed by Novartis International Pharmaceuticals Ltd., Novartis |

| | | |
|---|---|---|
| | | AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG. (Kallas, Nicholas) (Entered: 06/23/2005) |
| 06/23/2005 | 28 | NOTICE of Appearance by Nicholas Nicholas Kallas on behalf of all plaintiffs (Kallas, Nicholas) (Entered: 06/23/2005) |
| 06/23/2005 | 29 | NOTICE of Appearance by Diego Scambia on behalf of all plaintiffs. Document filed by Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG. (Kallas, Nicholas) (Entered: 06/23/2005) |
| 06/24/2005 | 30 | CASE MANAGEMENT PLAN: All parties do not consent to trial by Magistrate Judge.This case is not to be tried to a jury.Amended pleadings may not be filed and additional parties may not be joined except with leave of the Court. Any motion to amend or to join additional parties shall be filed within 14 days from the date of this Order.Initial disclosures will be completed no later than 14 days from the date of this order.All fact discovery is to be completed by March 24, 2005.Initial requests for production of documents to be served by July 25, 2005.Interrogatories to be served by July 25, 2005.Depositions to be completed by March 24, 2006, depositions to commence after November 15, 2005. If a party wishes to take a deposition prior to this date, the parties shall confer. If the parties are unable to agree, the matter shall be submitted to the Court. Requests to admit to be served no later than February 24, 2006.All counsel must meet face-to-face for at least one hour to discuss settlement within fourteen (14) days following the close of fact discovery. All claim construction and expert discovery: a) The parties shall exchange a list of those claim terms the menaing of which they believe to be in dispute on October 4, 2005. b) The parties shall exchange a list of proposed meanings for disputed claim terms on October 11, 2005. c) The parties shall file and serve opening claim construction briefs on November 14, 2005. d) The parties shall file and serve responsive claim construction briefs on December 14, 2005...g) The opposing partie shall serve their expert reports in response, no later than 30 days after service of opening expert reports. Any rebuttal or (reply) by the party serving the opening report shall be served 20 days after the report in response. h) Expert depositions on expert reports shall commence not earlier then 50 days after service of the opening expert report and shall be completed within six weeks. Premotion conference requests shall be made within 14 days of the close of fact discovery for any summary judgment motions. The submission date of the joint pre-trial order and trial papers is May 1, 2007 following the close of fact and expert discovery.The parties estimate the length of trial is two to three weeks.The parties to advise on retention of private mediator by July 11 at 5p.m. Trial will commence on July 9, 2007 at 10:00 a.m. Discovery due by 3/24/2006. Pretrial Conference set for 10/28/2005 02:15 PM before P. Kevin Castel. Bench Trial set for 7/9/2007 10:00 AM before P. Kevin Castel. (Signed by Judge P. Kevin Castel on 6/24/2005) (D'Agostino, Andrew) (Entered: 06/24/2005) |
| 06/27/2005 | 31 | MOTION for Lynn M. Terrebonne to Appear Pro Hac Vice. Document |

| | | filed by Apotex Inc., Apotex Corporation. (kw, ) (Entered: 06/28/2005) |
|---|---|---|
| 06/27/2005 | 33 | MOTION for an Order permitting Lynn M. Terrebonne to Appear Pro Hac Vice as co-counsel in the action. Declaration of William J. Castillo in support and proposed Order attached. Document filed by Apotex Inc., Apotex Corporation. (yv, ) Additional attachment(s) added on 6/30/2005 (yv, ). (Entered: 06/30/2005) |
| 06/28/2005 | 32 | ORDER granting 31 Motion for Lynn M. Terrebonne to Appear Pro Hac Vice subject to payment of the fee. (Signed by Judge P. Kevin Castel on 6/27/05) (kw, ) (Entered: 06/28/2005) |
| 06/28/2005 | | Transmission to Attorney Admissions Clerk. Transmitted re: 32 Order on Motion to Appear Pro Hac Vice, to the Attorney Admissions Clerk for updating of Attorney Information. (kw, ) (Entered: 06/28/2005) |
| 06/28/2005 | 34 | AMENDED COMPLAINT amending 1 Complaint, against Apotex Inc., Apotex Corporation.Document filed by Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG. Related document: 1 Complaint, filed by Novartis AG,, Novartis Pharmaceuticals Corporation, Novartis Pharma AG, Novartis International Pharmaceuticals Ltd., Novartis Ophthalmics Inc.,.(yv, ) Additional attachment(s) added on 7/7/2005 (sac, ). (Entered: 06/30/2005) |
| 06/28/2005 | | Set Answer Due Date purs. to 1 Complaint, as to Apotex Inc. answer due on 7/13/2005; Apotex Corporation answer due on 7/13/2005. (yv, ) (Entered: 06/30/2005) |
| 06/30/2005 | | CASHIERS OFFICE REMARK on 22 Order Admitting Attorney Pro Hac Vice, 23 Order Admitting Attorney Pro Hac Vice, 21 Order Admitting Attorney Pro Hac Vice in the amount of $75.00, paid on 6/24/2005, Receipt Number 547300. (gm, ) (Entered: 06/30/2005) |
| 07/05/2005 | 36 | MEMO ENDORSEMENT on re:granting (subject to payment of fee) 33 MOTION for Lynn M. Terrebonne to Appear Pro Hac Vice. filed by Apotex Corporation,, Apotex Inc., (Signed by Judge P. Kevin Castel on 7/5/05) (djc, ) (Entered: 07/11/2005) |
| 07/06/2005 | 35 | ANSWER to Amended Complaint., COUNTERCLAIM against Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG, Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG, Novartis Ophthalmics Inc., Novartis Pharma AG. Document filed by Apotex Inc., Apotex Inc., Apotex Corporation. Related document: 34 Amended Complaint, filed by Novartis AG,, Novartis Pharmaceuticals Corporation,, Novartis Pharma AG,, Novartis International Pharmaceuticals Ltd.,, Novartis Ophthalmics Inc.,.(Castillo, William) (Entered: 07/06/2005) |
| | | |

| 07/19/2005 | | CASHIERS OFFICE REMARK on <u>36</u> Memo Endorsement in the amount of $25.00, paid on 7/11/05, Receipt Number 548614. (mlo, ) (Entered: 07/19/2005) |
|---|---|---|
| 07/19/2005 | | CASHIERS OFFICE REMARK on <u>32</u> Order on Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 7/12/05, Receipt Number 548641. (mlo, ) (Entered: 07/19/2005) |
| 07/29/2005 | <u>37</u> | ANSWER to Counterclaim. Document filed by Novartis International Pharmaceuticals Ltd., Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG.(Kallas, Nicholas) (Entered: 07/29/2005) |
| 08/08/2005 | <u>38</u> | NOTICE of Dismissal. Document filed by Novartis International Pharmaceuticals Ltd., Apotex Inc., Apotex Corporation, Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG. (Kallas, Nicholas) (Entered: 08/08/2005) |
| 08/18/2005 | <u>39</u> | NOTICE of Voluntary Dismissal pursuant to Rule 41(a)(1) of the F.R.C.P. (Signed by Judge P. Kevin Castel on 8/16/2005) (D'Agostino, Andrew) (Entered: 08/18/2005) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/22/2006 17:53:06 | | | |
| PACER Login: | rm1794 | Client Code: | 0108-0031 |
| Description: | Docket Report | Search Criteria: | 1:05-cv-03855-PKC |
| Billable Pages: | 7 | Cost: | 0.56 |

# EXHIBIT I

## Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

NOVARTIS AG, NOVARTIS :
PHARMACEUTICALS CORPORATION, :
NOVARTIS OPHTHALMICS INC., :
NOVARTIS PHARMA AG and NOVARTIS :
INTERNATIONAL PHARMACEUTICALS :
LTD., :
             :
            Plaintiffs, :
            : CIVIL ACTION NO.: 05-CV-3855 (PKC)
     v. :
            :
APOTEX INC. and APOTEX :
CORPORATION, :
            :
            Defendants. :

------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/18/05_

## NOTICE OF DISMISSAL

Plaintiffs Novartis AG, Novartis Pharmaceuticals Corporation, Novartis

Ophthalmics Inc., Novartis Pharma AG and Novartis International Pharmaceuticals Ltd.

("Novartis") and defendants Apotex Inc. and Apotex Corporation ("Apotex"), by and through

their undersigned counsel, respectfully file this notice of dismissal with prejudice of the

Amended Complaint as against Apotex and of the counterclaims against Novartis pursuant to

Federal Rules of Civil Procedure 41(a)(1)(ii) and 41(c). This stipulation is signed by all parties

who have appeared in this action. Each party shall bear its own costs and attorneys fees.

Respectfully submitted,

Dated: August 8, 2005                    By: _Nicholas N. Kallas_

Robert L. Baechtold (RB 6866)
Nicholas N. Kallas (NK 1084)
Nina Shreve (NS 4731)
Diego Scambia (DS 0296)
FITZPATRICK, CELLA, HARPER
    & SCINTO
30 Rockefeller Plaza
New York, NY 10112-3801
Phone: (212) 218-2100
Facsimile: (212) 218-2200

Attorneys for Plaintiffs
Novartis AG,
Novartis Pharmaceuticals Corporation,
Novartis Ophthalmics Inc.,
Novartis Pharma AG and
Novartis International Pharmaceuticals Ltd.

By: _____

Robert S. Silver
Alan H. Bernstein
William J. Castillo (WC 6786)
Lynn M. Terrebonne (LT 2370)
William C. Youngblood (WY 2594)
CAESAR, RIVISE, BERNSTEIN, COHEN
    & POKOTILOW, LTD.
11th Floor, 1635 Market Street
Philadelphia, Pennsylvania 19103
Phone: (215) 567-2010
Facsimile: (215) 751-1142

Attorneys for Plaintiffs
Apotex Inc. and Apotex Corporation

SO ORDERED

USDJ
8-16-06

-2-

# EXHIBIT J

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc. 's Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

MAY. 9.2006 12.21PM    FDA OGD CHEMS                          NO. 187   P. 2

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

ANDA 77-354                                                  Food and Drug Administration
                                                             Rockville MD 20857


Apotex Inc.                                        **MAY   9 2006**
Attention: Tammy McIntire
U.S. Agent for Apotex Corporation
2400 North Commerce Parkway
Suite 400
Weston, FL 33326


Dear Madam:

This is in reference to your abbreviated new drug application
(ANDA) dated December 20, 2004, submitted pursuant to section
505(j) of the Federal Food, Drug, and Cosmetic Act (the Act),
for Ketotifen Fumarate Ophthalmic Solution, 0.025%.

Reference is also made to your amendments dated August 30,
September 9, and December 9, 2005; February 13 and 20, and April
11, 2006.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling. Accordingly the ANDA is approved. The
Division of Bioequivalence has determined your Ketotifen
Fumarate Ophthalmic Solution, 0.025% to be bioequivalent and,
therefore, therapeutically equivalent to the referenced listed
drug, Zaditor Ophthalmic Solution, 0.025% of Novartis
Ophthalmics Inc.

The referenced listed drug (RLD) upon which you have based your
ANDA, Zaditor Ophthalmic Solution, 0.025% of Novartis
Ophthalmics Inc. (Novartis), is subject to periods of patent
protection. The following patents and expiration dates are
currently listed in the agency's publication titled Approved
Drug Products with Therapeutic Equivalence Evaluations (the
"Orange Book"):

| U.S. Patent Number | Expiration Date |
|---|---|
| 6,774,137 (the '137 patent) | January 13, 2019 |
| 6,776,982 (the '982 patent) | January 13, 2019 |
| 6,777,429 (the '429 patent) | January 13, 2019 |

Your ANDA contains paragraph IV certifications to each of the patents under section 505(j)(2)(A)(vii)(IV) of the Act stating that the patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Ketotifen Fumarate Ophthalmic Solution, 0.025%, under this ANDA. Section 505(j)(5)(B)(iii) of the Act provides that approval of an ANDA shall be made effective immediately, unless an action is brought against Apotex Inc. (Apotex) for infringement of one or more of the patents that were the subjects of the paragraph IV certifications. This action must have been brought against Apotex prior to the expiration of 45 days from the date the notice you provided under paragraph (2)(B)(i) was received by the NDA/patent holder(s). You have notified the agency that Apotex complied with the requirements of section 505(j)(2)(B) of the Act, and that litigation for infringement of the '982 patent was initiated against Apotex within the statutory 45-day period in the United States District Court for the Southern District of New York [Novartis AG, Novartis Pharmaceuticals Corporation, Novartis Ophthalmics Inc., Novartis Pharma AG and Novartis International Pharmaceuticals LTD v. Apotex Inc. and Apotex Corporation, Civil Action No. 05-CV-3855]. You have also notified us that, by agreement of the parties, this case was dismissed with prejudice on August 18, 2005. As a result of this dismissal, your ANDA is eligible for full approval.

Apotex is eligible for 180 days of generic drug exclusivity for Ketotifen Fumarate Ophthalmic Solution, 0.025%. This exclusivity is provided for in section 505(j)(5)(B)(iv) of the Act, as amended on December 8, 2003, by the Medicare Prescription Drug, Improvement and Modernization Act. Apotex was the first applicant to submit a substantially complete ANDA with a paragraph IV certification for Ketotifen Fumarate Ophthalmic Solution, 0.025%, and Apotex has lawfully maintained this certification. As provided in section 505(j)(5)(B)(iv)(I), the exclusivity will begin to run from the date of the first commercial marketing of Ketotifen Fumarate Ophthalmic Solution, 0.025% (including the first commercial marketing of the listed drug) by any first applicant. Within 10 days of first commercial marketing, please submit correspondence to this ANDA informing the agency of the date you begin commercial marketing of Ketotifen Fumarate Ophthalmic Solution, 0.025%. Please also be aware that, under section 505(j)(5)(D), the 180-day exclusivity shall be forfeited by Apotex if a forfeiture event, as described in section 505(j)(5)(D), occurs with respect to Apotex.

MAY. 9. 2000 12:21PM    FDA OGD CHEM3                                    NO. 187   P. 4

Under section 506A of the Act, certain changes in the conditions
described in this ANDA require an approved supplemental
application before the change may be made.

Postmarketing reporting requirements for this ANDA are set forth
in 21 CFR 314.80-81 and 314.98.  The Office of Generic Drugs
should be advised of any change in the marketing status of this
drug.

Promotional materials may be submitted to FDA for comment prior
to publication or dissemination.  Please note that these
submissions are voluntary.  If you desire comments on proposed
launch promotional materials with respect to compliance with
applicable regulatory requirements, we recommend you submit, in
draft or mock-up form, two copies of both the promotional
materials and package insert(s) directly to:

        Food and Drug Administration
        Center for Drug Evaluation and Research
        Division of Drug Marketing, Advertising, and Communications
        5901-B Ammendale Road
        Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires
that all promotional materials be submitted to the Division of
Drug Marketing, Advertising, and Communications with a completed
Form FDA 2253 at the time of their initial use.

        Sincerely yours,

        Gary Buehler
        Director
        Office of Generic Drugs
        Center for Drug Evaluation and Research

# EXHIBIT K

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*

# Guidance for Industry

## Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2) Applications Under Hatch-Waxman, as Amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

## Questions and Answers

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 90 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document, contact Martin Shimer, 301-827-5710.

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research (CDER)

October 2004
OGD

# Guidance for Industry

## Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2) Applications Under Hatch-Waxman, as Amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

## Questions and Answers

*Additional copies are available from:*

*Office of Training and Communications*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**

**October 2004**
**OGD**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

## TABLE OF CONTENTS

I.     INTRODUCTION..................................................................................................................1
II.    QUESTIONS AND ANSWERS..........................................................................................2
    A.   Listed Drug..................................................................................................................2
    B.   Role of Court Decisions and Other Judicial Action......................................................3
    C.   Notice of Paragraph IV Certifications..........................................................................6
    D.   Multiple 30-Month Stays..............................................................................................8
    E.   180-Day Exclusivity..................................................................................................10
    F.   Applicability and Effective Dates...............................................................................11

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

1   # Guidance for Industry[1]
2   ## Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2)
3   ## Applications Under Hatch-Waxman, as Amended by the Medicare
4   ## Prescription Drug, Improvement, and Modernization Act of 2003
5
6   ## Questions and Answers
7
8

9   This draft guidance, when finalized, will represent the Food and Drug Administration's (FDA's)
10  current thinking on this topic. It does not create or confer any rights for or on any person and
11  does not operate to bind FDA or the public. You can use an alternative approach if the approach
12  satisfies the requirements of the applicable statutes and regulations. If you want to discuss an
13  alternative approach, contact the FDA staff responsible for implementing this guidance. If you
14  cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of
15  this guidance.
16
17

18  ## I.    INTRODUCTION
19
20  On December 8, 2003, President Bush signed into law the Medicare Prescription Drug,
21  Improvement, and Modernization Act of 2003 (Public Law 108-173) (MMA). Title XI
22  of the MMA amends sections 505(b), (c), and (j) of the Federal Food, Drug, and
23  Cosmetic Act (the Act) (21 U.S.C. 355(b), (c), and (j)). Among other things, the MMA
24  directs FDA to issue guidance defining the term *listed drug* with respect to amendments
25  and supplements to abbreviated new drug applications (ANDAs). This guidance is
26  intended to clarify when a change to an ANDA should reference a listed drug *different*
27  from the drug referenced in the original ANDA, thus requiring the change to be made
28  through an entirely new application. As directed by the MMA, this document (in the
29  form of questions and answers) provides guidance on the definition of *listed drug.*
30
31  Further, as indicated in our March 3, 2004, *Federal Register* notice,[2] we have been
32  considering what other steps we should take in light of the MMA. As one such step, this
33  document provides guidance to industry on certain sections of the MMA that
34  significantly change provisions of the Act that were originally added by the Drug Price
35  Competition and Patent Term Restoration Act of 1984 (Public Law 98-417) (Hatch-
36  Waxman). These changes relate, in substantial part, to 30-month stays and to the timing
37  of approval of ANDAs and new drug applications (NDAs) described in section 505(b)(2)
38  of the Act (505(b)(2) applications). Specifically, this guidance clarifies changes made by
39  the MMA with respect to (1) the availability and termination of 30-month stays of

---

[1] This guidance has been prepared by the Office of Generic Drugs (OGD) in the Center for Drug
Evaluation and Research (CDER) in cooperation with the Office of Regulatory Policy (ORP) and the
Office of the Chief Counsel (OCC) at the Food and Drug Administration.
[2] See *Generic Drug Issues; Request for Comments* (69 FR 9982).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

40  approval on ANDAs and 505(b)(2) applications under section 505(j)(5)(B)(iii) and
41  505(c)(3)(C) of the Act, respectively, and (2) requirements for notice of patent
42  certifications described in sections 505(b)(2)(A)(iv) and 505(j)(2)(A)(vii)(IV) of the Act
43  (paragraph IV certifications). It also clarifies the applicability of certain changes made
44  by the MMA regarding the period during which ANDAs that were not the first to
45  challenge a patent on the listed drug cannot be approved (180-day exclusivity), as
46  described in section 505(j)(5)(B)(iv) of the Act. Finally, this guidance explains the
47  various effective dates that apply to the MMA's provisions.
48
49  FDA's guidance documents, including this guidance, do not establish legally enforceable
50. responsibilities. Instead, guidances describe the Agency's current thinking on a topic and
51  should be viewed only as recommendations, unless specific regulatory or statutory
52  requirements are cited. The use of the word *should* in Agency guidances means that
53  something is suggested or recommended, but not required.
54
55  **II.    QUESTIONS AND ANSWERS**
56
57      **A.    Listed Drug**
58
59  **1.    Why is a guidance needed on the definition of *listed drug*?**
60
61  The MMA, among other things, generally prohibits an ANDA applicant from amending
62  or supplementing its application to refer to a listed drug which is different from that
63  referred to in the application when originally submitted. Such a change can be made only
64  by the submission of an entirely new application.
65
66  Title XI of the MMA states in part that the Secretary will issue guidance defining the
67  term *listed drug* for purposes of section 1101(a)(1)(B) of the MMA. That section, which
68  is now section 505(j)(2)(D)(i) of the Act, provides that "[a]n applicant may not amend or
69  supplement an [ANDA] to seek approval of a drug referring to a different listed drug
70  from the listed drug identified in the application as submitted to the Secretary."[3] FDA's
71  definition of *listed drug* is contained in § 314.3 (21 CFR 314.3).[4] The Agency does not
72  intend to amend that definition.

---

[3] The MMA added a related provision to the Act with respect to 505(b)(2) applications: "An applicant may not amend or supplement [a 505(b)(2) application] to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary" (section 505(b)(4)(A) of the Act). This guidance does not pertain to the foregoing provision on 505(b)(2) applications because that provision does not use the term *listed drug*, and the MMA only directs FDA to issue guidance with respect to the provision applicable to 505(j) applications.

[4] This definition reads:

*Listed drug* means a new drug product that has an effective approval under section 505(c) of the [A]ct for safety and effectiveness or under section 505(j) of the [A]ct, which has not been withdrawn or suspended under section 505(e)(1) through (e)(5) or (j)(5) of the [A]ct, and which has not been withdrawn fromsale for what FDA has determined are reasons of safety or effectiveness. Listed drug status is evidenced by the drug product's identification as a drug with an effective approval in the current edition of FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" [commonly referred to as the Orange Book] or any current supplement thereto.... A drug product is deemed to be a listed drug on the date of effective approval of the application or abbreviated application for that drug product.(21 CFR 314.3(b)).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

73
74  **2.    Generally, when should a separate ANDA be submitted for a different listed**
75      **drug?**
76
77  The appropriate choice of whether to submit a new ANDA for a proposed product — as
78  opposed to submitting an amendment or supplement to a previously submitted or already
79  approved ANDA — is governed by a number of considerations.  All changes that would
80  have the effect of seeking approval for a drug product different from the listed drug cited
81  in the initial submission (e.g., different active ingredient, dosage form, route of
82  administration) should be made in a new application.  When the Orange Book identifies
83  as a separate listed drug a product with the characteristics (e.g., active ingredient, dosage
84  form, route of administration) for which the applicant is seeking approval, the applicant
85  should submit a separate ANDA referencing the corresponding listed drug.[5]  The
86  applicant should not submit a supplement or amendment to its pending or approved
87  application to seek approval for such a change.
88
89  **3.    Can an amendment or supplement be submitted for different strengths?**
90
91  Each strength of an approved drug is a separate listed drug.  Each strength proposed in an
92  ANDA should reference the corresponding listed drug (although the reference standard
93  for purposes of bioequivalence may be only one strength).  Generally, a single
94  application can be used to seek approval for different strengths of the same listed drug.
95  Also, an applicant may submit an amendment or supplement to seek approval of a
96  different strength from that for which the application was initially submitted and is not
97  required to file a separate application for such a change.  This is expressly permitted
98  under the Act, as amended by the MMA (see section 505(j)(2)(D)(ii) of the Act, as
99  amended).
100
101      **B.    Role of Court Decisions and Other Judicial Action**
102
103  **1.    What court decisions and other judicial actions are relevant for lifting 30-**
104      **month stays of approval on ANDAs and 505(b)(2) applications?**
105
106  Hatch-Waxman amended the Act to establish up to a 30-month stay of approval on an
107  ANDA or 505(b)(2) application if:
108
109      • The application includes a paragraph IV certification challenging a patent
110          listed in the Orange Book (a listed patent) that claims the approved drug
111          (listed drug) on which the ANDA or 505(b)(2) application relies or claims
112          the use of the listed drug, and
113

---

[5] Separate approved drug products, other than products with different strengths, will ordinarily have
different NDA numbers.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

- The patent owner or NDA holder for the listed drug sues the ANDA or 505(b)(2) applicant for patent infringement within 45 days of receiving notice of the paragraph IV certification.

The 30-month stay may be shortened or lengthened by the court if "either party to the action fail[s] to reasonably cooperate in expediting the action."[6]

The MMA further amends the Act to specify what actions by what courts will terminate a 30-month stay of approval. (The MMA also amends the Act to alter the circumstances under which a 30-month stay can arise, as discussed below in questions 1 and 2 in subsection II.D of this document.) The provisions of the MMA that identify the relevant court actions apply to any proceeding under section 505 of the Act that is pending on or after December 8, 2003.[7] Under the MMA, a 30-month stay will be terminated and approval of an ANDA or 505(b)(2) application may be made effective, as of any of the following:

- **The date that the district court enters judgment** reflecting its decision that the patent at issue is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity),[8] **or**

- **The date of a settlement order or consent decree signed and entered by the district court** stating that the patent that is the subject of the certification is invalid or not infringed,[9] **or**

- If the district court decides that the patent has been infringed, and this decision is reversed on appeal, the **date on which the court of appeals decides that the patent is invalid or not infringed** (including any substantive determination that there is no cause of action for patent infringement or invalidity),[10] or the **date of a settlement order or consent decree signed and entered by the court of appeals** stating that

---

[6] Section 505(c)(3)(C) and 505(j)(5)(B)(iii) of the Act.

[7] See MMA Title XI section 1101(c)(1).

[8] See MMA Title XI section 1101(a)(2)(A)(ii)(II)(aa) and 1101(b)(2)(B)(ii)(II) (creating new section 505(j)(5)(B)(iii)(I)(aa) and 505(c)(3)(C)(i)(I) of the Act, respectively); see also MMA Title XI section 1101(a)(2)(A)(ii)(II)(cc) and 1101(b)(2)(B)(ii)(IV) (amending section 505(j)(5)(B)(iii)(III) and 505(c)(3)(C)(iii) of the Act, respectively).

[9] See MMA Title XI section 1101(a)(2)(A)(ii)(II)(aa) and 1101(b)(2)(B)(ii)(II) (creating new section 505(j)(5)(B)(iii)(I)(bb) and 505(c)(3)(C)(i)(II) of the Act, respectively); see also MMA Title XI section 1101(a)(2)(A)(ii)(II)(cc) and 1101(b)(2)(B)(ii)(IV) (amending section 505(j)(5)(B)(iii)(III) and 505(c)(3)(C)(iii) of the Act, respectively).

[10] See MMA Title XI section 1101(a)(2)(A)(ii)(II)(bb) and 1101(b)(2)(B)(ii)(III) (creating new section 505(j)(5)(B)(iii)(II)(aa)(AA) and 505(c)(3)(C)(ii)(I)(aa) of the Act, respectively); see also MMA Title XI section 1101(a)(2)(A)(ii)(II)(dd) and 1101(b)(2)(B)(ii)(V) (creating new section 505(j)(5)(B)(iii)(IV) and 505(c)(3)(C)(iv) of the Act, respectively).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

145
146         the patent that is the subject of the certification is invalid or not
        infringed.[11]

147

148 If the district court hearing a patent infringement suit resulting from a paragraph IV
149 certification decides that the patent at issue is infringed, and this decision is not appealed
150 or is affirmed on appeal, the ANDA or 505(b)(2) application may be approved based on
151 the district court's ruling in accordance with the patent's expiration and any extension or
152 exclusivity that remains.[12]

153

154 **2.     What court decisions are relevant for triggering 180-day exclusivity for**
155         **ANDAs?**

156

157 As established by Hatch-Waxman, if an applicant (or applicants) is the first to submit a
158 substantially complete ANDA containing a paragraph IV certification to a listed patent
159 that claims the listed drug on which the application relies or claims a use of the listed
160 drug (a paragraph IV ANDA), the applicant (or applicants) can be eligible for a 180-day
161 period during which no other ANDA with a paragraph IV certification for the same drug
162 may be approved.[13] This period is commonly referred to as *180-day exclusivity*.[14] Under
163 Hatch-Waxman before the MMA, the 180-day exclusivity period was triggered by the
164 earlier of the first commercial marketing of the drug described in the first applicant's
165 ANDA, or the first court decision holding invalid or not infringed the patent that was the
166 subject of the first applicant's paragraph IV certification.[15]

167

168 The MMA changes the relevance of court decisions for 180-day exclusivity in the
169 following ways:

170

171       •     For paragraph IV ANDAs filed after December 8, 2003, for a listed drug
172            for which no paragraph IV certification was made in any ANDA before
173            that date, **court decisions will no longer trigger the period of 180-day**
174            **exclusivity; and**

175

176       •     For all other ANDAs, **a court decision can still trigger the period of**
177            **180-day exclusivity.  However, if the exclusivity was not already**
178            **triggered before December 8, 2003, the triggering court decision must**
179            **be one from which no appeal has been or can be taken,** other than a

---

[11] See MMA Title XI section 1101(a)(2)(A)(ii)(II)(bb) and 1101(b)(2)(B)(ii)(III) (creating new section 505(j)(5)(B)(iii)(II)(aa)(BB) and 505(c)(3)(C)(ii)(I)(bb) of the Act, respectively); see also MMA Title XI section 1101(a)(2)(A)(ii)(II)(dd) and 1101(b)(2)(B)(ii)(V) (creating new section 505(j)(5)(B)(iii)(IV) and 505(c)(3)(C)(iv) of the Act, respectively).

[12] See MMA Title XI section 1101(a)(2)(A)(ii)(II)(bb) and 1102(b)(2)(B)(ii)(III) (creating new section 505(j)(5)(B)(iii)(II)(bb) and 505(c)(3)(C)(ii)(II) of the Act, respectively); see also MMA Title XI section 1101(a)(2)(A)(ii)(II)(dd) and 1101(b)(2)(B)(ii)(V) (creating new section 505(j)(5)(B)(iii)(IV) and 505(c)(3)(C)(iv) of the Act, respectively).

[13] See section 505(j)(5)(B)(iv) of the Act.

[14] 505(b)(2) applications do not qualify for 180-day exclusivity.

[15] See section 505(j)(5)(B)(iv) of the Act; *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

180  petition to the Supreme Court for a writ of certiorari (generally a decision
181  of an appellate court).[16] (This is a transitional provision that redefines the
182  court decision that can begin the 180-day period of exclusivity for any
183  product for which there was a paragraph IV ANDA before enactment of
184  the MMA.)
185
186  **3.  An ANDA was submitted on September 6, 2003, and was the first**
187  **substantially complete ANDA to be submitted with a paragraph IV**
188  **certification to the only listed patent for the listed drug. The ANDA**
189  **applicant is sued for patent infringement. After December 8, 2003, the**
190  **district court issues a decision finding the patent at issue invalid. This**
191  **decision is appealed. Can the ANDA be approved? Does the applicant's 180-**
192  **day exclusivity start to run on the date of the district court's decision?**
193
194  As explained in the response to question 1 in subsection II.B of this document, for any
195  proceeding under section 505 of the Act pending on or after December 8, 2003, the
196  district court's decision that the patent at issue is invalid or not infringed terminates the
197  30-month stay of approval. Thus, if it is otherwise ready for approval, the ANDA in this
198  question can be approved at the time of the district court's decision. However, as
199  explained in response to question 2 in subsection II.B, as a result of the MMA, 180-day
200  exclusivity for ANDAs filed before December 8, 2003, can now be triggered by a court
201  decision only if it is a decision that has not been, or cannot be, appealed. Therefore, the
202  district court's decision does not trigger 180-day exclusivity in the scenario described in
203  this question because that decision has been appealed. Note that this result is a departure
204  from prior law. Before enactment of the MMA, a district court decision finding a listed
205  patent invalid or not infringed would have both terminated a 30-month stay and, in the
206  case of an ANDA that qualified for 180-day exclusivity, triggered the start of such
207  exclusivity as to that patent (if the exclusivity was not already triggered by commercial
208  marketing).
209
210  **4.  What is the status of FDA's guidance for industry entitled *Court Decisions,***
211  ***ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman***
212  ***Amendments to the Federal Food, Drug, and Cosmetic Act?***
213
214  That guidance addresses the types of court decisions relevant for ANDA approvals and
215  180-day exclusivity under Hatch-Waxman before enactment of the MMA. The MMA
216  supersedes relevant provisions of Hatch-Waxman in effect at the time that guidance was
217  published and thus supersedes the guidance.
218
219  **C.  Notice of Paragraph IV Certifications**
220
221  **1.  Are ANDA and 505(b)(2) applicants required to give notice for paragraph IV**
222  **certifications made between August 18, 2003, and December 8, 2003?**

---

[16] See MMA Title XI section 1102(b)(3) (defining, for this purpose, *decision of a court* as used in section 505(j)(5)(B)(iv) of the Act).

*J:\GUIDANC\6174dft.doc*
*10/13/04*

6

223

224  Yes. The MMA requires ANDA and 505(b)(2) applicants to provide notice for *all*
225  paragraph IV certifications submitted to FDA on or after August 18, 2003.[17] Notice is to
226  be provided:

227

228  •   If the certification is included in the original application, not later than 20
229      days after the date of the postmark on the notice from FDA informing the
230      applicant that the application has been filed, or

231

232  •   If the certification is in an amendment or supplement, at the time the
233      applicant submits the amendment or supplement, regardless of whether the
234      applicant has already given notice of a prior paragraph IV certification
235      contained in the application or an amendment or supplement to the
236      application.[18]

237

238  We recognize that our final rule which became effective on August 18, 2003 (Final
239  Rule),[19] stated that notice was not required for a paragraph IV certification made by an
240  ANDA or 505(b)(2) applicant if the applicant had already provided notice of another
241  paragraph IV certification in its application or an amendment or supplement to the
242  application. However, as discussed above, the MMA's provisions regarding notice are
243  retroactive to August 18, 2003, and supersede the Final Rule's provisions concerning this
244  subject. On March 10, 2004, FDA revoked the Final Rule's notice-related provisions.[20]

245

246  We are also aware that compliance with the MMA's time frame for providing notice of a
247  paragraph IV certification made in an amendment to an ANDA or 505(b)(2) application
248  is not possible for ANDA and 505(b)(2) applicants who submitted paragraph IV
249  certifications in amendments between August 18, 2003, and December 8, 2003, for which
250  no notice was required under the Final Rule, and who have not yet provided notice of
251  these certifications. We emphasize, however, that the MMA's requirement for notice is
252  now in effect for all paragraph IV certifications made on or after August 18, 2003,[21]
253  including those paragraph IV certifications previously excluded from notice requirements
254  by the recently revoked provisions of the Final Rule. Accordingly, all applicants with
255  pending ANDAs or 505(b)(2) applications that include paragraph IV certifications made
256  on or after August 18, 2003, but before December 8, 2003, should have provided notice
257  to NDA holders and patent owners in a timely manner.

---

[17] See MMA Title XI section 1101(a)(1)(A) and 1101(b)(1)(A) (amending section 505(j)(2)(B)(i) and
505(b)(3)(A) of the Act, respectively); see also MMA Title XI section 1101(c)(2).
[18] See MMA Title XI section 1101(a)(1)(A) and 1101(b)(1)(A) (amending section 505(j)(2)(B)(ii) and
505(b)(3)(B) of the Act, respectively).
[19] See *Applications for FDA Approval to Market a New Drug:  Patent Submission and Listing
Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications
Certifying That a Patent Claiming a Drug Is Invalid or Will Not Be Infringed*; Final Rule (68 FR 36676;
June 18, 2003).
[20] See *Application of 30-Month Stays on Approval of Abbreviated New Drug Applications and Certain
New Drug Applications Containing a Certification That a Patent Claiming the Drug Is Invalid or Will Not
Be Infringed*; Technical Amendment (69 FR 11309; March 10, 2004).
[21] See MMA Title XI section 1101(c)(2).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

258
259   2.      **If, between August 18, 2003, and December 8, 2003, an ANDA or 505(b)(2)**
260          **applicant provided voluntary notice with respect to a paragraph IV**
261          **certification for which notice was not required under the Final Rule, is the**
262          **applicant considered to have satisfied the MMA's notice requirement?**

263
264 The applicant will have satisfied the MMA's notice requirement if the notice it gave
265 complies with all applicable provisions of the MMA (e.g., provisions specifying to whom
266 notice must be given and the notice's required contents).[22]

267
268   **D.      Multiple 30-Month Stays**

269
270   1.      **Does the MMA preclude ANDAs and 505(b)(2) applications from being**
271          **subject to more than one 30-month stay of approval?**

272
273 The MMA generally precludes multiple 30-month stays for those applications to which it
274 applies. The relevant provisions of the MMA apply to patents submitted to FDA on or
275 after August 18, 2003.[23] For ANDAs and 505(b)(2) applications with paragraph IV
276 certifications to a patent submitted to FDA on or after August 18, 2003, the MMA
277 provides that a 30-month stay may be available for litigation related to that patent only if
278 the patent was submitted to FDA before the date that the ANDA or 505(b)(2) application
279 (excluding an amendment or supplement) was submitted.[24] In other words, the MMA
280 precludes 30-month stays for *later listed* patents, that is, those patents submitted to FDA
281 on or after the date the ANDA or 505(b)(2) application was submitted. Because of this
282 limitation, in most cases, ANDAs and 505(b)(2) applications will be subject to no more
283 than one 30-month stay.[25]

284
285 Multiple 30-month stays, however, still may be possible in certain cases. For instance, an
286 ANDA or 505(b)(2) application may contain a paragraph IV certification to a patent at
287 the time of first submission that gives rise to one 30-month stay. If the same application
288 also contains a paragraph III certification to a different patent that was submitted to FDA
289 (1) on or after August 18, 2003, and (2) before the ANDA or 505(b)(2) application was
290 submitted, and the applicant subsequently converts this certification to a paragraph IV

---

[22] See MMA Title XI section 1101(a)(1)(A) and 1101(b)(1)(A) (amending section 505(j)(2)(B) and 505(b)(3) of the Act, respectively).

[23] See MMA Title XI section 1101(c)(3). The effective date for this provision means that the MMA supersedes FDA's Final Rule with respect to the availability of 30-month stays. As noted earlier in response to question 1 in subsection II.C of this document, on March 10, 2004, FDA revoked provisions of the Final Rule superseded by the MMA (see footnote 20, supra).

[24] See MMA Title XI section 1101(a)(2)(A)(ii)(I) and 1101(b)(2)(B)(i) (amending section 505(j)(5)(B)(iii) and 505(c)(3)(C) of the Act, respectively).

[25] Under the regulations in effect before FDA adopted its August 18, 2003, Final Rule, multiple 30-month stays could arise in the case of later-listed patents if (1) an ANDA or 505(b)(2) application had already been subject to one such stay based on a paragraph IV certification to a patent listed before the application's submission, and (2) the ANDA or 505(b)(2) applicant made a subsequent paragraph IV certification to a patent listed after the application's submission that triggered another timely patent infringement lawsuit.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

291 certification, a second 30-month stay could be possible. This is because the new
292 paragraph IV certification is subject to the MMA and references a patent submitted to
293 FDA before the applicant's ANDA was submitted.
294
295 **2.    Does the MMA ensure that a patent owner or NDA holder can obtain one 30-**
296      **month stay of approval on an ANDA or 505(b)(2) application containing a**
297      **paragraph IV certification to a listed patent when the patent owner or NDA**
298      **holder sues the ANDA or 505(b)(2) applicant for patent infringement?**
299
300 No. The MMA does not guarantee that any patent owner or NDA holder will receive a
301 30-month stay, even if it sues for patent infringement. Rather, the MMA provides the
302 opportunity to obtain a stay only in certain situations. As noted in response to question 1
303 in subsection II.D of this document, the amendments made by the MMA with respect to
304 the availability of 30-month stays apply to patents submitted to FDA on or after August
305 18, 2003. With respect to such patents, a 30-month stay of approval on an ANDA or
306 505(b)(2) application containing a paragraph IV certification to the patent will ensue if:
307
308    •    The patent was submitted before the date that the ANDA or 505(b)(2)
309         application (excluding an amendment or supplement) was submitted to
310         FDA, and
311
312    •    The patent owner or NDA holder initiates a patent infringement action on
313         the patent within 45 days of the date that it receives notice of the
314         certification.[26]
315
316 No 30-month stay of approval will result from a patent subject to the MMA, even if
317 litigation is initiated based on a paragraph IV certification to the patent, if either of the
318 conditions described above is not satisfied. That is, no 30-month stay of approval will
319 apply if the patent was submitted to FDA *on or after* the date the ANDA or 505(b)(2)
320 application with a paragraph IV certification to the patent was submitted. (Note that this
321 is the case even if the later-submitted patent is the first listed patent to claim the drug
322 described in the ANDA or 505(b)(2) application.) In addition, a 30-month stay will not
323 ensue if litigation is initiated more than 45 days after the date that the patent owner or
324 NDA holder receives notice of the certification.
325
326 **3.    An ANDA was submitted to FDA in November 2003 with multiple patent**
327      **certifications, including a paragraph IV certification to at least one patent.**
328      **No patent infringement lawsuit was initiated, but a new patent was**
329      **submitted to FDA on December 27, 2003. What are the ANDA applicant's**
330      **certification and notification obligations? Is a 30-month stay of approval**
331      **possible based on the December 27 patent?**
332

---

[26] See MMA Title XI section 1101(a)(2)(A) and 1101(b)(2)(B) (amending section 505(j)(5)(B)(iii) and
505(c)(3)(C) of the Act, respectively); see also MMA Title XI section 1101(c)(3).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

333    Under section 505(j)(2)(A)(vii) of the Act (which was not amended by the MMA), the
334    ANDA applicant would be required to provide a certification with respect to the
335    December 27, 2003, patent.  With regard to notice, as discussed in response to question 1
336    in subsection II.C of this document, the MMA amends section 505 of the Act to make
337    clear that ANDA and 505(b)(2) applicants must provide notice of all paragraph IV
338    certifications.[27]  Accordingly, if the applicant amends its ANDA to include a paragraph
339    IV certification to the December 27, 2003, patent, it would be required by the MMA to
340    notify the patent owner and NDA holder of its certification at the time its amendment is
341    submitted.[28]
342
343    As previously discussed, the MMA provides that a 30-month stay cannot arise from a
344    patent submitted on or after August 18, 2003, unless the patent was also submitted to
345    FDA before the ANDA or 505(b)(2) application was submitted.[29]  Accordingly, no 30-
346    month stay of approval would be possible based on the December 27, 2003, patent in this
347    question.
348
349    4.    **Is a 30-month stay based on a patent possible if the patent (1) is submitted to**
350          **FDA on or after August 18, 2003, and before an ANDA or 505(b)(2)**
351          **application with a paragraph IV certification to the patent is submitted, and**
352          **(2) is not published in the Orange Book before the application's submission?**
353
354    The patent described in this question could provide the basis for a 30-month stay if the
355    other conditions for a stay, as discussed above, are satisfied.  As previously noted, under
356    the MMA, a patent that is submitted to FDA on or after August 18, 2003, could
357    potentially trigger a 30-month stay if it is also "submitted . . . before the date on which
358    the [ANDA] application (excluding an amendment or supplement to the application) is
359    submitted."[30]  Eligibility for a 30-month stay thus turns on when the patent is *submitted*
360    to FDA, as opposed to when it is published in the Orange Book.  Because the patent in
361    this question meets the time frames for submission specified in the MMA, it can result in
362    a 30-month stay, regardless of when it is published in the Orange Book.
363
364    E.    **180-Day Exclusivity**
365
366    **What ANDAs are subject to the MMA's new 180-day exclusivity provisions?**
367
368    With two exceptions, the new provisions relating to 180-day exclusivity govern only
369    ANDAs filed after the date of the MMA's enactment (December 8, 2003) that reference a
370    listed drug for which no paragraph IV certification was made in any ANDA before that
371    date.[31]  The two exceptions concern the forfeiture of 180-day exclusivity by entering into

---

[27] See MMA Title XI section 1101(a)(1)(A) and 1101(b)(1)(A) (amending section 505(j)(2)(B)(i) and
505(b)(3)(A) of the Act, respectively); see also MMA Title XI section 1101(c)(2).
[28] See MMA Title XI section 1101(a)(1) (creating new section 505(j)(2)(B)(ii)(II) of the Act).
[29] See MMA Title XI section 1101(a)(2)(A)(ii)(I) (amending section 505(j)(5)(B)(iii) of the Act).
[30] MMA Title XI section 1101(a)(2)(A)(ii)(I) (amending section 505(j)(5)(B)(iii) of the Act).
[31] See MMA Title XI section 1102(b)(1).

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

372  a collusive agreement and the triggering of the exclusivity period by judicial action.[32]  All
373  other ANDAs remain subject to the 180-day exclusivity provisions in effect before the
374  MMA's enactment.  Thus, for example, FDA's guidance for industry, *180-Day*
375  *Exclusivity When Multiple ANDAs Are Submitted on the Same Day,* still applies to
376  ANDAs submitted before, on, or after December 8, 2003, that reference a listed drug for
377  which a paragraph IV certification had been made in any ANDA before December 8,
378  2003.  FDA will further interpret provisions of the MMA relating to 180-day exclusivity
379  in future regulations and/or guidances.
380
381    **F.    Applicability and Effective Dates**
382
383  **What are the effective dates of the various provisions of the MMA?**
384

| MMA Section | Amended or Added Sections of the Act | Effective Date or Scope of Applicability |
|---|---|---|
| 1101(a)(1) and (b)(1) (Amending or supplementing an application) | 505(j)(2)(D) and 505(b)(4) | A change in listed drug or proposed drug made on or after December 8, 2003 |
| 1101(a)(1) and (b)(1) (Notice provisions) | 505(j)(2)(B) and 505(b)(3) | Any paragraph IV certification submitted on or after August 18, 2003 in an application, amendment, or supplement |
| 1101(a)(2)(A)(ii)(I) and (b)(2)(B)(i) (30-month stay provisions) | 505(j)(5)(B)(iii) and 505(c)(3)(C) | Retroactive to patent information submitted to FDA on or after August 18, 2003 |
| 1101(a)(2)(A)(ii)(II) and (b)(2)(B)(ii) (Court decision provisions for approval) | 505(j)(5)(B)(iii) and 505(c)(3)(C) | Any proceeding pending on or after December 8, 2003, regardless of the date on which the proceeding was or is commenced |

---

[32]  The exception relating to forfeiture based on a first ANDA applicant's entry into an anti-competitive agreement applies if conditions specified in the MMA are met, regardless of when the first ANDA paragraph IV certification for the listed drug was made (see MMA Title XI section 1102(b)(2)).  The second exception relates to the MMA's definition of the term *decision of a court* for purposes of section 505(j)(5)(B)(iv) of the Act.  As discussed in response to question 2 in subsection II.B of this document, the MMA's definition of this term applies to alter the court decision trigger for 180-day exclusivity for all ANDAs other than those filed after December 8, 2003, for a listed drug for which no paragraph IV certification was made in any ANDA before that date (see MMA Title XI section 1102(b)(3)).

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

| MMA Section | Amended or Added Sections of the Act | Effective Date or Scope of Applicability |
|---|---|---|
| 1101(a)(2)(C) and (b)(2)(D)<br><br>(Civil action to obtain patent certainty) | 505(j)(5)(C) and 505(c)(3)(D) | Any proceeding pending on or after December 8, 2003, regardless of the date on which the proceeding was or is commenced |
| 1102(a)<br><br>(180-day exclusivity period) | 505(j)(5)(B)(iv) and 505(j)(5)(D) | ANDAs filed after December 8, 2003 for a listed drug for which no paragraph IV certification had been made in any ANDA before December 8, 2003, except as provided in the box immediately following |
| 1102(a)(2)<br><br>(Collusive agreement forfeiture provision) | New 505(j)(5)(D)(i)(V) | ANDAs filed after December 8, 2003, regardless of when the first paragraph IV certification was made for the listed drug referenced in any ANDA |
| 1102(b)(3)<br><br>(Meaning of *decision of a court* that will trigger the beginning of 180-day exclusivity for certain ANDAs) | 505(j)(5)(B)(iv) | ANDAs for a listed drug for which a paragraph IV certification was made in any ANDA before December 8, 2003, and for which there was no court decision or commercial marketing that triggered 180-day exclusivity (under the Act pre-MMA) on or before December 8, 2003 |
| 1103(a)<br><br>(Bioavailability/ bioequivalence) | 505(j)(8) | December 8, 2003 |

# EXHIBIT L

# Declaration of Arthur Y. Tsien

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order and/or Preliminary Injunction*



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 77-306

'NOV 0 3 2006

Rakoczy Molino Mazzochi Siwik, LLP
Attention: Christine J. Siwik and William A. Rakoczy
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy and Ms. Siwik:

This responds to your letter dated August 29, 2006, in which you request on behalf of Apotex Corporation that the Food and Drug Administration (FDA) consider the start of 180-day exclusivity for ondansetron hydrochloride tablets 4 mg and 8 mg (ondansetron) to have been triggered by the dismissal of a patent infringement suit.

As you are aware, FDA interpreted the relevant statutory provision in a letter dated April 11, 2006 (FDA letter decision) (attached). FDA's letter decision expressly states that the dismissal of a patent suit in and of itself is not sufficient to trigger the start of a 180-day exclusivity period; rather a court order must reflect a holding on the merits by the court that the patent at issue is invalid, not infringed, or unenforceable ("holding-on-the-merits" standard). The FDA letter decision explains in detail the legal grounds and policy justifications for the holding-on-the-merits standard. Apotex sued the agency, challenging the FDA letter decision as arbitrary and capricious, and the District of Columbia Circuit Court of Appeals ruled in the agency's favor, summarily affirming the district court's denial of Apotex's motion for a preliminary injunction. *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006). Apotex petitioned for a rehearing *en banc* by the court, which the court denied on August 17, 2006. On October 3, 2006, Apotex entered into a stipulation of dismissal ending the litigation.

In accordance with the FDA letter decision, we deny your request for the reasons detailed briefly below, and refer you to that decision for further guidance on this matter.

I.    Apotex's request.

Apotex now asks the FDA to confirm that: "(1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA [abbreviated new drug application] upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's final approval will not be delayed by any unexpired 180-day exclusivity associated with U.S. Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the '658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against Apotex Inc. [for infringement of the '658 patent]." In essence, you argue that the dismissal of the GSK lawsuit triggered any 180-day exclusivity arising from the '658 patent with respect to ondansetron, that any such 180-day exclusivity has now expired and, therefore, no unexpired 180-day exclusivity arising from the '658 patent could delay approval of Apotex's ANDA upon expiration of the '789 patent.

II.    The May 25, 2005 Order.

Apotex's ANDA for ondansetron includes a "paragraph IV" certification[1] in which Apotex alleges that the '658 patent is not infringed and/or is not valid.  Having received notice of this paragraph IV certification in December 2004, GSK sued Apotex for infringement of the '658 patent in January 2005.  You enclosed with your August 31, 2005 letter a copy of "the stipulation of dismissal pursuant to Fed. R. Civ. P. 41" filed May 25, 2005, dismissing the GSK suit (stipulation of dismissal).

The stipulation of dismissal states that the plaintiffs (GSK)

> . . . stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of GlaxoSmithKlines's U.S. Patent No. 5,344,658 ("the '658 patent"); and

> . . . [have] represented that [they] will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

and the parties

> . . . stipulate and agree to dismissal of the parties' respective claims and counterclaims with prejudice . . . .

The stipulation is signed on behalf of GSK and Apotex, and is signed as "so ordered" by the court.

---

[1] An NDA applicant must notify FDA of patents the applicant believes claim the drug or an approved use of the drug.  21 U.S.C. §§ 355(b)(1), 355(c)(2).  FDA relies on these notifications to post information on these patents in *Approved Drug Products with Therapeutic Equivalence Evaluations* (informally referred to as the Orange Book).  21 U.S.C. §§ 355(b)(1), 355(c)(2), 355(j)(7)(A)(iii).  An ANDA applicant must then make one of four certifications with respect to each patent that claims the drug or any use of the drug for which the ANDA applicant is seeking approval.  These certifications are commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them:

- a "paragraph I" certification that patent information has not been filed;
- a "paragraph II" certification that the patent has expired;
- a "paragraph III" certification of the date the patent will expire; or
- a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable.

21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A).  A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA.  A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires.  A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.  If an ANDA applicant makes a paragraph IV certification, the applicant must the notify the holder of the approved NDA and the patent owner.  21 U.S.C. § 355(j)(2)(B).

III.    180-day exclusivity and FDA letter decision.

Section 505(j)(5)(B)(iv) of the Act establishes 180-day exclusivity. This exclusivity provides a potential reward to the first ANDA applicant to submit a paragraph IV certification to a patent pursuant to section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act and thus to expose itself to the risk of being sued for infringing the patent.

Section 505(j)(5)(B)(iv)(II) provides that the start of 180-day exclusivity can be triggered as of "the date of a *decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed.*"[2] (Emphasis added.) This mechanism for initiating 180-day exclusivity is commonly referred to as the "court decision trigger."

The FDA letter decision announced the holding-on-the-merits standard to assess whether an action of a court qualifies as a court decision trigger to start the running of 180-day exclusivity. As the introduction to that letter states (and the body of that letter explains in detail):

> FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. . . . FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

FDA letter decision at 2.[3] FDA adopted this bright-line standard to provide clarity, reduce the likelihood of litigation over whether a court action triggers 180-day exclusivity, and promote greater marketplace certainty.

---

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). None of the amendments pertaining to 180-day exclusivity enacted through the MMA bear upon the determination of whether the stipulation of dismissal for the GSK suit triggered 180-day exclusivity for ondansetron, however, because the earliest ANDA containing a paragraph IV certification for this drug was submitted before the December 8, 2003, enactment date of the MMA. *See id.* § 1102(b)(1).

[3] Provisions of the MMA inapplicable to the 180-day exclusivity determination for ondansetron (*see* MMA § 1102(b)(1)) eliminated the court-decision trigger provision, but provided for forfeiture of exclusivity in certain circumstances. One event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2006). The holding-on-the-merits standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

IV.    Analysis

The GSK suit was dismissed by an agreement between the parties; the court never issued a holding on the merits of the patent claim. It is clear, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard. *See Apotex*, 449 F.3d at 1253.[4]

You assert that the stipulation of dismissal satisfies the holding-on-the-merits standard because, *inter alia*, it expressly reflects GSK's judgment that the patent at issue is not infringed and GSK's commitment not to sue. Your conclusion is not correct. It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim. As its title ("Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41") reflects, the stipulation of dismissal was the mechanism by which the parties sought and received dismissal of the case because, in their view, there was nothing left for the court to decide. The court was not asked to resolve the dispute on the merits and did not do so. In short, the stipulation of dismissal does not reflect a holding by the court on the merits of the patent claim.[5]

---

[4] Although the holding-on-the-merits standard was announced in relation to a declaratory judgment action, the standard is equally applicable to affirmative patent infringement suits, such as the GSK suit at issue here. The standard looks to whether the court has made a holding on the merits of the patent claim; it does not consider the manner by which the dispute came before the court.

This letter does not address the arguments made in your prior letter of August 31, 2005, to support your claim that the GSK stipulation of dismissal satisfies an estoppel-based interpretation of the court decision trigger. As explained in greater detail in the FDA letter decision, the agency has rejected this standard in favor of the holding-on-the-merits standard. Accordingly, this letter addresses only the arguments you made in your letter dated August 29, 2006, that the GSK stipulation of dismissal satisfies the holding-on-the-merits standard.

[5] We note that you raised additional arguments in telephone conversations with the agency that you chose not to submit in writing. These arguments relate to FDA's decision in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), as well as whether FDA's interpretation of section 505(j)(5)(B)(iii) is consistent with its interpretation of section 505(j)(5)(B)(iv). In this letter, however, we are only addressing the question that Apotex set forth in writing, *i.e.*, whether the ondansetron dismissal constitutes a court decision trigger under FDA's "holding-on-the-merits" standard. We do not believe that the additional arguments not submitted in writing are pertinent to making that determination, which simply looks to whether the court has held on the merits of a patent claim.

V.  Conclusion

The stipulation of dismissal did not trigger any 180-day exclusivity for ondansetron that may arise from another ANDA applicant's paragraph IV certification to the '658 patent.  The agency is not aware of any judicial action to date qualifying as a court decision trigger of 180-day exclusivity for ondansetron.  Accordingly, 180-day exclusivity may delay approval of Apotex's ANDA for ondansetron hydrochloride tablets 4 mg and 8 mg upon expiration of the '789 patent.[6]

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure

cc:    Elizabeth Dickinson, Office of Chief Counsel
       Applicants with Pending ANDAs for Ondansetron HCl Tablets, 4 mg and 8 mg

---

[6] FDA does not make its exclusivity determinations until an ANDA is ready for final approval, which will not occur for ondansetron until at least December 24, 2006, when the pediatric exclusivity associated with the '789 patent will expire.  Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations.  It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied.  21 U.S.C. § 355a.  Apotex assumes that another ANDA applicant will be entitled to 180-day exclusivity for ondansetron, which the agency neither confirms nor denies.



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

ANDA 76-341                                    Food and Drug Administration
                                               Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

    This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

    Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.    Statutory and Procedural Background

      A.    180-Day Exclusivity and the Court Decision Trigger

      Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are:  a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

      A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

      An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

      Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
>   (I)      the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
>   (II)     the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." See, e.g., Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. See The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L., No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

B.     The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[7] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (Apotex Inc. v. Bristol-Myers Squibb Co. (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the Teva cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed Teva I mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

_____

[7] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision of a court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision of a court . . . holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision of the court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

7

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5]  *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent;
(2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer, if
the patentee is allowed to proceed with its claim). Such determinations are often quite
subjective, dependent on an infinite variety of factual contexts, and provide scant basis
for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to
uncertainty. Experience has shown, for example, that declaratory judgment actions may
be dismissed for a variety of reasons, not all of which concern representations with
preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva
Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied,* 126 S.
Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter
jurisdiction despite the patentee's refusal to provide assurance that it would not sue).
Indeed, *Teva I* and *Teva II,* as well as the instant pravastatin case, demonstrate the
difficulty of applying an estoppel-based standard that requires the agency to evaluate the
underlying reasons for a dismissal — and the very low likelihood of industry certainty
under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether
certain statements or actions of a company in litigation to which FDA is not a party may
estop that company from enforcing its patent. FDA's interpretation of the court decision
trigger provision as requiring a holding on the merits will enable the agency to rely on the
face of the court's decision to determine whether there has been a holding that a patent is
invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-
based approach inexorably spawns subsequent litigations concerning FDA's estoppel
determinations — litigations that can be avoided under a clearer, textually-based
standard.

> 2.    FDA's Interpretation is Consistent with its Regulation, which
>       Includes Unenforceability as a Separate Basis for a Court Decision
>       Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-
Syntex dismissal was not a court decision trigger was consistent with FDA's regulation
including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I*
suggested that FDA's position was "absurd" because FDA's regulation included
unenforceability, but FDA refused to acknowledge a dismissal that had the apparent
effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from
suing Apotex for infringement, but for different reasons. *Compare Teva,* 398 F. Supp. 2d at 192 n.6
(finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension
from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated
assurances that it had no intention to sue Apotex for infringement).

9

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

  3.  FDA's Interpretation is Consistent with the FDA's 180-day
      Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7]  It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.    FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms, USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal reulies that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent . . . to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

Department of Health and Human Services
Public Health Service
Food and Drug Administration
Center for Drug Evaluation and Research
Office of Generic Drugs
Rockville, Maryland
FDA

To: _Christine Siwik_
_William Rakoczy_

Phone: _____          Fax: _312-222-6321_

From: _Gary Buehler_

Phone: (301) 827-5845            Fax: (301) 594-0183

Number of Pages: _21_
(Including Cover Sheet)

Comments: _____

_____

_____

_____

**THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW.**

If you are not the addressee, or a person authorized to deliver the document to the addressee, this communication is not authorized. If you have received this document in error, please immediately notify us by telephone and return it to us at the above address by mail. Thank you.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.                 ) <br><br> Plaintiff,       ) <br><br> v.              ) <br><br> FOOD AND DRUG ADMINISTRATION, *et al.*   ) <br><br> Defendants.     ) | Case No. _____ |

## APOTEX INC.'S CERTIFICATE OF COUNSEL PURSUANT TO LOCAL CIVIL RULE 65.1(a)

Pursuant to Local Civil Rule 65.1(a), the undersigned counsel for Apotex hereby certifies that, on November 6, 2006, at approximately 9:00 a.m. EST, counsel for Apotex informed the Federal Defendants, through counsel for FDA, of Apotex's intention to seek a temporary restraining order and/or preliminary injunction in this matter, as well as the anticipated time of the making of the application. In telephone conversations between counsel for Apotex and counsel for FDA at approximately 11:30 a.m. and 12:00 p.m. EST, the Federal Defendants declined to consent to entry of the requested injunctive relief, and consultation pursuant to Local Civil Rule 7(m) has failed to narrow the areas of disagreement. Federal Defendants have been provided with copies of Apotex's motion for temporary restraining order and/or preliminary injunction and all supporting papers, including the proposed order; and all other papers filed in this case.

Dated:  November 6, 2006.

Respectfully submitted,

APOTEX INC.

By:  _____

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3550 (facsimile)

*Counsel for Apotex Inc.*

<u>Of Counsel</u>:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| APOTEX INC. | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. _____ |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

### [PROPOSED] ORDER

Upon consideration of Plaintiff Apotex Inc.'s Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum of Law, the Declaration of Arthur Y. Tsien, the exhibits thereto, including the Declaration of Tammy McIntire, and counsel for the Plaintiff and Defendants having been heard on the motion,

The Court finds that Plaintiff has shown that it will be immediately and irreparably harmed absent injunctive relief, it is therefore

**ORDERED THAT** the motion be, and hereby is, is **GRANTED**. Defendants the Food and Drug Administration; Michael O. Leavitt, Secretary of Health and Human Services; and Andrew von Eschenbach, Acting Commissioner of Food and Drugs, shall: (a) set aside their November 3, 2006 administrative decision; (b) refrain from awarding any 180-day exclusivity for ondansetron tablet ANDAs; (c) immediately approve Apotex's ANDA No. 77-306 for ondansetron tablets upon the expiration of GlaxoSmithKline's pediatric exclusivity on December 24, 2006; and (d) refrain from approving any other ondansetron tablet ANDA until this determination is made and final approval is granted to Apotex.

**SO ORDERED**

_____          _____
United States District Judge                            Date