# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 06-1890 (RMC) |
| | ) |
| FOOD AND DRUG ADMINISTRATION, | ) |
| *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DR. REDDY'S LABORATORIES, LTD. | ) |
| *et al.*, | ) |
| | ) |
| Intervenors-Defendants. | ) |
| | ) |

## NOTICE OF FILING ADMINISTRATIVE RECORD

Federal defendants hereby file the certified administrative record in the above-captioned matter. The record, consisting of six documents designated Tabs 1 through Tab 6, is appended hereto.

Respectfully submitted,

OF COUNSEL:

DANIEL MERON
*General Counsel*

SHELDON T. BRADSHAW
*Associate General Counsel*
*Food and Drug Division*

PETER D. KEISLER
*Assistant Attorney General*

EUGENE M. THIROLF
*Director*
*Office of Consumer Litigation*

ERIC M. BLUMBERG
*Deputy Chief Counsel, Litigation*

WENDY S. VICENTE
*Associate Chief Counsel*
*United States Department of*
  *Health and Human Services*
*Office of the General Counsel*
*5600 Fishers Lane*
*Rockville, MD  20857*

Dated: November 17, 2006

_____/s/_____

ANDREW E. CLARK
*Attorney*
*Office of Consumer Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 386*
*Washington, D.C. 20044*
*Tel:  (202) 307-0067*
*Fax: (202) 514-8742*
andrew.clark@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that I caused the foregoing Notice of Filing Administrative Record to be served via the District Court's Electronic Filing System (ECF) and/or by Federal Express overnight delivery upon:


Arthur Y. Tsien (ECF)
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, NW, Suite 400
Washington, D.C.  20036-2220
*Counsel for Plaintiff Apotex Inc.*

William A. Rakoczy (FedEx)
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Suite 500
Chicago, IL 60610
*Counsel for Plaintiff Apotex Inc.*

John Longstreth (ECF)
Brian K. McCalmon
PRESTON GATES ELLIS & ROUVELAS MEEDS LLP
1735 New York Avenue, N.W.
Suite 500
Washington, DC 20006-5209
*Counsel for Intervenors-Defendants Dr. Reddy's Laboratories, Ltd. et al.*

Andrew J. Miller (ECF)
Stuart Sender
Bruce D. Radin
BUDD LARNER P.C.
150 John F. Kennedy Parkway
Short Hills, NJ 07078-2703
*Counsel for Intervenors-Defendants Dr. Reddy's Laboratories, Ltd. et al.*

D. Christopher Ohly (FedEx)
Jeffrey S. Jacobovitz
SCHIFF HARDIN LLP
1101 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
*Counsel for Proposed Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc.*

Andrew Berdon (FedEx)
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
*Counsel for Proposed Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc.*

this 17th day of November, 2006.

_____/s/_____
Andrew E. Clark

<u>CERTIFICATE</u>

Pursuant to the provisions of Rule 44 of the Federal Rules of Civil Procedure, I hereby

certify that Cecelia M. Parise, Regulatory Policy Advisor to the Director, Office of

Generic Drugs, Center for Drug Evaluation and Research, United States Food and Drug

Administration, whose declaration is attached, has custody of official records of the

United States Food and Drug Administration.

In witness whereof, I have, pursuant to the provision of Title 42, United States Code,

Section 3505, and 21 C.F.R. § 5.22(a), hereto set my hand and caused the seal of the

Department of Health and Human Services to be affixed this *15th* day of November,

2006.

Jennie C. Butler, Director
Division of Dockets Management
Office of Management Programs
Office of Management

By direction of the Secretary of
Health and Human Services



<u>DECLARATION OF CECELIA M. PARISE</u>

Cecelia M. Parise declares as follows:

1. I am Regulatory Policy Advisor to the Director, Office of Generic Drugs (OGD), Center for Drug Evaluation and Research, United States Food and Drug Administration (FDA).

2. In this capacity, I have custody of official records of FDA relating to 180-day exclusivity periods.

3. Attached is a copy of an index to the administrative record in *Apotex Inc. v. FDA*, Case No. 06-1890 (D.D.C.).

4. Copies of the documents referred to in the index in paragraph 3, above, are part of the official records of FDA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 14, 2006_.

Cecelia M. Parise

FDA ADMINISTRATIVE RECORD
APOTEX INC. v. FDA
CIVIL ACTION NO. 06-1890

<u>INDEX TO APOTEX'S ANDA NO. 77-306</u>

1.    Letter from Apotex to FDA seeking FDA determination of court decision trigger
      of 180-day exclusivity for Ondansetron Hydrochloride Tablets 4 mg and 8 mg
                Dated:  August 31, 2005      Received:  September 1, 2005

2.    Letter from Apotex to FDA resubmitting its request for FDA determination of
      court decision trigger of 180-day exclusivity for Ondansetron Hydrochloride
      Tablets 4 mg and 8 mg
                Dated:  August 29, 2006      Received:  August 30, 2006

3.    Letter from FDA to Apotex denying Apotex's request for a determination of a
      court decision trigger of 180-day exclusivity for Ondansetron Hydrochloride
      Tablets 4 mg and 8 mg
                Dated:  November 3, 2006

<u>INDEX TO MUTUAL'S ANDA NO. 76-628</u>

4.    Letter from Mutual to FDA seeking FDA determination of court decision trigger
      of 180-day exclusivity for Ondansetron Hydrochloride Tablets 4 mg and 8 mg
                Dated:  June 23, 2006      Received:  June 26, 2006

5.    Letter from FDA to Mutual denying Mutual's request for a court decision trigger
      of 180-day exclusivity for Ondansetron Hydrochloride Tablets 4 mg and 8 mg
                Dated:  November 8, 2006

<u>ADMINISTRATIVE PRECEDENT</u>

6.    Letter from FDA to Apotex re: FDA's holding-on-the-merits interpretation of 21
      U.S.C. § 355(j)(5)(B)(iv)(II)
                Dated:  April 11, 2006

# TAB 1

# RAKOCZY MOLINO MAZZOCHI SIWIK LLP

*N/MC*

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

Christine J. Siwik
312.222.6304 telephone
312.222.6324 facsimile
csiwik@rmmslegal.com

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmslegal.com

August 31, 2005

**CONFIDENTIAL ANDA DOCUMENT—
NOT TO BE DISCLOSED OUTSIDE FDA**

**VIA FedEx® and E-Mail**
Mr. Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

> Re: **Apotex Inc.'s ANDA No. 77-306 for Ondansetron Hydrochloride Tablets 4 mg and 8 mg**

Dear Mr. Buehler:

On behalf of Apotex Inc., we respectfully request that the Agency confirm the following:

- Subject to all other substantive requirements for approval, Apotex will be eligible for, and receive, immediate final approval of its ANDA No. 77-306 for Ondansetron Hydrochloride Tablets 4 mg and 8 mg when U.S. Patent No. 4,753,789 ("the '789 patent") expires;

- Apotex's final approval will not be delayed by any unexpired 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv) for these drug products; and

- The May 25, 2005, Order (Ex. E) dismissing the lawsuit brought by Glaxo Group Limited and SmithKline Beecham Corporation (collectively, "GSK") alleging infringement of U.S. Patent No. 5,344,658 ("the '658 patent") constitutes a "decision of a court" under 21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered any exclusivity arising out of that patent as of June 24, 2005.

RECEIVED

SEP 0 1 2005

OGD/CDER

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 2

Apotex requests the courtesy of a response by the end of business on November 1, 2005. If we do not hear from the Agency by then, Apotex will assume that its request has been denied and take appropriate action to protect its rights.

## I.    INTRODUCTION

Apotex and several other applicants have filed ANDAs for generic ondansetron hydrochloride tablets with paragraph IV certifications to some or all of the Orange-Book listed patents for Zofran®, the reference-listed drug at issue here. Based on public statements, an applicant other than Apotex claims to have 180-day generic exclusivity by virtue of having filed a paragraph IV certification to the '658 patent. If such exclusivity exists, the dismissal, with prejudice, of GSK's patent infringement action against Apotex triggered that exclusivity with respect to the '658 patent.

As detailed below, GSK filed suit against Apotex alleging infringement of the '658 patent. The parties ultimately stipulated to the dismissal of that action on May 18, 2004, after GSK stipulated to non-infringement and covenanted not to sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of, and described in, Apotex's ANDA No. 77-306. The dismissal of GSK's infringement action was with prejudice and contained GSK's express acknowledgement that Apotex's ANDA products do not infringe the '658 patent. The court entered the dismissal order on May 25, 2005.

Under 21 U.S.C. § 355(j)(5)(B)(iv)(II), generic exclusivity is triggered by "a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." The court's May 25, 2005 dismissal order is such a court decision. Indeed, even if someone erroneously believed that dismissal order did not fall within plain language of statute (which it does), in light of GSK's covenant not to sue and the terms of the dismissal order, which is final and unappealable, GSK is precluded from suing Apotex on the '658 patent. Under the D.C. Circuit's decisions in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharmaceuticals, USA, Inc. v. FDA*, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), this dismissal order constitutes a court decision sufficient to trigger the running of any exclusivity that might have existed for the '658 patent as of June 24, 2005, at the latest.

Accordingly, any exclusivity awarded based upon a paragraph IV certification to the '658 patent will expire no later than December 20, 2005, and cannot delay Apotex's approval beyond the expiration date of the '789 patent. Apotex seeks confirmation of this fact from the Agency.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 3

## II.    BACKGROUND

### A.    Reference-Listed Drug And Orange Book Patents.

The reference-listed drug upon which Apotex based its ANDA is GSK's prescription drug Zofran® (ondansetron hydrochloride) Tablets 4 mg, 8 mg, and 24 mg. FDA first approved that drug under New Drug Application (NDA) No. 20-103 on December 31, 1992.

GSK has submitted information on four patents for listing in the Orange Book in connection with Zofran® (ondansetron hydrochloride) tablets and NDA No. 20-103. Those patents are:

- U.S. Patent No. 4,695,578, which expired on January 25, 2005 (with pediatric exclusivity expired on July 25, 2005);

- U.S. Patent No. 5,578,628, which expired on February 16, 2005 (with pediatric exclusivity expired on August 16, 2005);

- U.S. Patent No. 4,753,789, which expires on June 24, 2006 (with pediatric exclusivity expiring on December 24, 2006); and

- U.S. Patent No. 5,344,658, which expires on September 6, 2011 (with pediatric exclusivity expiring on March 6, 2012).

### B.    Apotex's ANDA No. 77-306 For Ondansetron Hydrochloride Tablets 4 mg And 8 mg.

On September 30, 2004, Apotex submitted ANDA No. 77-306 for generic ondansetron hydrochloride tablets 4 mg and 8 mg. For all tablet strengths, Apotex's ANDA contains a paragraph III certification under 21 U.S.C. § 355(j)(2)(A)(vii)(III) to the '578, '628, and '789 patents, thus signifying that Apotex does not intend to market its ondansetron hydrochloride products until after the expiration of those patents and their corresponding pediatric exclusivities. Apotex submitted a paragraph IV certification, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to the '658 patent. As required by 21 U.S.C. §§ 355(j)(2)(B)(i)-(ii), Apotex provided the requisite notice of its ANDA and paragraph IV certification, together with the factual and legal bases for that certification, to GSK, the patentee and NDA-holder.

### B.    Other Ondansetron Hydrochloride ANDAs.

Based on publicly available information, Apotex believes that several other applicants apparently have submitted ANDAs for ondansetron hydrochloride tablets with paragraph IV certifications to some or all of the listed patents in the Orange Book. Further, one

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 4

or more of the other ANDAs with paragraph IV certifications to the '658 patent may have been submitted before Apotex's ANDA.    We understand, for example, that FDA considers Dr. Reddy's Laboratories (DRL) to be the first applicant to submit a paragraph IV ANDA (No. 76-183) for the 4 mg, 8 mg, and 24 mg strength ondansetron hydrochloride tablets to all four of the Orange-Book listed patents.    (As we understand it, DRL subsequently amended its application to contain a paragraph III certification to the '578 patent.)

By virtue of these purportedly previous ANDAs, FDA may consider DRL (or perhaps others) to be eligible for 180-day exclusivity periods for those drug products pursuant to 21 U.S.C. § 355(j)(5)(B)(iv).  Such exclusivity could delay approval of all subsequent paragraph IV ANDA-filers until 180 days after either first commercial marketing of each drug product by the first-filer or a court decision on the listed patents, whichever is earlier.

**C.    Apotex Obtains A "Decision Of A Court" That Triggers Any 180-Day Exclusivity For Ondansetron Hydrochloride Tablets With Respect To The '658 Patent.**

On January 14, 2005, after receiving Apotex's statutorily-required notice letter, GSK filed an action against Apotex in the U.S. District Court for the District of New Jersey, pursuant to 21 U.S.C. § 355(j) and 35 U.S.C. § 271.  (Ex. A).  GSK's complaint alleged that Apotex's ANDA products would, if marketed, infringe the '658 patent.  On March 22, 2005, Apotex answered GSK's complaint and counterclaimed for invalidity and non-infringement of the '658 patent.  (Ex. B).  On April 11, 2005, GSK responded to Apotex's counterclaims by denying invalidity and non-infringement.  (Ex. C).

As part of the litigation, Apotex produced to GSK a copy of Apotex's ANDA No. 77-306.  Upon reviewing Apotex's ANDA, GSK concluded that Apotex's ANDA products would not infringe the '658 patent.  After being apprised of GSK's position, the parties entered into a Covenant Not to Sue and Stipulation of Non-Infringement.  (Ex. D).  The parties also submitted to the court hearing GSK's infringement case a stipulation of dismissal with prejudice. That dismissal order provides, in pertinent part:

> WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported, manufactured, used, sold or offered for sale in the United States *would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent")*; and
>
> WHEREAS, *GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent* based on the importation, manufacture, use, sale

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 5

or offer for sale of ondansetron hydrochloride tablets that are the subject of and
described in ANDA No. 77-306;

*       *       *

THEREFORE based on the referenced Agreement, the parties, by their
undersigned attorneys, hereby stipulate and agree to the dismissal of the parties'
respective claims and counterclaims *with prejudice.*

(Ex. E (emphasis added).)  The May 25, 2005, Order became a final decision from which no
appeal has been, or can be, taken on June 24, 2005, at the latest.  On June 1, 2005, in accordance
with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to OGD.

The court's order triggered any exclusivity for ondansetron hydrochloride tablets
arising out of the '658 patent.  Consequently, such exclusivity will expire no later than December
20, 2005, thus leaving no barrier to final approval for Apotex upon expiration of the '789 patent.

## III.    ANALYSIS

### A.    Under The Plain Language Of The Statute, The Dismissal Of GSK's Infringement Action Against Apotex Triggers Any Exclusivity Attaching To The '658 Patent.

The first company to file an ANDA containing a paragraph IV certification to an
Orange Book-listed patent is eligible to receive 180 days of generic exclusivity:

(iv) If the application contains a certification described in subclause (IV) of
paragraph (2)(A)(vii) and is for a drug for which a previous application has been
submitted under this subsection continuing [*sic*] such a certification, the
application shall be made effective not earlier than one hundred and eighty days
after--

(I) the date the Secretary receives notice from the applicant under the previous
application of the first commercial marketing of the drug under the previous
application [the "commercial marketing trigger"], or

(II) the date of a decision of a court in an action described in clause (iii)
holding the patent which is the subject of the certification to be invalid or not
infringed [the "court decision trigger"],

whichever is earlier.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 6

21 U.S.C. § 355(j)(5)(B)(iv).[1]

Here, GSK filed a patent infringement suit against Apotex and the court has entered a dismissal order stating that Apotex's ANDA products "do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of" GSK's '658 patent. The order constitutes a "decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." In other words, this order constitutes an adjudication on the merits of the patent dispute.

Consequently, Apotex's May 25, 2005, court decision satisfies the court decision trigger, and triggers any exclusivity awarded for the '658 patent. Accordingly, Apotex should, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA immediately upon expiration of the '789 patent.

### B.    Under Controlling D.C. Circuit Case Law, A Dismissal Order With Preclusive Effect Triggers Generic Exclusivity.

Even if one could argue that the dismissal of a patent infringement action with prejudice is not a "decision" or a "holding" of a court finding the patent invalid or not infringed, such a dismissal order does constitute "a decision of a court" under § 355(j)(5)(B)(iv)(II), so long as it has preclusive effect. Controlling D.C. Circuit precedent so holds.

### 1.    The D.C. Circuit's Controlling Authority.

The dismissal of GSK's patent infringement action here constitutes a "decision of a court" under § 355(j)(5)(B)(iv). The D.C. Circuit's decisions in *Teva I* and *Teva II* require this result.

The D.C. Circuit has explicitly held that the dismissal of a declaratory judgment action for lack of subject matter jurisdiction constitutes a "court decision" sufficient to trigger the 180-day exclusivity, so long as it has estoppel effect under the patent laws. *See Teva I*, 182 F.3d at 1008; *Teva II*, 2000 WL 1838303. The facts and reasoning of the *Teva* decisions control here, and require FDA to treat the dismissal of GSK's patent infringement action as a triggering court decision under § 355(j)(5)(B)(iv)(II).

---

[1]    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), changed the 180-day exclusivity provision of the 1984 Hatch-Waxman Amendments (formally known as the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271)). Those changes are not applicable here, however, because, as we understand it, Dr. Reddy's Laboratories' ANDA No. 76-183, which FDA considers to be the first ANDA submitted containing paragraph IV certifications to the relevant Orange Book-listed patents, was filed on or before December 8, 2003.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 7

In the *Teva* cases, Apotex (then known as TorPharm) submitted the first paragraph IV ANDA for a generic version of Hoffman-La Roche's prescription drug ticlopidine (brand-name Ticlid®). The patentee, Syntex, did not sue Apotex or any subsequent ANDA applicants for infringement. By virtue of submitting the first paragraph IV ANDA, FDA awarded Apotex sole 180-day exclusivity for generic ticlopidine, which delayed the approval of all subsequent applicants until 180 days after first commercial marketing or a court decision of non-infringement, whichever is earlier.

Apotex's competitor, Teva, while awaiting ANDA approval, filed a declaratory judgment action against Syntex seeking a declaratory judgment of noninfringement of Syntex's listed patent. *See Teva I*, 182 F.3d at 1006. Teva did so in order to obtain a court decision that would trigger Apotex's 180-day exclusivity period, thereby allowing Teva to market its generic drug. *Id.* at 1004. The same day Teva sued, Syntex sent Teva a letter stating: "We will make no claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the formulation you have disclosed to us." *Id.* at 1006. Syntex then moved to dismiss the complaint for lack of subject matter jurisdiction, explaining:

> Given Syntex's express assurance that it would not bring suit against Teva on the '592 patent, Teva can have no reasonable apprehension that it will face a lawsuit for infringement of the '592 patent. Without such reasonable apprehension, no actual case or controversy exists of sufficient immediacy or reality to base jurisdiction over Teva's declaratory judgment claim.

*Id.* The district court granted Syntex's motion, holding that Teva "lacks a reasonable apprehension of suit by Syntex for infringement" of the patent at issue and, therefore, there was "no justiciable case or controversy between the parties concerning any infringement by Teva of the '592 Patent." *Id.*

FDA subsequently refused, without explanation, to recognize the dismissal of Teva's declaratory judgment action as a triggering court decision. Among other things, FDA refused to explain why the Agency had previously recognized as a triggering decision the grant of partial summary judgment based on the patentee's admission of noninfringement, but declined to give similar effect to Teva's dismissal based on a finding of no reasonable apprehension of suit arising from the patentee's stated intention not to sue.

Teva challenged the Agency's refusal to recognize the dismissal as a triggering court decision. The district court sided with FDA, holding that the dismissal order did not fall within the plain language of the statute, which requires "nothing less than a decision on the merits." *See id.* at 1007. On appeal, however, the D.C. Circuit reversed, holding that: (1) FDA's interpretation refusing to recognize Teva's dismissal as a court decision is not entitled to *Chevron* deference; (2) FDA "cannot avoid the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement under § 355(j)(5)(B)(iv)(II)"; and (3) FDA's

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 8

response was arbitrary and capricious. *Id.* In reaching these conclusions, the court made two separate findings that are applicable here.

*First*, the D.C. Circuit determined that the Agency's refusal to recognize the dismissal as a triggering court decision is not compelled by the statutory language, which merely requires a "decision of a court holding the patent . . . invalid or not infringed." *See id.* at 1007. Such a "decision," the court explained, can take many forms and "the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement." *Id.* at 1009; *see also id.* at 1007. Where estoppel exists, the dismissal constitutes a court decision.

The D.C. Circuit noted that "Syntex's declaration and conduct eliminated the need for a declaratory judgment because Syntex would be estopped from challenging Teva's marketing of its generic drug on the ground of patent infringement." *Id.* at 1008. The court further explained:

> The conclusion that the California dismissal has estoppel effect is supported by the decisions of the United States Court of Appeals for the Federal Circuit. That court has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect.
>
>        \*       \*       \*
>
> Put otherwise, the California dismissal appears to meet the requirements of a triggering "court decision" because that court had to make a predicate finding with respect to whether Syntex would ever sue Teva for infringement in order to conclude that there was no case or controversy between the parties.
>
>        \*       \*       \*
>
> Although the dismissal was not a judgment on the merits after consideration of evidence presented by the parties, there was no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement. This is the result that appears to be the purpose of the triggering "court decision" provision. A contrary view, as Teva contends, means that the patent holder could manipulate the system in order to block or delay generic competition by stating that the patent holder will not enforce its patent against the Paragraph IV challenger. For these reasons, the California dismissal would appear to meet the requirements of a "court decision" under § 355(j)(5)(B)(iv)(II).

*Id.* at 1008-09 (citations omitted).

*Second*, the D.C. Circuit held that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Id.* at 1009. In reaching this conclusion, the court noted that

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 9

both FDA and the Federal Circuit recognize that a decision that a patent is "unenforceable" also suffices as a court decision, even though the statute says only if the patent is "invalid" or "will not be infringed." *Id.* FDA included "unenforceability" because, in its own words, it would lead to absurd results otherwise. *Id.* As such, the court rejected as "unpersuasive" any attempt by FDA to treat unenforceability, which is included in the regulation, any differently than estoppel for purposes of § 355(j)(5)(B)(iv)(II). *Id.* The court explained:

> As the FDA and [Apotex] concede, Syntex cannot sue Teva for patent infringement as a result of the California dismissal. In its regulations, the FDA added 'unenforceability' to the list of what qualifies as a 'court decision' because it concluded that implementing the statute in any other way would be contrary to Congress' intent and produce absurd results . . . . However, the situation presented here appears no less absurd because Teva can never be sued by Syntex for patent infringement, but the FDA has nevertheless concluded that the California dismissal cannot satisfy the 'court decision' requirement of the statute. Thus, the FDA's application of the statute to this case runs counter to its explanation for permitting unenforceability to qualify as a 'court decision.'

*Id.* at 1010 (citations omitted.)

The D.C. Circuit reversed and remanded the district court's decision to afford FDA the opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement . . . ." *Teva II*, 2000 WL 1838303, at *1. On remand, FDA repeated "its claim that the California dismissal did not state on its face that the underlying patent was not infringed and that refusing to look beyond the face of the order served goals of administrative convenience." *Id.* The district court flatly rejected this explanation. On appeal, the D.C. Circuit agreed, holding that the "judgment of the agency fails for want of reasoned decisionmaking," and stating that the Agency had failed to provide any meaningful basis for departing from its past interpretation and precedent. *Id.* at *2.

The *Teva I* and *II* rulings remain the controlling rule of law on determining what will and will not constitute a court decision sufficient to trigger under § 355(j)(5)(B)(iv)(II).[2] Under this rule of law, so long as a dismissal has preclusive effect, it constitutes a triggering court decision.

---

[2]  FDA considered a proposed rule under which such a dismissal would not constitute a court decision trigger. *See* 64 Fed. Reg. 42873, 42881 (Aug. 6, 1999). However, after reconsidering the *Teva* decisions and comments, FDA rejected and formally withdrew its proposed rule in November 2002, and continues to regulate directly from the statute, just as it had done before *Teva*. *See* 67 Fed. Reg. 66593, 66594 (Nov. 1, 2002).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 10

      2.      **The Dismissal Of GSK's Action Triggers Any 180-Day Exclusivity On The '658 Patent And Entitles Apotex To Final ANDA Approval Immediately Upon Expiration Of The '789 Patent.**

      The controlling test for a triggering court decision under § 355(j)(5)(B)(iv), as articulated by the D.C. Circuit, is whether the decision estops or precludes the patentee "from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*, 182 F.3d at 1009. If so, it is a triggering court decision under the statute. As applied here, the dismissal of GSK's patent infringement suit against Apotex, with prejudice, precludes future litigation between the parties on the '658 patent.

      The May 25, 2005, dismissal order here explicitly is based on, *inter alia*, GSK's covenant not to sue Apotex and its admission that Apotex's ANDA products do not infringe the '658 patent. FDA need not look beyond the face of the order and covenant to confirm this fact. The order dismisses GSK's infringement action based upon its covenant not to sue and its representations that: (1) Apotex ANDA products "do not infringe" the '658 patent; and (2) it "will not sue Apotex for infringement of the '658 patent based on the manufacture, use, sale, offer for sale or importation of Apotex's generic ondansetron hydrochloride tablet product that are the subject of ANDA No. 77-306." (Ex. E).

      Plainly, GSK has disavowed any intent to sue Apotex. As the D.C. Circuit acknowledged, the Federal Circuit "has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *See Teva I*, 182 F.3d at 1008 (citing *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991) (holding that by filing with the district court a covenant not to sue the declaratory judgment plaintiff for infringement of the patent-in-suit, the patentee was "forever estopped from asserting the . . . patent claims against the [declaratory judgment plaintiff]")); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (holding that patentee "is forever estopped by its counsel's statement of nonliability, on its face and as explained during oral argument before this court, from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994. This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case."); *see also Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998) (discussing *Super Sack* and *Spectronics*).

      Thus, the dismissal order precludes GSK's from asserting the '658 patent against Apotex in the future. As in *Teva*, the dismissal meets all the requirements of a "decision of a court" under § 355(j)(5)(B)(iv)(II). Accordingly, there can be no barriers to final approval of Apotex's ANDA once the '789 patent expires. Any 180-day exclusivity for ondansetron hydrochloride tablets arising out of the '658 patent was triggered, at the latest, on June 24, 2005, and will have expired, at the latest, by December 20, 2005. Subject to all other substantive

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
August 31, 2005
Page 11

requirements for approval, Apotex is entitled to immediate final approval on expiration of the '789 patent.

## IV.    CONCLUSION

For all these reasons, Apotex requests, and is entitled to, confirmation that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA upon expiration of the '789 patent; (2) its final approval will not be delayed by any unexpired 180-day exclusivity on the '658 patent; and (3) any 180-day exclusivity on the '658 patent was triggered by the dismissal of GSK's patent infringement action. We look forward to receiving the Agency's response by November 1, 2005.

Should you have any questions, please do not hesitate to contact us.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

Christine J. Siwik

William A. Rakoczy

Enclosures
cc (*via e-mail*):        Elizabeth Dickinson, *Office of Chief Counsel*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

1-14-05

```
------------------------------------------------x
                                                :
GLAXO GROUP LIMITED and                         :
SMITHKLINE BEECHAM CORPORATION,                 :
                                                :
                    Plaintiffs,                 :   CIVIL ACTION NO.
                                                :
                                                :      05-307
          v.                                    :       C JLL)
                                                :
APOTEX INC.,                                    :
                                                :
                    Defendant.                  :
                                                :
------------------------------------------------x
```

## COMPLAINT

Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation, for their

Complaint against defendant Apotex Inc., aver and allege as follows:

### JURISDICTION AND PARTIES

1.     This is a civil action for patent infringement arising under the patent laws of the

United States, 35 U.S.C. §§ 271 et seq. and 21 U.S.C. § 355.

2.     Plaintiff Glaxo Group Limited is an English corporation having a registered office

at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 ONN, Middlesex,

England.

3.     Plaintiff SmithKline Beecham Corporation is a Pennsylvania corporation having a

principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102. Plaintiffs

Glaxo Group Limited and SmithKline Beecham Corporation shall hereinafter be referred to

jointly as "GlaxoSmithKline."

1-PR/1280871.1

4.    Defendant Apotex Inc. ("Apotex") is a privately held Canadian corporation having its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9. Novex Pharma is a division of Apotex, Inc. having its principal place of business at 380 Elgin Hills Road East, Richmond Hill, Ontario, Canada L4C 5H2. Upon information and belief, Apotex Inc. conducts continuous and systematic business activities within the State of New Jersey, and, alternatively, intends to market and sell the accused drug product in the State of New Jersey.

5.    This Court has jurisdiction pursuant to the patent laws of the United States, Title 35 U.S.C. and 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this district pursuant to 28 U.S.C. §§1391 and 1400(b).

## FIRST CAUSE OF ACTION
## INFRINGEMENT OF UNITED STATES PATENT NO. 5,344,658

6.    On September 6, 1994, United States Patent No. 5,344,658 ("the '658 patent") entitled "PROCESS AND COMPOSITION USING ONDANSETRON" was duly and legally issued to David T. Collin. Since its issuance, Glaxo Group Limited has been the assignee and owner of the '658 patent. SmithKline Beecham Corporation is the exclusive licensee of the '658 patent. A true and correct copy of the '658 patent is attached to this Complaint as Exhibit A.

7.    GlaxoSmithKline is the holder of approved New Drug Applications (hereinafter "NDAs") under Section 505(b) of the Federal Food, Drug and Cosmetic Act (hereinafter the "Act"), 21 U.S.C. § 355(b), for ondansetron hydrochloride tablets covered by the '658 patent.

8.    On or about December 7, 2004, GlaxoSmithKline received a written Notice of Patent Certification from Apotex stating that Apotex has filed Abbreviated New Drug Application (hereinafter "ANDA") No. 77-306 seeking approval from the FDA to market ondansetron hydrochloride tablets pursuant to Section 505(j) of the Act, 21 U.S.C. § 355(j), prior

to expiration of the '658 patent, and alleging that the '658 patent is not infringed and/or that the patent is invalid.

     9.    Pursuant to 35 U.S.C. § 271(e)(2), Apotex's filing of this ANDA is an actual act of infringement.

     10.    As such, Defendants Apotex have infringed the '658 patent and such infringement will continue unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for Judgment:

     1.    Finding that defendants have infringed United States Patent No. 5,344,658;

     2.    Ordering that the effective date of any approval of defendants' application under Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), for ondansetron hydrochloride tablets and their use be not earlier than the expiration dates of United States Patents Nos. 5,344,658;

     3.    Awarding plaintiffs preliminary and final injunctions enjoining defendants and their officers, agents, servants, employees and privies from continued infringement of United States Patents Nos. 5,344,658; and

     4.    Awarding plaintiffs their reasonable attorneys' fees, interest and costs of this action, and such other and further relief as this Court may deem just and proper.

Dated: January 14, 2005

          Robert A. White, (RW-6063)
          MORGAN, LEWIS & BOCKIUS, LLP
          502 Carnegie Center
          Princeton, NJ 08540-6241
          (609) 919-6600 (Telephone)
          (609) 919-6639 (Facsimile)

          Attorneys for Plaintiffs
          Glaxo Group Limited and
          SmithKline Beecham Corporation

<u>Of Counsel</u>
Dennis J. Mondolino
Lisa M. Ferri
Richard C. Pettus
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000

US005344658A

# United States Patent [19]

## Collin

[11] Patent Number: **5,344,658**

[45] Date of Patent: **Sep. 6, 1994**

[54] **PROCESS AND COMPOSITION USING ONDANSETRON**

[75] Inventor: David T. Collin, Ware, England

[73] Assignee: Glaxo Group Limited, London, England

[21] Appl. No.: 5,736

[22] Filed: Jan. 19, 1993

### Related U.S. Application Data

[63] Continuation of Ser. No. 755,736, Sep. 6, 1991, abandoned, which is a continuation of Ser. No. 544,644, Jun. 27, 1990, abandoned.

[30] **Foreign Application Priority Data**

Jun. 28, 1989 [GB] United Kingdom .............. 89148043

[51] Int. Cl.$^5$ ......................................... A61K 9/14
[52] U.S. Cl. ................................ 424/489; 424/484; 424/464; 424/465
[58] Field of Search ................ 424/484, 464, 465, 489

[56] **References Cited**

PUBLICATIONS

Sekiguchi et al., Chem. Pharm. Bull., 16(12), 2495–2502, 1968.
Pikal et al., Chemical Abstracts, 100:144884x, 1984.
Shirotani et al., Chemical Abstracts, 96:57633v, 1982.

*Primary Examiner*—Paul R. Michl
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Bacon & Thomas

[57] **ABSTRACT**

The invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent to a size which is suitable for effective distribution in a tablet blend, in particular 100% less that 250 μm. The ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated.

10 Claims, No Drawings

5,344,658

1

## PROCESS AND COMPOSITION USING ONDANSETRON

This application is a continuation of application Ser. No. 07/755,736, filed Sep. 6, 1991 now abandoned, which is a continuation of application Ser. No. 07/544,644, filed Jun. 27, 1990, now abandoned.

This invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate. More particularly the process involves desolvation and resolvation.

Reduction of crystal size through solvation and desolvation has been described previously, for instance for the compound griseofulvin (K. Sekiguchi et al., Chem. Pharm. Bull., 1968, 16, 2495–2502). Various techniques may be employed to effect desolvation such as drying at an elevated temperature and under vacuum, drying at an elevated temperature and at atmospheric pressure, drying at ambient temperature under a high vacuum, freeze-drying, or drying over a desiccant. However, the precise conditions of desolvation considerably affect the efficiency of the reduction in crystal size.

Ondansetron, the approved name for 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one, is a highly selective and potent antagonist of 5-hydroxytryptamine (5-HT) at 5-HT3 receptors. Ondansetron, together with its physiologically acceptable salts and solvates, is described and claimed in British Patent No. 2153821B, and may be used in the treatment of a variety of conditions, including the nausea and vomiting induced by cancer chemotherapy and radiotherapy (as described, for example, in European Patent Specification No. 226266A).

The preferred form of ondansetron for pharmaceutical formulation is the hydrochloride dihydrate. Ondansetron hydrochloride dihydrate may be presented in a variety of formulations, one of which is as tablets for oral administration, when particularly suitable unit doses of the drug substance for the treatment of emesis are 5 mg and 10 mg.

In the tablet manufacturing process, ondansetron hydrochloride dihydrate is blended with suitable excipients, and the blend is then compressed into tablets.

Since a low dose of drug substance per tablet is required, for example, 5 mg of ondansetron hydrochloride dihydrate in a tablet of 125 mg compression weight, the distribution of the drug substance in the blend is critical in obtaining individual tablets with the correct drug content. Uniform drug distribution in the tablet blend may be achieved using drug substance of appropriate particle size. However, the ondansetron hydrochloride dihydrate obtained by methods described in the art, i.e. that obtained by simple crystallisation from an aqueous solvent mixture with subsequent drying at ambient temperature and pressure contains particles which are too large (i.e. >250 μm) to give an homogeneous distribution of the drug substance in the tablet blend. Indeed if crystalline ondansetron hydrochloride dihydrate produced by such conventional methods were used in tablet manufacture, the tablets so produced would not possess an acceptable drug content which, for a 5 mg tablet, is 5 mg±0.25 mg of ondansetron hydrochloride dihydrate.

Attempts to mill crystals of ondansetron hydrochloride dihydrate to reduce their particle size have proved unsuccessful, for example, comminution milling of on-

2

dansetron hydrochloride dihydrate caused screen blockage of coarse and fine screens. Furthermore, although ondansetron hydrochloride dihydrate of particle size <250 μm can be obtained by passing the substance through a 60 mesh sieve (as described, for example, in UK Patent No. 2153821B), this method is not commercially viable.

We have now found a process which reduces the crystal size of ondansetron hydrochloride dihydrate produced by simple crystallisation from solvent (more particularly aqueous solvent mixtures) to a size which is suitable for effective distribution of the drug substance in the tablet blend.

Thus the invention provides a process for reducing the crystal size of ondansetron hydrochloride dihydrate obtained by simple crystallisation from solvent, more particularly an aqueous solvent mixture, to a size which is suitable for effective distribution in a tablet blend, which comprises desolvating the said drug substance by drying at an elevated temperature and reduced or atmospheric pressure, and then rehydrating the ondansetron hydrochloride so formed.

It is possible by means of the process according to the invention to reduce the crystal size of ondansetron hydrochloride dihydrate to the extent that the entire drug substance consists of particles of a sufficiently small size (i.e. less than 250 μm, of which typically about 80% by weight are less than 63 μm) to give an homogeneous distribution of the drug substance in the tablet blend.

Preferably, the ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at a temperature greater then 40° C. (e.g. 50° C.) and at reduced pressure (e.g. 200 torr or less) for more than 8 hours. Alternatively, the ondansetron hydrochloride dihydrate obtained by crystallisation may be desolvated at ambient pressure by heating at a temperature of 50° C. or above (more preferably 100° C.).

Most preferably, ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at 50° C. at a pressure of 100 torr for 24 hours.

The desolvation process may be carried out with or without mechanical agitation.

The resultant ondansetron hydrochloride of reduced crystal size is then rehydrated, for example, by placing it in a humidified atmosphere of, for example, air or nitrogen, at ambient temperature. Rehydration will generally be continued until there is no further gain in weight.

According to another aspect, the invention provides crystalline ondansetron hydrochloride dehydrate characterised in that 100% of the crystals have a size of less than 250μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis).

According to a yet further aspect, the invention provides a pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient characterised in that 100% of the ondansetron hydrochloride dihydrate crystals have a size less than 250 μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis). Generally the composition will contain at least one physiologically acceptable carrier or excipient.

The invention is illustrated by the following examples. Temperatures are in ° C. Crystal size was measured by air-jet sieve analysis.

5,344,658

3

## EXAMPLE 1

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 μm

A solution of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one (147 g) in a mixture of isopropanol (670 ml), water (250 ml) and glacial acetic acid (76 ml) at ca. 60° was clarified by filtration and diluted with more water (61 ml) and isopropanol (650 ml). The solution was treated at 70° with 36% w/w hydrochloric acid (46 ml) and cooled to ca. 5°. The resulting suspension was filtered and the filtered solid was washed by displacement with isopropanol (600 ml) to give a solvent wet solid (269 g). A portion of this solid (91 g) was dried at ca. 50° and 200 torr for ca. 16h to give a solid (55 g).

A portion of the dried solid (26 g) was placed in a current of humidified air at ambient temperature until there was no further gain in weight and the title compound (29 g) was obtained.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 43.4 |
| 63 | 83.7 |
| 90 | 97.6 |
| 125 | 98.4 |
| 180 | 99.6 |
| 250 | 100.0 |

## EXAMPLE 2

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 μm

The previous preparation was repeated except that after collection by filtration the solid was dried at ambient temperature and pressure to give large crystals (>45% by weight of crystals larger than 250 μm) of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate.

Particle Size Distribution of "Large Crystals"

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 5.8 |
| 63 | 9.8 |
| 90 | 20.8 |
| 125 | 26.7 |
| 180 | 37.8 |
| 250 | 50.6 |
| 355 | 71.5 |
| 500 | 90.9 |
| 710 | 98.4 |
| 1000 | 98.6 |

A sample of this solid (26.9 g) was dried at ambient pressure and 100° for ca. 17 h during which period the weight of the sample was reduced to 24.3 g. The sample was then exposed to ambient temperatures and humidities until it had regained its original weight to afford the title compound.

Particle Size Distribution of Title Compound

4

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 47.6 |
| 63 | 94.8 |
| 90 | 100.0 |

## EXAMPLE 3

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dehydrate wherein the crystals are less than 250 μm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 52° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 44.3 |
| 63 | 83.2 |
| 90 | 97.0 |
| 125 | 98.8 |
| 180 | 99.8 |
| 250 | 100.0 |

## EXAMPLE 4

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 90 μm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 48° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize |
|---|---|
| 45 | 49.0 |
| 63 | 92.4 |
| 90 | 100.0 |

I claim:

1. A process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent, in which said ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated, wherein the resulting crystals are suitable for homogeneous distribution in a tablet blend, and wherein 100% of the resulting crystals have a size of less than 250 μm and at least about 80% by weight of the crystals have a size of less than 63 μm.

2. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is prepared by crystallisation from an aqueous solvent mixture.

3. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature greater than 40° C. and at reduced pressure for more than 8 hours.

4. A process according to claim 3, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of about 50° C. at a pressure of about 100 torr for about 24 hours.

5                        5,344,658                        6

5. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of 50° C. or above at ambient pressure.

6. A process according to claim 5, in which said temperature is about 100° C.

7. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is rehydrated in a humidified atmosphere at ambient temperature.

8. Crystalline ondansetron hydrochloride dihydrate in which 100% of the crystals have a size of less than

250 μm and at least about 80% by weight of the crystals have a size of less than 63 μm.

9. A pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient, in which 100% of said ondansetron hydrochloride dihydrate crystals have a size less than 250 μm and at least about 80% by weight of said crystals have a size less than 63 μm.

10. A pharmaceutical composition according to claim 9, in which each tablet has a nominal content of active ingredient which is 5 mg or 10 mg.

* * * * *

# EXHIBIT B

BEATTIE PADOVANO, LLC
50 Chestnut Ridge Road
P.O. Box 244
Montvale, NJ 07645
(201) 573-1810
John R. Holsinger (JH0281)
jholsinger@beattielaw.com
Vanessa R. Elliott (VE4752)
velliott@beattielaw.com
David L. Blank (DB1671)
dblank@beattielaw.com

And

RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
William A. Rakoczy, Esq. (*Pro Hac Vice* Pending)
wrakoczy@rmmslegal.com
Christine J. Siwik, Esq. (*Pro Hac Vice* Pending)
csiwik@rmmslegal.com
Jane J. Jaang, Esq. (*Pro Hac Vice* Pending)
jjaang@rmmslegal.com
Attorneys for Defendant Apotex, Inc.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED and SMITHKLINE BEECHAM CORPORATION, ) ) ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil Action No. 05-307 (JLL) |
| ) | |
| APOTEX, INC., ) | (Document Electronically Filed) |
| ) | |
| Defendant. ) | |

### ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM,
### AND DEMAND FOR JURY TRIAL

Defendant, Apotex Inc. ( "Apotex"), for its Answer, Affirmative Defenses, Counterclaim,

and Demand for Jury Trial to the Complaint of Plaintiff Glaxo Group Ltd. and SmithKline

Beecham Corporation (collectively, "Plaintiffs"), in which all averments not expressly admitted are denied, states as follows:

## JURISDICTION AND PARTIES

1.    This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271 et seq. and 21 U.S.C. § 355.

**RESPONSE:** Apotex admits only that this action purports to be one for alleged patent infringement, and denies the remaining averments of Paragraph 1.

2.    Plaintiff Glaxo Group Limited is an English corporation having a registered office at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 ONN, Middlesex, England.

**RESPONSE:** Apotex lacks knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2 and denies those averments on that basis.

3.    Plaintiff SmithKline Beecham Corporation is a Pennsylvania corporation having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102. Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation shall hereinafter be referred to jointly as "GlaxoSmithKline."

**RESPONSE:** Apotex lacks knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 3 and denies those averments on that basis.

4.    Defendant Apotex Inc. ("Apotex") is a privately held Canadian corporation having its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9. Novex Pharma is a division of Apotex, Inc. having its principal place of business at 380 Elgin Hills Road East, Richmond Hill, Ontario, Canada L4C 5H2. Upon information and belief, Apotex Inc. conducts continuous and systematic business activities within the State of New Jersey, and, alternatively, intends to market and sell the accused drug product in the State of New Jersey.

**RESPONSE:** Apotex admits the averments in the first sentence of Paragraph 4. Apotex denies the remaining averments of Paragraph 4.

5.    This Court has jurisdiction pursuant to the patent laws of the United States, Title 35 U.S.C. and 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**RESPONSE**: Apotex admits the averments in the first sentence of Paragraph 5. Apotex further

admits that venue is proper in this District. Apotex denies the remaining averments of Paragraph

5.

6.     On September 6, 1994, United States Patent No. 5,344,658 ("the '658 patent")
entitled "PROCESS AND COMPOSITION USING ONDANSETRON" was duly and legally
issued to David T. Collin. Since its issuance, Glaxo Group Limited has been the assignee and
owner of the '658 patent. SmithKline Beecham Corporation is the exclusive licensee of the '658
patent. A true and correct copy of the '658 patent is attached to this Complaint as Exhibit A.

**RESPONSE**: Apotex admits only that U.S. Patent No. 5,344,658 ("the '658 patent"), entitled

"PROCESS AND COMPOSITION USING ONDANSETRON," issued on September 6, 1994;

that on its face the '658 patent names David T. Collin as inventor and Glaxo Group Limited as

assignee; and that what appears to be a copy of the '658 patent is attached to the Complaint.

Apotex denies that the '658 patent "was duly and legally issued." Apotex lacks knowledge or

information sufficient to form a belief as to the truth of the remaining averments of Paragraph 6

and denies those averments on that basis.

### FIRST CAUSE OF ACTION
### INFRINGEMENT OF UNITED STATES PATENT NO. 5,344,658

7.     GlaxoSmithKline is the holder of approved New Drug Applications (hereinafter
"NDAs") under Section 505(b) of the Federal Food, Drug and Cosmetic Act (hereinafter the
"Act"), 21 U.S.C. § 355(b), for ondansetron hydrochloride tablets covered by the '658 patent.

**RESPONSE**: Apotex lacks knowledge or information sufficient to form a belief as to the truth

of the averments of Paragraph 7 and on that basis denies those averments.

8.     On or about December 7, 2004, GlaxoSmithKline received a written Notice of
Patent Certification from Apotex stating that Apotex has filed Abbreviated New Drug
Application (hereinafter "ANDA") No. 77-306 seeking approval from the FDA to market
ondansetron hydrochloride tablets pursuant to Section 505(j) of the Act, 21 U.S.C. § 355(j), prior
to expiration of the '658 patent, and alleging that the '658 patent is not infringed and/or that the
patent is invalid.

**RESPONSE**: Apotex admits only that, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), Apotex

sent a notice of certification to Plaintiffs, dated November 29, 2004, stating, *inter alia*, that

Apotex submitted ANDA No. 77-306 for Ondansetron Hydrochloride Tablets 4 mg and 8 mg,

and that Apotex's ANDA contains a "paragraph IV certification," pursuant to 21 U.S.C. § 355

(j)(2)(A)(vii)(IV), stating that Apotex's proposed tablets will not infringe the '658 patent and/or

that such patent is invalid. Apotex lacks knowledge or information sufficient to form a belief as

to the truth of the remaining averments of Paragraph 8 and on that basis denies those averments.

9.    Pursuant to 35 U.S.C. § 271(e)(2), Apotex's filing of this ANDA is an actual act
of infringement.

**RESPONSE**: Apotex denies the averments of Paragraph 9.

10.    As such, Defendants [sic] Apotex have infringed the '658 patent and such
infringement will continue unless enjoined by this Court.

**RESPONSE**: Apotex denies the averments of Paragraph 10.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment:

1.    Finding that defendants have infringed United States Patent No. 5,344,658;

2.    Ordering that the effective date of any approval of defendants' [sic] application
under Section 505(j) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j), for
ondansetron hydrochloride tablets and their use be not earlier than the expiration dates of United
States Patents Nos. [sic] 5,344,658;

3.    Awarding plaintiffs preliminary and final injunctions enjoining defendants [sic]
and their officers, agents, servants, employees, and privies from continued infringement of
United States Patents Nos. [sic] 5,344,658; and

4.    Awarding plaintiffs their reasonable attorneys' fees, interests and costs of this
action, and such other and further relief as this Court may deem just and proper.

**RESPONSE**: Apotex denies that Plaintiffs are entitled to the relief requested or to any

relief whatsoever, and prays for judgment in its favor dismissing this action with prejudice and

awarding Apotex its reasonable attorneys' fees pursuant to 35 U.S.C. § 285, interest, and costs of

this action, and such other and further relief as this Court may deem just and proper.

## AFFIRMATIVE DEFENSES

Without prejudice to the denials set forth in its Answer, without admitting any averments of the Complaint not otherwise admitted, and without undertaking any of the burdens imposed by law on the Plaintiffs, the Defendant, Apotex Inc. ("Apotex"), avers and asserts the following Affirmative Defenses to the Complaint:

### First Affirmative Defense

The manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of United States Patent No. 5,344,658 ("the '658 patent").

### Second Affirmative Defense

The claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

\*     \*     \*

Apotex reserves the right to amend this pleading to assert additional affirmative defenses in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

### COUNTERCLAIM

Defendant/Counterclaim-Plaintiff, Apotex Inc. ("Apotex"), for its Counterclaim against Plaintiffs/Counterclaim-Defendants Glaxo Group Ltd. ("Glaxo"), and SmithKline Beecham Corporation ("SmithKline"; collectively, "Plaintiffs" or "Counterclaim-Defendants") alleges as follows:

## The Parties

1.      Counterclaim-Plaintiff Apotex Inc. is a corporation organized and existing under the laws of Canada and having places of business at 150 Signet Drive, Weston, Ontario, Canada M9L 1T9, and 50 Steinway Boulevard, Etobicoke, Ontario, Canada M9W 6Y3. Apotex Inc. develops and manufactures generic drugs.

2.      Apotex has submitted Abbreviated New Drug Application ("ANDA") No. 77-306, to the U.S. Food and Drug Administration seeking approval to market Ondansetron Hydrochloride Tablets 4 mg and 8 mg.

3.      Upon information and belief, Glaxo is a company organized and existing under the law of England, having an office and place of business at Glaxo Wellcome House, Berkeley Avenue, Greenford, Middlesex, UB6 ONN, United Kingdom.

4.      Upon information and belief, SmithKline is a Pennsylvania corporation having a principal place of business at One Franklin Plaza, Philadelphia, Pennsylvania 19102.

## Jurisdiction and Venue

5.      This Counterclaim arises under, *inter alia*, the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

6.      This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1338.

7.      This Court has personal jurisdiction over Counterclaim-Defendants by virtue of those parties having submitted to and invoked the jurisdiction of this Court by filing the Complaint against Apotex.

8.    Upon information and belief, this Court also has personal jurisdiction over Counterclaim-Defendants because they conduct substantial business in this District, and by virtue of their regular and systematic contact with this District.

9.    Venue is proper in this District under 28 U.S.C. § 1391.

### The Patent-In-Suit

10.    On or about January 19, 1993, the U.S. Patent and Trademark Office issued U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "PROCESS AND COMPOSITION USING ONDANSETRON."

11.    Glaxo purports and claims to be the owner of the '658 patent by assignment.

12.    SmithKline purports and claims to be the exclusive licensee of the '658 patent.

13.    On or about January 19, 2005, Counterclaim-Defendants sued Apotex in this District alleging infringement of the '658 patent under 35 U.S.C. § 271 (e)(2)(A).

### First Cause Of Action
### (Non-Infringement Of The '658 Patent)

14.    Apotex repeats, realleges, and incorporates by reference paragraphs 1 through 13 as though set forth fully herein.

15.    There is an actual, substantial, and continuing justiciable case and controversy between Apotex and Counterclaim-Defendants regarding noninfringement of the '658 patent.

16.    The manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent.

17.    Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of

-7-

ANDA No. 77-306, will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent.

**Second Cause Of Action**
**(Invalidity Of The '658 Patent)**

18.    Apotex repeats, realleges, and incorporates by reference paragraphs 1 through 17 as though set forth fully herein.

19.    There is an actual, substantial, and continuing justiciable case and controversy between Apotex and Counterclaim-Defendants regarding the invalidity of the '658 patent.

20.    The claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

21.    Apotex is entitled to a judicial declaration that the claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

WHEREFORE, Apotex respectfully prays for judgment in its favor and against Counterclaim-Defendants:

(a)    Declaring that the manufacture, sale, offer for sale, use, or importation of Apotex's Ondansetron Hydrochloride Tablets, that are the subject of ANDA No. 77-306, does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '658 patent; and

(b)    Declaring that the claims of the '658 patent are invalid for failure to satisfy one or more of the conditions for patentability under 35 U.S.C. § 1 *et seq.*

(c)    Ordering that the Complaint be dismissed with prejudice and

judgment entered in favor of Apotex; and

(d)    Awarding Apotex its reasonable attorneys' fees and costs of this

Counterclaim under 35 U.S.C. § 285; and,

(e)    Awarding Apotex such other and further relief as the Court may

deem just and proper.

### JURY DEMAND

The Defendant/Counterclaim-Plaintiff, Apotex Inc., hereby demands a trial by jury of all

issues so triable on its Counterclaim, Affirmative Defenses, and Plaintiffs' Complaint.

BEATTIE PADOVANO, LLC
Attorneys for Defendant Apotex Inc.

s/ Vanessa R. Elliott (VE4752)

Dated:  March 22, 2005

### CERTIFICATION PURSUANT TO L.R. 11.2

I certify that to my knowledge the matter in controversy is not the subject of any other

action pending in any court, or of any pending arbitration or administrative proceeding.

BEATTIE PADOVANO, LLC
Attorneys for Defendant Apotex Inc.

s/ Vanessa R. Elliott (VE4752)

Dated:  March 22, 2005

# EXHIBIT C

MORGAN, LEWIS & BOCKIUS, LLP
(A Pennsylvania Limited Liability Partnership)
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6600
By:    Robert A. White (RW-6063)

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
By:    Dennis J. Mondolino
        Lisa M. Ferri
        Richard C. Pettus
Attorneys for Plaintiffs and Counterdefendants Glaxo
Group Limited & SmithKline Beecham Corporation

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED, and<br>SMITHKLINE BEECHAM CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX, INC.,<br><br>Defendant. | Civil Action No. 05-307 (JLL)<br><br>Honorable Jose L. Linares, U.S.D.J.<br>Honorable Ronald J. Hedges, U.S.M.J.<br><br>**REPLY TO ANSWER AND**<br>**COUNTERCLAIMS** |

Plaintiffs and Counterdefendants GLAXO GROUP LIMITED and SMITHKLINE

BEECHAM CORP. (collectively "GSK") hereby respond to the allegations of the

Answer and Counterclaims filed on or about March 22, 2005 by Defendant Apotex, Inc.

(referred to hereinafter as "Defendant" or "Apotex") in like-numbered paragraphs, as

follows:

## REPLY TO COUNTERCLAIMS

### THE PARTIES

1.  Upon information and belief, GSK admits the allegations of Paragraph 1 with respect to the place of business at 150 Signet Drive. GSK lacks sufficient knowledge or information to admit or deny the allegations of Paragraph 1 and therefore denies the allegations.

2.  Upon information and belief, GSK admits the allegations of Paragraph 2.

3.  GSK admits the allegations of Paragraph 3.

4.  GSK admits the allegations of Paragraph 4.

### JURISDICTION AND VENUE

5.  GSK admits the allegations of Paragraph 5.

6.  GSK admits the allegations of Paragraph 6.

7.  GSK admits that it is subject to this Court's jurisdiction for this matter.

8.  GSK admits the allegations of Paragraph 8

9.  GSK admits the allegations of Paragraph 9

### THE PATENT-IN-SUIT

10.  GSK denies this paragraph, but admits that on or about September 6, 1994, the United States Patent and Trademark Office duly and legally issued United States Patent No. 5,344,658 ("the '658 patent").

11.  GSK admits that Glaxo Group Limited is the owner of the '658 patent by assignment.

12.  GSK admits that SmithKline Beecham Corporation is the exclusive licensee of the '658 patent.

13.  GSK admits the allegations of Paragraph 13.

### FIRST CAUSE OF ACTION
(Non-Infringement of the '658 Patent)

14.  In reply to Paragraph 14, GSK repeats Paragraphs 1 – 13 of this Reply as if set forth fully herein.

15.  GSK admits the allegations of Paragraph 15 regarding the infringement of the '658 patent.

16.  GSK denies the allegations of Paragraph 16.

17.  GSK denies the allegations of Paragraph 17.

### SECOND CAUSE OF ACTION
(Invalidity of the '658 Patent)

18.  In reply to Paragraph 18, GSK repeats Paragraphs 1 – 17 of this Reply as if set forth fully herein.

19.  GSK admits the allegations of Paragraph 19.

20.  GSK denies the allegations of Paragraph 20.

21.  GSK denies the allegations of Paragraph 21.

## CONCLUSION

WHEREFORE, GSK requests judgment as follows:

A.    Granting all of the relief requested in the Complaint;

B.    Dismissing Apotex' Counterclaims with prejudice; and

C.    Awarding GSK such other and further relief as the Court may deem just and

proper.

Dated: April 11, 2005

                                        MORGAN, LEWIS & BOCKIUS, LLP
                                        Attorneys for Plaintiffs

                                        By: _____
                                            Robert A. White (RW-6063)

OF COUNSEL:
Dennis J. Mondolino
Lisa M. Ferri
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, New York 10178-0600
(212)309-6000

I hereby certify that the following **REPLY TO DEFENDANTS' ANSWER and**

**COUNTERCLAIMS** was caused to be served this 11th day of March, 2005, upon the

following:

**One Copy - Via E-Mail & Federal Express**

Vanessa R. Elliott
Beattie Padovano, LLC
50 Chestnut Ridge Road
Montvale, NJ 07645

Dated April 11, 2005

Robert A. White

# EXHIBIT D

COVENANT NOT TO SUE
and
STIPULATION OF NON-INFRINGEMENT
OF U.S. PATENT NO. 5,344,658

This covenant and stipulation ("Agreement") is made and effective as of May 18, 2005 by Glaxo Group Limited and SmithKline Beecham Corporation, on behalf of themselves, their parents, subsidiaries, affiliates, successors and assigns (collectively "GlaxoSmithKline") with Apotex, Inc., its parents, subsidiaries, affiliates, successors and assigns (collectively "Apotex").

WHEREAS, Glaxo Group Limited is the owner by assignment and SmithKline Beecham Corporation is the exclusive licensee of U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "Process and Composition Using Ondansetron," relating to pharmaceutical compositions containing ondansetron and processes for preparing those compositions; and

WHEREAS, GlaxoSmithKline is the holder of record of NDA 20-103 for marketing ondansetron hydrochloride tablets, 4 mg, 8 mg and 24 mg; and

WHEREAS, Apotex submitted ANDA No. 77-306 to the FDA on September 30, 2004, seeking approval to market ondansetron hydrochloride tablets, 4 mg and 8 mg; and

WHEREAS, Apotex filed a certification in ANDA No. 77-306 pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) with respect to the '658 patent ("the Paragraph IV certification") and gave GlaxoSmithKline Notice of the Paragraph IV certification, along with a statement of the factual and legal bases of the Paragraph IV certification; and

WHEREAS, GlaxoSmithKline filed a civil action, captioned *Glaxo Group Limited and SmithKline Beecham Corporation v. Apotex, Inc.*, Case No. 2:05-CV-00307 (D.N.J.), on January 14, 2005, alleging that the product described in Apotex's ANDA No. 77-306 infringes the '658 patent; and

WHEREAS, Apotex filed an Answer, Affirmative Defenses, Counterclaim and Demand for Jury Trial to Plaintiffs' Complaint on March 22, 2005, seeking a declaratory judgment of non-infringement and invalidity of the '658 patent; and

WHEREAS, GlaxoSmithKline filed a Reply to Apotex's Counterclaims on April 11, 2005, seeking the relief requested in GlaxoSmithKline's Complaint and dismissal of Apotex's Counterclaim with prejudice; and

WHEREAS, on November 29, 2004, in response to GlaxoSmithKline's request, Apotex, through its attorneys, provided to GlaxoSmithKline's attorneys a copy of ANDA No. 77-306 as submitted to the FDA on September 30, 2004 and bates-stamped APO/OND 000001-002130 ("Apotex's ANDA") on a confidential "outside attorneys eyes only" basis; and

WHEREAS, from review of this documentation, GlaxoSmithKline maintains that there is no actual, justiciable controversy between the parties, as the ondansetron hydrochloride tablets that are the subject of and described in Apotex's ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of the '658 patent;

NOW, THEREFORE, in consideration of the covenants and promises set forth herein, GlaxoSmithKline and Apotex agree as follows:

1.    GlaxoSmithKline and Apotex consent to entry of a Stipulation of Dismissal, in the form attached hereto, dismissing with prejudice the parties' respective claims and counterclaims of the above-referenced action.

2.    GlaxoSmithKline will not sue Apotex, as defined herein, or its distributors or customers for infringement of the '658 patent based on the importation, manufacture, use, sale or

2

offer for sale of ondansetron hydrochloride tablets that are the subject of and described in Apotex's ANDA as defined above.

     3.     Apotex agrees that it will not seek a declaratory judgment declaring claims of the '658 patent to be invalid unless GlaxoSmithKline asserts a claim against Apotex for allegedly infringing one or more claims of the '658 patent, in which case Apotex retains the right to assert any and all invalidity defenses and claims it has with respect to the '658 patent, as well as its right to raise this Agreement as a defense in response to any such infringement action by GlaxoSmithKline.

     4.     Nothing in this Agreement shall be construed as a license of any kind under or to any GlaxoSmithKline patents or other forms of intellectual property including, but not limited to, the '658 patent.

     5.     This Agreement extends only to Apotex as defined herein and is not transferable.

     6.     The covenant not to sue expressed in paragraph 2 becomes valid upon (I) the execution of this Agreement and (ii) the execution and filing of the Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41 attached hereto.

     7.     Each party shall bear its own attorneys' fees, costs and expenses.

     8.     This Agreement may be executed in multiple counterparts.

     9.     This constitutes the entire and only agreement between the parties relating to the subject matter hereof.

GLAXO GROUP LIMITED

By: _____

Name: **Charles E. Dadswell**
     **Vice President, US Intellectual**
Title: **Property**_____

3

SMITHKLINE BEECHAM CORP.

By: _____

Name: Charles E. Dadswell _____
Title: Vice President, US Intellectual
Property _____


APOTEX, INC.

By: _____

Name: B Sherman _____

Title: Chairman _____

4

# EXHIBIT E

Case 1:06-cv-01890-RMC    Document 12-3    Filed 11/17/2006    Page 44 of 46
Case 2:05-cv-00307-JLL-RJH    Document 24    Filed 05/25/2005    Page 1 of 3
Case 2:05-cv-00307-JLL-RJH    Document 23    Filed 05/18/2005    Page 1 of 3



MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
(609) 919-6600
Robert A. White (RW-6063)
rwhite@morganlewis.com

AND

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Dennis J. Mondolino
dmondolino@morganlewis.com
Lisa M. Ferri
lferri@morganlewis.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED, and SMITHKLINE BEECHAM CORPORATION<br><br>     Plaintiffs,<br><br>v.<br><br>APOTEX, INC.,<br><br>     Defendant. | Civil Action No. 05-307 (JLL)<br><br>Honorable Jose L. Linares, U.S.D.J.<br>Honorable Ronald J. Hedges, U.S.M.J. |

### STIPULATION OF DISMISSAL PURSUANT TO FED.R.CIV.P. 41

Pursuant to the parties' Covenant Not to Sue and Stipulation of Non-infringement (the

"Agreement"), incorporated by reference herein, the parties, by their undersigned attorneys,

stipulate and agree to the dismissal of this action with prejudice, as follows:

Case 1:06-cv-01890-RMC   Document 12-3   Filed 11/17/2006   Page 45 of 46
Case 2:05-cv-00307-JLL-RJH   Document 24   Filed 05/25/2005   Page 2 of 3
Case 2:05-cv-00307-JLL-RJH   Document 23   Filed 05/18/2005   Page 2 of 3

WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

WHEREAS, GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306; and

WHEREAS, Apotex agrees that it will not seek a declaratory judgment declaring claims of the '658 patent to be invalid unless GlaxoSmithKline asserts a claim against Apotex for allegedly infringing one or more claims of the '658 patent, in which case Apotex retains the right to assert any and all invalidity defenses and claims it has with respect to the '658 patent, as well as its right to raise this Agreement as a defense in response to any such infringement action by GlaxoSmithKline;

THEREFORE, based on the referenced Agreement, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims with prejudice. Each party shall bear its own costs, expenses and attorneys' fees.

Dated: May 18, 2005

Robert A. White (RW-6063)
MORGAN, LEWIS & BOCKIUS, LLP

Dated: May 18, 2005

John Holsinger (JH-0281)
Vanessa R. Elliott (VE-4752)

2

SO ORDERED:
DATED:                    2/2/03

Case 1:06-cv-01890-RMC    Document 12-3    Filed 11/17/2006    Page 46 of 46
Case 2:05-cv-00307-JLL-RJH    Document 24    Filed 05/25/2005    Page 3 of 3
Case 2:05-cv-00307-JLL-RJH    Document 23    Filed 05/18/2005    Page 3 of 3

(A Pennsylvania Limited Liability
Partnership)
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6600

Dennis J. Mondolino
Lisa M. Ferri
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Attorneys for Plaintiffs and
Counterdefendants
Glaxo Group Limited & SmithKline
Beecham Corporation

David L. Blank (DB-1671)
BEATTIE PADOVANO LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
(201) 799-2120

William A. Rakoczy
Christine J. Siwik
Jane J. Jaang
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Chicago, IL 60610
(312) 222-6301
Attorneys for Defendant and Counter-Plaintiff
Apotex Inc.

3

# TAB 2

# RAKOCZY MOLINO MAZZOCHI SIWIK LLP

6 WEST HUBBARD STREET
SUITE 500
CHICAGO, IL 60610
www.rmmslegal.com

312-527-2157 main phone
312-527-4205 main fax

**Christine J. Siwik**
312.222.6304 Direct Phone
312.222.6324 Direct Fax
csiwik@rmmslegal.com

**William A. Rakoczy**
312.222.6301 Direct Phone
312.222.6321 Direct Fax
wrakoczy@rmmslegal.com

_MC_

August 29, 2006

**VIA ELECTRONIC TRANSMISSION
AND OVERNIGHT DELIVERY**

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
7500 Standish Place
Rockville, MD  20855

**PRIVILEGED AND CONFIDENTIAL
ANDA COMMUNICATION, ANDA NO. 77-306**

> Re:    **Apotex Inc.'s ANDA No. 77-306 for Ondansetron Hydrochloride
> Tablets 4 mg and 8 mg**

Dear Mr. Buehler:

By letter dated August 31, 2005, we requested that the Agency confirm that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's final approval will not be delayed by any unexpired period of 180-day exclusivity associated with U.S. Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the '658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against Apotex Inc. We have not heard from the Agency in response to our request. If we do not receive a satisfactory response by September 14, 2006, Apotex will have no choice but to consider immediate judicial action in order to protect its right to timely launch its ondansetron products.

As explained in our original correspondence, of the four patents originally submitted by GSK in connection with its Zofran® (ondansetron hydrochloride) Tablets, only two are relevant here: (1) the '789 patent, to which Apotex submitted a paragraph III certification and which prevents FDA from granting Apotex's ANDA final approval until patent expiration on June 24, 2006 (with pediatric exclusivity to December 24, 2006); and (2) the '658 patent, to

RECEIVED
AUG 3 0 2006
OGD / CDER

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 2

which Apotex submitted a paragraph IV certification. Because GSK's patent infringement litigation against Apotex over the '658 patent has been dismissed based upon an express concession by GSK of non-infringement, any remaining 180-day exclusivity for the '658 patent that could potentially delay the approval of Apotex's ondansetron ANDA has been triggered and expired. Thus, we again request that FDA confirm that Apotex's ANDA will receive final approval upon expiration of the '789 patent.

On April 11, 2006, FDA issued an administrative decision in connection with exclusivity relating to the drug pravastatin.[1] In this ruling, FDA stated that it will not look to the preclusive effect that a ruling might have when deciding whether an order is sufficient to trigger the 180-day exclusivity period pursuant to 21 U.S.C. § 355(j)(5)(B)(iv)(II). In the words of the D.C. Circuit: "the agency will never look beyond the face of a court order to ascertain whether it qualified as a triggering court decision." *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1250 (D.C. Cir. 2006). Rather, the Agency will only look to the face of the order to see if it expressly states that the patent at issue is invalid, unenforceable, and/or not infringed. (*See* April 11, 2006 Pravastatin Exclusivity Ruling at 2, Ex. A hereto). Even under this unduly restrictive view of the court decision trigger, the May 25, 2005 order in *Glaxo Group Ltd. v. Apotex Inc.* qualifies as a triggering court decision.

The Glaxo-Apotex patent litigation did not start as a declaratory judgment action by an ANDA applicant against the patentee. Instead, GSK sued Apotex for patent infringement within 45 days of receiving Apotex's notice letter on the '658 patent. During the course of that litigation, GSK concluded that Apotex's ANDA products would not infringe the '658 patent. After being apprised of GSK's position, the parties entered into a Covenant Not to Sue and Stipulation of Non-Infringement. (Ex. D to Apotex's 8/31/05 Submission). On May 24, 2005, the district court presiding over GSK's infringement case signed a dismissal order expressly acknowledging that Apotex's ANDA products do not infringe the '658 patent. That dismissal order provides, in pertinent part:

> Pursuant to the parties' ***Covenant Not to Sue and Stipulation of Non-infringement*** (the "Agreement"), ***incorporated by reference herein***, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:

---

[1] As the Agency is aware, Apotex vigorously disputes the legality of FDA's April 11, 2006 administrative ruling, which unlawfully restricts what types of orders are sufficient to trigger the start of the 180-day exclusivity period under 35 U.S.C. § 355(j)(5)(B)(iv)(II). For present purposes, however, Apotex will apply that decision to the facts of the exclusivity situation surrounding ondansetron tablets. Even under the Agency's April 11, 2006 ruling, any exclusivity attaching to the '658 patent has been triggered and has expired.

Gary Buehler                                    PRIVILEGED AND CONFIDENTIAL
Director, Office of Generic Drugs          ANDA COMMUNICATION, ANDA NO. 77-306
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 3

> WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and
> SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and
> agree that the ondansetron hydrochloride tablets that are the subject of and
> described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported,
> manufactured, used, sold or offered for sale in the United States *would not
> infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658
> patent")*; and
>
> WHEREAS, *GlaxoSmithKline has represented that it will not sue Apotex for
> infringement of the '658 patent* based on the importation, manufacture, use, sale
> or offer for sale of ondansetron hydrochloride tablets that are the subject of and
> described in ANDA No. 77-306;
>
>                     \*        \*        \*
>
> THEREFORE based on the referenced Agreement, the parties, by their
> undersigned attorneys, hereby stipulate and agree to the dismissal of the parties'
> respective claims and counterclaims *with prejudice.*

(Ex. E to Apotex's 8/31/05 Submission (emphasis added)). The district court entered the order
on May 25, 2005. The Order became a final decision from which no appeal has been, or can be,
taken on June 24, 2005, at the latest. On June 1, 2005, in accordance with 21 C.F.R.
§ 314.107(e), Apotex submitted a copy of this decision to OGD.

Thus, even if FDA does nothing but look at the face of this order, any exclusivity
with respect to the '658 patent has been triggered. The Order states on its face, *inter alia*, that
GSK "stipulate[s] and agree[s] that the ondansetron hydrochloride tablets that are the subject of
and described in Apotex Inc.'s ANDA No. 77-306 *do not infringe*, and if imported,
manufactured, used, sold or offered for sale in the United States *would not infringe, any claim
of [the '658 patent].*" (8/31/05 Letter, Ex. E). The Order further states that "[GSK] has
represented that it will not sue Apotex for infringement of the '658 patent . . . ." (*Id.*).

Accordingly, Apotex again asks that FDA confirm that any exclusivity attaching
to the '658 patent was triggered by the May 25, 2005 order in *Glaxo v. Apotex* and that such
exclusivity has now expired. Any other result would run contrary to the Agency's April 11,
2006 administrative decision, thus constituting arbitrary, capricious, and unlawful agency action.

                                    \*     \*     \*

Given the upcoming expiration of the '789 patent, if we do not receive a
satisfactory response from the Agency by September 14, 2006, Apotex will have no choice but to
consider immediate judicial action in order to protect its right to timely launch its ondansetron

Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
August 29, 2006
Page 4

PRIVILEGED AND CONFIDENTIAL
ANDA COMMUNICATION, ANDA NO. 77-306

products.  Apotex obviously would prefer to avoid any litigation over this issue, particularly given the clear language of the judicial order at issue.

Please do not hesitate to contact us should you request any additional information. We look forward to the Agency's response.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI SIWIK LLP

Christine J. Siwik

William A. Rakoczy

Enclosures
cc (*via e-mail*):        Elizabeth Dickinson, *Office of Chief Counsel*

# Exhibit A



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

ANDA 76-341                                              Food and Drug Administration
                                                        Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

        This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

        Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.      Statutory and Procedural Background

        A.      180-Day Exclusivity and the Court Decision Trigger

        Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

        A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

        An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
> (I)      the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)     the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman,* 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

3

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd,* 873 F.2d 1418 (Fed. Cir. 1989)).

B.   The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

### A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

> 1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "decision" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

    2.    FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

        3.        FDA's Interpretation is Consistent with the FDA's 180-day
                        Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra.* FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

11

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec.*" *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec.*

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.   FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

12

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] *The agency's brief on appeal to the Teva III court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:*

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability.  The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding.  FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

TAB 3



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 77-306

NOV 0 3 2006

Rakoczy Molino Mazzochi Siwik, LLP
Attention: Christine J. Siwik and William A. Rakoczy
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy and Ms. Siwik:

This responds to your letter dated August 29, 2006, in which you request on behalf of Apotex Corporation that the Food and Drug Administration (FDA) consider the start of 180-day exclusivity for ondansetron hydrochloride tablets 4 mg and 8 mg (ondansetron) to have been triggered by the dismissal of a patent infringement suit.

As you are aware, FDA interpreted the relevant statutory provision in a letter dated April 11, 2006 (FDA letter decision) (attached). FDA's letter decision expressly states that the dismissal of a patent suit in and of itself is not sufficient to trigger the start of a 180-day exclusivity period; rather a court order must reflect a holding on the merits by the court that the patent at issue is invalid, not infringed, or unenforceable ("holding-on-the-merits" standard). The FDA letter decision explains in detail the legal grounds and policy justifications for the holding-on-the-merits standard. Apotex sued the agency, challenging the FDA letter decision as arbitrary and capricious, and the District of Columbia Circuit Court of Appeals ruled in the agency's favor, summarily affirming the district court's denial of Apotex's motion for a preliminary injunction. *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006). Apotex petitioned for a rehearing *en banc* by the court, which the court denied on August 17, 2006. On October 3, 2006, Apotex entered into a stipulation of dismissal ending the litigation.

In accordance with the FDA letter decision, we deny your request for the reasons detailed briefly below, and refer you to that decision for further guidance on this matter.

    I.     Apotex's request.

Apotex now asks the FDA to confirm that: "(1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA [abbreviated new drug application] upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's final approval will not be delayed by any unexpired 180-day exclusivity associated with U.S. Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the '658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against Apotex Inc. [for infringement of the '658 patent]." In essence, you argue that the dismissal of the GSK lawsuit triggered any 180-day exclusivity arising from the '658 patent with respect to ondansetron, that any such 180-day exclusivity has now expired and, therefore, no unexpired 180-day exclusivity arising from the '658 patent could delay approval of Apotex's ANDA upon expiration of the '789 patent.

II.    The May 25, 2005 Order.

Apotex's ANDA for ondansetron includes a "paragraph IV" certification[1] in which Apotex alleges that the '658 patent is not infringed and/or is not valid. Having received notice of this paragraph IV certification in December 2004, GSK sued Apotex for infringement of the '658 patent in January 2005. You enclosed with your August 31, 2005 letter a copy of "the stipulation of dismissal pursuant to Fed. R. Civ. P. 41" filed May 25, 2005, dismissing the GSK suit (stipulation of dismissal).

The stipulation of dismissal states that the plaintiffs (GSK)

> . . . stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of GlaxoSmithKlines's U.S. Patent No. 5,344,658 ("the '658 patent"); and

> . . . [have] represented that [they] will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

and the parties

> . . . stipulate and agree to dismissal of the parties' respective claims and counterclaims with prejudice . . . .

The stipulation is signed on behalf of GSK and Apotex, and is signed as "so ordered" by the court.

---

[1] An NDA applicant must notify FDA of patents the applicant believes claim the drug or an approved use of the drug. 21 U.S.C. §§ 355(b)(1), 355(c)(2). FDA relies on these notifications to post information on these patents in *Approved Drug Products with Therapeutic Equivalence Evaluations* (informally referred to as the Orange Book). 21 U.S.C. §§ 355(b)(1), 355(c)(2), 355(j)(7)(A)(iii). An ANDA applicant must then make one of four certifications with respect to each patent that claims the drug or any use of the drug for which the ANDA applicant is seeking approval. These certifications are commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them:

- a "paragraph I" certification that patent information has not been filed;
- a "paragraph II" certification that the patent has expired;
- a "paragraph III" certification of the date the patent will expire; or
- a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable.

21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A). A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent. If an ANDA applicant makes a paragraph IV certification, the applicant must the notify the holder of the approved NDA and the patent owner. 21 U.S.C. § 355(j)(2)(B).

III.    180-day exclusivity and FDA letter decision.

Section 505(j)(5)(B)(iv) of the Act establishes 180-day exclusivity. This exclusivity provides a potential reward to the first ANDA applicant to submit a paragraph IV certification to a patent pursuant to section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act and thus to expose itself to the risk of being sued for infringing the patent.

Section 505(j)(5)(B)(iv)(II) provides that the start of 180-day exclusivity can be triggered as of "the date of a *decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed.*"[2]  (Emphasis added.)  This mechanism for initiating 180-day exclusivity is commonly referred to as the "court decision trigger."

The FDA letter decision announced the holding-on-the-merits standard to assess whether an action of a court qualifies as a court decision trigger to start the running of 180-day exclusivity. As the introduction to that letter states (and the body of that letter explains in detail):

> FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. . . . FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

FDA letter decision at 2.[3]  FDA adopted this bright-line standard to provide clarity, reduce the likelihood of litigation over whether a court action triggers 180-day exclusivity, and promote greater marketplace certainty.

---

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). None of the amendments pertaining to 180-day exclusivity enacted through the MMA bear upon the determination of whether the stipulation of dismissal for the GSK suit triggered 180-day exclusivity for ondansetron, however, because the earliest ANDA containing a paragraph IV certification for this drug was submitted before the December 8, 2003, enactment date of the MMA. *See id.* § 1102(b)(1).

[3] Provisions of the MMA inapplicable to the 180-day exclusivity determination for ondansetron (*see* MMA § 1102(b)(1)) eliminated the court-decision trigger provision, but provided for forfeiture of exclusivity in certain circumstances. One event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2006). The holding-on-the-merits standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

IV.        Analysis

The GSK suit was dismissed by an agreement between the parties; the court never issued a holding on the merits of the patent claim. It is clear, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard. *See Apotex*, 449 F.3d at 1253.[4]

You assert that the stipulation of dismissal satisfies the holding-on-the-merits standard because, *inter alia*, it expressly reflects GSK's judgment that the patent at issue is not infringed and GSK's commitment not to sue. Your conclusion is not correct. It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim. As its title ("Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41") reflects, the stipulation of dismissal was the mechanism by which the parties sought and received dismissal of the case because, in their view, there was nothing left for the court to decide. The court was not asked to resolve the dispute on the merits and did not do so. In short, the stipulation of dismissal does not reflect a holding by the court on the merits of the patent claim.[5]

---

[4] Although the holding-on-the-merits standard was announced in relation to a declaratory judgment action, the standard is equally applicable to affirmative patent infringement suits, such as the GSK suit at issue here. The standard looks to whether the court has made a holding on the merits of the patent claim; it does not consider the manner by which the dispute came before the court.

This letter does not address the arguments made in your prior letter of August 31, 2005, to support your claim that the GSK stipulation of dismissal satisfies an estoppel-based interpretation of the court decision trigger. As explained in greater detail in the FDA letter decision, the agency has rejected this interpretation in favor of the holding-on-the-merits standard. Accordingly, this letter addresses only the arguments you made in your letter dated August 29, 2006, that the GSK stipulation of dismissal satisfies the holding-on-the-merits standard.

[5] We note that you raised additional arguments in telephone conversations with the agency that you chose not to submit in writing. These arguments relate to FDA's decision in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), as well as whether FDA's interpretation of section 505(j)(5)(B)(iii) is consistent with its interpretation of section 505(j)(5)(B)(iv). In this letter, however, we are only addressing the question that Apotex set forth in writing, *i.e.*, whether the ondansetron dismissal constitutes a court decision trigger under FDA's "holding-on-the-merits" standard. We do not believe that the additional arguments not submitted in writing are pertinent to making that determination, which simply looks to whether the court has held on the merits of a patent claim.

V.    Conclusion

The stipulation of dismissal did not trigger any 180-day exclusivity for ondansetron that may arise from another ANDA applicant's paragraph IV certification to the '658 patent. The agency is not aware of any judicial action to date qualifying as a court decision trigger of 180-day exclusivity for ondansetron. Accordingly, 180-day exclusivity may delay approval of Apotex's ANDA for ondansetron hydrochloride tablets 4 mg and 8 mg upon expiration of the '789 patent.[6]

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure

cc:    Elizabeth Dickinson, Office of Chief Counsel
       Applicants with Pending ANDAs for Ondansetron HCl Tablets, 4 mg and 8 mg

---

[6] FDA does not make its exclusivity determinations until an ANDA is ready for final approval, which will not occur for ondansetron until at least December 24, 2006, when the pediatric exclusivity associated with the '789 patent will expire. Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a. Apotex assumes that another ANDA applicant will be entitled to 180-day exclusivity for ondansetron, which the agency neither confirms nor denies.



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

_____

ANDA 76-341

Food and Drug Administration
Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.*
*Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva*
*Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms, USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.    Statutory and Procedural Background

      A.    180-Day Exclusivity and the Court Decision Trigger

      Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

      A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

      An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
> (I)      the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)     the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman,* 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

   B.    The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006. [3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3]  Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied.  21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4]  The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

7

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer.if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

> 2. FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.    FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

11

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec.*" *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec.*

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.    FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. *Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents.* This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8]    Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like ... bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

14

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

TAB 4

United Research Laboratories, Inc.
Mutual Pharmaceutical Company, Inc.

1100 Orthodox Street
Philadelphia, PA 19124

215-288-6500
www.urlmutual.com

**URL MUTUAL**

June 23, 2006

Mr. Gary Buehler, Director
Office of Generic Drugs
Center for Drug Evaluation and Research
Food and Drug Administration
Metro Park North II                          **NEW CORRESPONDENCE**
7500 Standish Place, Room 150
Rockville, MD 20855-2773                         Mc

Re:     ANDA No. 76-628, Ondansetron Hydrochloride Tablets, 4 mg and 8 mg

Dear Mr. Buehler:

Mutual Pharmaceutical Company, Inc. ("Mutual") is submitting this letter to request that the
Agency acknowledge that there has been a "court decision" of non-infringement concerning U.S.
Patent No. 5,344,658 ("the '658 patent") for Ondansetron Hydrochloride Tablets, 4 mg and 8 mg
("Ondansetron Tablets"). We further request that the Agency confirm that such court decision
triggered the 180-day period of exclusivity for the '658 patent as it relates to the approval of
ANDAs for Ondansetron HCl Tablets.

The court decision at issue was entered by the District Court for the Eastern District of Virginia
on July 18, 2003. Mutual notified the Agency of the decision in a Patent Amendment dated
August 6, 2003 (attached as Exhibit A hereto). Mutual is writing again, now, to demonstrate that
the court decision at issue satisfies the test set forth in the Agency's letter ruling to Apotex, Inc.
dated April 11, 2006 (ANDA 76-341), which was upheld by the United States Court of Appeals
for the District of Columbia Circuit in *Apotex, Inc. v. Food and Drug Administration*, 2006 WL
1528871 (D.. Cir., June 6, 2006).

**I.      Factual and Procedural Background**

GlaxoSmithKline ("Glaxo") sells Ondansetron Tablets under the brand name Zofran. We
understand that Dr. Reddy's Laboratories submitted an ANDA with respect to U.S. Patent No.

RECEIVED

JUN 2 6 2006

OGD / CDER

Mr. Gary Buehler, Director
June 22, 2005
Page 2

5,344,658 no later than June 2001, and was likely the first ANDA applicant to submit a Paragraph IV certification with respect to the '658 patent. Mutual is the sponsor of the above-referenced, subsequently-filed ANDA for ondansetron tablets containing a Paragraph IV certification against the '658 patent.

On May 14, 2003, Mutual filed a Complaint against Glaxo in the Eastern District of Virginia, seeking a declaratory judgment of noninfringement of the '658 Patent. The action was captioned *Mutual Pharm. Co. v. Glaxo Grp. Ltd., et al.*, No. 3:03 CV 426 (E.D. Va. 2003) (complaint attached as Exhibit B hereto).

On June 9, 2003, instead of moving to dismiss the Complaint, Glaxo filed an Answer and Affirmative Defenses, in which it admitted that (a) Mutual's tablets "would not, if made, sold or offered for sale, infringe any valid and enforceable claim of the [Glaxo] Patent"; and (b) the "importation and use of ondansetron hydrochloride API for making [Mutual's tablets] would not infringe any valid and enforceable claim of the [Glaxo] Patent." Answer ¶¶ 45, 46 (Exhibit C hereto, admitting Complaint ¶¶ 45, 46).

In light of the admission contained in Glaxo's letter, Mutual and Glaxo executed a Covenant Not to Sue and Stipulation of Non-Infringement ("Covenant") in July 2003. The Covenant reiterated the admission contained in Glaxo's Answer, stating, that (a) Mutual's tablets "do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of [Glaxo's] patent," and (b) "Glaxo will not sue Mutual. . . or its distributors or customers for infringement of the. . . patent based on the importation, manufacture, use, sale or offer for sale" of Mutual's tablets. Covenant, ¶¶ 1, 2 (attached to Exhibit D hereto).

On July 18, 2003, District Judge Richard Williams' entered an Order that, on its face, reflected that Glaxo had made a substantive admission of non-infringement:

> The Complaint. . . is dismissed with prejudice for lack of subject matter
> jurisdiction based on the Covenant Not To Sue and Stipulation of Non-
> Infringement. . . *which is incorporated herein by reference* and filed herewith.

Stip. ¶ 1 (Exhibit D hereto) (emphasis added). Judge Williams in fact directly attached the Covenant to his Order, and filed it together with his Order. *Id.* Judge Williams' Order, therefore, expressly incorporated by reference Glaxo's admission that Mutual's Ondansetron Tablets "do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of [Glaxo's] patent." Covenant, ¶ 1 (attached to Exhibit D hereto).

Mr. Gary Buehler, Director
June 22, 2005
Page 3

## II. The Court Order Dismissing Mutual's Declaratory Judgment Action is a "Court Decision" Because it Reflects on Its Face a Holding of Noninfringement

Judge Williams' July 18, 2003, Order is a "court decision" under 21 U.S.C. § 355(j)(5)(B)(iv)(II) as interpreted by the Agency. That is, Judge Williams' Order is the "decision of a court that on its face evidences a holding on the merits that [the '658] patent is. . . not infringed. . . ." FDA letter ruling to Apotex (ANDA 76-341) dated April 11, 2006, at 6.

While Judge Williams' dismissal of Mutual's complaint occurred in the context of a motion to dismiss, and not a motion for summary judgment, it nonetheless satisfies all three prongs of the "court decision" test announced in the Agency's April 11, 2006, letter to Apotex. First, the dismissal rests on the court's express adoption of Glaxo's admission that Mutual's Ondansetron Tablets "do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of [Glaxo's] patent." Covenant, ¶ 1 (attached to Exhibit D hereto). In that respect it is identical to the court's order in the *Boehringer Ingelheim* decision. The similarity between Judge Williams order and that entered in the *Boehringer* case is discussed in additional detail below. Second, the holding appears *on the face of the decision* and on the face of the attached and incorporated Covenant. FDA need not look beyond the face of the order and the documents incorporated therein by reference in order to make its determination. Third, the dismissal has all of the substantive features of a *holding on the merits* of noninfringement, rather than merely the jurisdictional absence of a case or controversy. Judge Williams' dismissal is therefore a "court decision" as defined by the FDA's April 11, 2006, letter ruling.

Judge Williams' decision is substantively indistinguishable from the dismissal in the *Boehringer* litigation, which, the Agency has confirmed, constitutes a "court decision" under the test set forth in the Agency's April 11, 2006 letter. That decision provided as follows in its entirety:

> Defendants have moved for partial summary judgment as to Plaintiffs' [infringement] claim. . . . Based on Plaintiffs' express concession that Defendants' product does not infringe. . . Defendants' Motion for Partial Summary Judgment on this claim is GRANTED. So Ordered.

*Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996).

In the *Boehringer* case, the Court's one-paragraph memorandum decision rested entirely on Plaintiffs' concession of non-infringement. The same holds true in the case of Judge Williams' order, which was entered based on Glaxo's express concession in its Answer that Mutual's product does not infringe. Judge Williams' order is therefore indistinguishable from the

Mr. Gary Buehler, Director
June 22, 2005
Page 4

*Boehringer* dismissal.[1]

By contrast, Judge Williams' decision *is* distinguishable from the dismissal order in the pravastatin litigation between Apotex and the Bristol-Myers Squibb Company ("Bristol"), which litigation culminated in the D.C. Circuit's decision in *Apotex, Inc. v. FDA, et al.*, No. 06-5105 (June 6, 2006). In that case, (i) the parties moved to dismiss for lack of case of controversy before an answer was filed, and (ii) the dismissal was without prejudice. *Teva Pharms., USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 180 (D.D.C. 2005). That is, unlike in the instant case, the Defendant BMS never conceded that the Plaintiffs' products were noninfringing, and no judge ever made a ruling of noninfringement. As well, the stipulation of dismissal in that case did not indicate that the dismissal was with prejudice, *Id.* at 181, whereas the dismissal in the instant case was with prejudice.

Finally, we note that this case presents none of the administrative convenience concerns discussed by the Agency in its April 11, 2006, letter and in its pleadings in the *Apotex* matters. Judge Williams' dismissal order clearly and concisely indicates that it is based on Glaxo's admission of noninfringement. All of the relevant information for purposes of the Agency's analysis is presented on the face of Judge Williams' order and in the Covenant attached to and filed with the order. Far from creating a need for the Agency to tax its resources and rule upon complicated legal issues, Judge Williams' dismissal presents the Agency with the opportunity to quickly and easily determine that the "court decision" trigger has been satisfied.

## III. Conclusion

Accordingly, Mutual respectfully requests that the Agency deem the date the court ordered Mutual's declaratory judgment dismissed, July 18, 2003, as the date of a court decision triggering the 180-day exclusivity period based on the '658 patent for Ondansetron Hydrochloride Tablets, 4 mg and 8 mg.

Very truly yours,

Robert Dettery
Vice President, Regulatory Affairs
Mutual Pharmaceutical Company, Inc.

---

[1] Any possible argument that Judge Williams' order is distinguishable from the dismissal in *Boehringer* because the former was issued in the context of a motion to dismiss instead of a motion for summary judgment must fail. The circumstances and results of dismissal in the case at issue and the *Boehringer* dismissal are the same, and to distinguish between them on this bare procedural basis improperly and unnecessarily elevates form over substance.

**URL MUTUAL**

United Research Laboratories, Inc.
Mutual Pharmaceutical Company, Inc.

1100 Orthodox Street
Philadelphia, PA 19124

215-288-6500
www.urlmutual.com

August 6, 2003

Mr. Gary Buehler, Director
Office of Generic Drugs
Center for Drug Evaluation and Research      **PATENT AMENDMENT**
Food and Drug Administration
Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

Re:  ANDA No. 76-628, Ondansetron Hydrochloride Tablets, 4 mg and 8 mg

Dear Mr. Buehler:

Mutual Pharmaceutical Company, Inc. ("Mutual") is submitting this Patent Amendment to notify the Agency that Mutual obtained a court decision that triggers the 180-day period of exclusivity based on U.S. Patent No. 5,344,658 ("the '658 patent") for Ondansetron Hydrochloride Tablets, 4 mg and 8 mg.

Specifically, on July 18, 2003, Mutual obtained a court order that dismisses its action for a declaratory judgment of noninfringement brought against the '658 patentees, Glaxo Group Limited and Smithkline Beecham Corporation ("GlaxoSmithKline").  That court's order—on its face—states that the action is dismissed **with prejudice** for lack of subject matter jurisdiction based on the "**Covenant Not to Sue and Stipulation of Non-infringement** of U.S. Patent No. 5,344,658."  (Ex. A, 7/18/03 Order & Covenant) (emphasis added).  Because this dismissal has preclusive effect, it constitutes a court decision that triggers the 180-day exclusivity period based on the '658 patent.

### Background

On December 30, 2002, Mutual submitted the above referenced Abbreviated New Drug Application ("ANDA") seeking approval to market a generic version of the reference-listed drug Zofran® (ondansetron hydrochloride) Tablets, 4 mg and 8 mg.  That ANDA contained—and still contains—a Paragraph IV certification for the '658 patent.  After receiving the ANDA's filing receipt on January 2, 2003, Mutual sent notice of its Paragraph IV certification to the NDA holder and the '658 patent's owner, GlaxoSmithKline, as required under 21 U.S.C. § 355(j)(2)(B)(i)-(ii); 21 C.F.R. § 314.95(a)-(c).  GlaxoSmithKline chose not to sue Mutual for patent infringement within the 45-day period provided under 21 U.S.C. § 355(j)(5)(B)(iii).

After the 45-day period expired, Mutual commenced an action against GlaxoSmithKline for a declaratory judgment of noninfringement of the '658 patent.  (Ex. B, 5/14/03 Complaint).  GlaxoSmithKline answered Mutual's complaint with an admission that Mutual's Ondanestron Hydrochloride Tablets described in ANDA No. 76-628 do not infringe the '658 patent's claims.  (Ex. C, 6/10/03 Answer, ¶¶ 45-46)

Case 1:06-cv-01890-RMC    Document 12-6    Filed 11/17/2006    Page 7 of 34
Mr. Gary Buehler, Director                                    Mutual Pharmaceutical Company, Inc.
August 6, 2003                                                                        ANDA No. 76-628
Page 2 of 4                                        Ondansetron Hydrochloride Tablets, 4 mg & 8 mg

As a result, on July 8, 2003, GlaxoSmithKline and Mutual entered into the "Covenant Not to Sue and Stipulation of Non-infringement of U.S. Patent No. 5,344,658." (Ex. A, 7/18/03 Order & Covenant) Among other things, the Covenant and Stipulation states:

> .1.    The ondansetron hydrochloride tablets that are the subject of and described in Mutual's ANDA No. 76-628 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of the '658 patent.
>
> 2.    GlaxoSmithKline will not sue Mutual, as defined herein, or its distributors or customers for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 76-628.

(Ex. A, Covenant, at 2)

The parties subsequently filed a motion to dismiss Mutual's declaratory judgment action based on the Covenant and Stipulation. On July 18, 2003, the court granted that motion and ordered the case dismissed with prejudice. (Ex. A, 7/18/03 Order & Covenant) The order expressly states—on its face—that the dismissal is based on the "Covenant Not to Sue and Stipulation of Non-infringement" entered into by Mutual and GlaxoSmithKline. Id. at 1.

### The July 18, 2003 Order Dismissing Mutual's Action
### for a Declaratory Judgment of Noninfringement
### of the '658 Patent Is a Court-Decision Trigger

A generic company's 180-day marketing exclusivity period is triggered by the earlier of one of two events: (1) the date the FDA receives notice from the applicant of the first commercial marketing of the drug; or (2) the date of a court decision holding the patent that is the subject of the paragraph IV certification is invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv).

### A.    Definition of a Court-Decision Trigger

FDA's regulations concerning the nature of a "decision of a court" were invalidated in Mylan Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30 (D.D.C. 2000) (ruling that "a decision of a court" means the first court that renders a decision finding the patent invalid or not infringed). Another court went further and said that Congress intended for "a decision of a court" to mean all court decisions "whether subsequently vacated, settled, appealed or otherwise mooted." Mylan Pharm., Inc. v. Henney, 94 F. Supp. 2d 36, 52 (D.D.C. 2000), vacated as moot, Pharmachemie B.V. v. Barr Labs., Inc., 276 F.3d 627 (D.C. Cir. 2002).

Mr. Gary Buehler, Director
August 6, 2003
Page 3 of 4

Mutual Pharmaceutical Company, Inc.
ANDA No. 76-628
Ondansetron Hydrochloride Tablets, 4 mg & 8 mg

FDA stated that until it promulgates new regulations, it will regulate from the statute and applicable FDA regulations to make exclusivity determinations on an issue-by-issue basis. 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002). To date, the Teva cases are the only cases that provide guidance as to what type of court decision will satisfy the court-decision trigger. According to the Teva cases, the key to whether a court decision triggers exclusivity lies in that decision's preclusive effect. Thus, if an order dismissing a declaratory judgment of noninfringement has preclusive effect, then it constitutes a court-decision trigger.

B.      Under the Teva Cases, the Dismissal of a Declaratory
        Judgment Action Is a Court-Decision Trigger If It Has a
        Preclusive Effect

In Teva Pharm. USA, Inc. v. FDA, 182 F.3d 1003, 1012 (D.C. Cir. 1999), the Court of Appeals for the District of Columbia reversed the district court's denial of Teva's request for injunctive relief that required the FDA to recognize the dismissal of a declaratory judgment complaint as a court-decision trigger. Id. at *1004. According to the D.C. Circuit, FDA's actions were arbitrary and capricious because it had taken an inconsistent position in an earlier case (the Boehringer case)[1] where it recognized a partial summary judgment as a court-decision trigger. Id. at 1012.

In Teva v. FDA, Teva sought to trigger the first generic applicant's exclusivity by arguing that the dismissal of its declaratory judgment complaint for lack of subject-matter jurisdiction based on the patentee's admission of noninfringement constitutes a court-decision trigger. 182 F.3d at 1004. The FDA refused to recognize the dismissal as a trigger because it did not consider it to be a decision on the merits. Id. at 1004.

The D.C. Circuit explained that a court decision can take several forms and that its significance lies in its preclusive effect. Id. at 1007-08. It stated that Teva's dismissal was not a typical dismissal for lack of subject matter jurisdiction. Id. at 1008. Instead, the court dismissing Teva's action had to make a predicate finding that the patentee would never sue Teva for infringement. Id. at 1008-09. Thus, the dismissal sufficed to estop the patentee from suing Teva for patent infringement. Id. at 1009. Because the FDA failed to explain how Teva's dismissal differed from a grant of partial summary judgment, the D.C. Circuit remanded the action to give the FDA an opportunity to explain. Id. at 1012.

On remand, the FDA tried to reconcile its refusal to recognize Teva's dismissal with the grant of partial summary judgment in the Boehringer case. Teva Pharm. USA, Inc. v. FDA, Civ. No. 99-67, 1999 WL 1042743 at*1, *5-6 (D.D.C. August 19, 1999) ("Teva II"). The FDA based its arguments on the fact that the partial summary judgment was an actual decision on the merits whereas Teva's dismissal was not. Id. According to FDA, it should not have to go beyond the court order to determine the underlying rationale for the court decision. Teva II, 1999 WL 1042743, at *5. FDA argued that it lacked the expertise to make accurate determinations about the legal effect, such as estoppel, of patent representations that are embodied in a court decision. Id. Because the reason

---

[1] See, Glaxo v. Boehringer Ingelheim Corp., 954 F. Supp. 469 (D. Conn. 1996).

Mr. Gary Buehler, Director
August 6, 2003
Page 4 of 4

Mutual Pharmaceutical Company, Inc.
ANDA No. 76-628
Ondansetron Hydrochloride Tablets, 4 mg & 8 mg

for Teva's dismissal was not apparent on its face; and there was no memorandum that explained the basis for the order, the FDA declined to consider it a court decision. Id.

The district court rejected FDA's arguments as form over substance. Id. at *6. Teva provided the FDA with the court's order dismissing the action and the patentee's concessionary letter that operated to forever estop it from suing Teva for infringement. Teva II, 1999 WL 1042743 at *5 (emphasis added). According to the court, this was not a case were a "great deal of sophisticated legal analysis is required." Id. It determined that in "in light of the Court of Appeals' finding that the significance of a triggering court decision lies in its estoppel effect, it is unreasonable for the FDA to refuse to make even a cursory inquiry into the...court's order." Id. Thus, the court ruled that Teva's dismissal is a court-decision trigger and the FDA's refusal to recognize it as such was arbitrary and capricious. Id. at *6-7.

C.    The Order Dismissing Mutual's Declaratory Judgment Action
      Is a Court-Decision Trigger Because It Has Preclusive Effect

Here, like in Teva, GlaxoSmithKline is forever estopped from suing Mutual for infringement based on its ANDA for ondansetron tablets. (Ex. A, 7/18/03 Order & Covenant) Moreover, unlike the dismissal in Teva, the reason for dismissing Mutual's declaratory judgment is evident in its face. Mutual's order expressly states that the dismissal is **with prejudice** based on the "Covenant Not to Sue and Stipulation of Non-Infringement." (Ex. A, 7/18/03 Order & Covenant) (emphasis added) Thus, there is no need for the FDA to make sophisticated legal analysis to determine the preclusive effect of the court's order. The basis for the dismissal is evident on the order's face.

Accordingly, Mutual respectfully requests that the Agency deem the date the court ordered Mutual's declaratory judgment dismissed, **July 18, 2003**, as the date of a court decision triggering the 180-day exclusivity period based on the '658 patent for Ondansetron Hydrochloride Tablets, 4 mg and 8 mg.

A copy of this Patent Amendment is being provided to the FDA, Philadelphia District.


Sincerely,

Robert Dettery
Vice-President, Regulatory Affairs
Mutual Pharmaceutical Co., Inc.

Exhibits (3)


Cc:    K. Campbell, PHI-DO

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MUTUAL PHARMACEUTICAL COMPANY, INC., )
)
Plaintiff, )
)
v. )        Case No. _3:03CV426_
)
GLAXO GROUP LIMITED and )
SMITHKLINE BEECHAM )
CORPORATION, d/b/a )
GLAXOSMITHKLINE, )
)
Defendants. )
)

MAY 1 4 2003

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## COMPLAINT

Plaintiff Mutual Pharmaceutical Company, Inc. ("Mutual"), for its complaint against

defendants Glaxo Group Limited and SmithKline Beecham Corporation, doing business as

GlaxoSmithKline, alleges as follows:

## THE PARTIES

1.      Plaintiff Mutual Pharmaceutical Company, Inc. ("Mutual") is a Pennsylvania

corporation having a principal place of business at 1100 Orthodox Street, Philadelphia,

Pennsylvania.

2.      On information and belief, defendant Glaxo Group Limited ("Glaxo") is a

corporation organized under the laws of England having a registered office at Glaxo Wellcome

House, Berkeley Avenue, Greenford, Middlesex UB6 ONN, England.

3.      On information and belief, defendant SmithKline Beecham Corporation ("SKB")

is a Pennsylvania corporation conducting business under the name GlaxoSmithKline with a

principal place of business at 5 Moore Place, Research Triangle Park, North Carolina 27709.

Defendants Glaxo and SKB are hereinafter referred to collectively as GlaxoSmithKline.

## JURISDICTION AND VENUE

4.    This action for declaratory judgment arises under the patent laws of the United

States, 35 U.S.C. §§ 1 *et seq.* and 21 U.S.C. § 355. Jurisdiction is proper under 28 U.S.C. §§

1331 and 1338(a), 35 U.S.C. § 271(e)(2) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201

and 2202. This is a case of actual controversy within the Court's jurisdiction seeking a

declaratory judgment of non-infringement of U.S. Patent No. 5,344,658 ("the '658 patent").

5.    On information and belief, defendants Glaxo and SKB purposely avail themselves

of the privilege of doing business as GlaxoSmithKline within the Commonwealth of Virginia

and in this District.

6.    On information and belief, defendant SKB maintains offices in this District, doing

business as Glaxo Wellcome at 506 Kentucky Avenue, Alexandria, VA.

7.    SKB maintains a registered agent for service of process in this District at 11 S.

12th Street, Richmond, Virginia.

8.    On information and belief, defendants Glaxo and SKB maintain such continuous

and systematic contacts with the Commonwealth of Virginia and this Division of this District by

conducting substantial, regular and systematic business therein through marketing and sales of

their pharmaceutical products, including Zofran® — GlaxoSmithKline's product relevant to this

lawsuit — to allow this Court to reasonably exercise personal jurisdiction over them.

2

9.    Venue is proper in this District as to Glaxo under 28 U.S.C. §§ 1391(d) in that

Glaxo is an alien corporation. Venue is proper in this District and Division as to SKB under 28

U.S.C. §§ 1391(b) and (c) and 1400(b), in that, on information and belief, defendant SKB

maintains offices in this District and Division, doing business as GlaxoSmithKline, SKB

maintains a registered agent in this Division, and SKB markets and sells its pharmaceutical

products to healthcare providers in this Division.

## BACKGROUND

10.    On information and belief, GlaxoSmithKline develops, manufactures and markets

branded pharmaceutical products. Typically, branded drugs are those that are subject to approval

by the United States Food and Drug Administration ("FDA") of a New Drug Application

("NDA"). Once approved, such products generally are referred to as "brand-name" or "branded"

drugs because they are marketed under a trade name or trademark for the drug product, rather

than the chemical name for the active pharmaceutical ingredient ("API") in the drug product.

11.    Mutual develops, manufactures and markets generic drug products. A generic

drug product is a version of a branded drug that is generally sold using its chemical name,

without a trade name or trademark.

### The Hatch-Waxman Act

12.    The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L.

No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 (1994) and 35 U.S.C.

§ 271(d)–(h) (1995)), known as the Hatch-Waxman Act, was enacted in 1984 to permit generic

companies to seek expedited approval to market generic versions of previously approved brand-

name drugs by filing an Abbreviated New Drug Application ("ANDA"). As a condition for

3

approval, the FDA requires that an ANDA applicant establish bioequivalency between its generic version and a previously approved brand-name drug.

13.    As a mechanism for resolving patent disputes, the Hatch-Waxman Act requires that a brand-name drug manufacturer submit information about certain patents associated with its branded drug.  In particular, the brand-name drug manufacturer must file "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. §355(b)(1).

14.    The FDA lists the patent information, including each patent number and expiration date, provided by a brand-name drug manufacturer in a publication entitled, "Approved Drug Products with Therapeutic Equivalence Evaluations" (known throughout the industry as the "Orange Book").

15.    In its ANDA, an applicant must address the Orange Book patent information.  In particular, the Hatch-Waxman Act requires an ANDA applicant to submit one of four patent certifications:

- a Paragraph I certification stating that no patent information has been filed for the approved drug;

- a Paragraph II certification stating that the patent has expired;

- a Paragraph III certification stating that the patent will expire on a certain date (and that the ANDA applicant does not seek approval before that date);

- a Paragraph IV certification stating that the patent is invalid and/or will not be infringed.

21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV).

4

16.    If an ANDA applicant files a "Paragraph IV" certification stating that it believes that an unexpired patent associated with the branded drug is invalid, unenforceable, and/or not infringed by its proposed generic product, a statutory framework governing the approval process is triggered. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4).

17.    The ANDA applicant must give a Notice of the "Paragraph IV" certification to the patentee and owner of the NDA under which the corresponding branded product is sold. 21 U.S.C. § 355(j)(2)(B)(i)(I); 21 C.F.R. § 314.95(a)-(b). That Notice should include a detailed statement of the grounds for the belief that the patent is invalid, unenforceable, and/or not infringed. 21 U.S.C. § 355(j)(2)(B)(ii); 21 C.F.R. § 314.95(c)(6).

18.    In order to facilitate the orderly resolution of disputes arising out of Paragraph IV ANDAs without requiring the FDA to make patent-related determinations of law or fact — issues that the FDA has acknowledged are outside the scope of its expertise — the Hatch-Waxman Act included special jurisdictional provisions to allow the federal courts to exercise case or controversy jurisdiction to rule on a Paragraph IV applicant's claims of patent invalidity, unenforceability, or non-infringement before any actual commercial manufacturing or sales of the generic product take place. 35 U.S.C. § 271(e)(2).

19.    The patentee may commence an infringement action against the generic company within 45 days from the date it receives Notice of the "Paragraph IV" certification. 21 U.S.C. § 355(j)(5)(B)(iii). If the patentee brings suit, the Hatch-Waxman Act prohibits the FDA from approving the ANDA for a period of 30 months or until the infringement action is resolved or until the court otherwise orders. The 30-month period has been likened to a stay or an injunction because the FDA may not approve the ANDA — and the generic company may not market its product — during that period. The FDA may, however, approve an ANDA before the 30-month

5

period expires if a court decides that the patent is invalid, unenforceable, or not infringed. 21 U.S.C. § 355(j)(5)(B)(iii)(I).

20. If a patent holder does not bring a Paragraph IV infringement action within 45 days, the FDA must generally make the approval of the ANDA effective immediately upon satisfactory completion of its substantive review. 21 U.S.C. §355(j)(5)(B)(iii).

21. The Hatch-Waxman Act bars all parties from bringing a declaratory judgment action for patent invalidity, unenforceability, or non-infringement until after the expiration of the 45-day period following the patent-holder's receipt of Notice of a Paragraph IV certification. 21 U.S.C. §355(j)(5)(B)(iii).


## EXISTENCE OF CASE OF ACTUAL CONTROVERSY

### Ondansetron – ZOFRAN®

22. GlaxoSmithKline currently sells ondansetron hydrochloride tablets, 4 mg and 8 mg, in the United States under the brand name Zofran®. Ondansetron is indicated for prevention of nausea and vomiting associated with chemotherapy, radiotherapy or postoperatively.

23. On information and belief, branded sales for Zofran® 4 mg and 8 mg tablets in the United States for the year ended December 31, 2002 were over $420 million.

24. The FDA approved GlaxoSmithKline's NDA 20-103 for marketing ondansetron hydrochloride tablets, 4 mg and 8 mg, in 1992. On information and belief, GlaxoSmithKline is the holder of NDA 20-103 on record at the FDA.

### The '658 Patent

25. Among the patents listed in the Orange Book for NDA 20-103 is the '658 patent. The '658 patent, entitled "Process and Composition Using Ondansetron," issued on September 6,

1994 to Glaxo as owner by assignment. On information and belief, SKB is the exclusive licensee of the '658 patent. A true and correct copy of the '658 patent is attached hereto as Exhibit A.

26.      The '658 patent purports to cover a process for reducing the crystal size of ondansetron, crystalline ondansetron of a specific size range, and a pharmaceutical composition containing such crystalline ondansetron.

## Mutual's Ondansetron Products

27.      In order to engage in the commercial manufacture and sale of ondansetron hydrochloride tablets, 4 mg and 8 mg, Mutual submitted ANDA 76-628 to the FDA on December 30, 2002. The FDA accepted ANDA 76-628 for filing as of January 2, 2003.

28.      Mutual's finished products are 4 mg and 8 mg tablet dosages of ondansetron hydrochloride made using proprietary "liquisolid" technology licensed by Mutual from its inventors. Liquisolid technology is disclosed, *inter alia*, in U.S. Patent Nos. 5,800,834, 5,968,550, and 6,096,337.

29.      Mutual's ANDA 76-628 contains specifications for the ondansetron API employed in its liquisolid manufacturing process that meet specific crystal size requirements outside of the specific crystal size ranges claimed in the '658 patent. Moreover, on information and belief, Mutual's API supplier does not practice any of the processes disclosed or claimed in the '658 patent in making ondansetron hydrochloride API.

30.      The ondansetron API in Mutual's tablet dosage forms is in an unsaturated solution with propylene glycol (a non-volatile solvent) during the shelf life of Mutual's products. None of the ondansetron API is present in Mutual's finished tablets in crystalline form, but rather as a molecular dispersion (solution) within the propylene glycol solvent.

7

31.    Mutual filed a Paragraph IV certification in ANDA 76-628 with respect to the '658 patent.

32.    Mutual sent Notice of this Paragraph IV certification to GlaxoSmithKline on March 6, 2003, along with a detailed statement of the factual and legal bases of the certification.

33.    In response to Mutual's Notice, GlaxoSmithKline requested, through it attorneys, on March 27, 2002 "materials, documents and information to aid in our evaluation" of "the underlying facts of the matters communicated in [Mutual's] Notice."

34.    Pursuant to a confidentiality agreement, Mutual, through its attorneys, produced a copy of its entire 1457-page ANDA 76-628 to GlaxoSmithKline's attorneys on April 9, 2003.

35.    Mutual has made substantial preparation in the U.S. for the commercial manufacture, use and sale of ondansetron hydrochloride tablets, 4 mg and 8 mg, by, *inter alia*, preparing and submitting ANDA 76-628 and by licensing rights to the proprietary liquisolid technology for use in making ondansetron tablets.

36.    GlaxoSmithKline has demonstrated its intention to enforce patents relating to Zofran® by instituting patent infringement actions against other generic drug manufacturers, including ANDA applicants Dr. Reddy's Laboratories, Ltd. and Reddy-Cheminor, Inc. (collectively "Reddy"). GlaxoSmithKline filed Civil Action No. 01-CIV-4066 against Reddy in the District of New Jersey on August 24, 2001. In an Amended Complaint filed April 1, 2002, GlaxoSmithKline asserted U.S. Patent No. 5,622,720, entitled "Process For Reducing the Crystal Size of Ondansetron Hydrochloride Dihydrate," ("the '720 patent") against Reddy. The '720 patent is related to the '658 patent as a continuation of the application that issued as the '658 patent. And GlaxoSmithKline recently asserted the related '720 patent against Reddy in another

8

case, Civil Action No. 03cv1921, also filed in the District of New Jersey, on April 29, 2003, asserting the '720 patent.

37.    In response to yet another challenge to GlaxoSmithKline's Zofran® franchise (in particular, its injectable product) by Faulding Pharmaceutical Company, GlaxoSmithKline spokesman David Mawdsley stated on May 7, 2003, "We are very confident that our Zofran patents will be upheld and in any case they don't begin to expire until 2005."

38.    Mutual has not been served with a Paragraph IV infringement action commenced by GlaxoSmithKline within 45 days of its receipt of Mutual's Paragraph IV Notice. On information and belief, GlaxoSmithKline has not filed such an action against Mutual.

39.    On May 7, 2003, GlaxoSmithKline's litigation counsel confirmed by letter that it had not filed suit within the 45-day period in which Mutual was barred from commencing this action. Notwithstanding Mutual's voluminous production of its ANDA in support of its non-infringement position, GlaxoSmithKline's litigation counsel stated that it had not received other third-party supplier documents that it considers necessary to evaluate Mutual's Paragraph IV certification.

40.    Although Mutual has provided GlaxoSmithKline with a Notice of Paragraph IV certification, a detailed statement of the grounds for Mutual's belief that the '658 patent would not be infringed and a copy of Mutual's entire ANDA 76-628, GlaxoSmithKline has repeatedly insisted that it does not have sufficient information to substantiate Mutual's certification of non-infringement.

41.    GlaxoSmithKline has not offered Mutual a covenant not to sue or otherwise provide any assurances that it will not assert the '658 patent against Mutual. But on information and belief, GlaxoSmithKline has offered such a covenant to Reddy.

9

## CAUSE OF ACTION

### Declaratory Judgment of Non-Infringement
### of United States Patent No. 5,344,658

42.     Mutual repeats and realleges the allegations of paragraphs 1-41 above.

43.     An actual controversy exists between Mutual and GlaxoSmithKline under 35 U.S.C. § 271(e)(2) with respect to the '658 patent because GlaxoSmithKline has represented to the FDA and the public that the '658 patent covers Zofran® and because Mutual has filed a Paragraph IV certification in ANDA 76-628 seeking to market ondansetron hydrochloride, 4 mg and 8 mg, prior to the expiration of the '658 patent.

44.     GlaxoSmithKline's insistence that it does not consider Mutual's Paragraph IV certification to be substantiated by Mutual's ANDA, its failure to offer a covenant not to sue, or otherwise provide unconditional and binding assurances that it will not assert the '658 patent against Mutual, has created a reasonable apprehension in Mutual of imminent harm and loss in continuing its course of action to market generic ondansetron hydrochloride.

45.     Mutual's ondansetron hydrochloride tablets, 4 mg and 8 mg, which are the subject of ANDA 76-628, would not, if made, sold or offered for sale, infringe any valid and enforceable claim of the '658 patent.

46.     Mutual's importation and use of ondansetron hydrochloride API for making ondansetron hydrochloride tablets, 4 mg and 8 mg, which are the subject of ANDA 76-628, would not infringe any valid and enforceable claim of the '658 patent.

10

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| MUTUAL PHARMACEUTICAL COMPANY, INC. | ) |
| | ) |
| Plaintiff, | ) Case No.: 3:03CV426 |
| | ) |
| v. | ) |
| | ) |
| GLAXO GROUP LIMITED and | ) |
| SMITHKLINE BEECHAM CORPORATION, | ) |
| d/b/a GLAXOSMITHKLINE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

ANSWER AND AFFIRMATIVE DEFENSES
OF DEFENDANTS GLAXO GROUP LIMITED
AND SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE

Defendants Glaxo Group Limited and SmithKline Beecham Corporation d/b/a

GlaxoSmithKline (collectively, "GlaxoSmithKline") hereby answer Plaintiff's Complaint

("Complaint"), in accordance with the numbered paragraphs thereof, below.

GlaxoSmithKline notes that Glaxo Group Limited has not been served with process in

this action as of the filing of this Answer. Notwithstanding the lack of service, GlaxoSmithKline

submits this responsive pleading on behalf of Glaxo Group Limited as well, without any

concession concerning subject matter jurisdiction.

### THE PARTIES

1.    GlaxoSmithKline admits the allegations in Paragraph 1 of the Complaint.

2.    GlaxoSmithKline admits the allegations in Paragraph 2 of the Complaint.

3.    GlaxoSmithKline admits that defendant SmithKline Beecham is a Pennsylvania

corporation but denies the remaining allegations in Paragraph 3 because defendant

SmithKlineBeecham's principal place of business is at One Franklin Plaza, Philadelphia, Pennsylvania 19102.

## JURISDICTION AND VENUE

4.     GlaxoSmithKline admits that Mutual purports to state a cause of action for declaratory judgment under the patent laws of the United States and the Declaratory Judgment Act, but otherwise denies that subject matter jurisdiction exists for this action due to the absence of any actual case or controversy between the parties with respect to GlaxoSmithKline's U.S. Patent No. 5,349,658 ("the '658 Patent").

5.     GlaxoSmithKline admits that it transacts business within the Commonwealth of Virginia; it otherwise denies the allegations in Paragraph 5 of the Complaint.

6.     GlaxoSmithKline denies the allegation in Paragraph 6 of the Complaint.

7.     GlaxoSmithKline admits the allegations in Paragraph 7 of the Complaint.

8.     For purposes of this case only, GlaxoSmithKline admits the allegations of Paragraph 8 of the Complaint.

9.     GlaxoSmithKline denies the allegations in Paragraph 9 of the Complaint.

## BACKGROUND

10.     GlaxoSmithKline admits that it "develops, manufactures and markets branded pharmaceutical products" and that "[t]ypically branded drugs are those that are subject to approval by the United States Food and Drug Administration ('FDA') of a New Drug Application ('NDA')." GlaxoSmithKline denies the remaining allegations in Paragraph 10 of the Complaint.

11.     GlaxoSmithKline admits that Mutual is in the business of selling generic drug products but lacks sufficient information to admit or deny whether Mutual develops and/or

2

manufactures generic drug products. GlaxoSmithKline denies the remaining allegations of Paragraph 11 of the Complaint.

### The Hatch-Waxman Act

12.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits that *one* of the purposes for which the Hatch-Waxman Act was enacted in 1984 was to permit companies to seek expedited approval to market generic versions of previously-approved brand-name drugs by filing an Abbreviated New Drug Application ("ANDA"). GlaxoSmithKline admits the remaining allegations in Paragraph 12 of the Complaint.

13.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations contained in Paragraph 13 of the Complaint.

14.    GlaxoSmithKline admits the allegation contained in Paragraph 14 of the Complaint.

15.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 15 of the Complaint.

16.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 16 of the Complaint.

17.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 17 of the Complaint.

3

18.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 18 of the Complaint.

19.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 19 of the Complaint, provided any such "court deci[sion]" is rendered in the context of adjudicating and resolving an actual case or controversy as required by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and Article III of the United States Constitution.

20.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 20 of the Complaint.

21.    GlaxoSmithKline avers that the provisions and implementing regulations of the Hatch-Waxman Act speak for themselves. GlaxoSmithKline admits the allegations in Paragraph 21 of the Complaint.

## EXISTENCE OF CASE OR ACTUAL CONTROVERSY

### Ondansetron - ZOFRAN®

22.    GlaxoSmithKline admits the allegations in Paragraph 22 of the Complaint.

23.    GlaxoSmithKline admits the allegations in Paragraph 23 of the Complaint.

24.    GlaxoSmithKline denies the allegation that the FDA approved GlaxoSmithKline's NDA 20-103 for marketing ondansetron hydrochloride tablets, 4 mg and 8 mg, in 1992 because the approval was made in 1991. GlaxoSmithKline admits the remaining allegation in Paragraph 24 of the Complaint.

4

## The '658 Patent

25.    GlaxoSmithKline admits the allegations contained in Paragraph 25 of the Complaint.

26.    GlaxoSmithKline admits that the '658 Patent purports to cover a process for reducing the crystal size of ondansetron and a pharmaceutical composition containing crystalline ondansetron thereby obtained but denies the allegation in Paragraph 26 of the Complaint concerning "crystalline ondansetron of a specific size range."

### Mutual's Ondansetron Products

27.    On information and belief, GlaxoSmithKline admits that Mutual submitted ANDA 76-628 to the FDA bearing a date of December 30, 2002 in order to engage in the commercial manufacture and sale of ondansetron hydrochloride tablets, 4 mg and 8 mg. GlaxoSmithKline is without sufficient information to admit or deny the date on which ANDA 76-628 was submitted or whether the FDA "accepted ANDA 76-628 for filing as of January 2, 2003."

28.    GlaxoSmithKline admits that Mutual's proposed finished products involve 4 mg and 8 mg tablet dosages of ondansetron hydrochloride, but lacks sufficient information to admit or deny Mutual's allegations in Paragraph 28 of the Complaint concerning Mutual's purported use of "liquisolid" technology or the purported public disclosure of "liquisolid" technology.

29.    GlaxoSmithKline admits that Mutual's ANDA 76-628 contains specifications for the ondansetron API "that meet specific crystal size requirements outside of" the crystal size ranges claimed in the '658 Patent.  While GlaxoSmithKline lacks sufficient information to admit or deny Mutual's specific allegations that Mutual's API supplier does not practice any of the *processes* disclosed or claimed in the '658 Patent in making ondansetron hydrochloride API," it

5

admits that Mutual's product as supplied by Mutual's API supplier is of a crystal size requirement outside of the crystal size range which is claimed in the '658 Patent.

30.    Upon information and belief, GlaxoSmithKline admits the allegations contained in Paragraph 30 of the Complaint.

31.    GlaxoSmithKline admits the allegations in Paragraph 31 of the Complaint.

32.    GlaxoSmithKline admits the allegations in Paragraph 32 of the Complaint.

33.    GlaxoSmithKline admits the allegations in Paragraph 33 of the Complaint.

34.    GlaxoSmithKline admits the allegations in Paragraph 34 of the Complaint, except denies the production of the ANDA 76-628 documents was made on April 9, 2003 because it was actually made on April 16, 2003.

35.    GlaxoSmithKline lacks sufficient information to admit or deny the allegations in Paragraph 35 of the Complaint.

36.    GlaxoSmithKline admits that it commenced the patent litigations specifically identified in Paragraph 36 of the Complaint, but it denies the portion of the allegation characterizing the purported intention of those actions.

37.    GlaxoSmithKline admits the general substance of the quoted statement made by one of its spokespersons, David Mawdsley, but denies the remaining allegations of Paragraph 37 of the Complaint.

38.    GlaxoSmithKline admits the allegations in Paragraph 38 of the Complaint.

39.    GlaxoSmithKline admits that, as a courtesy to Mutual, counsel for GlaxoSmithKline formally advised Mutual's counsel by letter dated May 7, 2003 that GlaxoSmithKline would not file a Hatch-Waxman action against Mutual for infringement of the '658 Patent with respect to these products covered by Mutual's ANDA No. 76-628; and further

avers that Glaxo so advised Mutual notwithstanding Mutual's failure to provide

GlaxoSmithKline with any documents received from its API supplier concerning certain

representations from the API supplier with respect to the API that the manufacturing process

used by Mutual's API supplier does not infringe the '658 Patent. GlaxoSmithKline denies the

remainder of the allegations in Paragraph 39 of the Complaint.

40.    GlaxoSmithKline denies the allegations in Paragraph 40 of the Complaint.

41.    GlaxoSmithKline denies that it did not offer Mutual a covenant not to sue and

admits that it did offer a covenant not to sue Dr. Reddy for infringement of the '658 Patent.

## CAUSE OF ACTION

### Declaratory Judgment of Non-Infringement of
### United States Patent No. 5,344,658

42.    GlaxoSmithKline repeats and reincorporates Paragraphs 1 through 41 above.

43.    GlaxoSmithKline denies the allegations in Paragraph 43 of the Complaint because

no actual justiciable case or controversy exists between the parties with respect to the '658 Patent

based upon Mutual's proposed ondansetron products covered by and described in its ANDA 76-

628, inasmuch as GlaxoSmithKline has never threatened to sue Mutual in connection with

ANDA 76-628 and, indeed, GlaxoSmithKline offered Mutual a covenant not to sue in

connection therewith.

44.    GlaxoSmithKline denies the allegations in Paragraph 44 of the Complaint.

45.    GlaxoSmithKline admits the allegations in Paragraph 45 of the Complaint.

46.    GlaxoSmithKline admits the allegations in Paragraph 46 of the Complaint.

## REQUEST FOR RELIEF

GlaxoSmithKline denies that Mutual is entitled to the relief requested in this Paragraph of the Complaint, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      There is no actual justiciable case or controversy between the parties with respect to Mutual's ANDA 76-628 and GlaxoSmithKline's '658 Patent.

3.      This Court lacks subject matter jurisdiction with respect to this Complaint, because of the absence of any actual justiciable case or controversy between the parties.

4.      Plaintiff, by virtue of the products covered by its ANDA 76-628, has no reasonable apprehension of being sued by GlaxoSmithKline for infringement of the '658 Patent.

5.      GlaxoSmithKline at all times acted reasonably and in good faith toward Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, GlaxoSmithKline respectfully requests that this Court enter an Order and Judgment

1.      Dismissing with prejudice Mutual's Complaint and this action in its entirety, and awarding GlaxoSmithKline its costs and reasonable attorneys' fees; and

8

2.    Awarding GlaxoSmithKline such other and future relief as this Court deems just and proper.

Dated:    June 9, 2003

Respectfully submitted,

Gregory Lewis (V.S.B. No. 47096)
Morgan, Lewis & Bockius LLP
1600 Tysons Boulevard, Suite 1200
McLean, Virginia 22102
703-918-1828
703-918-1999 (facsimile)

Dennis J. Mondolino
Robert G. Gibbons
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178-0060
212-309-6000
212-309-6001 (facsimile)

*Attorneys for Defendants Glaxo Group Limited and
SmithKline Beecham Corporation, d/b/a
GlaxoSmithKline*

9

CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June 2003, I caused a true and correct copy

of the foregoing Answer and Affirmative Defenses of Defendants Glaxo Group Limited and

SmithKline Beecham Corporation d/b/a GlaxoSmithKline to be served by first class mail,

postage pre-paid, on the following:

> Dabney J. Carr, IV, Esquire
> TROUTMAN & SANDERS LLP
> 1111 East Main Street
> P.O. Box 1122
> Richmond, VA  23218-1122
>
> Andrew M. Berdon, Esquire
> James K. Stronski, Esquire
> Tedd W. Van Buskirk
> FROMMER LAWRENCE & HAUG LLP
> 745 Fifth Avenue
> New York, NY  10151

*Attorneys for Plaintiff*

Gregory S. Lewis



10

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

F I L E D
JUL 1 8 2003
CLERK, U.S DISTRICT COURT
RICHMOND, VA

MUTUAL PHARMACEUTICAL COMPANY, INC.,     )
                                          )
                Plaintiff,                )
                                          )
        v.                                )   Case No. 3:03CV426
                                          )
GLAXO GROUP LIMITED and                   )
SMITHKLINE BEECHAM                        )
CORPORATION, d/b/a                        )
GLAXOSMITHKLINE,                          )
                                          )
                Defendants.               )
                                          )

### STIPULATION OF DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, as the

respective attorneys of record for Plaintiff Mutual Pharmaceutical Company, Inc. and

Defendants Glaxo Group Limited and SmithKline Beecham Corporation that:

1.      The Complaint in the above-captioned action is DISMISSED WITH

PREJUDICE for lack of subject matter jurisdiction based on the Covenant Not To Sue and

Stipulation of Non-Infringement of U.S. Patent No. 5,344,658, which is incorporated herein by

reference and filed herewith.

2.      Each party shall bear its own costs.



R E C E I V E D
JUL 1 7 2003
CLERK, U.S. DISTRICT COURT
RICHMOND, VA.



Respectfully submitted,

Dated: July 17, 2003

_Dabney Carr_

Dabney J. Carr, IV, VSB No. 28679
TROUTMAN SANDERS LLP
1111 East Main Street
P.O. Box 1122
Richmond, Virginia 23218-1122
Tel.: (804) 697-1238
Fax: (804) 698-5119

Andrew M. Berdon
James K. Stronski
Tedd W. Van Buskirk
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
Tel.: (212) 588-0800
Fax: (212) 588-0500

Attorneys for Plaintiff.
Mutual Pharmaceutical Company, Inc.


Dated: July 16, 2003

_Gregory Lewis_

Gregory Lewis, VSB No. 47096
MORGAN, LEWIS & BOCKIUS LLP
1600 Tysons Boulevard
McLean, VA 22101
Tel: (703) 918-1000
Fax: (703) 918-1001

Dennis J. Mondolino
Robert G. Gibbons
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6001

Attorneys for Defendants Glaxo Group Limited and
SmithKline Beecham Corporation


It is SO ORDERED.

_Richard L. Williams_

RICHARD L WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

**JUL 1 8 2003**

2

# COVENANT NOT TO SUE
## and
## STIPULATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,344,658

This covenant and stipulation ("Agreement") is made and effective as of July 8, 2003 by Glaxo Group Limited and SmithKline Beecham Corporation, on behalf of themselves, their parents, subsidiaries, affiliates, successors and assigns (collectively "GlaxoSmithKline") with Mutual Pharmaceutical Company, Inc., its parents, subsidiaries, affiliates, successors and assigns (collectively "Mutual").

WHEREAS, Glaxo Group Limited is the owner by assignment and SmithKline Beecham Corporation is the exclusive licensee of U.S. Patent No. 5,344,658 ("the '658 patent"), entitled "Process and Composition Using Ondansetron", relating to pharmaceutical compositions containing ondansetron and processes for preparing those compositions;

WHEREAS, GlaxoSmithKline is the holder of record of NDA 20-103 for marketing ondansetron hydrochloride tablets, 4 mg and 8 mg;

WHEREAS, Mutual Pharmaceutical Company, Inc. ("Mutual") submitted ANDA 76-628 to the FDA on December 30, 2002 seeking approval to market ondansetron hydrochloride tablets, 4 mg and 8 mg;

WHEREAS, Mutual filed a certification in ANDA 76-628 pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) with respect to the '658 patent ("the Paragraph IV certification") and gave GlaxoSmithKline Notice of the Paragraph IV certification on March 6, 2003, along with a detailed statement of the factual and legal bases of the Paragraph IV certification;

WHEREAS, GlaxoSmithKline requested, through it attorneys, on March 27, 2002 materials, documents and information to aid in evaluating the underlying facts of the matters communicated in Mutual's Notice of the Paragraph IV certification;

WHEREAS, in response to GlaxoSmithKline's request and pursuant to a confidentiality agreement, Mutual, through its attorneys, provided to GlaxoSmithKline's attorneys a copy of ANDA 76-628;

WHEREAS, Mutual filed a civil action, captioned *Mutual Pharmaceutical Company, Inc. v. Glaxo Group Limited and SmithKline Beecham Corporation, d/b/a GlaxoSmithKline*, Case No. 3:03CV426 (E.D. Va.), on May 14, 2003 seeking a declaratory judgment of non-infringement of the '658 patent ("the Lawsuit");

WHEREAS, GlaxoSmithKline filed an Answer and Affirmative Defenses on June 10, 2003 in the Lawsuit in which it (i) admitted that the ondansetron hydrochloride tablets that are the subject of and described in Mutual's ANDA No. 76-628 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of the '658 patent, but (ii) denied subject matter jurisdiction due to the absence of an actual case or controversy between the parties concerning the '658 patent;

WHEREAS, in consideration of the covenants and promises set forth herein, Mutual and GlaxoSmithKline consent to entry of an Order, in the form attached hereto, dismissing the Lawsuit, with prejudice;

NOW, THEREFORE, in consideration of the foregoing, GlaxoSmithKline hereby unequivocally and unconditionally promises, covenants and stipulates as follows:

1.    The ondansetron hydrochloride tablets that are the subject of and described in Mutual's ANDA No. 76-628 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of the '658 patent.

2.    GlaxoSmithKline will not sue Mutual, as defined herein, or its distributors or customers for infringement of the '658 patent based on the importation, manufacture, use, sale or

00133582

offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 76-628.

    3.    Nothing in this Agreement shall be construed as a license of any kind under or to any GlaxoSmithKline patents or other forms of intellectual property, including, but not limited to, United States Patent No. 5,344,658.

    4.    This Agreement extends only to Mutual as defined herein and is not transferable, except in connection with the sale or acquisition of all or substantially all of the assets of Mutual.

    5.    The covenant not to sue expressed in paragraph 2 becomes valid upon (i) the execution of this Agreement and (ii) the entry of a Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41(a), as executed and filed by the parties in the form attached hereto.

GLAXO GROUP LIMITED

By: _____

Name: __DAVID J. LEVY__

Title: __ATTORNEY__

MUTUAL PHARMACEUTICAL CO., INC.

By: _____

Name: __Richard H Roberts, MD, Phd,__

Title: __Pres. & CEO__

SMITHKLINE BEECHAM CORP.

By: _____

Name: __DAVID J. LEVY__

Title: __ASSISTANT SECRETARY__



3

00133582

# TAB 5

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

_____

ANDA 76-628                                             Food and Drug Administration
                                                        Rockville MD 20857


Mutual Pharmaceutical Company, Inc.
Attention: Robert Dettery                               NOV 0 8 2006
1100 Orthodox Street
Philadelphia, PA 19124

Dear Mr. Dettery:

This is in response to your letter of June 23, 2006 regarding 180-day exclusivity for
ondansetron hydrochloride tablets 4 mg and 8 mg (ondansetron). You request that the
agency consider 180-day exclusivity arising from Patent No. 5,344,658 ('658 patent)
triggered by the dismissal of a suit brought by Mutual Pharmaceutical Company, Inc.
against GlaxoSmithKline (Glaxo) seeking declaratory judgment of non-infringement of
this patent (stipulated dismissal). The content and grounds of the stipulation of dismissal
at issue here are similar to those for the stipulation of dismissal discussed in the attached
agency letter dated November 3, 2006 to counsel for Apotex Corporation. Accordingly,
for the reasons articulated in that letter and in the agency's letter of April 11, 2006 (FDA
letter decision) to which you refer (attached), and for the additional reasons briefly
discussed below, we deny your request.

Section 505(j)(5)(B)(iv) of the Federal Food, Drug, and Cosmetic Act establishes 180-
day exclusivity. This exclusivity provides a potential reward to the first applicant for an
abbreviated new drug application (ANDA) to challenge a patent for a drug, pursuant to
section 505(j)(2)(A)(vii)(IV) of the Act, and thus expose itself to the risk of being sued
for infringing the patent. Section 505(j)(5)(B)(iv)(II) provides that the start of 180-day
exclusivity can be triggered as of "the date of a *decision of a court . . . holding the patent
which is the subject of the certification to be invalid or not infringed.*" (Emphasis added.)
This mechanism for initiating 180-day exclusivity is commonly referred to as the "court
decision trigger."

The FDA letter decision addresses the court decision trigger, expressly stating that the
dismissal of a patent suit in and of itself is not sufficient to trigger the start of a 180-day
exclusivity period; rather a court order must reflect a holding on the merits by the court
that the patent at issue is invalid, not infringed, or unenforceable (holding-on-the-merits
standard). The FDA letter decision explains in detail the legal grounds and policy
justifications for the holding-on-the-merits standard. *See also Apotex, Inc. v. FDA*, 449
F.3d 1249 (D.C. Cir. 2006) (finding the agency's decision permissible and the
justifications for it reasonable).

Like the dismissal discussed in the attached agency correspondence of November 3,
2006, the Glaxo-Mutual suit was dismissed with prejudice by agreement of the parties,

based upon stipulations that the patent was not infringed and that the ANDA applicant would not be sued for infringement. Here as there, the court never issued a holding on the merits of the patent claim. It is apparent, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard. *See Apotex*, 449 F.3d at 1253.

Under the holding-on-the-merits standard, the court itself has to have made a substantive determination on the merits of the patent claim. As its title ("Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41(a)") reflects, Mutual and Glaxo agreed to dismiss the case through the stipulated dismissal because they believed there were no longer any issues for the court to decide. Further, the stipulated dismissal expressly states that the action is being dismissed for "lack of subject matter jurisdiction." In short, the court was not asked to resolve the merits of the dispute and did not.

You raise one argument not expressly raised by Apotex's counsel and not addressed in the agency's November 3, 2006 letter. You argue that the stipulated dismissal should be considered to satisfy the holding-on-the-merits standard because the dismissal was "with prejudice." However, preclusive effect is not sufficient to satisfy the holding-on-the-merits standard; the standard requires an actual holding on the merits by the court. *See* FDA letter decision at 7. The agency issued the FDA letter decision in the context of a dispute over whether a dismissal of a declaratory judgment could trigger 180-day exclusivity if the dismissal had preclusive effect because it estopped future infringement claims. Consequently, that letter explains in some detail the challenges of implementing an estoppel-based standard, including the factually intensive and legally complex analysis that implementing such a standard would require. However, the agency did not cite these challenges alone to justify its decision, or even as a primary justification.

As we explained in the FDA letter decision, in the absence of clear evidence of alternate Congressional intent, we consider it most appropriate to apply the interpretation that most readily follows from the express statutory language ("the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed"), as the holding-on-the-merits standard does. Further, although there may be other judicial actions that reflect resolution of a patent dispute in favor of the generic applicant, FDA considered it best to establish as clear a bright line test as possible, to minimize litigation and maximize marketplace certainty. In the agency's view, because it so closely tracks the statutory language, the holding-on-the-merits standard serves both these goals well, by minimizing the potential grounds for interpretive debate.[1]

---

[1] We note that you also argue that the agency should consider 180-day exclusivity triggered by the stipulated dismissal because the agency considers the holding-on-the-merits standard consistent with an agency determination that 180-day exclusivity was triggered by the grant of a motion for summary judgment addressed in *Granutec, Inc. v. Shalala* (139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion)). Your argument goes to the validity of the holding-on-the-merits standard, rather than its application to the stipulated dismissal at issue here. As the FDA letter decision (p. 12) explains, the holding-on-merits standard is consistent with the agency's treatment of the grant of summary judgment at issue in *Granutec* because the grant of summary judgment was necessarily based upon a holding on the merits of the patent claim by the court. The Court of Appeals for the District of Columbia upheld the agency's analysis of this issue (*Apotex*, 449 F.3d at 1253). In short, we have considered and addressed this

2

In conclusion, the stipulated dismissal did not trigger any 180-day exclusivity for ondansetron arising from the '658 patent. The agency is not aware of any judicial action to date qualifying as a court decision trigger of 180-day exclusivity for ondansetron. Accordingly, 180-day exclusivity may delay approval of Mutual's ANDA for ondansetron hydrochloride tablets 4 mg and 8 mg.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure

CC:    Elizabeth Dickinson, Office of Chief Counsel
       Applicants with Pending ANDAs for Ondansetron HCl Tablets, 4 mg and 8 mg

---

question of the consistency of the holding-on-the-merits standard with past agency practice. No further consideration of this question is not needed to determine whether the stipulated dismissal at issue here meets the holding-on-the-merits standard, as the standard itself simply looks to whether the court has held on the merits of a patent claim.

3



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 77-306

NOV 0 3 2006

Rakoczy Molino Mazzochi Siwik, LLP
Attention: Christine J. Siwik and William A. Rakoczy
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy and Ms. Siwik:

This responds to your letter dated August 29, 2006, in which you request on behalf of Apotex Corporation that the Food and Drug Administration (FDA) consider the start of 180-day exclusivity for ondansetron hydrochloride tablets 4 mg and 8 mg (ondansetron) to have been triggered by the dismissal of a patent infringement suit.

As you are aware, FDA interpreted the relevant statutory provision in a letter dated April 11, 2006 (FDA letter decision) (attached). FDA's letter decision expressly states that the dismissal of a patent suit in and of itself is not sufficient to trigger the start of a 180-day exclusivity period; rather a court order must reflect a holding on the merits by the court that the patent at issue is invalid, not infringed, or unenforceable ("holding-on-the-merits" standard). The FDA letter decision explains in detail the legal grounds and policy justifications for the holding-on-the-merits standard. Apotex sued the agency, challenging the FDA letter decision as arbitrary and capricious, and the District of Columbia Circuit Court of Appeals ruled in the agency's favor, summarily affirming the district court's denial of Apotex's motion for a preliminary injunction. *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006). Apotex petitioned for a rehearing *en banc* by the court, which the court denied on August 17, 2006. On October 3, 2006, Apotex entered into a stipulation of dismissal ending the litigation.

In accordance with the FDA letter decision, we deny your request for the reasons detailed briefly below, and refer you to that decision for further guidance on this matter.

    I.    Apotex's request.

Apotex now asks the FDA to confirm that: "(1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its ondansetron ANDA [abbreviated new drug application] upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's final approval will not be delayed by any unexpired 180-day exclusivity associated with U.S. Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the '658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against Apotex Inc. [for infringement of the '658 patent]." In essence, you argue that the dismissal of the GSK lawsuit triggered any 180-day exclusivity arising from the '658 patent with respect to ondansetron, that any such 180-day exclusivity has now expired and, therefore, no unexpired 180-day exclusivity arising from the '658 patent could delay approval of Apotex's ANDA upon expiration of the '789 patent.

II.    The May 25, 2005 Order.

Apotex's ANDA for ondansetron includes a "paragraph IV" certification[1] in which Apotex alleges that the '658 patent is not infringed and/or is not valid. Having received notice of this paragraph IV certification in December 2004, GSK sued Apotex for infringement of the '658 patent in January 2005. You enclosed with your August 31, 2005 letter a copy of "the stipulation of dismissal pursuant to Fed. R. Civ. P. 41" filed May 25, 2005, dismissing the GSK suit (stipulation of dismissal).

The stipulation of dismissal states that the plaintiffs (GSK)

> . . . stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

> . . . [have] represented that [they] will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

and the parties

> . . . stipulate and agree to dismissal of the parties' respective claims and counterclaims with prejudice . . . .

The stipulation is signed on behalf of GSK and Apotex, and is signed as "so ordered" by the court.

---

[1] An NDA applicant must notify FDA of patents the applicant believes claim the drug or an approved use of the drug. 21 U.S.C. §§ 355(b)(1), 355(c)(2). FDA relies on these notifications to post information on these patents in *Approved Drug Products with Therapeutic Equivalence Evaluations* (informally referred to as the Orange Book). 21 U.S.C. §§ 355(b)(1), 355(c)(2), 355(j)(7)(A)(iii). An ANDA applicant must then make one of four certifications with respect to each patent that claims the drug or any use of the drug for which the ANDA applicant is seeking approval. These certifications are commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them:

- a "paragraph I" certification that patent information has not been filed;
- a "paragraph II" certification that the patent has expired;
- a "paragraph III" certification of the date the patent will expire; or
- a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable.

21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A). A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent. If an ANDA applicant makes a paragraph IV certification, the applicant must the notify the holder of the approved NDA and the patent owner. 21 U.S.C. § 355(j)(2)(B).

III.    180-day exclusivity and FDA letter decision.

Section 505(j)(5)(B)(iv) of the Act establishes 180-day exclusivity. This exclusivity provides a potential reward to the first ANDA applicant to submit a paragraph IV certification to a patent pursuant to section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act and thus to expose itself to the risk of being sued for infringing the patent.

Section 505(j)(5)(B)(iv)(II) provides that the start of 180-day exclusivity can be triggered as of "the date of a *decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed.*"[2] (Emphasis added.) This mechanism for initiating 180-day exclusivity is commonly referred to as the "court decision trigger."

The FDA letter decision announced the holding-on-the-merits standard to assess whether an action of a court qualifies as a court decision trigger to start the running of 180-day exclusivity. As the introduction to that letter states (and the body of that letter explains in detail):

> FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. . . . FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

FDA letter decision at 2.[3] FDA adopted this bright-line standard to provide clarity, reduce the likelihood of litigation over whether a court action triggers 180-day exclusivity, and promote greater marketplace certainty.

---

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). None of the amendments pertaining to 180-day exclusivity enacted through the MMA bear upon the determination of whether the stipulation of dismissal for the GSK suit triggered 180-day exclusivity for ondansetron, however, because the earliest ANDA containing a paragraph IV certification for this drug was submitted before the December 8, 2003, enactment date of the MMA. *See id.* § 1102(b)(1).

[3] Provisions of the MMA inapplicable to the 180-day exclusivity determination for ondansetron (*see* MMA § 1102(b)(1)) eliminated the court-decision trigger provision, but provided for forfeiture of exclusivity in certain circumstances. One event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2006). The holding-on-the-merits standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

3

IV.        Analysis

The GSK suit was dismissed by an agreement between the parties; the court never issued a holding on the merits of the patent claim. It is clear, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard. *See Apotex*, 449 F.3d at 1253.[4]

You assert that the stipulation of dismissal satisfies the holding-on-the-merits standard because, *inter alia*, it expressly reflects GSK's judgment that the patent at issue is not infringed and GSK's commitment not to sue. Your conclusion is not correct. It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim. As its title ("Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41") reflects, the stipulation of dismissal was the mechanism by which the parties sought and received dismissal of the case because, in their view, there was nothing left for the court to decide. The court was not asked to resolve the dispute on the merits and did not do so. In short, the stipulation of dismissal does not reflect a holding by the court on the merits of the patent claim.[5]

---

[4] Although the holding-on-the-merits standard was announced in relation to a declaratory judgment action, the standard is equally applicable to affirmative patent infringement suits, such as the GSK suit at issue here. The standard looks to whether the court has made a holding on the merits of the patent claim; it does not consider the manner by which the dispute came before the court.

This letter does not address the arguments made in your prior letter of August 31, 2005, to support your claim that the GSK stipulation of dismissal satisfies an estoppel-based interpretation of the court decision trigger. As explained in greater detail in the FDA letter decision, the agency has rejected this standard in favor of the holding-on-the-merits standard. Accordingly, this letter addresses only the arguments you made in your letter dated August 29, 2006, that the GSK stipulation of dismissal satisfies the holding-on-the-merits standard.

[5] We note that you raised additional arguments in telephone conversations with the agency that you chose not to submit in writing. These arguments relate to FDA's decision in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), as well as whether FDA's interpretation of section 505(j)(5)(B)(iii) is consistent with its interpretation of section 505(j)(5)(B)(iv). In this letter, however, we are only addressing the question that Apotex set forth in writing, *i.e.*, whether the ondansetron dismissal constitutes a court decision trigger under FDA's "holding-on-the-merits" standard. We do not believe that the additional arguments not submitted in writing are pertinent to making that determination, which simply looks to whether the court has held on the merits of a patent claim.

V.    Conclusion

The stipulation of dismissal did not trigger any 180-day exclusivity for ondansetron that may
arise from another ANDA applicant's paragraph IV certification to the '658 patent.  The agency
is not aware of any judicial action to date qualifying as a court decision trigger of 180-day
exclusivity for ondansetron.  Accordingly, 180-day exclusivity may delay approval of Apotex's
ANDA for ondansetron hydrochloride tablets 4 mg and 8 mg upon expiration of the '789 patent.[6]

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure

cc:    Elizabeth Dickinson, Office of Chief Counsel
       Applicants with Pending ANDAs for Ondansetron HCl Tablets, 4 mg and 8 mg

---

[6] FDA does not make its exclusivity determinations until an ANDA is ready for final approval, which will not occur
for ondansetron until at least December 24, 2006, when the pediatric exclusivity associated with the '789 patent will
expire.  Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested
by the agency on the use of drugs in pediatric populations.  It is a six-month exclusivity that attaches to any listed
patent or exclusivity for the drug studied.  21 U.S.C. § 355a.  Apotex assumes that another ANDA applicant will be
entitled to 180-day exclusivity for ondansetron, which the agency neither confirms nor denies.



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

ANDA 76-341                                                          Food and Drug Administration
                                                                     Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg, 20 mg, 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.    Statutory and Procedural Background

    A.    180-Day Exclusivity and the Court Decision Trigger

Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after -
>
> (I)       the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)     the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(e)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

B.    The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making.'" *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

_____

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines as "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court . . . holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision of the court holding the relevant patent invalid, unenforceable, or not infringed.")* (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

    A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

    1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

7

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5]  *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

        2.     FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

### 3. FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra.* FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec.*" *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.    FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8]    Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

12

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. See, e.g., Teva, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original Teva litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. See, e.g., Teva Pharms. USA, Inc. v. FDA, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as Amicus Curiae, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in Teva I. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the Teva III court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like ... bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" ....

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability.  The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding.  FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15

# TAB 6



DEPARTMENT OF HEALTH & HUMAN SERVICES                Public Health Service

ANDA 76-341                                          Food and Drug Administration
                                                     Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

        This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

        Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.      Statutory and Procedural Background

        A.      180-Day Exclusivity and the Court Decision Trigger

        Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii)) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

        A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

        An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after -
>
> (I)     the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g., Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

B.     The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed*.") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

### A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

#### 1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent; (2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if the patentee is allowed to proceed with its claim). Such determinations are often quite subjective, dependent on an infinite variety of factual contexts, and provide scant basis for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to uncertainty. Experience has shown, for example, that declaratory judgment actions may be dismissed for a variety of reasons, not all of which concern representations with preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not sue). Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the difficulty of applying an estoppel-based standard that requires the agency to evaluate the underlying reasons for a dismissal — and the very low likelihood of industry certainty under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-based approach inexorably spawns subsequent litigations concerning FDA's estoppel determinations — litigations that can be avoided under a clearer, textually-based standard.

        2.      FDA's Interpretation is Consistent with its Regulation, which Includes Unenforceability as a Separate Basis for a Court Decision Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-Syntex dismissal was not a court decision trigger was consistent with FDA's regulation including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I* suggested that FDA's position was "absurd" because FDA's regulation included unenforceability, but FDA refused to acknowledge a dismissal that had the apparent effect of unenforceability as a court decision trigger. *Id.*

---

[6]  In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6 (finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.    FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra.* FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.    FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8]  Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

> The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buchler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.