# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APOTEX INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1890 (RMC) |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DR. REDDY'S LABORATORIES, LTD. | ) | |
| *et al.*, | ) | |
| | ) | |
| Intervenors-Defendants. | ) | |
| | ) | |

## FEDERAL DEFENDANTS' MEMORANDUM IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DANIEL MERON
*General Counsel*

SHELDON T. BRADSHAW
*Associate General Counsel*
*Food and Drug Division*

ERIC M. BLUMBERG
*Deputy Chief Counsel, Litigation*

WENDY S. VICENTE
*Associate Chief Counsel*
*U.S. Dept. of Health & Human Services*
*5600 Fishers Lane*
*Rockville, MD  20857*

PETER D. KEISLER
*Assistant Attorney General*

EUGENE M. THIROLF
*Director*
*Office of Consumer Litigation*

ANDREW E. CLARK
*Attorney, Office of Consumer Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 386*
*Washington, D.C.  20044*
*(202) 307-0067*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     Statutory and Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           1.     New Drug Applications (NDAs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           2.     Abbreviated New Drug Applications (ANDAs) . . . . . . . . . . . . . . . . . . . 2

           3.     180-Day Marketing Exclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           4.     The Court Decision Trigger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.     Factual Background and Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . 7

           1.     Ondansetron NDA and ANDA Submissions . . . . . . . . . . . . . . . . . . . . 7

           2.     GSK-Apotex Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           3.     FDA's November 3, 2006 Decision . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     I.     Apotex Has No Likelihood of Success on the Merits of its Claim . . . . . . . . . . . 11

           A.     FDA's Statutory Interpretation is Entitled to Deference . . . . . . . . . . . . . 11

           B.     FDA's Statutory Interpretation Controls . . . . . . . . . . . . . . . . . . . . . . . . 14

           C.     FDA's Administrative Decision Should Be Upheld . . . . . . . . . . . . . . . . 15

           D.     This Court Should Not Revisit FDA's April 11, 2006 Decision . . . . . . 17

                   1.     FDA's April 11, 2006 Decision is Consistent
                       with *Granutec* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Page(s)**

    2.    FDA's Holding-On-The-Merits Standard is
          Consistent with Agency Practice Regarding the
          Termination of 30-Month Stays . . . . . . . . . . . . . . . . . . . . . . . . 22

    3.    Apotex's Remaining Arguments Are Meritless . . . . . . . . . . . . 27

II.    Apotex Will Not Suffer Irreparable Harm Absent Preliminary
      Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.    FDA and the Public Will be Harmed if Apotex's Request for
      Relief is Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page(s)**

*Am. Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ..................................................................... 12

*\*Apotex, Inc. v. FDA,*
    No. 06-627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ........................................ *passim*

*\*Apotex, Inc. v. FDA,*
    449 F.3d 1249 (D.C. Cir. 2006) ................................................................. *passim*

*Auer v. Robbins,*
    519 U.S. 452 (1997) ..................................................................... 12

*Barnhart v. Walton,*
    535 U.S. 212 (2002) ................................................................... 12, 13

*In re Barr Labs., Inc.,*
    930 F.2d 72 (D.C. Cir. 1991) ..................................................................... 29

*Boehringer Ingelheim Corp. v. Shalala,*
    993 F. Supp. 1 (D.D.C. 1997) ..................................................................... 10

*Boivin v. US Airways, Inc.,*
    297 F. Supp. 2d 110 (D.D.C. 2003) ............................................................... 31

*Bristol-Myers Squibb Co. v. Shalala,*
    923 F. Supp. 212 (D.D.C. 1996) ........................................................ 10-11, 15, 30, 31

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................... 10

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ..................................................................... 11

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ..................................................................... 15

*Cmty. Nutrition Inst. v. Block,*
    749 F.2d 50 (D.C. Cir. 1984) ..................................................................... 18

*\*Authorities upon which we chiefly rely are marked with asterisks.*

**Page(s)**

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ..................................................................................... 11

*Consumer Elecs. Ass'n v. FCC,*
    347 F.3d 291 (D.C. Cir. 2003) .................................................................... 11

*Experience Works, Inc. v. Chao,*
    267 F. Supp. 2d 93 (D.D.C. 2003) ......................................................... 30, 31

*Granutec, Inc. v. Shalala,*
    139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) ........................... 9, 19

*Group Life & Health Ins. Co. v. Royal Drug Co.,*
    440 U.S. 205 (1979) .................................................................................... 11

*Gulf Oil Corp. v. Dep't of Energy,*
    514 F. Supp. 1019 (D.D.C. 1981) .......................................................... 31, 33

*Lummus Co. v. Commonwealth Oil Ref. Co.,*
    297 F.2d 80, 89 (2d Cir. 1961) ................................................................... 18

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.,*
    605 F.2d 990 (7th Cir. 1979) ...................................................................... 18

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ........................................................ 4, 12, 34

*Mylan Labs., Inc. v. Thompson,*
    389 F.3d 1272 (D.C. Cir. 2004) ............................................................ 12, 13

*Mylan Pharm., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................ *passim*

*Mylan Pharms., Inc. v. Thompson,*
    207 F. Supp. 2d 476 (N.D. W. Va. 2001) ................................................... 31

*Mylan v. Thompson,*
    139 F. Supp. 2d 1 (D.D.C.) ................................................................. *passim*

*Nat'l Pharm. Alliance v. Henney,*
    47 F. Supp. 2d 37 (D.D.C. 1999) ............................................................... 30

**Page(s)**

*Norton v. S. Utah Wilderness Alliance,*
 542 U.S. 55 (2004) ..................................................................... 32

*Novartis Pharms. Corp. v. Leavitt,*
 435 F.3d 344 (D.C. Cir. 2006) ................................................. 12, 13

*PDK Labs., Inc. v. DEA,*
 362 F.3d 786 (D.C. Cir. 2004) ..................................................... 13

*Purepac Pharm. Co. v. Thompson,*
 354 F.3d 877 (D.C. Cir. 2004) .................................................. 12, 13

*Serono Labs., Inc. v. Shalala,*
 158 F.3d 1313 (D.C. Cir. 1998) .................................................... 12

*Skidmore v. Swift & Co.,*
 323 U.S. 134 (1944) .................................................................... 12

*Sociedad Anonima Vina Santa Rita v. Dep't of Treasury,*
 193 F. Supp. 2d 6 (D.D.C. 2001) ................................................. 31

*Stewart v. Nat'l Shopmen Pension Fund,*
 730 F.2d 1552 (D.C. Cir. 1984) ................................................... 11

*Teva Pharm. Indus. v. Crawford,*
 410 F.3d 51 (D.C. Cir. 2005) ....................................................... 29

*Teva Pharm., USA, Inc. v. FDA,*
 No. 99-5287, 2000 U.S. App. LEXIS 38667 (D.C. Cir. 2000) (*Teva II*) ................... 5, 20

*Teva Pharm., USA, Inc. v. FDA,*
 182 F.3d 1003 (D.C. Cir. 1999) (*Teva I*) ...................................... 5, 6

*Teva Pharms. USA, Inc. v. FDA,*
 398 F. Supp. 2d 176 (D.D.C. 2005) ............................................. 10

*Teva Pharms. USA, Inc. v. Pfizer, Inc.,*
 395 F.3d 1324 (Fed. Cir. 2005) ................................................... 28

*Teva Pharms. v. FDA,*
 441 F.3d 1 (D.C. Cir. 2006) (*Teva III*) ...................................... 6, 13

**Page(s)**

*United States Dep't of Treasury v. Fabe,*
    508 U.S. 491 (1993) .................................................................................... 11

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .................................................................................... 12

*Varicon Int'l v. OPM,*
    934 F. Supp. 440 (D.D.C. 1996) .................................................................. 30

*Virginia Petroleum Jobbers Ass'n v. FPC,*
    259 F.2d 921, 925 (D.C. Cir. 1958) ............................................................ 31

*Wisconsin Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ............................................................... 30, 31

## DOCKETED CASES

*Glaxo Group Ltd. et al. v. Apotex Inc.,*
    No. 05-307 (D.N.J.) ..................................................................................... 16

*Glaxo, Inc. v. Boehringer Ingelheim Corp.,*
    No. 95-CV-01342 (D. Conn. Oct. 7, 1996) ................................................. 19

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ........................................................................................... 15

21 U.S.C. § 355 ..................................................................................................... 2

21 U.S.C. § 355(a) ............................................................................................. 2, 7

21 U.S.C. § 355(b) ................................................................................................ 2

21 U.S.C. § 355(b)(1) ........................................................................................... 2

21 U.S.C. § 355(c)(2) ........................................................................................... 2

21 U.S.C. § 355(d) .............................................................................................. 12

21 U.S.C. § 355(j)(2)(A)(vii) ............................................................................... 2

**Page(s)**

21 U.S.C. § 355(j)(2)(A)(vii)(III) .................................................................. 7

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ............................................................... 3, 7

21 U.S.C. § 355(j)(4) .................................................................................. 12

21 U.S.C. § 355(j)(5) .................................................................................. 12

21 U.S.C. § 355(j)(5)(B)(I) ........................................................................... 3

21 U.S.C. § 355(j)(5)(B)(ii) ........................................................................... 3

21 U.S.C. § 355(j)(5)(B)(iii) .................................................... 3, 9, 15, 22, 27

21 U.S.C. § 355 (j)(5)(B)(iii) (2006) ............................................................. 4

21 U.S.C. §355(j)(5)(B)(iii)(I) ........................................................... 23, 24, 26

21 U.S.C. § 355 (j)(5)(B)(iii)(I) (2006) ....................................................... 22

21 U.S.C. § 355 (j)(5)(B)(iii)(I)(bb) ...................................................... 23, 26

21 U.S.C. § 355(j)(5)(B)(iv) ......................................................................... 4

*21 U.S.C. § 355(j)(5)(B)(iv)(II) ........................................... 1, 5, 23, 26, 27

21 U.S.C. § 360cc ........................................................................................ 2

35 U.S.C. § 156 ........................................................................................... 2

35 U.S.C. § 271 ........................................................................................... 2

35 U.S.C. § 271(e)(2) ................................................................................ 28

35 U.S.C. § 282 ........................................................................................... 2

## FEDERAL REGULATIONS

21 C.F.R. § 314.105(d) ................................................................................ 7

21 C.F.R. § 314.107(c)(1) ............................................................................ 4

**Page(s)**

21 C.F.R. § 314.107(c)(1)(ii) ........................................................................ 6

21 C.F.R. § 314.107(c)(2) ........................................................................ 4-5

21 C.F.R. § 314.107(f)(2) ........................................................................ 3

21 C.F.R. § 314.430 ........................................................................ 7, 8

**FEDERAL RULES**

Fed. R. Civ. P. 56(c) ........................................................................ 10, 20

Fed. R. Civ. P. 65(a)(2) ........................................................................ 10

**LEGISLATIVE MATERIALS**

130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) ........................................ 24

130 Cong. Rec. S10504 (daily ed. Aug. 10, 1984) ...................................... 24

Drug Price Competition and Patent Term Restoration Act of 1984
    ("Hatch-Waxman Amendments"), Pub. L. No. 98-417, 98 Stat. 1585 (1984) ................ 2

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No.
    108-173, 117 Stat. 2066 (Dec. 8, 2003) .............................................. 4, 22, 25

**MISCELLANEOUS**

18 James Wm. Moore et al., Moore's Federal Practice ¶ 132.03[5][b][ii] (3d. ed. 2006) .......... 18

# INTRODUCTION

Plaintiff Apotex Inc. ("Apotex"), a manufacturer of generic drugs, asks this Court to set aside a decision of the Food and Drug Administration ("FDA" or "Agency") that will permit one of Apotex's competitors to exclusively market a generic version of the blockbuster drug Zofran (also known by its generic name, "ondansetron") for 180 days before Apotex may be eligible for approval of its own generic ondansetron product. Apotex's request for immediate approval of its ondansetron abbreviated new drug application ("ANDA"), however, is based on a legal theory that has no likelihood of success on the merits following the D.C. Circuit's June 6, 2006, decision in *Apotex, Inc. v. FDA,* 449 F.3d 1249 (D.C. Cir.), *rehearing en banc denied* (Aug. 17, 2006) ("*Apotex (pravastatin)*"), in which the court rejected Apotex's virtually identical challenge to FDA's interpretation of the statutory provision here at issue. In that case, the court upheld FDA's position that the so-called "court decision trigger" provision, 21 U.S.C. § 355(j)(5)(B)(iv)(II), requires a "decision of a court . . . holding the patent . . . to be invalid or not infringed" – *i.e.*, an actual court holding on the merits of the patent claim. *Id.* at 1252-53 (upholding FDA's interpretation as "in no way inconsistent with the plain language of the statute").

Apotex now seeks a second bite at the apple, contending that exclusivity for ondansetron has been triggered by the stipulated dismissal of a lawsuit that was based solely on an agreement by the parties that the patent at issue is not infringed. As the D.C. Circuit has held, however, FDA has properly construed the statute to require an actual court holding on the merits of the patent claim, and the stipulated dismissal fails to qualify as a triggering court decision. Because FDA's interpretation of the relevant statutory provision is permissible under *Chevron*, and has already been upheld by the D.C. Circuit in the face of Apotex's indistinguishable prior challenge,

Apotex cannot succeed on the merits of its recycled claim.  Nor has Apotex, the largest

pharmaceutical company in Canada, established that it will suffer irreparable harm without the

relief that it seeks.  For these and other reasons explained in greater detail below, Apotex is not

entitled to preliminary injunctive relief.

## BACKGROUND

### A.    Statutory and Regulatory Framework

#### 1.    New Drug Applications (NDAs)

Under the Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act"), companies

seeking to market "pioneer" or "innovator" drugs must first obtain FDA approval by filing a new

drug application ("NDA").  21 U.S.C. § 355(a), (b).  An NDA must contain extensive clinical

and other scientific data demonstrating the safety and effectiveness of the drug, as well as patent

information for the drug product.  More specifically, an NDA applicant is required to submit

information on any patent that claims the drug or a method of using the drug and for which a

claim of patent infringement could reasonably be asserted.  21 U.S.C. § 355(b)(1), (c)(2).

#### 2.    Abbreviated New Drug Applications (ANDAs)

In 1984, the FDCA was amended to allow approval of generic drugs through Abbreviated

New Drug Applications, or ANDAs.  *See* Drug Price Competition and Patent Term Restoration

Act of 1984 (commonly known as the Hatch-Waxman Amendments), Pub. L. No. 98-417, 98

Stat. 1585 (1984), codified at 21 U.S.C. §§ 355, 360cc, 35 U.S.C. §§ 156, 271, 282.  An ANDA

must contain, among other things, one of four specified certifications for each patent that "claims

the listed drug" or a "use for such listed drug for which the applicant is seeking approval."  21

U.S.C. § 355(j)(2)(A)(vii).  The certification must state one of the following:

(I)  that the required patent information relating

2

to such patent has not been filed;

(II)  that such patent has expired;

(III) that such patent will expire on a particular date; or

(IV) that such patent is invalid or will not be infringed
by the drug for which approval is being sought.

*See id*.

If a certification is made under paragraph I or II indicating that patent information

pertaining to the drug or its use has not been filed with FDA or the patent has expired, then the

patent, by itself, will not delay approval of the ANDA.  21 U.S.C. § 355(j)(5)(B)(i).  A

certification under paragraph III indicates that the ANDA applicant does not intend to market the

drug until after the applicable patent has expired, and FDA will not approve the ANDA until

after the patent has expired.  21 U.S.C. § 355(j)(5)(B)(ii).  If an ANDA applicant wants to market

its product before the expiration of a listed patent, it may submit a so-called "paragraph IV

certification" stating that such patent is invalid or will not be infringed by the drug for which

approval is being sought.  *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).  The statute requires the ANDA

applicant to give notice of the filing of a paragraph IV certification to the patent owner and, if

different, the NDA holder for the listed drug.

FDA may approve an ANDA with a paragraph IV certification, and the approval may

become effective immediately despite the unexpired patent, unless an action for patent

infringement is brought against the ANDA applicant within 45 days of the date the patent owner

and NDA holder receive notice of the paragraph IV certification.  21 U.S.C. § 355(j)(5)(B)(iii);

21 C.F.R. § 314.107(f)(2).  If an infringement action is brought within 45 days, approval of the

ANDA is automatically stayed for 30 months from the date that the patent owner and NDA

3

holder received notice ("the 30-month stay"), unless the litigation has been terminated or the district court orders a longer or shorter period.  21 U.S.C. § 355(j)(5)(B)(iii) (2006).

### 3.    180-Day Marketing Exclusivity

As an incentive to the first generic drug manufacturer to expose itself to the risk of patent litigation, the statute provides that the applicant that files an ANDA containing the first paragraph IV certification to a patent may be eligible for a 180-day period of marketing exclusivity.  21 U.S.C. § 355(j)(5)(B)(iv).  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998).

The statutory provision governing 180-day exclusivity provides:

> If the application [submitted under 21 U.S.C. § 355(j)(2)] contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, *the application shall be made effective not earlier than one hundred and eighty days after*-
>
> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
>
> (II) the date of a *decision of a court* in an action described in clause (iii) *holding the patent which is the subject of the certification to be invalid or not infringed*,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added).[1]  *See also* 21 C.F.R. § 314.107(c)(1) &

---

[1] Congress amended 21 U.S.C. § 355(j) in late 2003.  *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA").  Pursuant to the effective dates of those amendments, they do not apply to the exclusivity determinations for the ANDAs in this case because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date of the MMA.  *See id.* § 1102(b)(1).  Except where otherwise noted, this memorandum refers to the pre-MMA version of the statute.

(2).  Under this provision, either of two events can trigger the start of the exclusivity period:  (1)

the commercial marketing of the drug product as set forth in subclause (I); or (2) an applicable

court decision as set forth in subclause (II) (the "court decision trigger"), the provision at issue in

this case.

### 4.        The Court Decision Trigger

The court decision trigger has been the subject of long-running litigation involving FDA,

Teva Pharmaceuticals USA Inc., and Apotex, which recently concluded when the D.C. Circuit

upheld FDA's April 11, 2006 decision that articulated a statutory-based interpretation of section

355(j)(5)(B)(iv)(II).  *Apotex (pravastatin),* 449 F.3d 1249.  Prior to the issuance of its April 11,

2006 interpretation, FDA believed that it was bound to apply a different interpretation of the

court decision trigger set forth in *Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir.

1999) ("*Teva I*") and *Teva Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS

38,667, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), two decisions that arose from

litigation with Teva and Apotex.  FDA believed that the D.C. Circuit's *Teva I* and *Teva II*

decisions compelled the agency to conclude that the court decision trigger was satisfied by the

dismissal of a patent case when the circumstances of that dismissal would estop the patentee

from suing the ANDA applicant for infringement (the "estoppel-based approach").

FDA subsequently applied the estoppel-based approach for the drug pravastatin and

determined that exclusivity had been triggered for that drug by a stipulated dismissal order that

contained the patentee's representations that it had no intention of suing the ANDA applicant.

AR Tab 6 at 5.  Teva, the putative exclusivity holder, sued FDA, arguing that FDA was not

bound by the estoppel standard and that it was contrary to the statute.  Apotex was also a party to

that case, having sought to trigger Teva's exclusivity for pravastatin.  Teva prevailed in the

district court, and, on appeal, the D.C. Circuit held that FDA was not bound by *Teva I* and *II* to apply an estoppel-based approach and was free to adopt its own, independent interpretation of the court decision trigger provision. *Teva Pharms. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) ("*Teva III*").

Following *Teva III*, FDA interpreted the court decision trigger to require "a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable" ("holding-on-the-merits" standard). *See* April 11, 2006 decision, AR Tab 6, at 6-7 (emphasis in original).[2] FDA adopted this standard as the most natural reading of the statute, and to provide a bright line for the regulated industry so that court decision trigger determinations would be more transparent than they had been under the estoppel-based approach. *Id.* at 13-14. Apotex challenged that determination for the drug pravastatin, seeking a preliminary injunction to prevent FDA from granting exclusivity to Apotex's competitors. This Court (Judge John D. Bates) denied Apotex's request for an injunction, *Apotex, Inc. v. FDA*, No. 06-627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006), and the D.C. Circuit summarily affirmed, concluding that FDA's decision adequately addressed past criticism of a statutory-based interpretation, and that FDA's interpretation was reasonable. *Apotex (pravastatin)*, 449 F.3d at 1252-53. Apotex unsuccessfully sought *en banc* rehearing of the court's decision, which request was denied on August 17, 2006. Subsequently, on October 3, 2006, Apotex dismissed its suit.[3]

_____

[2] Although the statute does not expressly include unenforceability as one of the grounds for a paragraph IV certification or a triggering court decision, FDA has construed the statute to include unenforceability because a patent that is held unenforceable cannot be asserted against an ANDA applicant and should not serve as a basis for delaying generic drug market entry. 21 C.F.R. § 314.107(c)(1)(ii); *see Teva I*, 182 F.3d at 1009 (recognizing and approving unenforceability as the basis for a paragraph IV certification).

[3] Apotex dismissed its claims regarding the 10, 20, and 40 mg dosage strengths of pravastatin with prejudice, and dismissed its claims regarding the 80 mg strength without prejudice. *See* Stipulation of Dismissal, Docket No. 42, *Apotex v. FDA*, No. 06-627-JDB (D.D.C. Oct. 3, 2006).

**B.     Factual Background and Proceedings Below**

**1.     Ondansetron NDA and ANDA Submissions**

GlaxoSmithKline ("GSK") is the holder of approved NDA 20-103 for ondansetron

hydrochloride tablets ("ondansetron") in the 4 and 8 mg strengths, which it markets under the

brand-name Zofran.  Zofran is approved for the prevention of nausea and vomiting associated

with certain chemotherapy treatments.  GSK listed two patents in the Orange Book for

ondansetron that are relevant to this suit:  U.S. Patent No. 4,753,789 ("the '789 patent"), and

5,344,658 ("the '658 patent").[4]  Apotex submitted an ANDA for generic versions of ondansetron

in the 4 and 8 mg strengths on September 30, 2004.  AR Tab 1, at 3.  Apotex's ANDA contains a

paragraph III certification to the '789 patent, indicating that Apotex will not market a generic

version of the drug until the '789 patent and its associated pediatric exclusivity period expire on

December 24, 2006.[5]  *Id.; see* 21 U.S.C. § 355(j)(2)(A)(vii)(III).  Apotex's ANDA also contains a

paragraph IV certification challenging the '658 patent.  *Id.; see* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

As of this date, no tentative approval letter for Apotex's ANDA is posted on FDA's website.[6]

Several other generic manufacturers have submitted ANDAs for ondansetron that, like

---

[4] *See* Electronic Orange Book, *available at*
http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=020103&Product_No=001&table1=OB_Rx.

[5] Among other exclusivities, an NDA holder can receive six months of pediatric exclusivity
beyond patent expiration if, as GSK did here, it satisfactorily completes requested studies
concerning the effects of its drug in the pediatric population.  21 U.S.C. § 355a.

[6] *See* http://www.fda.gov/cder/ogd/approvals/default.htm.  A tentative approval indicates that the
technical and scientific requirements for approval have been met as of a particular date but that
approval cannot be made effective (and marketing is not permitted) until after some future event
(such as expiration of a 30-month stay, a patent, or a period of marketing exclusivity).  *See* 21
C.F.R. § 314.105(d).  FDA may publicly disclose certain information pertaining to the status of
unapproved ANDAs, such as the issuance of a tentative approval letter, although other
information remains confidential before the application is approved.  *See* 21 C.F.R. § 314.430.

Apotex's ANDA, contain paragraph IV certifications challenging the '658 patent. FDA does not make its exclusivity determinations until an ANDA is ready for final approval. Apotex assumes that another ANDA applicant will be entitled to 180-day exclusivity for ondansetron, which, because of confidentiality considerations, the agency can neither confirm nor deny. *See* 21 C.F.R. § 314.430.

### 2.    GSK-Apotex Litigation

GSK sued Apotex for infringement based on Apotex's paragraph IV certification to the '658 patent on January 14, 2005. AR Tab 1, at 4. The parties settled the case on May 25, 2005. *Id.* at 4-5. The "Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41" states in relevant part that the plaintiffs (GSK):

> . . . stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold, or offered for sale in the United States would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

> . . . [have] represented that [they] will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

> Therefore, based on the referenced Agreement, the parties, by their undersigned attorneys, hereby stipulate and agree to dismissal of the parties' respective claims and counterclaims with prejudice.

AR Tab 1, Ex. E. The stipulation is signed on behalf of GSK and Apotex, and is signed as "so ordered" by the court. *Id.*

### 3.    FDA's November 3, 2006 Decision

On August 31, 2005, Apotex requested that FDA determine that the GSK-Apotex stipulated dismissal constitutes a court decision trigger – meaning that any applicable 180-day

exclusivity period for ondansetron would have begun running when the May 25, 2005 dismissal

became final and unappealable on June 24, 2005, and elapsed six months later.  AR Tab 1.  At

the time of Apotex's request, FDA was litigating the court decision trigger issue with Teva and

Apotex for the drug pravastatin, which ultimately resulted in FDA's articulation of the holding-

on-the-merits standard on April 11, 2006.  AR Tab 6.  Apotex was well aware that the outcome

of the pravastatin litigation could influence FDA's decision with respect to ondansetron.  Thus,

on August 29, 2006, Apotex renewed its request for a court decision trigger determination for

ondansetron, arguing that the GSK-Apotex stipulated dismissal was a court decision trigger even

in view of the agency's April 11, 2006 holding-on-the-merits standard.  AR Tab 2.  In that letter,

Apotex also stated that Apotex "vigorously disputes the legality of FDA's April 11, 2006

administrative ruling."  *Id.* at 2 n.1.[7]

Separately, Apotex continued to challenge FDA's interpretation of the court decision

trigger in the pravastatin case until that litigation concluded on October 3, 2006.  Following

Apotex's dismissal of its pravastatin claims, FDA turned to Apotex's ondansetron request.  On

November 3, 2006, FDA issued a letter decision concluding that the GSK-Apotex stipulated

dismissal did not satisfy the holding-on-the-merits standard because the court did not hold

anything on the merits of the patent claims.  *Id.* at 4.  Accordingly, FDA determined that the

GSK-Apotex stipulated dismissal did not trigger any exclusivity for ondansetron, and that such

---

[7] Apotex's counsel made two additional arguments to agency counsel over the telephone
concerning *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998)
(unpublished opinion), and FDA's interpretation of the provisions for terminating a 30-month
stay in section 355(j)(5)(B)(iii), but Apotex declined to submit those arguments in writing.  AR
Tab 3, at 4 n.5.  FDA did not address those oral arguments in its decision letter because they
were not pertinent to the agency's determination, which required only straightforward application
of the holding-on-the-merits standard to the ondansetron stipulated dismissal.  *Id.* at 4 n.5.

exclusivity might apply to delay approval of Apotex's ANDA.  *Id.* at 5.[8]

## ARGUMENT

To obtain a preliminary injunction, a party must demonstrate that:  (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest.[9]  *See Boehringer Ingelheim Corp. v. Shalala,* 993 F. Supp. 1, 1 (D.D.C. 1997); *Mova*, 140 F.3d at 1066.  The Court must balance the four factors in deciding whether to grant the injunctive relief.  *Id.*

The injunctive relief Apotex seeks is "an extraordinary form of judicial relief" and is not to be granted lightly.  *Mylan v. Thompson*, 139 F. Supp. 2d 1, 17 (D.D.C.) ("*Mylan (buspirone)*"), *rev'd other grounds*, 268 F.3d 1323 (Fed. Cir. 2001); *Bristol-Myers Squibb Co. v.*

---

[8] Proposed Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc. ("Mutual"), another ANDA applicant for ondansetron, also requested that FDA determine that there has been a court decision trigger for ondansetron, based on a stipulated dismissal of a declaratory judgment action that is similar to the GSK-Apotex stipulated dismissal.  AR Tab 4.  FDA issued a letter decision to Mutual denying its request on November 8, 2006.  *See* AR Tab 5.

[9] FDA believes that Apotex's motion for injunctive relief should be consolidated with a hearing on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 181 n.1 (D.D.C. 2005) (citing reasons of judicial economy), *vacated on other grounds*, 441 F.3d 1 (D.C. Cir. 2006).  Alternatively, because the facts necessary for a resolution of this case are not disputed, summary judgment may be appropriate with respect to Apotex's claims against FDA.  Federal Rule of Civil Procedure 56(c) provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The federal defendants have filed an administrative record in this case, and there is no known dispute about the contents of that record.  Courts have held that it is appropriate to provide judgment for the non-moving party in such circumstances if the court's determination of the legal issues establishes that the defendant is entitled to such a judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (noting that courts may grant summary judgment *sua sponte*).

*Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996).  Moreover, Apotex's  request that this Court order

FDA to approve Apotex's ANDA is a "mandatory injunction" that must be reviewed "with even

greater circumspection."  *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000)

("*Mylan (terazosin")*; *see also Mylan (buspirone)*, 139 F. Supp. 2d at 18.

I.      **Apotex Has No Likelihood of Success on the Merits of its Claim**

        A.      **FDA's Statutory Interpretation is Entitled to Deference**

        "[T]he starting point . . . in any case involving the meaning of a statute, is the language of

the statute itself."  *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993) (quoting

*Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979)).  Indeed, as the D.C.

Circuit has observed,  "[T]he best guide to what a statute *means* is what it *says*."  *Stewart v. Nat'l

Shopmen Pension Fund*, 730 F.2d 1552, 1561 (D.C. Cir. 1984) (emphasis in original).  Thus,

when interpreting a statute, "a court should always turn first to one, cardinal canon before all

others.  We have stated time and again that courts must presume that a legislature says in a

statute what it means and means in a statute what it says there."  *Connecticut Nat'l Bank v.

Germain*, 503 U.S. 249, 253-54 (1992).

        When a court is reviewing an agency's construction of a statutory provision, the first step

is to determine "whether Congress has spoken to 'the precise question at issue.'"  *Consumer

Elecs. Ass'n v. FCC*,  347 F.3d 291, 297 (D.C. Cir. 2003) (quoting *Chevron U.S.A., Inc. v.

Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)) ("*Chevron* step one") (internal

citation omitted).  To the extent there exists any ambiguity in the statutory provisions at issue and

their relationship to other relevant portions of the Act, the Court should defer to FDA's

interpretation of its own statute.  *See Chevron*, 467 U.S. at 843-44 & n.11 (in case of ambiguity,

court must uphold agency's interpretation if construction is permissible under the statute; court

need not conclude that agency construction was only one it permissibly could have adopted or even reading court would have reached) ("*Chevron* step two"); *see also Barnhart v. Walton*, 535 U.S. 212, 218 (2002); *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).[10]

 *Chevron* deference applies where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law." *Id.* at 226-27.  Congress has authorized and directed FDA to decide not only what drugs may lawfully enter the marketplace through the NDA and ANDA approval process, but also when they may enter the market.  The statute is replete with references to findings and determinations that must be made by the agency in the drug approval process.  *See, e.g.,* 21 U.S.C. §§ 355(d), 355(j)(4), 355(j)(5).  Such determinations necessarily require interpretation of a statutory scheme that is undeniably "complex."  *See, e.g., Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1079 (D.C. Cir. 2001); *Mova*, 140 F.3d at 1062.  The D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the FDCA, including its interpretation of the very provision here at issue.  *See Apotex (pravastatin),* 449 F.3d at 1253*; see also, e.g., Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations."); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

---

[10] In addition, FDA is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), "where the regulatory scheme is highly detailed, and the agency can bring the benefit of specialized experience to bear on the subtle questions in th[e] case." *Mead*, 533 U.S. at 235.

Moreover, deference is appropriate even where, as here, FDA's administrative

determination is not embodied in rulemaking or formal adjudication. *See Barnhart v. Walton*,

535 U.S. at 222; *Mylan*, 389 F.3d at 1279-80 (deference to FDA tentative approval letter

warranted under *Chevron* step two because of the "complexity of the statutory regime," FDA's

"expertise," the "careful craft of the scheme [FDA] devised to reconcile the various statutory

provisions," and the fact that the agency's decision "made no great legal leap but relied in large

part on its previous determination of the same or similar issues and on its own regulations"); *see*

*also Novartis*, 435 F.3d at 349 (deferring to FDA letter decision); *Purepac*, 354 F.3d at 889

(deferring to FDA letter decision, observing that deference to FDA "is, if anything, at zenith

when the action assailed relates primarily not to the issue of ascertaining whether conduct

violates the statute, or regulations, but rather to the fashioning of policies, remedies and

sanctions") (citations omitted).

Here, as noted, the D.C. Circuit has already concluded that the statutory court decision

trigger provision at issue is ambiguous, and it charged FDA with the task of interpreting the

statute in the first instance. *Teva III*, 441 F.3d at 4-5. Consistent with the court's direction, FDA

brought "'its experience and expertise to bear in light of competing interests at stake,'" and made

"a reasonable policy choice." *Id.* at 5 (quoting *PDK Labs., Inc. v. DEA,* 362 F.3d 786, 797-98

(D.C. Cir. 2004)). FDA's April 11, 2006 letter interprets the court decision trigger provision as

requiring "a court decision with an actual 'holding' on the merits that the patent is invalid, not

infringed, or unenforceable." AR Tab 6, at 2. The D.C. Circuit explicitly upheld FDA's

interpretation in *Apotex (pravastatin)*, 449 F.3d at 1253. The court noted FDA's concern that a

standard less clear and objective than the holding-on-the-merits standard would "'undermin[e]

marketplace certainty and interfer[e] with business planning and investment.'" 449 F.3d at 1252.

The court was also sympathetic to FDA's "worries that forcing [FDA] to parse court decisions will invite fruitless litigation from generic drug manufacturers seeking to trigger, or to avoid triggering, exclusivity periods." *Id.* Thus, the court stated: "In our view, these perfectly reasonable propositions adequately support FDA's position that an estoppel-based approach [advocated by Apotex] to the court decision trigger is ill-advised." *Id.* The court also rejected Apotex's argument that FDA's holding-on-the-merits standard would make it too difficult for a subsequent ANDA applicant to obtain a court decision trigger, holding that FDA's interpretation "is in no way inconsistent with the plain language of the statute." *Id.* at 1253.

### B.    FDA's Statutory Interpretation Controls

Apotex argues without any merit that FDA's April 11, 2006 letter construing the court decision trigger is not relevant to the agency's ondansetron determination because FDA set forth its holding-on-the-merits standard in the context of a declaratory judgment action brought by an ANDA applicant against the patent holder and not, as in the ondansetron litigation, in the context of a patent infringement suit instituted by the patent holder against the ANDA applicant. Br. 7-8. This distinction, however, is meaningless. FDA's April 11, 2006 determination broadly applies to all FDA court decision trigger determinations. AR Tab 6, at 2; Nov. 3, 2006 letter (AR Tab 3) at 4 n.4 ("Although the holding-on-the-merits standard was announced in relation to a declaratory judgment action, the standard is equally applicable to affirmative patent infringement suits, such as the GSK suit at issue here. The standard looks to whether the court has made a holding on the merits of the patent claim; it does not consider the manner by which the dispute came before the court.").

Apotex also fails to state any reason why such a distinction is relevant to FDA's statutory interpretation of the statute. The court decision trigger provision is based on "an action described

in clause (iii)." That clause (section 355(j)(5)(B)(iii)) specifically refers to actions brought by NDA holders as well as declaratory judgment actions brought by ANDA applicants. The statute simply provides no basis for FDA to adopt a different interpretation of the court decision trigger provision based on whether the NDA holder sued the ANDA applicant first, or the other way around. FDA sees no policy justification for making that distinction, and Apotex does not proffer any.

### C.    FDA's Administrative Decision Should Be Upheld

FDA's administrative decisions are subject to review by the Court under the Administrative Procedure Act ("APA"), and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Indeed, "[t]here is a presumption in favor of the validity of the administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996). The reviewing court must consider whether the agency's decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416. However, "under this narrow scope of review, '[t]he court is not empowered to substitute its judgment for that of the agency.'" *Bristol-Myers*, 923 F. Supp. at 216 (quoting *Overton Park*, 401 U.S. at 416).

In its November 3, 2006 decision letter, FDA properly applied its statutory interpretation to the facts of the ondansetron stipulated dismissal and determined, in accordance with the agency's clear holding-on-the-merits standard, that there has been no court decision trigger for ondansetron. AR Tab 3, at 4. The only issue in this case is whether the agency's application of the holding-on-the-merits standard to these facts was arbitrary and capricious – an issue that

15

Apotex barely addresses.

Apotex offers only one argument why, "[e]ven under this unduly restrictive view of the court decision trigger [as set forth in the agency's April 11, 2006 letter], the May 25, 2005 Order in *Glaxo Group Ltd. et al. v. Apotex Inc.*, No. 05-307 (D.N.J.), qualifies as a triggering court decision." Br. 16. In support, Apotex quotes certain provisions of the ondansetron stipulated dismissal, emphasizing text showing that the parties agreed that the patent at issue does not infringe, that GSK agreed that it would not sue Apotex for infringement, and that the case was dismissed with prejudice. Br. 18. Critically, however, Apotex ignores the holding-on-the-merits standard altogether: a court decision trigger requires an actual "holding" by the court that the patent at issue is invalid, not infringed, or unenforceable. AR Tab 6, at 2. As the agency stated in its November 3, 2006 letter: "It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim." AR Tab 3, at 4. And, as the agency correctly observed with respect to the ondansetron stipulated dismissal, "[t]he court was not asked to resolve the dispute on the merits and did not do so. In short, the stipulation of dismissal does not reflect a holding by the court on the merits of the patent claim." *Id.* Thus, even if the dismissal order on its face reflects the *parties*' agreement as to the merits of the infringement action – which Apotex asserts has some relevance (Br. 16, 18) – such agreement between the parties does not qualify as a "decision of a *court* . . . holding the patent . . . to be invalid or not infringed" within the meaning of the statute and FDA's already-sanctioned interpretation thereof.

The fact that the district court "so ordered" the parties' stipulated dismissal does not help Apotex. The pravastatin dismissal order was also "so ordered" by the court, but did not qualify as a court decision trigger because, as here, the court did not consider the merits of the patent

claims when it accepted the parties' representations for purposes of ordering the dismissal.  AR Tab 6, at 5, 10.  Nor does it matter that the ondansetron stipulated dismissal was made "with prejudice."  Br. 18.  A Rule 41 stipulated dismissal, even if it precludes further litigation, does not elevate the parties' agreement into a determination by the court on the merits, as is required for a triggering court decision trigger.  *See* FDA's Nov. 8, 2006 letter to Mutual, AR Tab 5, at 2 ("[P]reclusive effect is not sufficient to satisfy the holding-on-the-merits standard; the standard requires an actual holding on the merits by the court.").

FDA's ondansetron decision is entirely consistent with the agency's April 11, 2006 decision letter, which noted the difficulty that the agency faced in making court decision trigger determinations under the broader estoppel-based standard that included dismissals based on agreements of the parties.  Such determinations turned on various circumstances of the dismissal, such as what factors the court may have considered, whether the court found the dismissal was for "good cause," and other esoteric concerns.  AR Tab 6, at 13-14 n.9.  As FDA made express in its letter, the holding-on-the-merits standard, in accordance with the statutory language, requires that the court actually consider the merits, and cannot be satisfied by a stipulated dismissal based solely upon the representations of the parties.  *Id.* at 12.

### D.    This Court Should Not Revisit FDA's April 11, 2006 Decision

This Court need not revisit FDA's underlying statutory construction, as Apotex repeatedly invites it to do, notwithstanding Apotex's prior unsuccessful challenge in *Apotex (pravastatin)*.  There is simply no room, nor any reason, for this Court to weigh in on FDA's interpretation of the court decision trigger when that construction has already been explicitly upheld by the D.C. Circuit.  If this Court were to entertain Apotex's duplicative challenge to FDA's statutory interpretation, its only option would be to reach the same conclusion the D.C.

17

Circuit reached and hold that the agency's interpretation is reasonable and entitled to deference under *Chevron* step two, for all of the reasons set forth by FDA in its April 11, 2006 decision, by the district court in *Apotex, Inc. v. FDA*, No. 06-627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006), and by the D.C. Circuit in *Apotex (pravastatin)*, 449 F.3d 1249.

Moreover, Apotex should be collaterally estopped from challenging FDA's holding-on-the-merits interpretation of the court decision trigger. Although Apotex's previous challenge for pravastatin was made in the context of a motion for a preliminary injunction, the D.C. Circuit's opinion is an "insuperable obstacle" to Apotex's present challenge. *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979) ("The fact that our judgment in [another case] was rendered in an appeal from a preliminary injunction order does not preclude application of collateral estoppel. Although such a judgment will ordinarily not foreclose subsequent litigation on the merits . . . it will be given preclusive effect if it is necessarily based upon a determination that constitutes an insuperable obstacle to the plaintiff's success on the merits.") (internal citations omitted). *But see Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 56 (D.C. Cir. 1984) (noting that, where the district court's preliminary injunction decision was only a "tentative assessment," it did not have collateral estoppel effect).

Thus, a court's preliminary injunction ruling will preclude a subsequent challenge by the same plaintiff on that same issue (*i.e.*, "issue preclusion" or "collateral estoppel") if the court's decision was "'practically' final because (1) it was not avowedly tentative, (2) the hearing was adequate, and (3) there was opportunity for review." 18 James Wm. Moore et al., Moore's Federal Practice ¶ 132.03[5][b][ii] (3d. ed. 2006) (quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)). Here, there was nothing at all tentative about the D.C. Circuit's decision to uphold FDA's interpretation of the statute. *Apotex (pravastatin)*, 449 F.3d

at 1253-54 (stating that Apotex had not shown a likelihood of success on the merits because FDA's interpretation "is in no way inconsistent with the plain language of the statute," and declining even to address the other non-merits preliminary injunction factors). Apotex has had ample opportunity to challenge that interpretation, having already submitted at least six briefs totaling over 120 pages to the district court and the D.C. Circuit on this issue. Finally, Apotex most certainly had opportunity for review of that issue by the D.C. Circuit, which conclusively upheld FDA's holding-on-the-merits standard and denied Apotex's request for *en banc* review. *Id.* Moreover, Apotex's challenge to FDA's interpretation concerns a narrow legal issue; there is nothing new in Apotex's present challenge that Apotex hasn't already said or could not have raised before. In short, this Court should not reconsider Apotex's wholly repetitious challenge, especially, where, as here, the D.C. Circuit's decision upholding FDA's interpretation is controlling law.[11]

### 1.    FDA's April 11, 2006 Decision is Consistent with *Granutec*

Apotex asserts that FDA's April 11, 2006 decision, as well as the November 3, 2006 decision, should be set aside because the ondansetron stipulated dismissal is as much of a merits ruling as the summary judgment order in *Granutec, Inc. v. Shalala* (139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion)),[12] which FDA found to be a triggering court decision. Br. 19. Apotex raised this identical claim in its previous challenge to FDA's

---

[11] Although Proposed Intervenor-Plaintiff Mutual is not collaterally estopped from challenging FDA's interpretation of the court decision trigger, it cannot avoid the fact that *Apotex (pravastatin)* is controlling authority in this circuit and governs the outcome of this case.

[12] This underlying decision at issue in *Granutec* was issued by the court in *Glaxo, Inc. v. Boehringer Ingelheim Corp.* (No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision)).

April 11, 2006 decision, however, and it was squarely rejected by the D.C. Circuit:

> Not only did FDA address the *Granutec* issue, but it did so persuasively by pointing out that the summary judgment order at issue in *Granutec* was "clearly a holding on the merits of patent noninfringement as a matter of law." Buehler Letter 12; see also *Teva II*, 2000 U.S. App. LEXIS 38667, 2000 WL 1838303, at *3 (Edwards, J., dissenting) ("It is clear from the face of the summary judgment order at issue in *Granutec* that the court there had issued a decision on the merits."). By contrast, the "stipulation and order" here, as well as the dismissal for lack of subject matter jurisdiction at issue in *Teva I*, make no such holding on their faces.

*Apotex (pravastatin)*, 449 F.3d at 1253. The critical distinction is that the grant of the motion for summary judgment in *Granutec* was based upon a holding on the merits of the patent claim by the court. As explained in the agency's April 11, 2006 decision, a motion for summary judgment asks the court to determine whether the party prevails as a matter of law because there is no genuine issue of material fact to resolve. AR Tab 6, at 12 (citing Fed. R. Civ. Proc. 56(c)) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law."). Therefore, by operation of law, the *Granutec* court necessarily held on the merits of the motion, and FDA's conclusion in the April 11, 2006 letter that the holding-on-the-merits standard is consistent with *Granutec* is reasonable.

Apotex faults FDA for not addressing Apotex's arguments concerning *Granutec* in its November 3, 2006 decision, asserting that such refusal "alone renders its November 3 letter ruling arbitrary and capricious." Br. 22. Nonsense. Although invited to do so, Apotex chose not to submit those arguments to the agency in writing, and FDA reasonably declined to address Apotex's oral assertions in its November 3 decision – especially in view of the fact that the *Granutec* issue had already been addressed and decided by the D.C. Circuit in *Apotex*

*(pravastatin)*. 449 F.3d at 1253.  And, as FDA explained in its November 3, 2006 decision,

Apotex's *Granutec* arguments are not pertinent to FDA's straightforward application of the

holding-on-the-merits standard to the ondansetron stipulated dismissal.  FDA properly concluded

that the ondansetron stipulated dismissal does not constitute a triggering court decision because it

does not meet the holding-on-the-merits standard.  The stipulated dismissal does not, on its face,

indicate that the court gave any consideration to the merits or made any conclusion of law as to

the patent claims.  AR Tab 3, at 4.  By contrast, the *Granutec* court's grant of partial summary

judgment necessarily encompasses a conclusion of law relating to the patent claims.  *Apotex*

*(pravastatin)*, 449 F.3d at 1253.  Thus, FDA's decision that there has been no court decision

trigger for ondansetron is entirely consistent with the holding-on-the-merits standard, and that

standard is itself consistent with FDA's earlier determination that the *Granutec* summary

judgment constituted a court decision trigger.

Furthermore, even if FDA's decision in *Granutec* were inconsistent with the holding-on-

the-merits standard, it would have no bearing on whether FDA can properly apply the holding-

on-the-merits standard to the ondansetron stipulated dismissal.  FDA decided the *Granutec*

matter before it articulated the holding-on-the-merits standard.  Although FDA believes that the

*Granutec* decision is consistent with its new interpretation for the reasons explained above, the

district court in *Apotex (pravastatin)* correctly observed that "decisions rendered under the case-

by-case method when it was still viable have little, if any, bearing on assessments made under the

new holding-on-the-merits approach, and it makes little sense to require the FDA to justify its

decision here under the case-by-case method when that method is no longer being employed."

*Apotex (pravastatin)*, 2006 WL 1030151 at *13.  Thus, FDA could and would still properly apply

the holding-on-the-merits standard to the ondansetron stipulated dismissal even if FDA's

decision in *Granutec* were somehow inconsistent with that standard.

### 2. FDA's Holding-On-The-Merits Standard is Consistent with Agency Practice Regarding the Termination of 30-Month Stays

Apotex additionally argues that FDA's April 11, 2006 interpretation of the court decision trigger provision is inconsistent with FDA's practice of terminating 30-month stays when the patent litigation giving rise to such a stay has been dismissed by the parties.  Br. 23.  The applicable MMA version of section 355(j)(5)(B)(iii) provides that the timing of approval of an ANDA can be delayed by up to thirty months ("thirty-month stay") if the patent-holder brings an action for patent infringement against an ANDA applicant within 45 days of receiving notice of that ANDA applicant's paragraph IV certification.  Under the statute, however, the stay may be terminated before the end of the 30-month period if the patent litigation is concluded in the ANDA applicant's favor:

> (I) if before the expiration of such period the *district court decides* that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on–
>
>> (aa) the date on which the court enters judgment reflecting the decision; or
>>
>> (bb) the *date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed*;

21 U.S.C. § 355 (j)(5)(B)(iii)(I) (2006) (emphases added).[13]

Apotex relies on the language in the introductory paragraph of subsection (I) to argue

---

[13] The MMA 30-month stay provision applies here pursuant to MMA § 1101(c)(1) (stating that the amendments made with respect to termination of 30-month stays "apply to any proceeding under section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) that is pending on or after the date of the enactment of this Act regardless of the date on which the proceeding was commenced or is commenced").

that, because a 30-month stay is terminated on the date that "the district court decides that the patent is invalid or not infringed" pursuant to section 355(j)(5)(B)(iii)(I), then such decision must also be considered a "decision of a court . . . holding" that triggers 180-day exclusivity under section 355(j)(5)(B)(iv)(II).  Br. 23-24.  Thus, Apotex maintains, if a stipulated dismissal suffices to terminate a 30-month stay, it should also suffice to trigger 180-day exclusivity.  *Id.*

This argument is meritless.  Indeed, FDA's termination of the 30-month stay in this case does not even implicate the "court decides" language in section 355(j)(5)(B)(iii)(I) that Apotex highlights its brief (Br. 24).  Apotex entirely ignores the more relevant language in section 355(j)(5)(B)(iii)(I)(bb):  "the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed."  The ondansetron stipulated dismissal qualifies as a "settlement order . . . stating that the patent that is the subject of the certification is invalid or not infringed" because the order reflects the parties' settlement agreement to terminate the case based on the patentee's concession that Apotex's ANDA "do[es] not infringe" GSK's patent.  Any 30-month stay arising from the GSK-Apotex litigation was terminated under section 355(j)(5)(B)(iii)(I)(bb).  That section, in sharp contrast to the court decision trigger provision in section 355(j)(5)(B)(iv)(II), does not require a "decision of a court . . . holding" on the merits of the patent claims; a settlement order containing a statement regarding the merits of the patent claims will suffice to terminate a 30-month stay.  Thus, there is nothing inconsistent in FDA's treatment of 30-month stays in section 355(j)(5)(B)(iii)(I)(bb) and FDA's holding-on-the-merits standard for section 355(j)(5)(B)(iv)(II).

Although not at issue, it bears noting that FDA's interpretation of the MMA is entirely consistent with FDA's prior practice in terminating 30-month stays upon conclusion of the patent litigation.  The pre-MMA version of the statute is silent with respect to the effect of a stipulated

23

dismissal on termination of a 30-month stay:

> if before the expiration of such period [*i.e.*, the thirty-month stay] the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision.

21 U.S.C. § 355(j)(5)(B)(iii)(I) (2002).  In the absence of explicit legislative direction, FDA has reasonably interpreted this provision to allow the termination of 30-month stays when patent litigation is concluded without a formal court decision.  Such an interpretation is entirely in keeping with Congressional intent to stay generic approval until the litigation is resolved.  *See generally* 130 Cong. Rec. S10504 (daily ed. Aug. 10, 1984) ("[The 30-month stay] increases the likelihood that the litigation will be concluded within the time period during which ANDA's are not allowed.") (statement of Sen. Hatch); 130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman).  Nor would it make any pragmatic sense to maintain a stay of approval for a generic drug when there is no remaining dispute between the innovator and the generic applicant concerning whether that drug may be marketed; indeed, the parties may arrive at such a settlement agreement with the understanding that generic marketing will begin soon thereafter, and it would be absurd to suppose that Congress would foreclose early generic entry in those circumstances.  By contrast, Congress intended the 180-day exclusivity period as a reward to the first generic applicant to challenge a particular patent, and Congress wrote the court decision trigger provision narrowly so that exclusivity would only be triggered in a limited set of circumstances, as FDA's holding-on-the-merits standard properly reflects.

Apotex maintains that FDA's construction of section 355(j)(5)(B)(iii)(I) is relevant to the court decision trigger interpretation because "FDA itself previously has acknowledged that a court decision that ends the 30-month stay of final ANDA approval also triggers 180-day exclusivity where (as here) the court decision has not been, or cannot be, appealed."  Br. 24-25

(citing FDA's Draft Guidance for Industry: Listed Drugs, 30-Month Stays, and Approval of ANDAs and 505(b)(2) Applications Under Hatch-Waxman, As Amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Questions and Answers (Oct. 2004) ("Draft Guidance")).[14]  Apotex's reliance on FDA's Draft Guidance, however, is misplaced.

The language Apotex selectively quotes in its brief answers the question whether a district court decision "finding the patent at issue invalid" that has been appealed (as opposed to a district court decision that has not been, or cannot be appealed) will trigger the 180-day exclusivity period.  FDA answered that question in the negative:  such a decision, although it

---

[14] The relevant portion of the Draft Guidance is reproduced in full:

> 3.     An ANDA was submitted on September 6, 2003, and was the first substantially complete ANDA to be submitted with a paragraph IV certification to the only listed patent for the listed drug.  The ANDA applicant is sued for patent infringement.  After December 8, 2003, the district court issues a decision finding the patent at issue invalid.  This decision is appealed.  Can the ANDA be approved?  Does the applicant's 180-day exclusivity start to run on the date of the district court's decision?

> As explained in the response to question 1 in subsection II.B of this document, for any proceeding under section 505 of the Act pending on or after December 8, 2003, the district court's decision that the patent at issue is invalid or not infringed terminates the 30-month stay of approval.  Thus, if it is otherwise ready for approval, the ANDA in this question can be approved at the time of the district court's decision.  However, as explained in response to question 2 in subsection II.B, as a result of the MMA, 180-day exclusivity for ANDAs filed before December 8, 2003, can now be triggered by a court decision only if it is a decision that has not been, or cannot be, appealed.  Therefore, the district court's decision does not trigger 180-day exclusivity in the scenario described in this question because that decision has been appealed.  Note that this result is a departure from prior law.  Before enactment of the MMA, a district court decision finding a listed patent invalid or not infringed would have both terminated a 30-month stay and, in the case of an ANDA that qualified for 180-day exclusivity, triggered the start of such exclusivity as to that patent (if the exclusivity was not already triggered by commercial marketing).

would suffice to terminate a 30-month stay under the applicable MMA provision, 21 U.S.C. §

355(j)(5)(B)(iii)(I), would not trigger 180-day exclusivity because the decision was still on

appeal.  As Apotex points out, FDA noted that such a decision would have triggered exclusivity

if it had not been, or could not be appealed.  FDA's unremarkable statements, however, do

nothing to further Apotex's cause.  Indeed, under the hypothetical posited by the agency, there

would be little question that a district court decision "finding the patent at issue invalid" would

constitute both a decision "that the patent is invalid or not infringed" for purposes of terminating

the 30-month stay under section 355(j)(5)(B)(iii)(I), and a "decision of a court . . . holding the

patent . . . to be invalid or not infringed" that would satisfy the holding-on-the-merits standard for

triggering 180-day exclusivity under section 355(j)(5)(B)(iv)(II).  This hypothetical scenario,

however, is entirely irrelevant to the question whether a dismissal of a case for reasons other than

a district court's decision on the merits will terminate a 30-month stay or trigger exclusivity, and

thus does nothing to inform the analysis in *this* case.  As explained above, a dismissal based on

the parties' settlement of the case would terminate a 30-month stay under section

355(j)(5)(B)(iii)(I)(bb), but would not trigger exclusivity under section 355(j)(5)(B)(iv)(II)

because it would not satisfy FDA's holding-on-the-merits standard.

Notably, Apotex does not challenge FDA's practice to terminate 30-month stays upon the

dismissal of patent infringement litigation, nor has any other generic manufacturer, for the

obvious reason that no generic manufacturer would want to be bound by a 30-month stay when it

could otherwise be approved for marketing.  Instead, Apotex weakly asserts that FDA's approach

to 30-month stays is somehow inconsistent with its approach to 180-day exclusivity – an

argument Apotex could have raised in the pravastatin litigation but did not.  Regardless, FDA has

already proffered a host of reasons to support its interpretation of the court decision trigger in the

unique context of that statutory provision, and the agency's interpretation has been upheld by the D.C. Circuit. *Apotex (pravastatin)*, 449 F.3d at 1252-53. Apotex's belated contentions notwithstanding, there is nothing about the 30-month stay provision – with its different language and different Congressional purpose – that is relevant to the sole issue before this Court: whether the GSK-Apotex stipulated dismissal constitutes a triggering court decision under 21 U.S.C. § 355(j)(5)(B)(iv)(II). Because the dismissal plainly fails to satisfy the governing "holding-on-the-merits" standard set forth in FDA's April 11, 2006 decision letter and *Apotex (pravastatin)*, Apotex's claims must be rejected.[15]

### 3.    Apotex's Remaining Arguments Are Meritless

Apotex fares no better with its contention that FDA's holding-on-the-merits standard nullifies the court decision trigger provision because it allegedly "guarantees that later-filers, like Apotex, cannot obtain a triggering court decision." Br. at 26. Hatch-Waxman contemplates that ANDA applicants, even subsequent ANDA applicants such as Apotex, can bring declaratory judgment actions to seek to obtain court decisions that trigger exclusivity. To the extent there remains a possibility that no court decision will ultimately trigger exclusivity, such a prospect is merely a by-product of the scheme Congress enacted, and does not mean that Congress's will has been thwarted. Indeed, the D.C. Circuit noted as much when it rejected Apotex's identical "nullification" argument in *Apotex (pravastatin)*, 449 F.3d at 1253 (observing that the alleged "anomaly" that there may be no court decision trigger in a particular case was fully in accordance

---

[15] Apotex also faults FDA for not considering Apotex's section 355(j)(5)(B)(iii) argument in the agency's November 3, 2006 decision. Br. 24. As with Apotex's *Granutec* argument, however, FDA reasonably declined to address arguments that Apotex did not make to the agency in writing, and that were not pertinent to the agency's straightforward application of its holding-on-the-merits standard to the ondansetron stipulated dismissal.

with Congress's regulatory scheme).

With no sense of irony, Apotex cites the D.C. Circuit's *Apotex (pravastatin)* decision in support of its complaint that FDA refuses to treat dismissals of declaratory judgment suits brought by ANDA applicants as triggering court decisions, even when those dismissals have preclusive effect. Br. 27. The *Apotex (pravastatin)* court specifically held, however, that any hurdles to obtaining declaratory judgment jurisdiction and thus obtaining a triggering court decision (because there cannot be a holding on the merits without jurisdiction) are well within the purview of Congress's statutory scheme. *Apotex (pravastatin)*, 449 F.3d at 1253 ("If a court cannot constitutionally assert jurisdiction, then certainly one reasonable view is that it cannot issue a 'decision' that 'holds' anything [for purposes of satisfying the court decision trigger]."). In addition, whether an ANDA applicant can obtain declaratory judgment jurisdiction in the first instance is a distinct issue beyond the scope of FDA's authority to resolve. *See Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005) (requiring a reasonable apprehension of suit to obtain declaratory judgment jurisdiction).

Apotex's argument that FDA's holding-on-the-merits standard allows brand companies to "manipulate the system in order to block or delay generic competition" and is thus contrary to congressional intent is similarly unfounded. Br. 27. The Hatch-Waxman Amendments empower brand companies to file patent infringement suits against ANDA applicants (35 U.S.C. § 271(e)(2)); brand companies may then dismiss those suits if, during the course of the litigation, they come to the conclusion that the patent is invalid or not infringed. Such a conclusion by a party, however, does not meet the Congressional requirement of a "court decision ... holding the patent . . . to be invalid or not infringed." The D.C. Circuit has observed that, for the Hatch-Waxman Amendments, "Congress sought to strike a balance between incentives, on the one

hand, for innovation, and on the other, for quickly getting lower-cost generic drugs to market. Because the balance struck between these competing goals is quintessentially a matter for legislative judgment, the court must attend closely to the terms in which Congress expressed that judgment." *Teva Pharm. Indus., Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005). Here, FDA has permissibly interpreted Congress's actual language to require a court's holding-on-the-merits for a court decision trigger, notwithstanding Apotex's desire for a broader court decision trigger to suit its immediate interest. FDA's interpretation, in keeping with the precise statutory language chosen by Congress, is hardly contrary to Congressional intent.

Apotex also asserts that FDA's holding-on-the-merits standard is unlawful because it will delay generic entry by 180 days, and possibly "much longer." Br. 29. In addition to being speculative, Apotex's argument misses the mark. To be sure, the Hatch-Waxman Amendments were designed in significant part "to get generic drugs into the hands of patients at reasonable prices — fast." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). One way Congress attempted to achieve that goal, however, was by encouraging generic manufacturers to challenge patents by rewarding such patent challenges with a period of marketing exclusivity that serves to temporarily delay wider generic competition. FDA's holding-on-the-merits standard may in many circumstances allow the ANDA applicant eligible for exclusivity to actually benefit from that exclusivity period, rather than have it be triggered by the dismissal of a declaratory judgment action brought by another ANDA applicant and, as a consequence, lapse before the eligible ANDA applicant can benefit from the exclusivity (because, for example, its application has not yet received final approval). As FDA stated in its April 11, 2006 decision: "A relatively narrow interpretation, such as the 'holding-on-the-merits' standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable,

and thus make patent challenges more common overall." AR Tab 6, at 13. FDA's holding-on-the-merits standard, rather than "destroy[ing] the *quid pro quo* created by Congress" (Br. 30), in fact gives effect to the exact language that Congress used to create a delicate balance among the interests of innovators, ANDA applicants eligible for exclusivity, and subsequent ANDA applicants.

In light of the above, Apotex has *no* likelihood of success on the merits of its claim and its motion for a preliminary injunction should be denied for that reason alone.

## II.    Apotex Will Not Suffer Irreparable Harm Absent Preliminary Injunctive Relief

Not only has Apotex failed to make the requisite showing of likely success on the merits, it has also failed to demonstrate that it will suffer irreparable harm absent injunctive relief or that the balance of hardships tips in its favor. Courts insist that only *irreparable* harm justifies the issuance of a preliminary injunction. Indeed, "[t]he *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003). Because Apotex's likelihood of success on the merits is exceedingly slim, Apotex "would have to make a very substantial showing of severe irreparable injury" to prevail on its motion. *Nat'l Pharm. Alliance v. Henney,* 47 F. Supp. 2d 37, 41 (D.D.C. 1999). Irreparable injury is a "very high standard." *See Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996); *Apotex v. FDA*, 2006 WL 1030151 at *16 (D.D.C. April 19, 2006) ("The irreparable injury requirement erects a very high bar for a movant."), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006); *Bristol-Myers,* 923 F. Supp at 220. The injury alleged must be certain, great, actual, and imminent, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan (buspirone)*, 139 F. Supp. 2d at 27 (quoting

*Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

It is well settled that mere economic loss in and of itself does not constitute irreparable harm. *Wisconsin Gas*, 758 F.2d at 674; *Apotex (pravastatin)*, 2006 WL 1030151 at *16 ("In this jurisdiction, harm that is 'merely economic' in character is not sufficiently grave under this standard,"); *see also Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan Pharms., Inc. v. Thompson*, 207 F. Supp. 2d 476, 485 (N.D. W. Va. 2001);  *Mylan (terazosin)*, 81 F. Supp. 2d at 42; *Bristol-Myers*, 923 F. Supp. at 220.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are inadequate.  *Wisconsin Gas*, 758 F.2d 674 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is so great as to "cause extreme hardship to the business, or even threaten destruction of the business." *Gulf Oil*, 514 F. Supp. at 1025;  *see also Wisconsin Gas*, 758 F.2d at 674 (recoverable monetary loss may constitute irreparable harm only where it "threatens the very existence of the movant's business"); *Apotex (pravastatin)*, 2006 WL 1030151 at * 16 ("To successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.") (quoting *Gulf Oil*, 514 F. Supp at 1025); *Experience Works, Inc.*, 267 F. Supp. 2d at 96 ($21.1 million reduction in funding is serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens survival of the business); *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business").

31

In the present case, Apotex does not come close to establishing that it would suffer irreparable injury in the absence of the preliminary injunctive relief it seeks. Apotex asserts that it will be irreparably harmed if another ANDA applicant is allowed "a 180-day head-start" in the generic ondansetron market, claiming that it "would result in over $11.7 million in lost sales for Apotex in the first year alone." Br. 13-14. The relevant time period within which to calculate Apotex's alleged harm is not over an entire year, however, but only the period between the time the exclusivity holder launches its product and the time the case is resolved on the merits, at which point, if Apotex were to prevail on its claims and its ANDA were otherwise eligible for approval, Apotex would be permitted to launch its product as well.[16]

In any event, Apotex's claimed financial loss, as well as its claim of intangible losses, such as "critical access to major customers and the opportunity for long-term contracts" (*id.* at 15), are speculative and are merely forms of economic loss that do not meet the high standards set forth above. Allegations of lost sales and a lost opportunity to gain certain market advantages are a far cry from the required demonstration of a "serious" and "irretrievable" loss that "would significantly damage its business above and beyond a simple diminution in profits." *Mylan (buspirone)*, 139 F. Supp. 2d at 27; *Mylan (terazosin)*, 81 F. Supp. 2d at 42. Indeed, Apotex's

---

[16] Apotex's request that the court order FDA to "immediately approve" Apotex's ondansetron ANDA "upon the expiration of GlaxoSmithKline's pediatric exclusivity on December 24, 2006" is untenable – even if Apotex were to prevail on its claims. Proposed Order; *see also* Br. at 1, 31. In such circumstances, the court should, at most, hold that the exclusivity period has expired and thus poses no barrier to FDA approval of any otherwise eligible ANDA. Given the variety of scientific and regulatory considerations that FDA must take into account before issuing final approval to any drug product, a court should ordinarily stop well short of ever ordering the agency to actually *approve* a particular drug application. *See, e.g., Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (stating that the APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'") (internal citations omitted) (emphasis in original).

claimed $11.7 million loss pales in comparison to the company's worldwide annual revenue of some $800 million. *See* http://www.apotex.com/CorporateInformation/Default.asp?flash=Yes (citing worldwide sales in excess of $900 million (Canadian $) per year)) (last visited November 17, 2006). As such, Apotex's claim of harm in this case is no different from its virtually identical claim of economic harm in *Apotex (pravastatin)*, which Judge Bates flatly rejected:

> Apotex merely submits that it stands to lose approximately $9.9 million dollars in sales over the course of one year if intervenor-defendants are permitted to exercise their statutory exclusivity entitlements. . . . Even so, the harm that Apotex allegedly faces cannot be called anything more than "merely economic." Apotex "produces more than 260 generic pharmaceuticals in approximately 4000 dosages and formats which, in Canada, are used to fill over 60 million prescriptions a year – the largest amount of any pharmaceutical company [in Canada]. . . . Moreover, Apotex reaps annual revenues that total approximately $700 million USD. . . . Under the circumstances, it hardly seems possible that a $9.9 million loss in sales over a year would cause extreme hardship, much less threaten the company's very existence, and Apotex has not established (or even contended) that it would.

*Apotex (pravastatin)*, 2006 WL 1030151 at *17 (citing figures from Apotex's website) (citations omitted).

Thus, Apotex has failed to demonstrate that obtaining a smaller market position than it desires would result in economic injury "sufficiently large in proportion to [its] operations that the loss of the amount of money involved would also cause extreme hardship to [its] business, or even threaten destruction of [its] business." *Gulf Oil*, 514 F. Supp. at 1025. Here, as in *Apotex (pravastatin)*, "Apotex's speculative sales loss . . . remains an economic loss that does not meet the irreparable harm standard." *Apotex (pravastatin)*, 2006 WL 1030151 at *17.[17]

---

[17] Contrary to Apotex's claim, the D.C. Circuit has *never* held that a 180-day delay in ANDA approval due to another applicant's exclusivity itself constitutes irreparable harm. Br. 14. In *Teva I*, on which Apotex relies, the court merely observed that Teva's appeal was not mooted by the approval of the exclusivity holder's ANDA because Teva would continue to face harm from its inability to market its product during the exclusivity period. 182 F.3d at 1011 n.8. The court did not hold that such harm would necessarily constitute "irreparable" harm for purposes of

Indeed, Apotex's concern that it would obtain a smaller-than-desired market position rings especially hollow here, where Apotex concedes that there are at least eight companies that have filed ANDAs for generic ondansetron tablets. Tsien Dec. Ex. 4 (McIntire Decl.) ¶ 10. Thus, even if this Court were to grant Apotex's request for injunctive relief and open the door for all eligible ondansetron applicants to begin marketing on December 24, 2006, Apotex would potentially be merely one of eight competitors launching a generic ondansetron product at approximately the same time. Clearly, the stakes are much lower for Apotex than for the generic manufacturer(s) rightfully entitled to exclusivity, which stands to lose its entire exclusivity period.[18] As Judge Bates reasonably concluded in *Apotex (pravastatin)*, any harm that Apotex might suffer in the absence of preliminary injunctive relief would be at least equaled, if not exceeded, by the harm to the applicant entitled to exclusivity should it be wrongfully deprived of its exclusivity reward:

> [Apotex's] concerns about a lost market share fall well short of the serious, irretrievable damage to its business required to warrant a preliminary injunction, particularly when one considers that the actual relevant period for assessing harms is probably only a few months. And even assuming that Apotex has adequately established a cognizable irreparable injury, the Court cannot conclude that the balance of hardships tips decidedly in its favor because . . . each of the intervenor-defendants [entitled to exclusivity] stands to lose a much greater sum if the launch of their generic products is delayed. Particularly where Apotex has made a very

---

preliminary injunctive relief. In *Mova*, the other case Apotex cites, the court noted that Mova would be severely harmed by the *loss* of exclusivity due in particular to its small size. 140 F.3d at 1066 n.6. Here, of course, Apotex is not complaining about the loss of exclusivity itself, but is trying instead to deprive another applicant of its right to a 180-day period of market exclusivity.

[18] In this respect the case is much like *Mylan (terazosin)*, in which Mylan sought immediate final approval of its ANDA, arguing, as Apotex does here, that another company was not entitled to exclusivity. 81 F. Supp. 2d at 44-45. Even though the court determined that Mylan was likely to succeed on the merits, the court denied the requested injunctive relief, noting that Mylan's claims of economic losses did not constitute irreparable harm, and that the harm of losing exclusivity would be much greater than Mylan's alleged losses. *Id.*

weak showing of likely success on the merits, that balance of harms is fatal to its request for emergency injunctive relief.

*Apotex (pravastatin)*, 2006 WL 1030151 at *17.

## III.    FDA and the Public Will be Harmed if Apotex's Request for Relief is Granted

Apotex has also failed to show that any harm it would suffer in the absence of injunctive relief outweighs the potential harm to FDA, or that the entry of such relief would further the public interest.  Although FDA has no commercial stake in the outcome of this litigation, FDA is the government agency charged with implementing the statutory scheme governing exclusivity and the approval of generic drugs.  As such, FDA's interest coincides with the public interest.

*Apotex (pravastatin)*, 2006 WL 1030151 at *18 (FDA interest "is deemed to be aligned with that of the public" when administering a statute placed within its charge); *Serono*, 158 F.3d at 1326 (determining that the public interest is "inextricably linked" to Congress' purpose in passing the Hatch-Waxman Amendments); *Mylan (terazosin)*, 81 F. Supp. 2d at 44-45.

FDA agrees that the public benefits from the entry of lower cost drugs into the marketplace, but it is also important to ensure that such entry occurs in accordance with the statutory scheme that Congress enacted and that the rewards and incentives contained in the statute are properly allocated in the manner Congress intended.  FDA has interpreted and applied the court decision trigger provision in accordance with the statutory language and purpose. Under the agency's interpretation, which the D.C. Circuit explicitly upheld in *Apotex (pravastatin)*, exclusivity is triggered only when a court holds on the merits that a patent is invalid, not infringed, or unenforceable.  Exclusivity for ondansetron was therefore not triggered by the GSK-Apotex stipulated dismissal (or by the similar GSK-Mutual stipulated dismissal). Thus, FDA anticipates granting final approval only to the ANDA(s) eligible for exclusivity when

all other barriers to approval have been removed (*i.e.*, pediatric exclusivity for the '789 patent), in accordance with the Hatch-Waxman statutory regime for generic drug approvals. The preliminary injunctive relief sought by Apotex would upset the agency's careful balancing of the statutory factors, disrupt the agency's administration of the Hatch-Waxman provisions governing exclusivity, and thwart the interests of the public and industry alike in a strong exclusivity incentive and a clear and predictable standard for the triggering of exclusivity periods.

Because FDA's conclusion that there has been no court decision trigger of exclusivity for ondansetron is based on a reasonable interpretation of the statute in accordance with governing caselaw and the agency's own expertise and policy preferences, both the balance of harms and the public interest weigh strongly against Apotex's claim for preliminary injunctive relief.

Apotex's alternative request that the Court stay the approval of *any* ondansetron tablet ANDA pending approval of its own ANDA and/or pending appeal of an adverse decision by this Court is equally unwarranted. Br. at 1, 31. Indeed, such action would only further delay the entry of generic ondansetron into the marketplace. Nor is there any legal basis for entry of a stay to preserve what Apotex characterizes as the current *status quo.* Although Apotex has challenged FDA's decision that exclusivity has not yet been triggered, nowhere in Apotex's pleadings does it suggest that the approval of any other applicant's ANDA would be improper or unwarranted. To the contrary, Apotex's only claim is that its ANDA should be approved at the same time as the first applicant(s). Under these circumstances, Apotex's bid to stay the agency's approval of all ondansetron ANDAs until these issues are resolved is serious overreaching, and would only result in an unwarranted extension of GSK's current market monopoly.

## CONCLUSION

For the foregoing reasons, Apotex's motion for a preliminary injunction should be denied, and judgment entered for the federal defendants.

Respectfully submitted,

OF COUNSEL:

DANIEL MERON
*General Counsel*

SHELDON T. BRADSHAW
*Associate General Counsel*
*Food and Drug Division*

ERIC M. BLUMBERG
*Deputy Chief Counsel, Litigation*

WENDY S. VICENTE
*Associate Chief Counsel*
*United States Department of*
  *Health and Human Services*
*Office of the General Counsel*
*5600 Fishers Lane*
*Rockville, MD  20857*

PETER D. KEISLER
*Assistant Attorney General*

EUGENE M. THIROLF
*Director*
*Office of Consumer Litigation*


_____/s/_____
ANDREW E. CLARK
*Attorney*
*Office of Consumer Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 386*
*Washington, D.C. 20044*
*Tel:  (202) 307-0067*
*Fax: (202) 514-8742*
andrew.clark@usdoj.gov

Dated: November 17, 2006

37

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction to be served via the District Court's Electronic Filing System (ECF) and/or by Federal Express overnight delivery upon:


Arthur Y. Tsien (ECF)
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, NW, Suite 400
Washington, D.C.  20036-2220
*Counsel for Plaintiff Apotex Inc.*

William A. Rakoczy (FedEx)
Christine J. Siwik
Alice L. Riechers
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Suite 500
Chicago, IL 60610
*Counsel for Plaintiff Apotex Inc.*

John Longstreth (ECF)
Brian K. McCalmon
PRESTON GATES ELLIS & ROUVELAS MEEDS LLP
1735 New York Avenue, N.W.
Suite 500
Washington, DC 20006-5209
*Counsel for Intervenors-Defendants Dr. Reddy's Laboratories, Ltd. et al.*

Andrew J. Miller (ECF)
Stuart Sender
Bruce D. Radin
BUDD LARNER P.C.
150 John F. Kennedy Parkway
Short Hills, NJ 07078-2703
*Counsel for Intervenors-Defendants Dr. Reddy's Laboratories, Ltd. et al.*

D. Christopher Ohly (FedEx)
Jeffrey S. Jacobovitz
SCHIFF HARDIN LLP
1101 Connecticut Avenue, N.W.
Suite 600
Washington, D.C. 20036
*Counsel for Proposed Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc.*

Andrew Berdon (FedEx)
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
*Counsel for Proposed Intervenor-Plaintiff Mutual Pharmaceutical Co., Inc.*

this 17th day of November, 2006.

_____/s/_____
Andrew E. Clark