## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

|  |  |
|---|---|
| APOTEX INC. | ) |
|  | ) |
| Plaintiff | ) |
|  | ) |
| v. | )     Case No. 06-1890 (RMC) |
|  | ) |
| FOOD & DRUG ADMINISTRATION, et al, | ) |
|  | ) |
| Defendants, | ) |
|  | ) |
| and | ) |
|  | ) |
| DR. REDDY'S LABORATORIES, LTD., | ) |
|  | ) |
| and | ) |
|  | ) |
| DR. REDDY'S LABORATORIES, INC. | ) |
|  | ) |
| Intervenors-Defendants. | ) |

———————————————————————

### DR. REDDY'S LABORATORIES, LTD.'S AND DR. REDDY'S LABORATORIES, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO APOTEX'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

John Longstreth, D.C. Bar No. 367047
Brian K. McCalmon, D.C. Bar No. 461196
PRESTON GATES ELLIS
   & ROUVELAS MEEDS LLP
1735 New York Avenue, N.W.
Suite 500
Washington, DC 20006-5209
(202) 628-1700

Andrew J. Miller, admitted *pro hac vice*
Stuart D. Sender, admitted *pro hac vice*
Bruce D. Radin, admitted *pro hac vice*
BUDD LARNER P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078-2703
(973) 379-4800
(973) 379-7734 (facsimile)

*Counsel for Intervenors-Defendants*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*

Dated:  November 17, 2006

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

BACKGROUND .....................................................................................................................6

I.      Statutory and Regulatory Landscape ...........................................................................6

II.     Factual Background .....................................................................................................9

      A.     The ANDA Filings..........................................................................................9

      B.     The '658 Patent ...............................................................................................10

      C.     Background of the Present Suit........................................................................11

ARGUMENT ..........................................................................................................................12

I.      Apotex Has No Likelihood of Success on the Merits..................................................12

      A.     Apotex's Attempt to Relitigate the FDA's Interpretation of the Court-Decision Exclusivity Trigger Is Barred by Collateral Estoppel.........................13

      B.     The Arguments That Apotex Raises Here Have Already Been Soundly Rejected by the FDA, This Court and the D.C. Circuit .....................................14

            1.     The FDA Has Already Twice This Year Rejected Apotex's Arguments to Maintain the Estoppel-Based Standard ...........................15

            2.     Earlier This Year, This Court and the D.C. Circuit Endorsed the FDA's Interpretation of the "Court-Decision" Exclusivity Trigger as Requiring a Holding on the Merits ...................................................16

      C.     The *Chevron* Deference To Be Accorded the FDA's Decision Is at its Apex......................................................................................................................17

            1.     In *Apotex I*, This Court Conducted a Thorough Analysis of the FDA's April 11 Decision .....................................................................18

            2.     In *Apotex II*, the D.C. Circuit Likewise Endorsed the FDA's April 11 Decision ............................................................................................20

      D.     Apotex's *Granutec* Argument Failed Before and Fails Again ...........................21

      E.     The FDA Properly Determined That the Rule 41 Stipulation of Dismissal That Apotex Negotiated with GSK Is Not a Triggering Court Decision............21

      F.     Apotex's Argument That FDA Is Acting Unreasonably by Treating Court Decisions That Trigger the 180-Day Exclusivity Period Differently From Those That Terminate the 30-Month Stay Is Unfounded ..................................23

      G.     FDA's Interpretation of the Court-Decision Trigger Does Not Nullify That Provision or Encourage Brand Company Manipulation of the Hatch-Waxman Process ...............................................................................................27

      H.     FDA's Interpretation of the Court-Decision Trigger Does Not Conflict with Congressional Intent .............................................................................29

i

II.      The Balance of Harms Strongly Favors DRL.................................................................30

        A.      Apotex Will Not Suffer Irreparable Injury and This Court and the D.C.
                Circuit So Found on a Nearly Identical Record....................................................30

        B.      DRL Will Suffer Far More Than Apotex ...........................................................33

III.     The Public Interest Strongly Favors Denying Apotex the Relief It Seeks ....................34

CONCLUSION..................................................................................................................36

## TABLE OF AUTHORITIES

**Cases**

*Apotex, Inc. v. FDA*, 449 F.3d 1249 (D.C. Cir. 2006) ..................................................... passim

*Apotex, Inc. v. FDA*, No. 06-0627, 2006 U.S. Dist. LEXIS 20894 (D.D.C. Apr. 19, 2006),
    *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006) ........................................................................... passim

*Yamaha Corp. v. United States*, 961 F.2d 245 (D.C. Cir. 1992) ................................................ 13

*American Iron & Steele Inst. v. EPA*, 886 F.2d (D.C. Cir. 1989) ............................................... 13

*Apotex, Inc. v. FDA*, 393 F.3d 210 (D.C. Cir. 2004) .................................................................... 6

*Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003) ......................................................... 6

*Baker Norton Pharm. Inc. v. FDA*, 132 F. Supp. 2d 30 (D.D.C. 2001) ...................................... 26

*Boivin v. U.S. Airways, Inc.,* 297 F. Supp. 2d 110 (D.D.C. 2003) ............................................... 31

*Bowman Trans., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ......................... 18

*Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598
    (2001) ......................................................................................................................................... 4, 22

*Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d, 2 (D.D.C. 2004) ................................. 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984) . passim

*Experience Works, Inc. v. Chao,* 267 F. Supp. 2d 93 (D.D.C. 2003) ........................................... 31

*Granutec Inc. v. Shalala*, No. 97-1873, 1998 WL 153410 (4th Cir. Apr. 11, 1998) ................... 21

*Gulf Oil Corp. v. Dept. of Energy,* 514 F. Supp. 1019 (D.D.C.1981) .......................................... 31

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ..................................................... 4, 22

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ................................................ 34

*Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004) ......................................... 17, 18

*Mylan Pharms., Inc. v. Shalala,* 81 F. Supp. 2d 30 (D.D.C. 2000) ............................................. 31

*Natural Resources Defense Council, Inc. v. EPA*, 25 F.3d 1063 (D.C. Cir. 1994) ..................... 12

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................. 13

*PDK Labs., Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004).............................................................. 18

*Purepac Pharm. Co. v. Thompson*, 354 F.3d 877 (D.C. Cir. 2004) ..................................... 6, 7, 17

*Ranbaxy Labs. Ltd. v. Leavitt*, No. 06-5154, 2006 WL 3289050 (D.C. Cir. Nov. 14, 2006)…………………………………………………………………………………..7, 28

*Ranger Cellular v. FCC*, 333 F.3d 255 (D.C. Cir. 2003) ............................................................ 18

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) .......................................................................... 26

*SEC v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) ......................................................................... 24

*SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 261 F. Supp. 2d 1002 (N.D. Ill. 2003) .... 22

*Sociedad Anonima Vina Santa Rita v. Dep't of Treasury,* 193 F. Supp. 2d 6 (D.D.C.2001) ....... 31

*Tenacre Found. v. INS*, 78 F.3d 693 (D.C. Cir. 1996).................................................................. 12

*Teva Pharms. USA v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999)................................................ passim

*Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005), *vacated and remanded by* 441 F.3d 1 (D.C. Cir., 2006) ....................................................................... 4, 19, 21, 22

*Teva Pharms. USA, Inc. v. FDA,* 441 F.3d 1 (D.C. Cir. 2006)............................................. passim

*Teva Pharms., USA, Inc. v. FDA*, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ........... 7, 15, 20

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001)....................................... 26

*United States v. Mead*, 533 U.S. 218 (2001) ............................................................................... 17

*Varicon Int'l v. OPM,* 934 F. Supp. 440 (D.D.C. 1996) .............................................................. 30

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)...................................................... 31

## Statutes and Rules

21 U.S.C. § 355 ..................................................................................................................... *passim*

Fed. R. Civ. P. 16...................................................................................................................22

Fed. R. Civ. P. 26...................................................................................................................22

Fed. R. Civ. P. 41 ................................................................................................................. *passim*

**Other Authorities**

"Marketers of Plavix Outfoxed on a Deal," *New York Times*, August 9, 2006 .........................31

**\***Denotes authorities upon which DRL chiefly relies**.**

Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (hereinafter referred to collectively as "DRL"), submit this memorandum in opposition to Apotex's Motion for Temporary Restraining Order and/or Preliminary Injunction.

## INTRODUCTION

DRL is the first ANDA filer on GSK's antiemetic drug ondansetron. DRL filed its ANDA in 2001, including certifications under paragraph IV that the four GSK patents listed in the Orange Book for ondansetron were invalid, unenforceable or would not be infringed by DRL's generic ondansetron. GSK sued DRL on August 24, 2001 for infringement of the '578, '628 and '789 patents, and after years of discovery and motion practice, the case was tried beginning in May 2004. Subsequently, the parties settled the litigation in June 2006, prior to the rendering of any decision. DRL was never sued on the '658 patent, presumably because DRL's notice letter made it clear that DRL's ANDA product would not infringe the '658 patent because it avoided the particle size limitations of the patent. DRL anticipates receiving 180-day marketing exclusivity for having been the first paragraph IV ANDA filer with respect to the '658 patent.

Apotex is a late ANDA-filer on ondansetron – filing its ANDA *after* DRL's trial on the merits. As such, it could not enjoy exclusivity for ondansetron. But Apotex had a plan: It would attempt to trigger the exclusivity of the first-filer so that exclusivity would run during a time that other patents prevented any generic manufacturer from selling ondansetron, putting Apotex on an equal footing with other ANDA filers, including the first-filer. Rather than make clear their noninfringement of the '658 patent in their notice letter, as required by 21 U.S.C. § 355(j)(2)(B)(iv)(II), Apotex withheld relevant information in order to provoke a lawsuit by GSK. Only after it was sued (but notably prior to any discovery in the case) did Apotex make

its particle size information available to GSK and obtain a stipulated dismissal under Fed. R.

Civ. P. 41.  Apotex, as it has done before in other cases (unsuccessfully), sued FDA here in an

attempt to declare the first-filer's 180-day exclusivity triggered by its stipulated Rule 41

dismissal, so that it can receive approval at the same time as the first-filer.

While this is DRL's first time in this Court on this issue, it is *deja vu* for the other

parties.  Earlier this year, Apotex tried the same ploy in connection with its ANDA on the drug

pravastatin.  Notwithstanding the fact that FDA ruled that a stipulated dismissal is not a court

decision that triggers the 180-day exclusivity, and that this Court as well as the Court of

Appeals for the D.C. Circuit agreed, Apotex is at it again.  All of the pertinent issues presented

in Apotex's motion were decided by this Court against Apotex in *Apotex, Inc. v. FDA*, No.

06-0627, 2006 U.S. Dist. LEXIS 20894 (D.D.C. Apr. 19, 2006) ("*Apotex I*"), *aff'd*, 449 F.3d

1249 (D.C. Cir. 2006) ("*Apotex II*") (*Apotex I* is appended as Attachment 1).  Apotex

ultimately has **no chance of success on the merits** of its action to overturn the FDA's

November 3, 2006 letter ruling.

The FDA's reasoned conclusion that Apotex's Rule 41 stipulation of dismissal of

GSK's patent infringement lawsuit did not trigger the 180-day exclusivity is based squarely

on FDA's April 11, 2006 letter ruling to Apotex, which was considered and approved by this

Court, and which was in turn affirmed by the D.C. Circuit.  As this Court made clear in

*Apotex I*, FDA's interpretation of the court-decision trigger provision of the Hatch-Waxman

Act is based on the plain text of the statute, is justified by the policy choices left by Congress

to the FDA's discretion, and is subject to substantial deference under *Chevron, U.S.A., Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  In any event, it is not enough for

Apotex merely to quibble with the FDA's reasoning.  To secure immediate relief it must show

it is likely to prevail in its argument that a private agreement embodied in a Rule 41 Stipulation of Dismissal acknowledging that there is no infringement and requiring no court action constitutes a "decision of a court . . . holding the patent . . . not infringed." Apotex cannot possibly make that showing.

The only conceivable distinction between this case and the pravastatin case that led to the FDA's April 11, 2006 letter ruling is that in this case the underlying action that was dismissed by stipulation between the parties was a patent infringement action brought by the innovator, whereas in the pravastatin case the underlying action that was dismissed by stipulation between the parties was a declaratory judgment action for noninfringement brought by Apotex. This is a distinction without a difference, and it was rejected by the FDA in its November 3, 2006 letter ruling. (The FDA's November 3, 2006 letter ruling is attached as Exhibit 1 to the accompanying declaration of Brian K. McCalmon ("McCalmon Decl."). The FDA's April 11, 2006 letter ruling is McCalmon Decl. Ex. 2.)

The FDA set forth its "holding-on-the-merits" standard for whether a court order is sufficient to trigger the start of a 180-day exclusivity in its April 11, 2006 letter ruling. FDA required "a court decision with an actual 'holding' on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court." (McCalmon Decl. Ex. 2, at 2.) There is nothing in the FDA's reasoning requiring an actual holding on the merits which would be impacted by whether the action was a direct infringement suit or a declaratory judgment action.

In applying this standard to Apotex's stipulation of dismissal here, FDA stated in the

November 3, 2006 letter ruling:

> It is not enough that the order reflects the views and commitments of the
> parties.  The court itself has to have made a substantive determination on the
> merits of the patent claim.  As its title ("Stipulation of Dismissal Pursuant to
> Fed. R. Civ. P. 41") reflects, the stipulation of dismissal was the mechanism
> by which the parties sought and received dismissal of the case because, in their
> view, there was nothing left for the court to decide.  The court was not asked
> to resolve the dispute on the merits and did not do so.  In short, the stipulation
> of dismissal does not reflect a holding by the court on the merits of the patent
> claim.

(McCalmon Decl. Ex. 1, at 4.)

This Court has already concluded that "FDA's interpretation of its statute and

implementing regulation is reasonable."  *Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *43.  The

GSK-Apotex Rule 41 stipulation of dismissal ("GSK Stipulation") recites agreements between

the parties, but was self-executing and required no court consideration, deliberation or decision

at all.  (The GSK Stipulation is McCalmon Decl. Ex. 3.)  Indeed, while the GSK Stipulation

incorporates a separate agreement between Apotex and GSK by reference, the separate

agreement was not filed with the court.

As this Court previously held (relying on, *inter alia*, the U.S. Supreme Court's decisions

in *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994) ("[a] judge's mere awareness

and approval of the terms of the settlement agreement do not suffice to make them part of [the]

order"), and *Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*,

532 U.S. 598 (2001)), a stipulated dismissal cannot possibly be the decision of a court and thus

cannot trigger DRL's exclusivity – for the simple reason that such a dismissal "lacks sufficient

judicial imprimatur to transform it from a private agreement between the parties into a finding of

fact made by a district court."  *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 191 (D.D.C.

2005), *vacated and remanded by* 441 F.3d 1 (D.C. Cir. 2006).  With this judicial backdrop, Apotex cannot carry its burden of establishing that FDA's ruling was arbitrary and capricious.

Nor can Apotex satisfy the other requirements for a preliminary injunction.  This Court squarely addressed this exact issue when it denied Apotex's motion for injunctive relief in the prior pravastatin litigation.  As the Court stated then with respect to irreparable injury:  "Apotex's speculative sales loss thus remains an economic loss that does not meet the irreparable harm standard.  So, too, its concerns about a lost market share fall well short of the serious, irretrievable damage to its business required to warrant a preliminary injunction . . . ." *Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *56-57.  With respect to the intervenor's injury, the Court found that "unlike the harm that Apotex allegedly faces, the potential injury that the intervenor-defendants face is not 'merely economic.'  Rather, they stand to lose a statutory entitlement, which is a harm that has been recognized as sufficiently irreparable. . . .  Once the statutory entitlement has been lost, it cannot be recaptured." *Id*. at *58 (citation omitted).  Finally, the Court found that "the balance of hardships clearly tips against granting Apotex emergency injunctive relief that it seeks." *Id*. at *59-60.  Plainly, a party with exclusivity at stake has substantially more to lose than Apotex – who will either launch with numerous competitors in late December if it wins or with numerous competitors six months later if it loses.  Apotex's alleged harm of approximately $11.7 million (s*ee* Apotex Br. at 14-15) is not only contrived, but was found insufficient in the pravastatin case.

At bottom, nothing has changed since this Court grappled with these issues and decided the pravastatin cases involving Teva and Apotex earlier this year.  Having rejected Apotex's interpretation of the Hatch-Waxman Act and its arguments in favor of injunctive relief in pravastatin, the Court should reach the same result with respect to generic ondansetron.

5

**BACKGROUND**

I.     **Statutory and Regulatory Landscape**

This case involves the Drug Price Competition and Patent Term Restoration Act of 1984

(popularly known as the Hatch-Waxman Act) and the FDA's regulation and interpretation of

what this Court has termed "an ambiguous statute in this complex arena."  *Apotex I*, U.S. Dist.

LEXIS 20894, at *42.  The Hatch-Waxman Act was enacted "to expedite the process by which

companies gain approval to sell generic versions of already-approved brand-name drugs . . . ."

*Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004).  The Act "eased the

process of generic drug approval by allowing companies seeking to market generic versions of

approved drugs to submit Abbreviated New Drug Applications ('ANDAs')."  *Apotex, Inc. v.*

*FDA*, 393 F.3d 210, 212 (D.C. Cir. 2004).  "If the ANDA establishes both that the active

ingredient in the proposed drug product is the same as the active ingredient in the previously

approved drug and that the proposed product is bioequivalent to the approved drug, the ANDA

applicant may rely on the safety and effectiveness data contained in the original NDA [New

Drug Application]."  *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1338 (Fed. Cir. 2003) (citing 21

U.S.C. §§ 355(j)(2)(A)(ii), (iv)).  The statute requires NDA applicants to identify any patent that

claims the drug that is the subject of the NDA.  The FDA lists this information in its "Approved

Drug Products with Therapeutic Equivalence Evaluations" publication (known as the "Orange

Book").  *Id.*

ANDAs must address patents that cover or might cover the relevant drugs, a requirement

that can be satisfied through one of four "certifications" that explain why the FDA should

approve the application.  *See Purepac*, 354 F.3d at 879 (citing 21 U.S.C. § 355(j)(2)(A)(vii)).

This case involves the "paragraph IV certification," which states "that such patent is invalid

or will not be infringed by the manufacture, use, or sale of the new drug." 21 U.S.C.

§ 355(j)(2)(A)(vii)(IV).[1]

"In essence, applicants use paragraph IV certifications to challenge the validity of brand-name manufacturers' patents," *Purepac*, 354 F.3d at 879, an action that is a key part of the incentive structure underlying the Act. "In order to encourage paragraph IV challenges, thereby increasing the availability of low-cost generic drugs," *id.*, "[t]he Act rewards the first manufacturer to file an approved ANDA containing the certification in paragraph IV by giving it a 180-day period of marketing exclusivity, which begins with the earlier of the applicant's first commercial marketing of the generic or when the applicant *prevails in a suit* over infringement or the validity of the patent covering the branded drug." *Ranbaxy Labs. Ltd. v. Leavitt*, No. 06-5154, 2006 WL 3289050, at *2 (D.C. Cir. Nov. 14, 2006) (emphasis added) (citing 21 U.S.C. § 355(j)(5)(B)(iii)-(iv)) (appended as Attachment 2).

As discussed further below, the meaning of the so-called court-decision trigger has been the subject of extensive litigation. In a series of cases involving Teva and, for the most part Apotex as well, the federal courts in the District of Columbia have reviewed the FDA's interpretation of the court-decision trigger. *See, e.g., Teva Pharms. USA v. FDA,* 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*"); *Teva Pharms., USA, Inc. v. FDA*, No. 99-5342, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) (unpublished disposition) ("*Teva II*")(appended as Attachment 3); *Teva Pharms. USA, Inc. v. FDA,* 441 F.3d 1 (D.C. Cir. 2006) ("*Teva III*"); *Apotex I*; and *Apotex II*.

In *Teva II*, the D.C. Circuit found that the FDA's interpretation of the court-decision trigger "fail[ed] for want of reasoned decisionmaking." *Teva II,* 2000 WL 1838303, at *2. In

---

[1] This case also involves, tangentially, the "paragraph III" certification, where the ANDA applicant seeks approval upon patent expiration.

*Teva III*, the D.C. Circuit held that "FDA mistakenly thought itself bound by" the decisions in *Teva I* and *Teva II*, and directed it to "bring its experience and expertise to bear in light of competing interests at stake and make a reasonable policy choice." *Teva III*, 441 F.3d at 5 (internal quotation and citations omitted).

In response to the court's directive, the FDA reconsidered its position and, on April 11, 2006, issued a "fifteen-page, single-spaced remand decision" that not only "thoughtfully deconstruct[ed] the multifaceted implications of the estoppel and holding-on-the-merits approaches, but it also sufficiently addressed each of the three concerns raised in *Teva I* and recalled in *Teva III*." *Apotex I*, U.S. Dist. LEXIS 20894, at *52-53.

In its decision, the FDA adopted a textual approach, based on the plain language of the statute, stating that only a decision of a court holding on the merits that a particular patent is invalid, not infringed or unenforceable would suffice to trigger the 180-day exclusivity period. (McCalmon Decl. Ex. 2, at 2.)  The FDA further interpreted "holding" to be "evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits [as to the] invalidity, noninfringement, or unenforceability [of the relevant patent]."  (*Id.*)  In sum, the FDA concluded that the 180-day exclusivity period can only be triggered by a "decision-on-the-merits approach."

Immediately thereafter, Apotex challenged the FDA's rulemaking decision in the pravastatin case.  In that case, Apotex, again a late-filer, challenged the FDA's April 11, 2006 ruling that a Stipulated Order dismissing its case was not a holding on the merits and therefore did not trigger the 180-day exclusivity period.  This Court, in *Apotex I*, affirmed summarily by the D.C. Circuit in *Apotex II*, rejected Apotex's position, and held that the FDA's "court-decision trigger" interpretation was reasonable.  *Apotex I*, U.S. Dist. LEXIS 20894, at *27-43.

II.    **Factual Background**

A.    **The ANDA Filings**

The reference-listed drug upon which DRL based its ANDA is GSK's prescription drug Zofran® (ondansetron). GSK listed four patents in the Orange Book in connection with its Zofran® ondansetron product. Three of them, U.S. Patents Nos. 4,695,578, 5,578,628, and 4,753,789 (the '578, '628 and '789 patents, respectively), are now expired. The last, U.S. Patent No. 5,344,658 (the '658 patent), expires on September 6, 2011 (with pediatric exclusivity expiring on March 6, 2012).

DRL was the first ANDA applicant to file a paragraph IV certification with regard to each of these patents in connection with an ANDA seeking approval to market ondansetron tablets in 4 mg, 8 mg and 24 mg strengths. The '658 patent is, however, the only patent relevant for 180-day marketing exclusivity purposes since the marketing exclusivity which attached to the other patents expired along with those patents.

In response to DRL's certification, on August 24, 2001 GSK instituted suit against DRL in the United States District Court for the District of New Jersey, alleging that by filing ANDA No. 76-183 DRL infringed three of the four Orange Book patents – the '578, '628 and '789 patents. GSK later amended its complaint to sue DRL on a non-Orange Book process patent, the '720 patent. By instituting suit on the '578, '628 and '789 patents, GSK received a 30-month stay of approval of DRL's ANDA No. 76-183. GSK did not institute suit against DRL alleging infringement of the '658 patent. DRL, however, filed a counterclaim of non-infringement of the '658 patent and, in response, GSK provided DRL with a covenant not to sue. The '658 patent was thereafter eliminated from the case when DRL did not include the '658 patent in its invalidity counterclaim when it answered GSK's amended complaint that added the '720 patent.

DRL and GSK spent several years litigating the matter. Extensive discovery was taken and summary judgment motions were filed. A nine-day bench trial was held before the Honorable Jose Linares beginning in May 2004. Following trial, the '578 and '628 patents expired in January and February of 2005. Closing arguments were held in June 2005.

With the '789 patent due to expire on June 24, 2006, GSK and DRL entered into a comprehensive agreement settling their ondansetron litigation concerning both the Orange Book and non-Orange Book patents. Pursuant to this agreement, on or about June 22, 2006, a Stipulation of Dismissal was filed. GSK provided to DRL certain covenants not to sue, the effect of which (together with expiration of the '789 patent-in-suit) will be to permit DRL, effective December 24, 2006, to launch sales of its ondansetron 4 mg, 8 mg and 24 mg product, subject only to FDA approval of DRL's ANDA No. 76-183.

### B.    The '658 Patent

The '658 patent at issue in the lawsuit between GSK and Apotex claims, *inter alia*, ondansetron crystals with a specific particle size distribution. (McCalmon Decl. Ex. 4 ('658 patent), claim 8). Significantly, an ANDA applicant's product that is not within the claimed particle size range would not be subject to a good faith infringement claim by GSK. Indeed, it is not difficult to develop a crystalline form of ondansetron outside the claimed range, as did the many ANDA filers that Apotex claims are ready to launch their product.

By statute, ANDA applicants are required to notify GSK of the factual and legal basis for an assertion of non-infringement of the '658 patent. It is only with this information that GSK could properly determine whether an infringement action was warranted, since unlike in an ordinary patent case, there is no existing "accused product" for the patent owner to examine. DRL provided this information to GSK and was not sued on the '658 patent. Apotex *did not* provide GSK with proper information regarding the crystalline size of its ondansetron product,

10

despite knowing full well that its product was outside the scope of the claims of the '658 patent.

Thus, because Apotex did not comply with its obligations under the Hatch-Waxman Act to

provide GSK with a detailed factual and legal basis for its non-infringement position regarding

the '658 patent, GSK had no choice but to file suit against Apotex for infringement of the '658

patent.  After the litigation was commenced, but prior to any discovery, Apotex apparently

provided GSK with the relevant information and the parties stipulated to a dismissal of the

complaint.  The stipulation was entered into even before the Initial Scheduling Conference

occurred.

### C.    Background of the Present Suit

By letter dated August 31, 2005, Apotex requested that the FDA confirm that Apotex's

ANDA would be approved at the expiration of GSK's pediatric exclusivity period for the '789

patent, and that any 180-day generic marketing exclusivity period associated with the '658 patent

was triggered by the May 25, 2005 Stipulation dismissing GSK's infringement action against

Apotex.  (The August 31, 2005 letter is Exhibit B to the Declaration of Arthur Y. Tsien ("Tsien

Decl.") submitted in support of Plaintiff's Motion for Temporary Restraining Order and/or

Preliminary Injunction).  Apotex reiterated its request in a letter dated August 29, 2006,

threatening immediate judicial action if the FDA did not take any action by September 14, 2006.

(Tsien Decl. Ex. C.)   Apotex argued that under the FDA's  April 11, 2006 administrative

decision, the May 25, 2005 GSK Stipulation qualifies as a triggering court decision.

On November 3, 2006, the FDA denied Apotex's request to deem the start of the 180-day

exclusivity period to have been triggered by the May 25, 2005 GSK Stipulation.  The FDA

thoroughly reviewed the GSK Stipulation in light of the holding-on-the-merits standard set forth

in its April 11, 2006 letter ruling approved by the D.C. Circuit in *Apotex II*.  Specifically, the

FDA found "[t]he GSK suit was dismissed by an agreement between the parties; the court never

11

issued a holding on the merits of the patent claim.  It is clear, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard." (McCalmon Decl. Ex. 1, at 4.)  The ruling also found the holding-on-the-merits standard applicable to patent infringement suits as well as the declaratory judgment actions referenced in the FDA's April 11, 2006 letter decision. (*Id.* at 4 n.4.)

On November 6, 2006, Apotex commenced the present case against FDA and moved for injunctive relief, and DRL intervened shortly thereafter.

## ARGUMENT

### I.    Apotex Has No Likelihood of Success on the Merits

If there "is no basis for a judgment" that the movant "is likely to succeed on the merits of any of its claims . . . it is clear that a preliminary injunction is unwarranted." *Tenacre Found. v. INS*, 78 F.3d 693, 696 (D.C. Cir. 1996).  Apotex has no likelihood of success on the merits.  This Court (Bates, J.) has told it that.  *Apotex I*, U.S. Dist. LEXIS 20894, at *53 ("Apotex is, accordingly, unlikely to prevail on the merits of its claim. . . .").  The D.C. Circuit has told it that. *Apotex II*, 449 F.3d at 1253 ("In short, Apotex has little likelihood of succeeding on the merits of its claim.").  The result here must be the same.[2]

---

[2] The similarity of Apotex's arguments here to the arguments it asserted in *Apotex I* and *Apotex II* raises the question why Apotex believes it should obtain a different result this time around.  It also leads to a suspicion that Apotex may be holding something back for reply.  This would be improper.  *See Natural Resources Defense Council, Inc. v. EPA*, 25 F.3d 1063, 1072 n.4 (D.C. Cir. 1994) (refusing to consider challenge to administrative record raised for first time in reply briefs; parties must raise all their arguments in opening briefs to prevent "sandbagging" and give opposing counsel the opportunity to respond); *Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2, 10-11 (D.D.C. 2004) (striking summary judgment briefs and ordering rebriefing in which "parties must place their best arguments and supportive evidence in their opening briefs"). The Court should not consider any new arguments that Apotex first raises in reply.

**A.      Apotex's Attempt to Relitigate the FDA's Interpretation of the Court-Decision Exclusivity Trigger Is Barred by Collateral Estoppel**

Apotex should be barred on grounds of collateral estoppel (issue preclusion) from challenging yet again the FDA's interpretation of the court decision exclusivity trigger set forth in the Hatch-Waxman Act.  In any event, because issue preclusion is likely to bar Apotex's current claim, Apotex cannot show substantial likelihood of success on the merits.  *See Newdow v. Bush*, 355 F. Supp. 2d 265, 272 (D.D.C. 2005).

"The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality."  *Yamaha Corp. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (affirming district court decision that appellant was precluded from relitigating the issue that U.S. Customs regulations were invalid under the Tariff Act because these identical issues had already been litigated and resolved by a different district court in a different case); *see American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C. Cir. 1989) (barring relitigation of challenge to EPA regulations).

The criteria for establishing the preclusive effect of a prior holding are (1) the same issue must have been contested and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by the court in that prior case and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination."  *Yahama Corp.*, 961 F.2d at 254.

All of the prerequisites to collateral estoppel are met here:  (1) Apotex contested and submitted for judicial determination the FDA's interpretation of the court-decision exclusivity trigger both in this Court and in the D.C. Circuit in the pravastatin matter (*see* Apotex Br. at 8 n.6 (acknowledging that it "challenged the lawfulness of FDA's April 11, 2006 administrative ruling in connection with the drug pravastatin")); (2) the court-decision trigger issue was actually

13

and necessarily determined by both courts in the pravastatin matter; and (3) issue preclusion would not be unfair to Apotex here.

With respect to the third requirement, "[a]n example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude." *Yamaha Corp.*, 961 F.2d at 254. Apotex had every incentive to litigate the matter in the pravastatin case, and did so vigorously. Indeed, the D.C. Circuit acknowledged, "The stakes are high." *Apotex II*, 449 F.3d at 1249. Nonetheless, the actual "damage" numbers that Apotex asserts are modest for an ANDA case and are substantially the same in the two actions: $11.7 million here versus $9.9 million in the pravastatin case. (*Compare* McIntire Decl. ¶ 18 submitted in this case *with* McIntire Decl. ¶ 15 submitted in the pravastatin case (attached as Exhibits 5 and 6, respectively, to the McCalmon Decl.)) Indeed, any unfairness argument would be hard to make since Apotex does not claim that it is entitled to any period of marketing exclusivity for ondansetron.

Even if the Court decides to hear Apotex's challenge to the FDA's interpretation of the court-decision trigger yet again, Apotex's lack of success in the prior litigation points towards the same negative outcome for it in this one.

**B.** **The Arguments That Apotex Raises Here Have Already Been Soundly Rejected by the FDA, This Court and the D.C. Circuit**

Apotex tries to define this action as presenting a new issue, but it does not. Attempting to draw a distinction that is not there, Apotex asserts that each of the prior rulings in the pravastatin case, as well as those in the numerous "*Teva*" cases, "considered whether an order issued in a declaratory judgment suit brought by the ANDA applicant against the brand company, constituted a triggering court decision," but that, "*[n]one specifically considered the impact of an order issued in a patent infringement action brought by the brand company against a paragraph*

*IV ANDA Applicant.*"  (Apotex Br. at 7 (emphasis in original).)  The FDA rejected Apotex's

premise in its November 3, 2006 letter decision, stating:

> Although the holding-on-the-merits standard was announced in relation to a
> declaratory judgment action, the standard is equally applicable to affirmative
> patent infringements suits, such as the GSK suit at issue here.  The standard looks
> to whether the court has made a holding on the merits of the patent claim; it does
> not consider the manner in which the dispute came before the court.

(McCalmon Decl. Ex. 1, at 4 n.4.)  Much as Apotex would like to pretend otherwise, the

holding-on-the-merits standard for the court-decision exclusivity trigger that the FDA enunciated

in its April 11, 2006 letter decision was a watershed event that made a clear break with its prior,

ill-fated estoppel-based standard.[3]  It was the agency's response to the D.C. Circuit's directive in

*Teva III* to "'bring its experience and expertise to bear in light of competing interests at stake'

and make a reasonable policy choice."  *Teva III*, 441 F.3d at 5 (citation omitted).  The D.C.

Circuit confirmed earlier this year that the FDA has now properly done so.  *Apotex II*, 449 F.3d

at 1252.  Given the judicial landscape, there is no way that Apotex can show that the FDA's

November 3, 2006 letter was arbitrary and capricious.

1.      **The FDA Has Already Twice This Year Rejected Apotex's Arguments
to Maintain the Estoppel-Based Standard**

Apotex nearly ignores the FDA November 3, 2006 letter decision from which it

ostensibly appeals. (Apotex Br. at 1, 12.)  As discussed above, in this letter, the FDA informed

Apotex that the "Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41" between Apotex and

---

[3] One indication of the extent to which Apotex is living in the past is that the Table of
Authorities of its brief denotes *Teva Pharms. USA v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999)
("*Teva I*")  as one of the cases on which it "chiefly relies."  However, as this Court pointed out in
*Apotex I*, "[i]t would be nonsensical if [certain language in *Teva III*] required the FDA to
reconcile the results that it reached in *Teva I*, *Teva II*, and *Granutec*, or to justify the result that it
reached here regarding the Apotex-BMS dismissal under the now-defunct case-by-case method."
*Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *45; *see also id.* at *33 n.7 (stating that, in the wake
of *Teva III*, language in *Teva I* on which Apotex relied "has little continuing force").  Tellingly,
Apotex does not even cite to *Apotex I* in its brief here.  Although it cites to *Apotex II passim*, its
Table of Authorities does not denote *Apotex II* as one of the cases on which it "chiefly relies."

GlaxoSmithKline "does not constitute a court decision trigger under the holdings-on-the-merits standard." (McCalmon Decl. Ex. 1, FDA Nov. 3 Decision at 4.) Rather, "As its title . . . reflects, the stipulation of dismissal was the mechanism by which the parties sought and received dismissal of the case because, in their view, there was nothing left for the court to decide. The court was not asked to resolve the dispute on the merits and did not do so." (*Id.*)

The FDA specified that this action was taken in accordance with its April 11, 2006 letter decision which it attached to its November 3, 2006 letter decision, and to which it referred Apotex for "further guidance on this matter." (McCalmon Decl. Ex. 1 (FDA Nov. 3 decision), at 1.) Nonetheless, Apotex professes surprise that "FDA apparently believes that its April 11, 2006 ruling has relevance to the instant dispute." (Apotex Br. at 8.) To the contrary, the FDA April 11 decision has everything to do with this litigation, as Apotex later in its brief grudgingly admits. (*See* Apotex Br. at 16 & n.9.)

> **2.    Earlier This Year, This Court and the D.C. Circuit Endorsed the FDA's Interpretation of the "Court-Decision" Exclusivity Trigger as Requiring a Holding on the Merits**

Apotex acknowledges that it "challenged the lawfulness of FDA's April 11, 2006 administrative ruling in connection with the drug pravastatin," the pharmaceutical product at issue in *Apotex I* and *Apotex II*, and that it lost both in this Court and in the D.C. Circuit. (Apotex Br. at 8 n.6.) Nonetheless, Apotex asserts that it "vigorously disputes the legality of FDA's April 11, 2006 administrative ruling, which unlawfully restricts what types of orders are sufficient to trigger the start of the 180-day exclusivity period under 21 U.S.C. § 355(j)(5)(B)(iv)(II)." (Apotex Br. at 16 n.9; *see also id.* at 19 (characterizing the FDA's April 11 and/or November 3 letter decisions as "impermissible as applied to the facts of this dispute" and arguing that "FDA cannot lawfully take this position").)

16

As this Court stated in the pravastatin case, "Apotex's dissatisfaction with the way in which the agency's approach affects its interests in generic pravastatin does not offer the Court a sufficient basis to disturb the legislative scheme reasonably adopted by the FDA." *Apotex I*, U.S. Dist. LEXIS 20894, at *49.   And so Apotex's dissatisfaction continues.  It casts itself in the position of spoiler, a role that it has played before.  *See Apotex II*, 449 F.3d at 1250-51 ("Teva expected to roll out its product and take advantage of its 180-day exclusivity period.  But one of Teva's competitors had other plans."); *see also Purepac*, 354 F.3d at 890 (in rejecting TorPharm's (now Apotex) arguments in a dispute regarding entitlement to exclusivity for marketing generic gabapentin, stating that "Purepac's 'advantage,' which derived simply from the fact that the FDA agreed with Purepac's interpretation of the statute rather than with TorPharm's, hardly warrants setting aside the FDA's decision.").  Apotex simply refuses to take "no" for an answer.

C.     The *Chevron* Deference To Be Accorded the FDA's Decision Is at its Apex

Review of the FDA's November 3 letter decision and the April 11 letter decision incorporated therein is governed by "the familiar and deferential two-part framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, [467 U.S. 837 (1984)]." *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279 (D.C. Cir. 2004).  Under the *Chevron* framework, if Congress has spoken to the precise question at issue, then Congress' intent must be given effect, but if the statute is ambiguous, then the question becomes whether the agency's position rests on a permissible construction of the statute.  *Id*. at 1280.  "When the agency decision is based upon its interpretation of the statute that it is charged with administering, a court's deference to the agency is at its apex." *Apotex I*, U.S. Dist. LEXIS 20894, at *25 (citing *United States v. Mead*, 533 U.S. 218, 226-27 (2001)); *see also Purepac*, 354 F.3d at 889 (confirming longstanding recognition that breadth of agency discretion is "at zenith" when the

17

challenged action relates not to ascertaining whether conduct violates statute or regulations, but rather to the fashioning of policies, remedies and sanctions).

Under the "arbitrary and capricious" standard, the court's scope of review is narrow. *Bowman Trans., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). "The court is not empowered to substitute its judgment for that of the agency;" rather, the court is to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285-86. It is up to the agency to "bring its experience and expertise to bear in light of [the] competing interests at stake" and make a reasonable policy choice. *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004). To be upheld, an agency's interpretation need not be the only one it permissibly could have adopted. *Chevron*, 467 U.S. at 843 n.11; *Ranger Cellular v. FCC*, 333 F.3d 255, 260 (D.C. Cir. 2003). "It makes no difference, moreover, that an administrative determination is embodied in a decision letter, as here, rather than in a rulemaking or formal adjudication; *Chevron* deference still applies." *Apotex I*, U.S. Dist. LEXIS 20894, at *26; *see Mylan Labs.*, 389 F.3d at 1280.

### 1.    In *Apotex I*, This Court Conducted a Thorough Analysis of the FDA's April 11 Decision

In *Apotex I*, this Court conducted a thorough *Chevron* analysis. In step one of the analysis – whether the relevant statutory provision, here § 355(j)(5)(B)(iv)(II), is silent or ambiguous with respect to the issue presented – the Court commented that "[a]ny superficial simplicity" regarding the meaning of "decision of a court . . . holding the patent . . . invalid or not infringed" was "deceptive." *Apotex I*, U.S. Dist. LEXIS 20894, at *28-29 ("The Court is well aware of the confusion that this language has caused."). Although finding a "latent ambiguity inherent in the terms 'decision' and 'holding,'" the Court opined that "the holding-on-the-merits approach arises more naturally from the statutory language than does the estoppel approach, and,

accordingly, is the better interpretation." *Id*. at *33. Having found the statutory language ambiguous, however, it proceeded to step two of the *Chevron* analysis.

The threshold inquiry in step two of the *Chevron* analysis is whether the FDA's holding-on-the-merits approach is a permissible construction of the statute. The Court found that the FDA had "correctly commenced its analysis with the plain language of the statutory provision." *Id.* at *32.

Next, the Court determined whether the FDA's approach was the product of reasoned agency decisionmaking. The Court pointed out that *Teva III* made clear that "*Teva I* and *Teva II* were purely procedural in nature." *Id*. "Hence, plaintiff's suggestion that the holding-on-the-merits approach itself is arbitrary and capricious is misleading – it was the agency's failure to justify that approach under the law that was deemed arbitrary and capricious, not the approach itself." *Id.* This time, however, in the Court's view, FDA "brought its experience and expertise to bear" and "has properly adopted an interpretation that hews closely to the terms chosen by Congress to express its legislative judgment." *Id.* at *37. The Court explained:

> By facilitating patent challenges and reducing complex litigation, the holding-on-the-merits approach actually furthers the very policy that Apotex claims it undermines-the goal of getting more low-cost generic products into the hands of consumers as quickly as possible. FDA's April 11, 2006 decision therefore constitutes a much more thorough, considered and comprehensive analysis than the agency undertook in *Teva I* or *Teva II*. In any event, the choice between competing policy concerns is for the agency, not this Court, to make . . . .

*Id.* at *36-37.

Finally, the Court determined that the FDA's approach was reasonable in practice. *Id.* at *38 ("For many of the same reasons that the holding-on-the-merits approach is supported by reasoned agency decisionmaking, it is also reasonable in practice."). It also commented that "the estoppel approach completely ignores the language of the statutory provision, which requires a

*decision* of a *court* with an actual *holding*." *Id.* at *39 (emphasis added). The court concluded,

"[n]ot only did the agency's fifteen-page, single-spaced remand decision thoughtfully

deconstruct the multifaceted implications of the estoppel and holding-on-the merits approaches,

but it also sufficiently addressed each of the three concerns raised in *Teva I* and recalled in *Teva*

*III*. There is no 'want of reasoned decisionmaking' here." *Id.* at *52-53 (citation omitted).

> **2.**    **In *Apotex II*, the D.C. Circuit Likewise Endorsed the FDA's April 11**
> **Decision**

The D.C. Circuit likewise accorded *Chevron* deference to the FDA's April 11 letter

decision. Applauding the FDA's rulemaking, the court stated:

> In sharp contrast to the decision at issue in *Teva II* [2000 WL 1838303 (D.C. Cir.
> Nov. 15, 2000)], FDA's rejection of Apotex's 'stipulation and order' as a
> triggering court decision addressed concerns identified in *Teva I* [182 F.3d 1003
> (D.C. Cir. 1999)]. Indeed, FDA provided entirely new justifications for declining
> to look beyond the face of a court order. To be sure, those justifications share a
> common premise with the drain-on-resources rationale laid out in the Sporn
> affidavit . . . . But the validity of this premise is not in question. . . .
>                                   . . . .
> As FDA sees it, the uncertainty inherent in an estoppel-based inquiry would lead
> to two inter-related problems, neither of which relates to the drain-on-resources
> rationale set forth in the quite brief Sporn affidavit the agency relied on in *Teva II*.
> First, FDA believes that the uncertainty would 'undermin[e] marketplace certainty
> and interfer[e] with business planning and investment.' [FDA April 11 decision]
> at 14. And second, FDA worries that forcing it to parse court decisions will invite
> fruitless litigation from generic drug manufacturers seeking to trigger, or to avoid
> triggering, exclusivity periods.

*Apotex II*, 449 F.3d at 1252.

Notably, the D.C. Circuit recognized that the FDA's rulemaking was meant to curtail

exactly the type of "fruitless litigation" that Apotex initiated here with respect to the FDA's

exclusivity determination regarding ondansetron. *See id.* As the court concluded, "[i]n our view,

these perfectly reasonable propositions adequately support FDA's position that an estoppel-based

approach to the court decision trigger is ill-advised." *Id.*

### D.    Apotex's *Granutec* Argument Failed Before and Fails Again

In *Apotex II*, the D.C. Circuit soundly rejected Apotex's contention that the FDA's April 11 decision could not stand because the agency failed to address "a possible inconsistency between its holding-on-the-merits approach and *Granutec* [*Inc. v. Shalala*, No. 97-1873, 1998 WL 153410 (4th Cir. Apr. 11, 1998)  (unpublished disposition)]." (appended as Attachment 4) Apotex is wrong.  Not only did FDA address the *Granutec* issue, but it did so persuasively. . . ." *Apotex II*, 449 F.3d at 1252-53.  The district court pointed out, as the FDA stated in its April 11 decision, the result previously reached in *Granutec* would be the same under the holding-on-the-merits approach that applies today because "[b]y its very nature, summary judgment requires the weighing of substantive arguments and necessitates legal analysis. . . ." *Apotex I*, U.S. Dist. LEXIS 20894, at *50.

### E.    The FDA Properly Determined That the Rule 41 Stipulation of Dismissal That Apotex Negotiated with GSK Is Not a Triggering Court Decision

The FDA correctly determined that the Rule 41 stipulation of dismissal that Apotex negotiated with GSK was not sufficient to trigger the start of the 180-day exclusivity period because it did not reflect "a holding on the merits by the court that the patent at issue is invalid, not infringed, or unenforceable."  (McCalmon Decl. Ex. 1 (FDA Nov. 3 letter) at 1.)  Just as this Court previously recognized with respect to the BMS-Apotex dismissal order at issue in the Teva litigation, the Rule 41 stipulation of dismissal at issue here "required no court action whatsoever and lacked the requisite judicial imprimatur to constitute 'decision of a court.'"  *Apotex I,* 2006 U.S. Dist. LEXIS, at *50-51; *see also Teva Pharms., USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005), *vacated and remanded by* 441 F.3d 1 (D.C. Cir. 2006).  The court recognized that the U.S. Supreme Court "has proclaimed that a 'judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of [the] order.'"  *Id.* (citing

21

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994)).   The court cited to additional

U.S. Supreme Court authority that "private settlements are not the equivalent of consent decrees

because they require a lesser degree of judicial involvement."  *See Teva*, 398 F. Supp. 2d at 189

(citing *Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.*, 532 U.S.

598, 604 n.7 (2001)).  As one court has stated:

> [T]he granting of a motion to dismiss under Rule 41(a)(2) does not imply judicial
> approval of the underlying settlement agreement.  The grant of the motion implies
> no view of the merits of the agreement and confers no immunities on the settling
> parties.  It is not as if the settlement agreement were embodied in a consent
> decree.  Such a decree is judicially enforceable and the judge in issuing it must
> determine that it does not offend public policy, as by harming third parties, before
> he can approve it.  *A settlement agreement that merely motivates the dismissal of
> a suit is not a judicial order*, and the dismissal does not insulate it from legal
> challenge.

*SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill.

2003) (internal citation omitted; emphasis added) (holding that alleged illegality of settlement

agreement between manufacturers was not the type of injury to a non-settling supplier which

would justify the court's denial of voluntary dismissal motion).

The GSK-Apotex so-called "court decision" here consists of three "Whereas" clauses

followed by a "Therefore" clause.  It is entitled "Stipulation of Dismissal Pursuant to Fed. R.

Civ. P. 41."  Even Apotex in its brief does not contend that this document "holds" anything.

Indeed, Apotex is hard-pressed to describe it as a "court decision" at all,[4] instead referring to it

as the court's "order."  (*See, e.g.*, Apotex Br. at 2, 10, 11, 14.)

Apotex does not refer to any "finding" by the court, nor could it, because the court did

not "find" anything.  Nonetheless, Apotex tries to create the impression that the stipulation of

dismissal followed a protracted litigation:  "As the litigation progressed, GSK realized that

---

[4] When it does so, Apotex puts the term in quotes.  (Apotex Br. at 10 ("Apotex Obtains A
'Decision Of A Court' that Triggers Any 180-Day Exclusivity . . . .").)

Apotex's ANDA products would not infringe the '658 patent." (Apotex Br. at 10.)  In reality, it

was over in months.  The complaint was filed in January 2005, and the stipulation of dismissal

was entered four months later, in May 2005.  Nothing of substance happened in that brief period;

nor could it have, as the case was settled even before the Rule 16 conference was held.  *See*

Docket for *GSK v. Apotex*, attached as Exhibit 7 to the McCalmon Decl.; Fed. R. Civ. P. 16(b);

Fed. R. Civ. P. 26(f).

There is no indication that the judge even reviewed the GSK Stipulation.  It is apparent

that the parties' underlying agreement – the Covenant Not to Sue and Stipulation of Non-

Infringement of U.S. Patent No. 5,344,658 – was not even presented to Judge Linares.  Notably,

although it is purportedly incorporated by reference in the GSK Stipulation, it is not attached to

the copy of the GSK Stipulation "so-ordered" by the judge.  (*See* Exhibit E to Exhibit B of the

Tsien Decl.)  Instead, it is submitted in Exhibit D to Exhibit B of the Tsien Decl. as a separate

document.  Tellingly, the ECF docketing lines denoting the filing of the GSK Stipulation show

the document to be comprised of only three pages.  Thus, the Stipulation of Dismissal Pursuant

to Fed. R. Civ. P. 41 lacks the requisite judicial imprimatur, or any judicial involvement

whatever, and constitutes no more than a private settlement agreement between Apotex and

GSK.

> **F.    Apotex's Argument That FDA Is Acting Unreasonably by Treating Court Decisions That Trigger the 180-Day Exclusivity Period Differently From Those That Terminate the 30-Month Stay Is Unfounded**

Apotex argues that FDA's refusal to treat the May 2005 GSK Stipulation as a triggering

court decision is arbitrary, capricious and contrary to law because it is inconsistent with the

FDA's treatment of that same order as being sufficient to terminate the 30-month stay of ANDA

approval.  Apotex's argument is nothing more than an afterthought.  Apotex never raised this

issue in its previous appearances before this Court and the D.C. Circuit, very likely because

Apotex knows that the 30-month stay and 180-day exclusivity period are two different features of the Hatch-Waxman Act that serve two different purposes.  Only now, after both this Court and the D.C. Circuit have unequivocally endorsed FDA's holding on the merits standard, does Apotex press this point in a last-ditch attempt to create an issue where there is none.  Nothing in the statute requires the approach Apotex advocates.

In order for Apotex to assert that FDA's interpretation of court decision is inconsistent, Apotex must show that the language and the policy behind each provision is the same.  Apotex cannot dispute that Congress chose to use different words to define "court decision" in each provision.  While the 30-month stay provision explicitly accounts for termination of a suit based on settlement orders, there is no similar language in the 180-day exclusivity trigger provision.  The fact that Congress chose to use different language tends to undermine any presumption that the interpretation of "court decision" in each provision would necessarily be the same.  *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words.").  FDA's holding-on-the-merits standard is close to the statutory language of the 180-day exclusivity trigger in 21 U.S.C. § 355(j)(5)(B)(iv)(II) (2002):  "the date of a decision of a court . . . holding the patent . . . to be invalid or not infringed."

Moreover, Apotex has utterly failed to articulate the policy behind each provision and why those policies would compel the same interpretation of "court decision" for purposes of terminating the 30-month stay and triggering the 180-day exclusivity.  Indeed, the purposes behind the two – and how they operate – are very different.

24

The first significant difference is the reach of each provision.  When Apotex entered into its Rule 41 dismissal, it was the only generic company whose 30-month stay would or could have been triggered.  Apotex and GSK had control over the Rule 41 dismissal – since it does not require court approval – and they contracted for language that impacted them in a manner which they found suitable.  It is a far different thing to say that two parties can enter into a private agreement which will have the effect of triggering someone else's (180-day exclusivity) rights.  Apotex's Rule 41 dismissal did not impact any other generic company's 30-month stay.  It is hard to see why it should impact someone else's 180-day marketing exclusivity rights.

Another significant difference is that the 30-month stay is for the benefit of the innovator, while the 180-day exclusivity is for the benefit of the first-filer.  If the branded company chooses to sue, it automatically invokes the 30-month stay.  If it discontinues its suit, for whatever reason, it should and does give up its stay.  The result could hardly be different.  Surely no one would argue that if the brand company filed a complaint against a second filer, and then took a voluntary dismissal even before an answer, that this act should trigger the first-filer's exclusivity even though it appropriately terminates the 30-month stay that automatically came into existence when the complaint was filed.[5]

Congress' intent and the FDA's interpretations over the years have always been to permit the generics to launch, but not to force them to do so at risk.  Indeed, when courts previously held that a triggering "court decision" could be a district court decision, Congress stepped in to assure that generic companies were not forced to launch at risk prior to final court of appeals

---

[5] The express provision in the statute permitting the court to shorten the 30-month stay based on lack of cooperation in expediting the action indicates that the stay is predicated on the notion that the patent holder is actively pursuing the litigation.  21 U.S.C. § 355(j)(5)(B)(iii).  It is clear that the stay is intended solely to give the patent holder a reasonable opportunity to do so.  The dismissal of the lawsuit means, by definition, that the patent holder is not pursuing the infringement action and there is no interest to be protected.

decisions.  This rationale supports interpreting "court decision" more liberally for the 30-month

stay than for the 180-day marketing exclusivity.

A liberal rule on ending 30-month stays permits (but does not require) the generic to

launch once its case ends.  A more restrictive rule on triggering the 180-day marketing

exclusivity does the same for the first-filer – the first-filer can wait until a litigation is complete

on the merits before launching, and not be forced to launch merely because some other company

has had its case dismissed.  Thus, FDA's holding-on-the-merits approach to determine what

court decisions will trigger the 180-day exclusivity period prevents the value of that exclusivity

from being diminished or completely eliminated.

In short, it is not inconsistent with either the statutory language or Congressional intent

for FDA to apply its holding-on-the-merits approach to the court-decision trigger of 180-day

marketing exclusivity even if that narrow approach is not required by the 30-month stay

provision.  Neither the language of the statute nor the Congressional intent embodied in the

statute requires the meaning of "court decision" in the 30-month stay and 180-day exclusivity

trigger provisions to be coextensive.  *See United States v. Cleveland Indians Baseball Co.*, 532

U.S. 200, 212-16 (2001) (different statutory contexts of worker eligibility for Social Security

benefits and "administrability" of tax rules justify different interpretations); *Robinson v. Shell Oil

Co.*, 519 U.S. 337, 342-43 (1997) (term "employees" means current employees only in some

sections of the Title VII of Civil Rights Act, but in other sections includes former employees);

*Baker Norton Pharm. Inc. v. FDA*, 132 F. Supp. 2d 30, 35-36 (D.D.C. 2001) ("What one

statutory provision defines as 'drug' may not necessary [sic] control another statutory provision's

definition of a 'drug' . . . .").  Thus, Apotex's attempt to cast doubt on FDA's holding-on-the-

merits standard by suggesting that FDA is applying district court decisions inconsistently is nothing more than a red herring.

### G. FDA's Interpretation of the Court-Decision Trigger Does Not Nullify That Provision or Encourage Brand Company Manipulation of the Hatch-Waxman Process

Apotex invokes the canon of statutory interpretation against adopting a construction that renders a provision of a statute inoperative or superfluous, and asserts that FDA's interpretation violates this principle by "nullifying the court decision trigger of the 180-day generic exclusivity provision." (Apotex Br. at 26.)

Contrary to Apotex's assertion, nothing in FDA's interpretation of the court-decision trigger forecloses later-filers, like Apotex, from obtaining a triggering court decision. A second or later filer can obtain a final decision of invalidity, unenforceability or noninfringement before a first-filer and thereby trigger the first-filer's 180-day exclusivity. Indeed, nothing in the statutory scheme confers on the first-filer any special privileges or benefits that guarantee resolution of its case before subsequent filers. FDA's holding-on-the-merits rule operates after a litigation is over, whether it is the first or a later-filer's litigation, and cannot operate to prevent a later-filer from obtaining a court decision that will trigger the exclusivity period.

Indeed, stripped of its varnish, Apotex's dissatisfaction with FDA's rule is not that a later-filer is foreclosed from obtaining a court decision that will trigger the exclusivity period, but rather that FDA will not sanction the short-cut approach that Apotex mistakenly argues Congress intended to include in the court-decision trigger. Stated another way, Apotex's complaint is that for purposes of deciding whether the 180-day exclusivity period is triggered, FDA should not be permitted to draw any distinctions between a stipulation of dismissal based on an agreement of the parties that a patent is not infringed, and a decision of the court reflecting

27

a holding-on-the-merits. But this is ground that has already been covered. The D.C. Circuit has ruled that FDA's holding-on-the-merits rule is reasonable.

Equally unavailing is Apotex's assertion that FDA's holding-on-the-merits rule will allow brand companies to "manipulate the system in order to block or delay generic competition" by entering into Rule 41 dismissals to avoid triggering exclusivities. (Apotex Br. at 27.) But surely Apotex cannot contend that a brand company is manipulating the system when it does not sue an ANDA filer after it concludes (presumably based on the notice that the ANDA applicant is statutorily required to give) that the ANDA-filer's product does not infringe. Moreover, it must be equally the case that the branded company has behaved appropriately where, as here, it receives inadequate information on noninfringement, is forced to commence suit, and promptly dismisses the suit pursuant to Rule 41 when the appropriate information is belatedly provided.

The far greater concern is that brand companies could easily discourage all paragraph IV filings by triggering exclusivities and removing the incentive to challenge their Orange Book-listed patents by simply filing meritless suits against later filers and then dismissing them. The holding-on-the merits approach "preserves the incentive for companies to undertake the very substantial risks and costs associated with patent challenges" and, in that way, "it is congruent with the intent of Congress as expressed through the plain language of the statute." *Apotex I*, U.S. Dist. LEXIS 20894, at *36. Maintaining the "incentive structure adopted by the Congress" is critical, as the D.C. Circuit recognized again this week. *Ranbaxy Labs.*, 2006 WL 3289050, at *5.

Plainly, the rule Apotex is advocating is more likely to encourage manipulation harmful to the incentive structure of the Hatch-Waxman Act than the rule that FDA has chosen.

H.     **FDA's Interpretation of the Court-Decision Trigger Does Not Conflict with Congressional Intent**

Apotex asserts that FDA's refusal to treat the GSK Stipulation as a "court decision" produces absurd results that conflict with Congressional intent in enacting the Hatch-Waxman Act.  (Apotex Br. at 28-30.)  Both this Court and the D.C. Circuit have already considered whether FDA's holding-on-the-merits approach conflicts with Congressional intent.  And, as Apotex is well aware, both this Court and the D.C. Circuit have determined that it does not. Indeed, this Court explicitly found that FDA had considered Congressional intent in interpreting the court-decision trigger:

> FDA "brought its experience and expertise to bear" utilizing its resources and fulfilling its statutory mandate by carefully considering the statute's text, balancing the advantages and drawbacks of each approach, considering the competing policy interests that underlie the statute, *examining the possible implications of congressional intent*, and ultimately exercising its delegated discretion to choose from among the available options.

*Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *35 (citations omitted; emphasis added).

Nevertheless, Apotex insists on asserting that FDA's refusal to recognize a stipulation of dismissal as a court-decision trigger "undeniably delays generic competition in direct contravention of Congress' express intent."  (Apotex Br. at 28.)  In reality, it is Apotex's position that would undermine the goal of bringing low-cost generic drugs to the public because an expansive interpretation of the court-decision trigger would undoubtedly diminish the value of the exclusivity period to generics.  This in turn would result in fewer patent challenges because generic companies would be less motivated to challenge brand-company patents, which, ultimately, would translate into fewer generic drugs.  It is for exactly this reason that this Court rejected this very argument in *Apotex I*:

> [The holding-on-the-merits approach] preserves the incentive for companies to undertake the very substantial risks and costs associated with patent challenges; it is congruent with the intent of Congress as expressed through the plain language

of the statute; it facilitates certainty and consistency on an industry-wide basis; it
offers heightened ease of administration; and it reduces opportunities for lengthy,
costly, and repetitive litigation.  By facilitating patent challenges and reducing
complex litigation, the holding-on-the-merits approach *actually furthers the very
policy that Apotex claims it undermines – the goal of getting more low-cost
generic products into the hands of consumers as quickly as possible.*

*Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *36 (citations omitted; emphasis added).

Thus, far from rewriting the statute, by adopting the holding-on-the-merits approach,

"FDA has properly adopted an interpretation [of the court- decision trigger] that hews closely to

the terms chosen by Congress to express its legislative intent."  *Id*. at *37.  FDA's refusal to

recognize the GSK Stipulation as a triggering court decision is, therefore, not arbitrary,

capricious, or contrary to law.

Accordingly, Apotex has not and cannot show that it is likely to succeed on the merits of

its claim.  As Apotex cannot even meet the first factor for securing injunctive relief, the Court

need not even reach the other factors:  that the plaintiff would suffer irreparable injury if the

requested injunction is denied; that an injunction will not substantially injure the opposing

party or other third parties; and that the public interest will be furthered by the issuance of the

injunction.  *See Apotex II*, 449 F.3d at 1253-54 (finding no need to address the other preliminary

injunction factors since Apotex had not shown the likelihood of succeeding on the merits of its

claim).  But – even if the Court decides to consider these additional preliminary injunction

factors – Apotex cannot make the requisite showings on any of those other preliminary

injunction factors, either.

## II.    The Balance of Harms Strongly Favors DRL

### A.    Apotex Will Not Suffer Irreparable Injury and This Court and the D.C. Circuit So Found on a Nearly Identical Record

The irreparable injury requirement erects a very high bar for Apotex.  *See Varicon Int'l v.

OPM,* 934 F. Supp. 440, 447 (D.D.C. 1996).  Apotex must show that it will suffer harm that is

"more than simply irretrievable." *See Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981). In this jurisdiction, harm that is "merely economic" in character is not sufficiently grave to meet this standard. *Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *53; *see Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42-44 (D.D.C. 2000).

To satisfy the irreparable harm requirement by demonstrating a potential economic loss Apotex must establish that the economic harm is so severe as to "cause extreme hardship to the business" or threaten its very existence. *See Gulf Oil*, 514 F. Supp. at 1025; *see also Wisconsin Gas,* 758 F.2d at 674; *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96-97 (D.D.C. 2003); *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury,* 193 F. Supp. 2d 6, 14 (D.D.C. 2001). Even as described by Apotex, its potential harm is completely speculative and essentially immaterial to a company like Apotex. Apotex is a large and prosperous company and will remain so regardless of the outcome of this case. How and when generic ondansetron first reaches the commercial U.S. market can have no material impact on Apotex whatsoever. As this Court recently found:

> Apotex "produces more than 260 generic pharmaceuticals in approximately 4000 dosages and formats which, in Canada, are used to fill over 60 million prescriptions a year-the largest amount of any pharmaceutical company in [Canada]." *See* http://www.apotex.com/CorporateInformation/Default.asp?/ flash=Yes (last visited Apr. 18, 2006). Moreover, Apotex reaps annual revenues that total approximately $700 million USD. *Id.* (boasting annual revenue of more than $800 million in Canadian currency).

*Apotex I*, U.S. Dist. LEXIS 20894, at *56.

Moreover, given Apotex's current financial windfall stemming from its August 8, 2006 launch of generic Plavix, Apotex's claimed damages here ($11.7 million in year one) cannot

credibly be characterized as anything near the level required for the relief it seeks.  Apotex's

chief executive Barry Sherman characterized its generic Plavix launch as the "largest and most

successful launch" of a generic drug in history.  *See* "Marketers of Plavix Outfoxed on a Deal,"

*New York Times*, August 9, 2006 (attached as McCalmon Decl. Ex. 8) ("Some analysts predicted

yesterday that by the time a federal judge in New York could rule on the big companies' request

to block the drug's sale, based on their patent that runs until late 2011, Apotex could have up to

$1 billion of its product on the market.").

      In fact, even before its recent windfall, Apotex made virtually the same irreparable harm

claim and lost.  The core evidence Apotex offers this Court – the Declaration of Tammy L.

McIntire (attached as Exhibit D to the Tsien Decl.) – is essentially a copy of Ms. McIntire's

declaration from *Apotex I* regarding generic pravastatin.  (Both McIntire Declarations are

attached as Exhibits 5 and 6, respectively, of the McCalmon Decl.)  Even a cursory examination

of the two declarations shows that they are essentially identical, but for the swapping of "DRL"

for "Teva and Ranbaxy," and the pertinent information concerning "ondansetron" for

"pravastatin."  Even the alleged damages numbers are substantially the same: $11.7 million here

vs. $9.9 million in the pravastatin case.[6]  (*Compare* McCalmon Decl. Ex. 5 (Ms. McIntire's

declaration in this case), ¶ 18 *with* ¶ 15 of her declaration in the pravastatin case.  (McCalmon

Decl. Ex. 6.).)

      There is no reason why this Court should now find Ms. McIntire's declaration persuasive

when it found her prior, essentially identical declaration entirely unpersuasive.  *See Apotex I*,

2006 U.S. Dist. LEXIS 20894, at *55-56.  This Court's ruling was upheld by the D.C. Circuit,

---

[6] DRL questions the accuracy of that figure at least because neither Apotex nor its declarant
explains how it is derived.  DRL asserts that Apotex's "loss" here would be approximately $1
million during the 180-day marketing exclusivity period.  (*See* Declaration of Amit M. Patel
¶ 10.)

and the same result should obtain.  The facts are the same.  The law is correct.  There is no basis for a different decision.

The remainder of Apotex's purported harm is nothing more than the usual and common commercial landscape faced by any generic pharmaceutical company entering the marketplace after patent expiration followed by an award of exclusivity to another pharmaceutical company. While Apotex has exaggerated the perils of entering such a market, there are indeed obvious and significant benefits to the generic company who obtains an exclusivity and starts marketing first. *See, e.g.,* McIntire Decl. ¶ 13 (McCalmon Decl. Ex. 5).  Those benefits matter greatly to DRL for the reasons that Apotex explains.  However, Apotex makes no argument that FDA should grant exclusivity to Apotex, and thus Apotex cannot earn any of these benefits even if it prevails. Apotex's harm clearly is not irreparable.

Finally, to the extent that any of Apotex's purported "lost investment" harm is real, Apotex knew, at least as of *Apotex I* that its position was contrary to the law.  If Apotex nevertheless elected to bet on the vanishingly-small chance that the law would subsequently change in its favor, it cannot fault anyone but itself if its investment does not pay off because the law remains the same.

### B.    DRL Will Suffer Far More Than Apotex

DRL has invested significant resources in developing its generic ondansetron tablets, shepherding its administrative filings through FDA, and litigating against GSK for years in a hard-fought case through trial that resulted in a settlement.  Because DRL was the first to file an ANDA application for ondansetron containing a paragraph IV certification as to the '658 patent, DRL deserves its 180-day exclusivity period.  This exclusivity has great worth, and will have substantial and long-term benefits thereafter.  (*See* the accompanying Declaration of DRL Vice President, Amit M. Patel, ¶¶ 7-9.)  Thus, the award of this exclusivity is precisely the type of

benefit envisioned by the drafters of the Hatch-Waxman Act to urge companies like DRL to challenge patents and introduce lower-cost generic drugs as early as possible.

The D.C. Circuit has explicitly held that the type of loss potentially *faced by DRL* here is sufficiently irreparable to defeat Apotex's motion because it is the loss of a statutory entitlement. *See, e.g., Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1067 n.6 (D.C. Cir. 1998) (noting the first-filer "would be harmed by the loss of its 'officially sanctioned head start'"). Thus, DRL's loss is not "merely economic." *See Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *58. DRL faces exactly same type of harm here that Teva faced in Apotex's challenge to FDA's award of exclusivity to Teva concerning pravastatin. For exactly the same reasons that this Court held Teva's potential harm greatly exceeded that of Apotex, this Court should find that DRL's potential harm here greatly exceeds that of Apotex. *See id*. at *57 ("[E]ach of the intervenor-defendants stands to lose a much greater sum if the launch of their generic products is delayed. Particularly where Apotex has made a very weak showing of likely success on the merits, that balance of harms is fatal to its request for emergency injunctive relief.").

## III.    The Public Interest Strongly Favors Denying Apotex the Relief It Seeks

Apotex asserts three reasons why the public would purportedly benefit from the injunctive relief that Apotex seeks: (1) the public benefits when FDA gets it right; (2) Apotex's position fosters expedited "full" generic competition; and (3) the public benefits from the earliest full generic competition. (Apotex Br. at 30.) None of these goals truly supports Apotex here.

DRL agrees that everyone benefits when FDA rules consistently and in conformance with controlling statutory language. Of course, DRL insists FDA has already done so, and both this Court and the D.C. Circuit have previously agreed. *See Apotex I*; *Apotex II*.

If there were no 180-day marketing exclusivity, it is true that Apotex's position could result in faster "full" generic competition because all generic companies, including Apotex,

could theoretically enter the ondansetron market six months earlier than if there were exclusivity. However, Apotex's position ultimately undermines the primary benefit that the Hatch-Waxman Act offers to generic companies:  the 180-day exclusivity.  If generic companies like Apotex are able to trigger the exclusivity of other generic companies merely by stipulating to uncontested non-infringement, that prospect would ultimately chill the incentive of all generic companies to undertake patent challenges that could result in earlier generic product launches.  Thus, as this Court found, the public interest supports upholding exclusivity.  *See Apotex I*, 2006 U.S. Dist. LEXIS 20894, at *60-62.

## CONCLUSION

For the foregoing reasons, this Court should preserve the status quo and deny Apotex's

motion for preliminary injunction.

November 17, 2006                          Respectfully Submitted,


                                   _____/s/ Brian K. McCalmon_____
                                   John Longstreth, D.C. Bar No. 367047
                                   Brian K. McCalmon, D.C. Bar No. 461196
                                   PRESTON GATES ELLIS
                                       & ROUVELAS MEEDS LLP
                                   1735 New York Avenue, N.W.
                                   Suite 500
                                   Washington, DC 20006-5209
                                   (202) 628-1700
                                   (202) 331-1024 (facsimile)

                                   _____/s/ Andrew J. Miller_____
                                   Andrew J. Miller
                                   Stuart D. Sender
                                   Bruce D. Radin
                                   BUDD LARNER P.C.
                                   150 John F. Kennedy Parkway
                                   Short Hills, New Jersey 07078-2703
                                   (973) 379-4800
                                   (973) 379-7734 (facsimile)

                                   *Counsel for Intervenors-Defendants*
                                   *Dr. Reddy's Laboratories, Ltd. and*
                                   *Dr. Reddy's Laboratories, Inc.*

Case No. 06-1890 (RMC)

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 1 of 8
Attachment 9 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

LEXSEE 2006 U.S. DIST LEXIS 20894

**Apotex, Inc., Plaintiff. v. FOOD AND DRUG ADMINISTRATION, et al., Defendants, and TEVA PHARMACEUTICALS USA, INC., Intervenor-Defendant, and RANBAXY PHARMACEUTICALS, INC., Intervenor-Defendant.**

**Civil Action No. 06-0627 (JDB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2006 U.S. Dist. LEXIS 20894*

**April 19, 2006, Decided**
**April 19, 2006, Filed**

**SUBSEQUENT HISTORY:** Injunction denied by *Apotex, Inc. v. FDA, 2006 U.S. App. LEXIS 10561 (D.C. Cir., Apr. 24, 2006)*
Affirmed by, Remanded by *Apotex, Inc. v. FDA, 449 F.3d 1249, 2006 U.S. App. LEXIS 13841 (D.C. Cir., June 6, 2006)*
Affirmed by, Motion granted by *Apotex, Inc. v. FDA, 2006 U.S. App. LEXIS 14086 (D.C. Cir., June 6, 2006)*

**PRIOR HISTORY:** *Teva Pharms. USA. Inc. v. FDA, 370 U.S. App. D.C. 192, 441 F.3d 1, 2006 U.S. App. LEXIS 6384 (D.C. Cir., 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After a separate suit's remand, defendant Food and Drug Administration (FDA) reconsidered an earlier decision that the exclusivity period of 21 U.S.C.S. § 355(j)(5)(B)(iv) (amended) of the Drug Price Competition and Patent Term Restoration Act of 1984 was triggered by plaintiff drug company's dismissal of a prior action. The company filed suit for a preliminary injunction preventing approval of intervenor-defendant companies' generic drug.

**OVERVIEW:** "Decision" and "holding" in § 355(j)(5)(B)(iv)(II) were latently ambiguous. A natural, and thus permissible, construction of that language required a judicial decision addressing the merits of a patent infringement or invalidity action. The FDA's letter opinion following remand thus correctly began with the statute's plain language. The appellate court had not invalidated the holding-on-the-merits interpretation that the FDA now advocated nor established a substantive rule regarding the proper construction of the court-decision trigger. The FDA's prior failure to justify its holding-on-the-merits approach was what prompted remand, after which it articulated many reasons for its decision to abandon the case-by-case method, reject the estoppel approach, and adopt the holding-on-the-merits approach. The holding-on-the-merits approach did not nullify the crucial declaratory judgment mechanism; it only nullified manipulating it. Congress focused on the nature of the dismissal, not its practical effect, and the agency's holding-on-the-merits approach furthered that scheme. The drug company's harm was merely economic, but the other companies' harm was the loss of a statutory entitlement.

**OUTCOME:** The motion for a preliminary injunction was denied.

**LexisNexis(R) Headnotes**

*Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act*
*Patent Law > Infringement Actions > Exclusive Rights > Limitations*

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 2 of 8
Attachment 9 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO
Case No. 06-1890 (RMC)

[HN1] The Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C.S. § 355, provides a 180-day period of generic exclusivity to the first company that files an Abbreviated New Drug Application (ANDA) containing a "paragraph IV certification" for a patent connected to the branded version of the drug. 21 U.S.C.S. § 355(j)(5)(B)(iv). A "paragraph IV" certification alleges that the relevant patent is either invalid or will not be infringed by the proposed ANDA product. 21 U.S.C.S. § 355(j)(2)(A)(vii)(IV). The exclusivity period begins on the earlier of two dates: (1) the date on which the Secretary of the Food and Drug Administration receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application or (2) the date of a decision of a court holding the patent which is the subject of the certification to be invalid or not infringed. 21 U.S.C.S. § 355(j)(5)(B)(iv)(II).

*Administrative Law > Agency Adjudication > Decisions > Contents*
*Administrative Law > Judicial Review > Administrative Record > General Overview*
*Administrative Law > Judicial Review > Standards of Review > General Overview*
[HN2] Agency action must be supported by thorough, reasoned decisionmaking. An order may not stand if the agency has misconceived the law.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Elements > Balance of Hardship*
*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders*
[HN3] When considering a motion for preliminary injunction or temporary restraining order, a court must weigh four factors: (1) the prospective irreparable injury to the movant in the event that the requested relief is denied; (2) the possibility of harm to other parties in the event that the relief is granted; (3) the likelihood that the movant will prevail on the merits; and (4) the public interest. These factors interrelate on a sliding scale and must be balanced against each other, such that a particularly strong showing with respect to one may compensate for a weaker showing with respect to another. Specifically, the "likelihood of success on the merits" inquiry is inversely proportional to the "degree of irreparable harm" inquiry -- that is, a court may grant the sought-after relief when the movant is very likely to succeed on the merits, in the face of a lesser degree of potential irreparable injury.

*Civil Procedure > Judgments > Entry of Judgments > Stays Pending Appeals > Nonmoney Judgments*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders*
[HN4] Where a plaintiff has also moved for a stay pending appeal in the event that it does not prevail on its motion for a temporary restraining order or preliminary injunction, that request is analyzed under the same four-pronged legal framework that applies to the motion for temporary restraining order and preliminary injunction.

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
[HN5] Pursuant to the provisions of the Administrative Procedure Act, a court may vacate an agency's decision if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, 5 U.S.C.S. § 706(2)(A), or in excess of statutory authority, 5 U.S.C.S. § 706(2)(C). Agency actions are entitled to much deference, and the standard of review is narrow. The reviewing court is not permitted to substitute its judgment for that of the agency. That is, it is not enough for the agency decision to be incorrect -- as long as the agency decision has some rational basis, the court is bound to uphold it. The court may only review the agency action to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
[HN6] At step one of a Chevron analysis of an agency's action, the court first must inquire whether the statute speaks clearly to the precise question at issue. If so, then the analysis proceeds no further -- the court must give effect to the

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 3 of 18
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

unambiguously expressed intent of Congress. If, however, the statute is not clear in relation to the specific issue before the court, then under Chevron step two, the court must consider whether the agency's interpretation is supported by a "permissible construction" of the statute. But the court will only reach the second inquiry under Chevron if it determines that the statute is silent or ambiguous with respect to the specific issue presented. The existence of ambiguity is not enough per se to warrant deference to the agency's interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to the agency to cure that ambiguity. Hence, under the Chevron step two deferential analysis, if the statute is ambiguous in such a way as to make the agency's decision worthy of deference, then the court should uphold the agency's interpretation of the ambiguous statute as long as that interpretation is "permissible," that is, if it is "reasonable."

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
[HN7] When the agency decision is based upon its interpretation of the statute that it is charged with administering, a court's deference to the agency is at its apex. Where the agency is interpreting its own statute, the appropriate degree of deference will be determined based upon the circumstances surrounding that interpretation. An agency will receive utmost deference if it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.

*Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act*
[HN8] The Food, Drug, & Cosmetic Act, pursuant to 21 U.S.C.S. § 371(a), grants explicit authority to the Food and Drug Administration (FDA) to promulgate regulations for the efficient enforcement of the statute. Similarly, the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C.S. § 355, permit the FDA to promulgate regulations that are necessary for the administration of those amendments. 21 U.S.C.S. § 355 note.

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Administrative Law > Judicial Review > Standards of Review > Rule Interpretation*
*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
*Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act*
[HN9] The Food and Drug Administration's (FDA) interpretations of the Food, Drug, & Cosmetic Act receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations. The FDA is entitled to the same "substantial deference" whether the court is viewed as assessing the agency's interpretation of its statute or its implementing regulation. It makes no difference, moreover, that an administrative determination is embodied in a decision letter rather than in a rulemaking or formal adjudication; Chevron deference still applies.

*Civil Procedure > Remedies > Injunctions > Elements > Likelihood of Success*
[HN10] To obtain emergency injunctive relief, the plaintiff need not prevail on each factor of the four-pronged calculus. Nevertheless, the "likelihood of success on the merits" inquiry is the most salient consideration because a plaintiff's failure to prevail on that prong necessitates an unusually strong showing as to the remaining three factors in order to turn the tide in its favor.

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*
*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
[HN11] At step one of the Chevron analysis of an agency's action, the mere possibility of more than one meaning, in a given context, for a statutory word or phrase is sufficient to warrant further inquiry into the agency's deliberative process. Under such circumstances, the text and reasonable inferences from it do not give a clear answer against either interpretation. In determining whether a statutory provision speaks directly to the question before it, a court must consider it in context.

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 4 of 18
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

***Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation***
[HN12] It is perfectly appropriate for an agency to consider administrative convenience as one component of the overall mix of factors when developing an interpretive approach.

***Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review***
***Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation***
[HN13] The reasonableness of the agency's approach in practice plays an important part in the Chevron step two analysis. An approach that is practically infeasible may thus prove not to be a permissible construction of the statute.

***Administrative Law > Judicial Review > Reviewability > Standing***
***Civil Procedure > Justiciability > Standing > General Overview***
***Constitutional Law > The Judiciary > Case or Controversy > Standing > Particular Parties***
***Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act***
[HN14] As long as the party filing a declaratory judgment action under the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C.S. § 355, meets the "case or controversy" requirements of U.S. Const. art. III (meaning that it has a reasonable apprehension of suit by the branded product manufacturer), that party may seek a court decision that qualifies as a triggering event under the statute.

***Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review***
***Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation***
[HN15] The act of analyzing competing policy concerns against the backdrop of the statutory landscape that Congress has placed in its charge is the quintessential function of an administrative agency. It is precisely the province of the agency to choose from among the permissible constructions and competing policy interests of a statute after assessing the benefits and disadvantages of each, and the court may not substitute its judgment for that of the agency. Under Chevron's highly deferential standard, it matters not which is the better or even the correct interpretation, as long as the one advocated by the agency is not entirely irrational. This is particularly so in an administrative context that is admittedly fraught with complications and conflicts. Where an agency has been given substantial authority over an ambiguous statute in a complex arena, and has chosen a method that it believes properly strikes the delicate balance between competing legislative policies, thereby filling the gap left by Congress, the deference to which the agency is entitled is at its apex. So long as the agency's interpretation is "permissible," that is, if it is "reasonable," it must be upheld under Chevron.

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
[HN16] By its very nature, summary judgment requires the weighing of substantive arguments and necessitates legal analysis -- the court is required to determine that there is no genuine dispute of material fact, and the moving party is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c).

***Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm***
[HN17] The irreparable injury requirement erects a very high bar for a movant seeking a preliminary injunction. A plaintiff must show that it will suffer harm that is "more than simply irretrievable." Harm that is merely economic in character is not sufficiently grave under this standard. To successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business or threaten its very existence. To warrant emergency injunctive relief, the harm alleged must be certain, great, actual, and imminent. Where a plaintiff has not established a likelihood of success on the merits, its showing of irreparable harm must be very strong.

***Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm***
[HN18] Losing a statutory entitlement is a harm that has been recognized as sufficiently irreparable for purposes of a preliminary injunction. Once the statutory entitlement has been lost, it cannot be recaptured.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 5 of 18
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
[HN19] Where an agency is administering a statute that has been placed within its charge and has no financial interest in the outcome, its interest is deemed to be aligned with that of the public for purposes of a preliminary injunction.

**COUNSEL:** [*1] For APOTEX INC., Plaintiff: Arthur Y. Tsien, OLSSON, FRANK AND WEEDA, PC, Washington, DC, LEAD ATTORNEY, ATTORNEY TO BE NOTICED; William A. Rakoczy, RAKOCZY MOLINO MAZZOCHI, LLP, Chicago, IL, LEAD ATTORNEY, ATTORNEY TO BE NOTICED.

For FOOD AND DRUB ADMINISTRATION, MICHAEL O. LEAVITT, Secretary of Health and Human Services, ANDREW VON ESCHENBACH, Acting Commissioner of Food and Drugs, Defendants: Andrew E. Clark, US DEPARTMENT OF JUSTICE, Washington, DC, LEAD ATTORNEY, ATTORNEY TO BE NOTICED.

For TEVA PHARMACEUTICALS USA, INC, Intervenor: Jay P. Lefkowitz, KIRKLAND & ELLIS LLP, Washington, DC, LEAD ATTORNEY, ATTORNEY TO BE NOTICED; John Caviness O'Quinn, KIRKLAND & ELLIS, LLP, Washington, DC, ATTORNEY TO BE NOTICED.

For RANBAXY INC., RANBAXY LABORATORIES LIMITED, RANBAXY PHARMACEUTICALS, INC., Inter-venors: Kate Cumming Beardsley, BUC & BEARDSLEY, Washington, DC, LEAD ATTORNEY, ATTORNEY TO BE NOTICED.

**JUDGES:** John D. Bates, United States District Judge.

**OPINION BY:** John D. Bates

**OPINION:**

### MEMORANDUM OPINION

Plaintiff Apotex, Inc. ("Apotex") seeks a temporary restraining order and preliminary injunction to prevent defen-dants Food and Drug Administration ("FDA"), Michael O. Leavitt [*2] in his capacity as the Secretary of Health and Human Services, and Andrew Von Eschenbach in his capacity as the Acting Commissioner of Food and Drugs, from granting final approval under the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), *21 U.S.C. § 355*, to intervenor-defendants Teva Pharmaceuticals USA, Inc. ("Teva") and Ranbaxy Pharmaceuti-cals, Inc. ("Ranbaxy") based upon their Abbreviated New Drug Applications ("ANDA") for pravastatin sodium ("pravastatin"), the generic version of the branded drug Pravachol (R). Although this action was actually filed prematurely in advance of the FDA's most recent decision, it is now effectively a challenge to the April 11, 2006 decision by the FDA issued to Apotex. For the reasons that follow, the Court will deny plaintiff's motion.

### BACKGROUND

#### I. Prior Proceedings

This action stems from an earlier case ("Teva III") in which Teva sued defendants pursuant to the Administrative Procedure Act, *5 U.S.C. § 706(2)(A)* ("APA"), and the Federal Food, Drug, and Cosmetic Act, *21 U.S.C. §§ 301 et seq.* ("FDCA"), challenging the [*3] determination that the dismissal of a previous action in the United States District Court for the Southern District of New York, Apotex Inc. v. Bristol-Myers Squibb Co., No. 1: 04-CV-2922 (S.D.N.Y.) ("Apotex-BMS litigation"), had triggered the 180-day exclusive marketing period to which Teva might otherwise be entitled under the provisions of the Hatch-Waxman Act. See *Teva Pharms. USA, Inc. v. FDA, 398 F. Supp. 2d 176, 179 (D.D.C. 2005)* ("Teva III Dist. Ct. Mem. Op."). n1 Apotex, the plaintiff here, was an intervenor-defendant in Teva III, and vigorously opposed Teva's effort to prevent the FDA from granting final approval to any other ANDA for generic pravastatin in the relevant dosage form and strength. See generally *398 F. Supp. 2d 176*. The complex factual background giving rise to Teva III -- including the underlying Apotex-BMS litigation -- is discussed in detail in this Court's October 21, 2005 decision and FDA's April 11, 2006 administrative decision on remand, and will not be repeated in full here.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 6 of 18
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

n1 [HN1] The Hatch-Waxman Act provides a 180-day period of generic exclusivity to the first company that files an ANDA containing a "paragraph IV certification" for a patent connected to the branded version of the drug. See *21 U.S.C. § 355(j)(5)(B)(iv)*. A paragraph IV certification alleges that the relevant patent is either invalid or will not be infringed by the proposed ANDA product. See *21 U.S.C. § 355(j)(2)(A)(vii)(IV)*. The exclusivity period begins on the earlier of two dates: (1) "the date on which the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application"; or (2) "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." See *§ 355(j)(5)(B)(iv)(II)*. At issue here is the latter triggering-even, referred to as the "court-decision trigger." For a full discussion of the intricate statutory landscape established by the Hatch-Waxman Act, see this Court's earlier opinion and the FDA's April 11, 2006 administrative decision.

[*4]

At the request of the parties, the motion for preliminary injunction in Teva III was consolidated with a trial on the merits pursuant to *Fed. R. Civ. P. 65(a)(2)*, and the Court treated the proceeding as "akin [to a motion for] summary judgment." *Id. at 181* & n. 1. On October 21, 2005, this Court ruled that because the Apotex-BMS litigation was dismissed for lack of subject matter jurisdiction at the request of the plaintiff in that case (Apotex), it constituted a private settlement agreement between the parties and, accordingly, was not "a decision of a court . . . holding the [relevant] patent . . . to be invalid or not infringed," as required by the plain language of the Hatch-Waxman Act and applicable FDA regulations, and, in this Court's view at the time, as contemplated by two prior decisions of the D.C. Circuit: (1) *Teva Pharms. USA, Inc. v. FDA, 337 U.S. App. D.C. 204, 182 F.3d 1003 (D.C. Cir. 1999)* ("Teva I"), and (2) Teva Pharms. USA, Inc. v. FDA, 2000 WL 1838303 (D.C. Cir. 2000) (unpublished disposition) ("Teva II"). See *398 F. Supp. 2d at 187-192*. [*5] n2 Hence, the Court concluded that FDA's decision was "arbitrary, capricious, or otherwise not in accordance with law" under the APA and granted Teva's motion for a preliminary injunction. *Id. at 179, 192*. Apotex and the FDA then appealed this Court's ruling to the D.C. Circuit. Apotex moved this Court for a stay pending appellate review in the D.C. Circuit, but the motion was denied because, based upon the circumstances at the time, Apotex faced no impending likelihood of irreparable injury and the balance of hardships did not tip decidedly in its favor. See *Teva Pharms. USA, Inc. v. FDA, 404 F. Supp. 2d 243, 244-46 (D.D.C. 2005)*.

n2 The factual background for, and decisions in, Teva I and Teva II are detailed in this Court's October 21, 2006 decision and the FDA's April 11, 2006 administrative decision.

Before the D.C. Circuit, the FDA stated that its administrative decision was based on the view that Teva I and Teva II constituted substantive rules of law [*6] establishing that dismissals of declaratory judgment actions for lack of subject matter jurisdiction are court decisions within the language of the Hatch-Waxman Act. See *Teva Pharms. USA, Inc. v. FDA, 370 U.S. App. D.C. 192, 441 F.3d 1, 5 & n. 5 (D.C. Cir. 2006)* ("Teva III"). The FDA represented that if it had understood that Teva I and Teva II stood only for the proposition that FDA had not sufficiently articulated the rationale in support of its administrative conclusions, then it would have reached the same conclusion as this Court reached in Teva III Dist. Ct. Mem. Op. See Pl.'s Exh. D. FDA's counsel all but promised that, on remand, FDA would adopt a "textual approach" to the statute, pursuant to which it would find that the Apotex-BMS dismissal did not qualify as a "decision of a court" and, accordingly, did not trigger the 180-day exclusivity period.

On March 16, 2006, the D.C. Circuit held that FDA had in fact operated under an erroneous interpretation of law -- namely, that Teva I and Teva II set forth substantive rules of law regarding what constitutes a "decision of a court" within the meaning of the Hatch-Waxman Act. See *Teva III, 441 F.3d at 5*. [*7] According to the panel, Teva I and Teva II did nothing more than reaffirm and apply the long-standing axiom of administrative law that [HN2] agency action must be supported by thorough, reasoned decisionmaking. See id. Because "'[a] n order may not stand if the agency has misconceived the law,'" id. (citing *SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S. Ct. 454, 87 L. Ed. 626 (1943)*), the panel vacated the Teva III Dist. Ct. Mem. Op. and remanded the case to this Court, with instructions to vacate FDA's agency decision and then remand to the FDA so that it could fulfill its statutory mandate to "'bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id. at 5* (quoting *PDK Labs., Inc. v. DEA, 360 U.S. App. D.C. 344, 362 F.3d 786, 797-98 (D.C. Cir. 2004)*). The panel clearly expressed a desire for bona fide agency action that would explicitly articulate a specific rationale -- oral representations during arguments before courts could not suffice as a substitute. Id. (stating that "the FDA's 'stated rationale for its decision is erroneous' and 'we cannot sustain its action on [*8] some other basis [it] did not mention,'" and describing the agency's statutory mandate and noting that it had

Case No. 06-1890 (RMC)

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 7 of 18
Attachment 9 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

not yet been fulfilled) (citing *PDK Labs., 362 F.3d at 798*). The D.C. Circuit also recalled that FDA had attempted to adopt a textual approach in Teva I, and hinted that, on remand, the agency would be expected to address the concerns expressed in Teva I regarding the reasonableness of such an approach. *Id. at 5 n. 5*.

## II. FDA's Decision on Remand

On remand, the FDA reconsidered its earlier decision in light of Teva III's pronouncement that Teva I and Teva II were purely procedural in nature. In a fifteen-page, single-spaced decision letter issued on April 11, 2006, the agency adopted a textual approach to the statute, under which, based upon the plain language of the Hatch-Waxman Act, only a decision of a court holding on the merits that a particular patent is invalid, not infringed, or unenforceable would suffice to trigger the 180-day exclusivity period. See Pl.'s Exh. A at 2, 6. The agency began by analyzing the meaning of the word "holding," referring to the definition adopted by the Seventh Edition of Black's [*9] Law Dictionary: "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Id. at 6-7 (citing BLACK'S LAW DICTIONARY at 737 (7th ed. 1999)). Based on this definition, the FDA concluded that, to be sufficient, the "holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits [as to the] invalidity, noninfringement, or unenforceability [of the relevant patent]." Id. at 7. Under this approach, the determination must address one or more of the actual "elements or grounds of a claim or defense [of patent invalidity, noninfringement or unenforceability]; the substantive considerations to be taken into account in [making that] decision, as opposed to extraneous or technical points, especially of procedure." Id. (citing BLACK'S LAW DICTIONARY, supra, at 1003).

FDA then assessed the first of three concerns expressed by the D.C. Circuit in Teva I and referred to in footnote five of Teva III -- whether a textual interpretation of the statute (as contrasted with the estoppel-based interpretation that Apotex advocates) n3 would [*10] lead to absurd results that undermine the purpose of the statute. Id. Recognizing that, in light of Teva III, the preference for an estoppel-based approach allegedly embodied in Teva I no longer constrains its decisionmaking process, FDA concluded that a textual approach is preferable because it gives substantive effect to the words chosen by Congress. Id. at 8. The estoppel-based approach would, in FDA's view, "render[] the terms 'decision,' 'holding,' and 'invalid or not infringed' superfluous, in contravention of accepted canons of statutory construction." Id. (citing *Bailey v. United States, 516 U.S. 137, 146, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995)*). The agency further expressed a concern that an estoppel-based approach would impose a large administrative burden by requiring it to resolve complex factual issues under the law in the absence of meaningful guidance from the courts. Id. at 8. FDA reasoned that the determination of whether one party is estopped from suing another is dependent upon a multifaceted composite of factual considerations and the legal consequences that flow therefrom, which it is admittedly "ill-equipped" to evaluate. Id. at [*11] 8, 9. Based upon its previous experience, FDA characterized the estoppel-based approach as arduous and impractical, often leading to uncertain and inconsistent results, and, as illustrated by the instant case, "inexorably spawning" perpetual litigation that undermines the statute's purpose of providing lower-cost generic alternatives to the public in an expedient fashion. Id. at 9. FDA concluded that following a textual interpretation of the statute, on the other hand, greatly improves the likelihood of industry certainty by facilitating consistency, dispenses with the inherent subjectivity that plagues an estoppel-focused analysis, and reduces the administrative burden by enabling the agency to look at the four corners of a court order to determine whether the exclusivity clock has been triggered. Id. at 9.

n3 The many contours, drawbacks, and advantages of the estoppel approach are detailed in this Court's earlier decision.

Addressing the second concern raised in Teva I, FDA considered whether [*12] a textual approach would be consistent with its regulation, *21 C.F.R. § 314.107(c)(1)*, recognizing unenforceability as a "separate basis for a court decision trigger." See id. at 9. The plain language of the regulation, FDA concluded, parallels the terms of the statute: the exclusivity clock is triggered as of "the date of a decision of a court holding the relevant patent invalid, unenforceable, or not infringed." *§ 314.107(c)(1)*; Pl.'s Exh. A at 10. Essentially, the only difference between the language of the regulation and that of the statute is that the former expressly provides for patent challenges based upon alleged unenforceability, whereas the latter does not. Pl.'s Exh. A at 10. Thus, "even if a patentee's representations have the apparent effect of rendering a patent unenforceable vis-a-vis a particular ANDA applicant, in the agency's view, a holding of unenforceability must result from a court's consideration of that issue on the merits, rather than FDA's evaluation of the effect of a patentee's statement." Id. at 10 (emphasis in original). From FDA's perspective, then, an estoppel-based approach "turns

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 8 of 18
Attachment 9 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

the statutory language [*13] on its head, by compelling FDA -- rather than a court" to "make a 'decision' and a 'holding' of unenforceability." Id.

Turning to the final issue raised by Teva I, FDA discussed two perceived inconsistencies in its prior decisionmaking, specifically: (1) how the conclusion that it reached in Teva I could be justified under the "case-by-case" approach allegedly adopted by the agency in its earlier guidance document; and (2) how it could have reached a different conclusion with respect to the court action at issue in Teva I and the court action at issue in another case, *Granutec, Inc. v. Shalala, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998)* (unpublished disposition). With respect to the guidance document, FDA pointed to "dramatic[] changes" in the regulatory landscape that have occurred since it considered the dismissal at issue in Teva I. Pl.'s Exh. A at 10. The Teva I opinion "suggested that [the agency] had failed to adopt any particular interpretation of the statute . . . [or] 'abide[]' by the commitments it made in the [guidance document]." Id. at 10-11. Subsequently, FDA had proposed a new approach, under which exclusivity [*14] would be forfeited if the clock had not been triggered within a particular amount of time. Id. at 11. The proposed rule was withdrawn in 2002 "in part due to [FDA's] belief that the Teva I 'holding was directly at odds with the [triggering-period] approach.'" Id. Thereafter, Congress significantly changed the 180-day exclusivity provision through the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), and FDA thought it unwise to waste precious resources drafting a regulation that would become less important in light of the MMA and perhaps be "vulnerable to challenge if it diverged from Teva I." Id. n4 The agency concluded its analysis by stating that it "is [now] independently interpreting the statute in accordance with the direction of the Teva III court" and adopting an interpretation that it considers "fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue." Id.

n4 The pre-MMA version of the statute applies to this case, and all statutory citations to the Hatch-Waxman Act and the FDCA are to the pre-amendment version of the statute.

[*15]

On the second consistency point, the dismissals at issue in Teva I and Granutec were both predicated on statements made by the manufacturers of the branded drugs, which functioned to estop those companies from being able to file suit for patent infringement in the future. FDA reached different conclusions in those cases, determining that the dismissal underlying Teva I did not trigger the exclusivity period but the one in Granutec did. According to FDA, its conclusions are not irreconcilable, and they are consistent with the textually-based approach that the agency now espouses. Id. at 12. The Granutec dismissal was a court-issued memorandum decision that granted a motion for partial summary judgment on the basis that the relevant patent was not infringed. Id. at 12 (citing *Glaxo, Inc. v. Boehringer Ingelheim Corp., 1996 U.S. Dist. LEXIS 17828, No. 95-CV-01342 (D. Conn. Oct. 7, 1996)*). A grant of partial summary judgment is, in FDA's view, a holding on the merits. Id. In contrast, the dismissal underlying Teva I was purely jurisdictional in nature, because it was based upon a determination that, in light of the statements made by the manufacturer of the branded drug, the [*16] non-movant (Teva) lacked a reasonable apprehension that it would be sued for infringement of the relevant patent. Id. (citing *Teva I, 182 F.3d at 1004*). In FDA's words, "once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted . . . the motion to dismiss." Id. Hence, FDA does not consider the Teva I dismissal to be a "decision of a court" under a textual interpretation of the statute, but does consider the Granutec dismissal based on a grant of partial summary judgment to be one. Id.

Next, FDA explained how the textual approach was more consistent with congressional intent. To begin with, although the textual approach could theoretically slow the entry of lower-cost generic drugs into the marketplace by more jealously safeguarding exclusivity entitlements, FDA noted that it also facilitates patent challenges "overall." Id. at 13. The estoppel approach, on the other hand, interprets the court-decision trigger more broadly, which may at first blush appear to further the underlying purpose of the statute by making generic products available to consumers at an expedited pace, [*17] id. at 13, but actually diminishes the value of the exclusivity entitlement and, accordingly, deters pharmaceutical companies from challenging patents, id. at 12, 13. By creating the exclusivity entitlement, the FDA observed, Congress manifested a belief that some incentive in addition to the prospect of earlier generic market entry was required in order to encourage pharmaceutical companies to undertake the risks and burdens of pursuing patent challenges. Id. at 12, 13. A narrower interpretation of the court-decision trigger (as provided by the textual approach) makes it harder to trigger the exclusivity periods, thereby preserving their value to pharmaceutical companies and, in FDA's view, leaving in place the incentive that Congress saw fit to create. Id. at 13.

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 9 of 18
Case No. 06-1890 (RMC)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

Put another way, FDA recognized that each approach furthers certain policy objectives while undercutting others. Id. The agency pointed to the instant litigation involving Apotex and Teva as an example of the creative legal maneuvering in which pharmaceutical companies have repeatedly engaged, flip-flopping between diametrically opposed positions in various litigation actions based upon their financial [*18]  interests. Id. at 13-14. This behavior, FDA concluded, will occur "whenever the potential financial rewards are sufficiently high," and "a standard less objective and clear than the 'holding-on-the-merits' standard" would increase the opportunities for such disputes. Id. at 14. Because such contests are lengthy and costly, they often delay the entry of generic drugs into the market. Id. "It is in the public's interest, as well as FDA's own interest," FDA continued, "to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered." Id. at 14. In its view, the estoppel approach "offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment." Id.

Finally, FDA addressed the application of the textual approach to the facts of Teva III, and determined that the underlying Apotex-BMS dismissal is not a "decision of a court" because it contains no "'holding' that the subject patents are invalid, not infringed [*19]  or unenforceable" and the face of the dismissal is devoid of any court determination touching on any of the patents at issue. Id. Like the dismissal at issue in Teva I, the Apotex-BMS dismissal is (by its own terms) wholly jurisdictional, FDA concluded, and does not constitute a "holding on the merits." See id. On this rationale, FDA determined that the "180-day exclusivity for pravastatin was not triggered by the [Apotex-BMS] dismissal" and proclaimed that "absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the [relevant] patent . . . expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered." Id.

### III. The Current Proceeding

Taking note of the proverbial "writing on the wall," Apotex initially filed the complaint in this action and a motion for a temporary restraining order on April 5, 2006, in advance of FDA's remand decision. See generally Compl.; Pl.'s Mot. T.R.O. Teva was added as an intervenor-defendant on April 10, 2006. Apotex Inc. v. FDA, Civil Action No. 06-0627, dkt. [*20]  no. 10 (D.D.C. Apr. 10, 2006) (Order). In its April 5th motion, Apotex argued that the representations of government counsel at the oral argument on appeal -- and in FDA's appellate briefs -- constituted "final agency action" on the basis of which it was entitled to pursue relief in this Court under *5 U.S.C. § 705*. See Pl.'s Mot. T.R.O. at 12-13; see also Compl. at 13 P53. Unpersuaded -- and wary of potential jurisdictional complications -- this Court directed Apotex to re-file its motion following the release of the impending agency decision. On April 11, 2006, FDA issued its remand decision. See generally Pl.'s Exh. A. Three days later, on April 14, 2006, Apotex re-filed its motion, this time choosing also to pursue a preliminary injunction immediately. See Pl.'s Mot. T.R.O. & Prelim. Inj. Ranbaxy filed a motion to intervene on April 12, 2006, arguing that it was the first to file an ANDA containing a paragraph IV certification for one particular dosage of Pravachol (R) -- here, Ranbaxy contended that it was entitled to the contested exclusivity period. See Ranbaxy Mot. Interv. as Defs. at 1. The Court granted Ranbaxy's motion the same day.  [*21]  Apotex Inc. v. FDA, Civil Action No. 06-0627, dkt. no. 16 (D.D.C. Apr. 12, 2006) (Order). The FDA and intervenor-defendants responded to Apotex's motion on April 18, 2006, and all parties have agreed that this matter should be addressed as a preliminary injunction request. Armed with the final agency decision, plaintiff's motion, and the memoranda of all parties, the Court will now address the merits of plaintiff's contentions.

### LEGAL STANDARDS

[HN3] When considering a motion for preliminary injunction or temporary restraining order, a court must weigh four factors: (1) the prospective irreparable injury to the movant in the event that the requested relief is denied; (2) the possibility of harm to other parties in the event that the relief is granted; (3) the likelihood that the movant will prevail on the merits; and (4) the public interest. See, e.g., *Mova Pharm. Corp. v. Shalala, 329 U.S. App. D.C. 341, 140 F.3d 1060, 1066 (D.C. Cir. 1998)*. n5 "These factors interrelate on a sliding scale and must be balanced against each other," *Davenport v. Int'l Bd. of Teamsters AFL-CIO, 334 U.S. App. D.C. 228, 166 F.3d 356, 360-61 (D.C. Cir. 1999)*, such that a particularly [*22]  strong showing with respect to one may compensate for a weaker showing with respect to another, *CityFed Fin. Corp. v. OTS, 313 U.S. App. D.C. 178, 58 F.3d 738, 747 (D.C. Cir. 1995)*. Specifically, the "likelihood of success on the merits" inquiry is inversely proportional to the "degree of irreparable harm" inquiry -- that is, a court may grant the sought-after relief when the movant is very likely to succeed on the merits, in the face of a lesser degree of potential irreparable injury. *Cuomo v. United States Nuclear Regulatory Com., 249 U.S. App. D.C. 54, 772 F.2d 972, 974 (D.C. Cir. 1985)*.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 10 of 14
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

n5 [HN4] Plaintiff has also moved for a stay pending appeal in the event that it does not prevail before this Court. That request is analyzed under the same four-pronged legal framework that applies to the motion for temporary restraining order and preliminary injunction. See *Teva Pharms. USA, 404 F. Supp. 2d at 245* (citing *Washington Area Metro. Auth. Comm'n v. Holiday Tours, 182 U.S. App. D.C. 220, 559 F.2d 841, 843-44 (D.C. Cir. 1977))*.

[*23]

Whether plaintiff is likely to prevail on the merits is, under the circumstances of this case, informed by the deferential standards of review under the APA. [HN5] Pursuant to the relevant provisions of the APA, a court may vacate FDA's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," *5 U.S.C. § 706(2)(A)*, or in excess of statutory authority, *5 U.S.C. § 706(2)(C)*. Agency actions are entitled to much deference, and the standard of review is narrow. See *Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971)*. The reviewing court is not permitted to substitute its judgment for that of the agency. See id. That is, it is not enough for the agency decision to be incorrect -- as long as the agency decision has some rational basis, the court is bound to uphold it. See id. The court may only review the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id.

The familiar framework of *Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*, [*24]  applies here. [HN6] At step one of Chevron, the Court first must inquire whether the statute "speaks clearly 'to the precise question at issue.'" *Chevron, 467 U.S. at 842-43*. If so, then the analysis proceeds no further -- the Court must "give effect to the unambiguously expressed intent of Congress." Id.; see also *Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)* (if text is plain and unambiguous, then the analysis ends there). If, however, the statute is not clear in relation to the specific issue before the Court, then under Chevron step two, the Court must consider whether FDA's interpretation is supported by a "permissible construction" of the statute. *Chevron, 467 U.S. at 843*. But the Court will only reach the second inquiry under Chevron if it determines that the statute is "silent or ambiguous with respect to the specific issue" presented. Id. The "existence of ambiguity is not enough per se to warrant deference to the agency's interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity." *Am. Bar Ass'n v. FTC, 368 U.S. App. D.C. 368, 430 F.3d 457, 469 (D.C. Cir. 2005)*; [*25]  see also *Michigan v. EPA, 348 U.S. App. D.C. 6, 348 U.S. App. D.C. 7, 268 F.3d 1075, 1082 (D.C. Cir. 2001)*. Hence, under the Chevron step two deferential analysis, if the statute is "ambiguous in such a way as to make the [FDA's] decision worthy of deference," then this Court should "uphold the [FDA's] interpretation of the ambiguous statute as long as that interpretation is 'permissible,' that is, if it is 'reasonable.'" *Am. Bar Ass'n, 430 F.3d at 468* (quoting *Chevron, 467 U.S. at 843, 845)*.

[HN7] When the agency decision is based upon its interpretation of the statute that it is charged with administering, a court's deference to the agency is at its apex. See *United States v. Mead, 533 U.S. 218, 226-27, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)*. Because FDA is interpreting its own statute here (the FDCA), the appropriate degree of deference will be determined based upon the circumstances surrounding that interpretation. See *id. at 227-31*. An agency will receive utmost deference if "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming [*26]  deference was promulgated in the exercise of that authority." *Mead, 533 U.S. at 226-27*. [HN8] The FDCA, pursuant to *21 U.S.C. § 371(a)*, grants explicit authority to FDA "to promulgate regulations for the efficient enforcement of" the statute. Similarly, the Hatch-Waxman Amendments permit FDA to promulgate regulations that are "necessary for the administration" of those amendments. See *21 U.S.C. § 355* note, Pub. L. No. 98-417, 105, 98 Stat. 1585, 1597 (1984).

As the D.C. Circuit noted in Teva III, it is the responsibility of FDA "to 'bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *441 F.3d at 5* (quoting *PDK Labs., Inc., 362 F.3d at 797-98*). Frequently, the D.C. Circuit has given Chevron deference to FDA's interpretation of the FDCA and the agency's implementing regulations. See *Novartis Pharms. Corp. v. Leavitt, 369 U.S. App. D.C. 232, 435 F.3d 344, 349 (D.C. Cir. 2006)* (stating that [HN9] "FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent [*27]  with the regulations"); *Mylan Labs., Inc. v. Thompson, 363 U.S. App. D.C. 440, 389 F.3d 1272, 1281 (D.C. Cir. 2004)*; *Purepac Pharm. Co. v. TorPharm, Inc., 359 U.S. App. D.C. 319, 354 F.3d 877, 883 (D.C. Cir. 2004)*. n6 It makes no difference, moreover, that an administrative determination is embodied in a decision letter, as here, rather than in a rulemaking or formal adjudication; Chevron deference still applies. See *Mylan, 389 F.3d at 1279-80*.

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 11 of 14
Case No. 06-1890 (RMC)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

n6 The FDA is entitled to the same "substantial deference" whether this Court is viewed as assessing the agency's interpretation of its statute or its implementing regulation. See *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994); *U.S. Air Tour Ass'n v. FAA*, 353 U.S. App. D.C. 213, 298 F.3d 997, 1005 (D.C. Cir. 2002).

## ANALYSIS

### I. Whether Plaintiff is Likely to Prevail on the Merits of its Argument that the Apotex-BMS Dismissal Triggered the 180-Day Exclusivity Period  [*28]  for Pravastatin

[HN10] To obtain emergency injunctive relief, plaintiff need not prevail on each factor of the four-pronged calculus. See *Teva Pharms., 404 F. Supp. 2d at 245* (citing *Holiday Tours, Inc., 559 F.2d at 843-44*). Nevertheless, the case law in this Circuit indicates that the "likelihood of success on the merits" inquiry is the most salient consideration, because a plaintiff's failure to prevail on that prong necessitates an unusually strong showing as to the remaining three factors in order "to turn the tide in [its] favor." *Davenport, 166 F.3d at 366*. Hence, the Court will tackle this step in the analysis first. As noted above, whether plaintiff is likely to succeed on the merits is an assessment that is governed by the Chevron framework.

#### A. Chevron Step One

At step one of Chevron, the Court must first consider whether the relevant statutory provision, § 355(j)(5)(B)(iv)(II), is silent or ambiguous with respect to the issue presented. The provision appears, at first blush, to use language that is sufficiently uncomplicated to lend itself to but one interpretation of the qualifying event: a "decision [*29] of a court . . . holding the patent . . . invalid or not infringed." § 355(j)(5)(B)(iv)(II). Any superficial simplicity, however, is deceptive. The Court is well aware of the confusion that this language has caused. One need not look very far to discover that there is considerable room for debate regarding what constitutes a "decision" or "holding." See, e.g., *Teva III, 441 F.3d at 3, 4*; *Teva I, 182 F.2d at 1007-08*. It seems, then, that careful, inventive lawyering has rendered uncertain what might otherwise have appeared straightforward and unambiguous. See *Teva I, 182 F.3d at 1007-08* (noting that a "'decision' can take several forms" and the word "'holding' . . . is also susceptible to interpretation"). To be sure, the language of the statute does not foreclose the textual or holding-on-the-merits approach adopted by the FDA; nor does it require the estoppel-based interpretation that plaintiff so vehemently urges. See *id. at 1012* (noting that the estoppel approach is not the only permissible construction of the court-decision trigger). But the latent ambiguity inherent in the terms "decision" and "holding" is sufficient [*30] to render the provision ambiguous. In fact, the FDA itself has previously acknowledged that the holding-on-the-merits approach is arguably more narrow than the language of § 355(j)(5)(B)(iv)(II) supports. See *id. at 1011*.

In this Court's view, the holding-on-the-merits approach arises more naturally from the statutory language than does the estoppel approach, and, accordingly, is the better interpretation. But that is not the proper inquiry. [HN11] At Chevron step one, the mere possibility of more than one meaning, in a given context, for a statutory word or phrase is sufficient to warrant further inquiry into the agency's deliberative process. Under such circumstances, "'the text and reasonable inferences from it [do not] give a clear answer against'" either interpretation. See *Cal. Indep. Sys. Operator Corp. v. FERC, 362 U.S. App. D.C. 28, 372 F.3d 395, 402 (D.C. Cir. 2004)* (quoting *Brown v. Gardner, 513 U.S. 115, 120, 115 S. Ct. 552, 130 L. Ed. 2d 462 (1994))*. "In determining whether a statutory provision speaks directly to the question before [it, a court must] consider it in context." See *Holly Sugar Corp. v. Johanns, 369 U.S. App. D.C. 358, 437 F.3d 1210, 1213 (D.C. Cir. 2006)* ((citing *FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000))*. [*31] Here, it simply cannot be said that the FDA's approach is the only reasonable way to interpret the statute -- the statute never specifies that the "decision" and "holding" rendered by the court must be "on the merits" of the dispute. Hence, the provision is ambiguous, and the Court will proceed to step two of the Chevron analysis. Certainly, that assessment is consistent with the thrust of the D.C. Circuit's observations in Teva I and Teva III.

#### B. Chevron Step Two

##### 1. Whether the FDA's Approach is a Permissible Construction of the Statute

At step two of Chevron, the threshold inquiry is whether the holding-on-the-merits approach may reasonably be divined from the text of the statute. See *Chevron, 467 U.S. at 843*. This Court readily concludes that it may: by its plain terms, the language of the provision requires a "decision of a court . . . holding the patent . . . invalid or not infringed," and makes no mention of notions of estoppel. A natural, and therefore permissible, construction of this language is that it

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 12 of 17
Case No. 06-1890 (RMC)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

requires a judicial decision addressing the merits of the patent infringement or invalidity action. Indeed, in so concluding, [*32] FDA has correctly commenced its analysis with the plain language of the statutory provision. See *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002); *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979).

### 2. Whether the FDA's Approach is the Product of Reasoned Agency Decisionmaking

The Court must also consider whether the approach taken by the FDA is supported by reasoned agency decision-making. See *Teva II*, 2000 WL 1838303, at *2. Apotex argues that the FDA's April 11, 2006 decision is identical to the views FDA espoused in Teva I and Teva II. Because the holding-on-the-merits approach was, in Apotex's view, rejected by the D.C. Circuit in Teva I and Teva II, and rejected by Judge Kollar-Kotelly of this Court on remand, it allegedly follows that it should likewise be deemed insufficient here. But Teva I and Teva II must be construed in light of Teva III, which states clearly that the D.C. Circuit neither invalidated the holding-on-the-merits interpretation that FDA now advocates nor established a substantive rule of law regarding [*33] the proper construction of the court-decision trigger. See *Teva III*, 441 F.3d at 3-4. Teva I and Teva II were purely procedural in nature, and they held only that "the FDA's conclusion [was] 'arbitrary and capricious inasmuch as [it] [took] an inconsistent position in another case and failed to explain adequately the inconsistency.'" *Id.* at 4 (citing *Teva I*, 182 F.3d at 1004) (emphasis added). n7 Hence, plaintiff's suggestion that the holding-on-the-merits approach itself is arbitrary and capricious is misleading -- it was the agency's failure to justify that approach under the law that was deemed arbitrary and capricious, not the approach itself. Because the FDA had suddenly reversed course and failed to follow the case-by-case method that it purportedly adopted in its earlier guidance document "without justification" and based on nothing more than a desire for administrative ease, see *Teva I*, 182 F.3d at 1011, the FDA's ultimate conclusion could not be sustained as the product of a reasoned agency decision-making process, see *Teva II*, 2000 WL 1838303 at *2. Thus, in Teva [*34] I the FDA failed even to establish that it was entitled to deference under Chevron -- it "offered no particular interpretation of [the court-decision trigger] provision, relying instead on its authority to interpret the provision narrowly until it promulgated a new rule." *182 F.2d at 1007*.

n7 Apotex also relies on certain language in Teva I that it characterizes as a categorical recognition by the D.C. Circuit that dismissals like the Apotex-BMS dismissal are qualifying triggering events. See Pl.'s Mot. T.R.O. &. Prelim. Inj. at 17; see also *Teva I*, 182 F.3d at 1009 (stating that "the [Teva I] dismissal appears to meet the requirements of a triggering 'court decision' because the dismissing court had to make a predicate finding with respect to whether [the manufacturer of the branded drug] would ever sue . . . for infringement in order to conclude that there was no case or controversy between the parties"). The problem with this argument is that, in the wake of Teva III, the language has little continuing force: its function was to identify weaknesses in the agency's logic that remained unaddressed as a result of the failure to engage in considered analysis. The language cannot be considered a determinative statement of law regarding the types of dismissals that would satisfy the statute; rather, it must be understood as an invitation for FDA to grapple with certain issues on remand.

[*35]

The outcome in Teva I and Teva II rested on the FDA's abdication of its responsibility "to bring its experience and expertise to bear" upon the court-decision trigger interpretation. *Teva III*, 441 F.3d at 5 (quoting *PDK Labs, Inc.*, 362 F.3d at 797-98). This Court is not convinced, however, that the FDA has similarly "failed to adequately explain" its conclusion here. The FDA's April 11, 2006 remand decision is not, as Apotex claims, "indistinguishable" from the agency's actions in Teva I and Teva II. This time, the FDA has not relied solely on administrative concerns. Rather, the record reveals that the FDA "brought its experience and expertise to bear," utilizing its resources and fulfilling its statutory mandate by carefully considering the statute's text, see Pl.'s Exh. A at 7, balancing the advantages and drawbacks of each approach, considering the competing policy interests that underlie the statute, examining the possible implications of congressional intent, and ultimately exercising its delegated discretion to choose from among the available options, see id. at 8-10, 12-14. As the FDA has acknowledged, neither the [*36] holding-on-the-merits approach nor the estoppel approach is without complication or idiosyncrasy. Both approaches may, in theory, function to undercut legislative policy and congressional intent in some regard. However, the holding-on-the-merits approach offers benefits that the estoppel approach does not. Primarily, it preserves the incentive for companies to undertake the very substantial risks and costs associated with patent challenges; it is congruent with the intent of Congress as expressed through the plain language of the statute; it facilitates certainty and consistency on an industry-wide basis; it offers heightened ease of administration; n8 and it reduces op-

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 13 of 19
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

portunities for lengthy, costly, and repetitive litigation. By facilitating patent challenges and reducing complex litigation, the holding-on-the-merits approach actually furthers the very policy that Apotex claims it undermines -- the goal of getting more low-cost generic products into the hands of consumers as quickly as possible. FDA's April 11, 2006 decision therefore constitutes a much more thorough, considered, and comprehensive analysis than the agency undertook in Teva I or Teva II. In any event, the [*37] choice between competing policy concerns is for the agency, not this Court, to make, and here FDA has properly adopted an interpretation that hews closely to the terms chosen by Congress to express its legislative judgment. See *Teva Pharm. Indus., Ltd. v. Crawford, 366 U.S. App. D.C. 203, 410 F.3d 51, 54 (D.C. Cir. 2005).*

n8 [HN12] It is perfectly appropriate for the agency to consider administrative convenience as one component of the overall mix of factors when developing an interpretive approach. See Teva II, 2000 WL 1838303, at *1 (quoting *Teva Pharms., USA, 337 U.S. App. D.C. 204, 1999 WL 1042743, at *5*); see also *Clinton Mem'l Hosp. v. Shalala, 304 U.S. App. D.C. 79, 10 F.3d 854, 860 (D.C. Cir. 1993).* The problem in Teva I and Teva II was that the agency attempted to insulate its otherwise unexplained action solely on that basis. See Teva II, 2000 WL 1838303, at *2 (quoting *Teva Pharms., USA, 337 U.S. App. D.C. 204, 1999 WL 1042743, at *5*). Here, in contrast, the agency has articulated many reasons for its decision to abandon the case-by-case method, reject the estoppel approach, and adopt the holding-on-the-merits approach. Under such circumstances, the Court "has no business second-guessing the agency." Teva II, 2000 WL 1838303, at *4 (Edwards, J., concurring in part and dissenting in part).

[*38]

*3. Whether the FDA's Approach is Reasonable in Practice*

[HN13] The reasonableness of the agency's approach in practice plays an important part in the Chevron step two analysis. See *Associated Gas Distribs. v. FERC, 283 U.S. App. D.C. 265, 899 F.2d 1250, 1261-63 (D.C. Cir. 1990)*; cf. *Teva I, 182 F.3d at 1011* (stating that the FDA must interpret the court-decision trigger clause of Hatch-Waxman in a manner that "avoids absurd results and furthers the statute's purpose"). An approach that is practically infeasible may thus prove not to be a permissible construction of the statute. For many of the same reasons that the holding-on-the-merits approach is supported by reasoned agency decisionmaking, it is also reasonable in practice.

Plaintiff's argument that the approach "nullifies the crucial declaratory judgment mechanism for ANDA applicants," Pl.'s Mot. T.R.O. & Prelim. Inj. at 26, does not warrant a contrary conclusion. [HN14] As long as the party filing the declaratory judgment action meets the "case or controversy" requirements of Article III (meaning that it has a reasonable apprehension of suit by the branded product manufacturer), that party may [*39] seek a court decision that qualifies as a triggering event under the statute. The holding-on-the-merits approach does not "nullify[] the crucial declaratory judgment mechanism," then, it only nullifies the manipulation of that mechanism, which has facilitated numerous sham lawsuits akin to the Apotex-BMS litigation.

As the FDA's remand decision acknowledged, the holding-on-the-merits approach is not perfect, but neither is the estoppel approach advocated by Apotex. For example, the estoppel approach completely ignores the language of the statutory provision, which requires a decision of a court with an actual holding. Pl.'s Exh. A at 8. The FDA has correctly noted that parties may be estopped for any number of reasons, based upon various considerations, which may be wholly unrelated to patent infringement, unenforceability, or invalidity. To make estoppel the pivotal focus is essentially to amend the statute's text, effectively deleting the words "holding the [relevant] patent . . . invalid or not infringed." Such an approach would "contravene accepted cannons of statutory construction," id. (citing *Bailey, 516 U.S. at 146*), because, as [*40] the Court discussed supra, it would run counter to the seemingly clear language of the statute. n9

n9 This observation does not conflict with the Court's earlier conclusion that the provision's text is not sufficiently unambiguous to end the inquiry at Chevron step one. The ambiguity in the language is latent in nature, arising from the fine legal distinctions that may be drawn when interpreting the meaning of individual words like "decision" and "holding." Hence, while the language is ambiguous when judged by Chevron step one standards, it does, nonetheless, lend itself strongly and naturally to the FDA's interpretation, and not the estoppel approach urged by Apotex.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 12 of 19
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

Plaintiff may well be correct that "some degree of legal analysis is unavoidable in the context of the court-decision trigger." See Teva II, 2000 WL 1838303, at *1 (quoting *Teva Pharms., USA, 337 U.S. App. D.C. 204, 1999 WL 1042743, at *5*). But the holding-on-the-merits approach does not entirely eradicate legal analysis; [*41]  it merely focuses that analysis. Instead of engaging in the broader, more amorphous, subjective, and labor-intensive inquiries associated with estoppel (including what constitutes a reasonable apprehension of suit, what is sufficient to eradicate such an apprehension, and what is sufficient to prevent such an apprehension from ever arising in the first place), the FDA will instead concern itself with the more focused issues of what constitutes a holding "on the merits" of the patent suit, and whether that holding is the result of a court decision, rather than a decision or agreement of the parties.

Even if, as plaintiff contends, the estoppel approach is less imperfect than the holding-on-the-merits approach, that does not render the FDA's approach impermissible. See *Am. Bar Ass'n, 430 F.3d at 468*. [HN15] The act of analyzing competing policy concerns against the backdrop of the statutory landscape that Congress has placed in its charge is the quintessential function of an administrative agency. See, e.g., *Teva Pharms. Indus., 410 F.3d at 54*. It is precisely the province of the agency to choose from among the permissible constructions and competing [*42]  policy interests of a statute after assessing the benefits and disadvantages of each, and the Court may not substitute its judgment for that of the agency. See *Am. Bar Ass'n, 430 F.3d at 468*; see also *Chevron, 467 U.S. at 866* (stating that "the responsibility for assessing the wisdom of such policy choices . . . [is] not [a] judicial one[]"); cf. *Teva III, 441 F.3d at 4-5*. Under Chevron's highly deferential standard, it matters not which is the better or even the correct interpretation, as long as the one advocated by the FDA is not entirely irrational. See *Am. Bar Ass'n, 430 F.3d at 468*. This is particularly so in an administrative context that, like the one currently before the Court, is admittedly fraught with complications and conflicts. See *Barnhart, 535 U.S. 212, 222, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002)*. Here, the FDA has been given substantial authority over an ambiguous statute in this complex arena, and has chosen a method that it believes properly strikes the delicate balance between competing legislative policies, thereby filling the gap left by Congress. See *Teva III, 441 F.3d at 4* (citing *Chevron, 467 U.S. at 843-44*). [*43]  Under such circumstances, the deference to which the agency is entitled is at its apex, see *Mead, 533 U.S. at 226-27*, and the Court cannot conclude that the FDA has acted irrationally or outside the scope of its authority, see *Cal. Indep. Sys. Operator Corp., 372 F.3d at 399-400* (citing *Chevron, 467 U.S. at 843-44*; *Motion Picture Ass'n of Am., Inc. v. FCC, 353 U.S. App. D.C. 405, 309 F.3d 796, 801 (D.C. Cir. 2002)*). "So long as [the FDA's] interpretation is 'permissible,' that is, if it is 'reasonable,'" it must be upheld under Chevron. *Am. Bar Ass'n, 430 F.3d at 468* (quoting *Chevron, 467 U.S. at 843, 845)*. Operating, as it must, within these well-settled principles, the Court concludes that the FDA's interpretation of its statute and implementing regulation is reasonable.

### C. Whether the FDA's Remand Decision Adequately Addresses the Concerns Expressed in Teva I

In Teva III, the D.C. Circuit noted that

> the FDA states that in the absence of any perceived Teva I constraint, it would employ a 'textual' approach to interpreting the statute,  [*44]  and would take the position that dismissals of declaratory judgment actions are not court decisions holding a patent to be invalid or not infringed . . . . The agency took a similar position in Teva I, but failed to provide adequate explanation. In this litigation the FDA still has not answered the questions put to it by the Teva I court.

*441 F.3d at 5 n5*. Apotex argues that this language constitutes a requirement that the FDA, on remand in Teva III, reconcile the result that it reached in Teva I and Teva II under the case-by-case method adopted in the earlier guidance document; reconcile the result that it reached in Teva I and Teva II, as well as the result that it has reached regarding the Apotex-BMS dismissal, with the result that it reached in Granutec; and explain how its departure from the estoppel approach is permissible in light of its regulation including a decision as to unenforceability as a possible triggering event. Apotex also submits that the FDA's remand decision has left these questions unanswered yet again.

As a threshold matter, Apotex is mistaken regarding the effect of the D.C. Circuit's statement in  [*45]  Teva III. It would be nonsensical if that language required the FDA to reconcile the results that it reached in Teva I, Teva II, and Granutec, or to justify the result that it reached here regarding the Apotex-BMS dismissal under the now-defunct case-by-case method. At the time of those earlier decisions, the FDA had committed itself to using the case-by-case method while it awaited promulgation of a new, final rule. In Teva I and Teva II, however, the FDA decided to apply the

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 15 of 19

Case No. 06-1890 (RMC)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

holding-on-the-merits approach, and did not explain its departure from the case-by-case method. The concerns expressed by the D.C. Circuit in Teva I were predicated upon the improper rejection of the case-by-case method and considerations of estoppel in favor of the holding-on-the-merits approach in the absence of any justification for the departure. Now, however, the agency has explicitly rejected the case-by-case method, as well as the estoppel approach, in favor of the holding-on-the-merits approach, and that rejection has been fully explained in the April 11, 2006 decision letter. Teva III explicitly opened the door for the FDA to do this -- the FDA stated, at oral argument [*46] and in its briefs, that it would adopt the holding-on-the-merits approach if it were free to do so. Following these representations, the D.C. Circuit issued the Teva III opinion, which held that neither Teva I, Teva II, nor any other circuit precedent required the FDA to use the estoppel approach or the case-by-case method. As long as the FDA explained adequately its reasons for doing so, it could adopt whatever approach it preferred. The necessary corollary is that Teva III recognized the agency's authority to reject other approaches, including the one previously followed. Accordingly, decisions rendered under the case-by-case method when it was still viable have little, if any, bearing on assessments made under the new holding-on-the-merits approach, and it makes little sense to require the FDA to justify its decision here under the case-by-case method when that method is no longer being employed.

Instead, the Court interprets the language in Teva III as an admonishment to the agency that while it is free to reject certain approaches and adopt the one that it prefers, it must explain adequately its reasons for doing so, and it must reconcile any currently relevant [*47] aberrations that may be created as a result (including any inconsistency with the still-effective regulation on unenforceability). Teva III merely reminded the agency that it cannot commit the same sins as it did in Teva I. In any event, even if Apotex's interpretation of that language were correct, the Court is convinced that the FDA has satisfied its responsibilities in its remand decision. To begin with, the agency has explained why its decision is not arbitrary or capricious in light of its previous guidance document -- the guidance document is no longer viable. Because the FDA is no longer required, by its own commitment, to make a case-by-case assessment based on considerations of estoppel, it is permissible for the FDA to reach a conclusion under its new approach that might not have been supported under a case-by-case assessment. Simply put, the guidance document can no longer be considered the frame of reference for proper agency action.

Moreover, the FDA has adequately articulated how the holding-on-the-merits approach is consistent with its implementing regulation. The language of the regulation parallels the language of the statute, except that the regulation adds [*48] the word "unenforceable" to the statutory terms "invalid or not infringed." By its plain terms, then, the regulation requires nothing less, and nothing more, than what the statute requires. The FDA has reasonably determined that both the statute and the regulation require a decision of a court that is a holding on the merits regarding the patent action. It cannot convincingly be argued that there is any incongruity between the regulation and the statute, such that it would be improper under the regulation to utilize a holding-on-the-merits approach that is reasonably supported by the terms of the statute itself. Both the statute and the regulation reflect the intent of Congress for the exclusivity clock to be triggered only by a judicial determination that the relevant patent is invalid, not infringed, or unenforceable.

Hence, neither a private agreement between litigants that procures a voluntary dismissal of a declaratory judgment action (like the Apotex-BMS dismissal), nor a determination by the FDA regarding whether or not the branded drug manufacturer is estopped from pursuing a patent action will satisfy the statute's requirements as also embodied in the [*49] regulation. Apotex's argument that the agency has "elevated the form of the dismissal over its substance," Pl.'s Mot. T.R.O. & Prelim. Inj. at 21, thus begs the question: Congress chose to focus on the nature of the dismissal, rather than its practical effect, by specifying a court decision with a holding. That is the legislative scheme that Congress created, and the agency's holding-on-the-merits approach furthers that scheme. The relevant inquiry under the FDA's reasonable interpretation of the statute and regulation is not whether there is estoppel as a result of a given court proceeding, but rather whether the court has itself rendered a decision that holds -- on the merits -- that the relevant patent is invalid, not infringed, or unenforceable. Apotex's dissatisfaction with the way in which the agency's approach affects its interests in generic pravastatin does not offer the Court a sufficient basis to disturb the legislative scheme reasonably adopted by the FDA.

Finally, the agency has adequately explained why the court action at issue in Granutec was a triggering event, whereas the Apotex-BMS dismissal is not. The Granutec court granted partial summary judgment, [*50] through a memorandum opinion, in one party's favor on the basis of representations that had estoppel effect. [HN16] By its very nature, summary judgment requires the weighing of substantive arguments and necessitates legal analysis -- the court is required to determine that there is no genuine dispute of material fact, and the moving party is entitled to prevail as a matter of law. See Fed. R. Civ. P. 56(c). Of course, under the FDA's April 11, 2006 decision, estoppel is no longer the relevant inquiry -- the focus is now on whether there is a court decision and what it holds. However, the result previously

Case No. 06-1890 (RMC)

Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 16 of 17
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

reached in Granutec would, as FDA concluded, be the same under the holding-on-the-merits approach that applies today. n10 In Granutec, the court was called upon to make a factual and legal finding with respect to the substantive arguments presented on the issue of patent invalidity, infringement, or unenforceability. This did not happen in the Apotex-BMS litigation. As this Court articulated in its prior decision, the Apotex-BMS dismissal was nothing more than a private settlement agreement between the parties, which required [*51]  no court action whatsoever and lacked the requisite judicial imprimatur to constitute a "decision of a court." See *398 F. Supp. 2d at 190-91*. It was a "decision," in essence, by the parties. The court was not called upon to make any substantive determinations, and its signature upon the face of the order added nothing of substance. See *id. at 189-92*. The same outcome would have been reached whether or not the court signed the document, because the action that made the document effective was taken by the parties, not by the court. See id. In contrast, the parties in Granutec could never have obtained the outcome in that case -- partial summary judgment -- without a court decision addressing the merits.

> n10 In its opposition memorandum, defendant-intervenor Teva submits as well that Granutec has been superseded by statute, such that a partial grant of summary judgment would no longer qualify as a triggering event because it is not a "decision of a court" within the meaning of the statute pursuant to the MMA. See Teva Mem. Opp'n at 14.

[*52]

With respect to the results reached by the agency in Teva I and Teva II (prior to the D.C. Circuit's decisions in those cases), there is no inconsistency with the holding-on-the-merits approach. As the D.C. Circuit recognized, the dismissal at issue in those cases was not a holding on the merits. See *Teva I, 182 F.3d at 1009* (recognizing that the "dismissal was not a judgment on the merits after consideration of evidence presented by the parties"). Hence, it would not qualify as a triggering event under the approach that applies as of April 11, 2006. The D.C. Circuit rejected the FDA's conclusion in this regard because the agency itself had made estoppel the focal point of the analysis, and the dismissal at issue in Teva I and Teva II did have preclusive effect. See id. Hence, the dismissal was, at the time, a qualifying triggering event, and the FDA's unexplained refusal to recognize it as such was improper. See id.

Not only did the agency's fifteen-page, single-spaced remand decision thoughtfully deconstruct the multifaceted implications of the estoppel and holding-on-the-merits approaches, but it also sufficiently addressed each of [*53]  the three concerns raised in Teva I and recalled in Teva II. There is no "want of reasoned decisionmaking" here. See Teva II, 2000 WL 1838303, at *2. Moreover, the agency's remand decision represents a permissible construction of the statute as a matter of textual interpretation as well as practice. Apotex is, accordingly, unlikely to prevail on the merits of its claim that the FDA acted arbitrarily, capriciously, in excess of statutory authority, or otherwise not in accordance with law when it determined that the Apotex-BMS dismissal is not a qualifying triggering event under *§ 355(j)(5)(B)(iv)(II)*.

## II. Whether Plaintiff Will Suffer Irreparable Harm if Relief is Not Granted

[HN17] The irreparable injury requirement erects a very high bar for a movant. See *Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996)*. A plaintiff must show that it will suffer harm that is "more than simply irretrievable." *Gulf Oil Corp. v. Dept. of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)*. In this jurisdiction, harm that is "merely economic" in character is not sufficiently grave under this standard. See *Wisconsin Gas Co. v. FERC, 244 U.S. App. D.C. 349, 758 F.2d 669, 674 (D.C. Cir. 1985)*; [*54]  *Boivin v. US Airways, Inc., 297 F. Supp. 2d 110, 118 (D.D.C. 2003)*; *Mylan Pharms., Inc. v. Shalala, 81 F. Supp. 2d 30, 42 (D.D.C. 2000)*. To successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to "cause extreme hardship to the business" or threaten its very existence. *Gulf Oil, 514 F. Supp. at 1025*; see also *Wisconsin Gas, 758 F.2d at 674*; *Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D. D.C. 2003)*; *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury, 193 F. Supp. 2d 6, 14 (D.D.C. 2001)*. To warrant emergency injunctive relief, the harm alleged must be certain, great, actual, and imminent. See *Wisconsin Gas, 758 F.2d at 674*. Moreover, because Apotex has not established a likelihood of success on the merits, its showing of irreparable harm must be very strong. See *Cuomo, 772 F.2d at 974*; *Davenport, 166 F.3d at 366*.

The Court is not convinced that Apotex can satisfy these standards. To be sure, if Apotex is correct that all generic exclusivity connected [*55]  to pravastatin has already been triggered and extinguished, then it probably stands to lose a significant sum of money unless it is granted emergency injunctive relief. But if, as the FDA has concluded (reasonably, this Court believes), intervenor-defendants are statutorily entitled to benefit from a period of generic exclusivity that has

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-2    Filed 11/17/2006    Page 1 of 1 (?)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

not yet been triggered, then Apotex faces no harm whatsoever because the denial of emergency injunctive relief leaves its position untouched.

Apotex has never contended that it has a statutory entitlement to generic exclusivity; it has never claimed that it was the first to file an ANDA containing a paragraph IV certification with respect to one of the Pravachol (R) patents. Rather, Apotex merely submits that it stands to lose approximately $ 9.9 million dollars in sales over the course of one year if intervenor-defendants are permitted to exercise their statutory exclusivity entitlements. The Court will assume the accuracy of that dollar estimate for the moment, putting aside the FDA's contention that the relevant time period for the calculation of losses is only from the point when the intervenor-defendants launch their products on April 20, 2006 to [*56] the time that the case is resolved on the merits, probably just a few months. Even so, the harm that Apotex allegedly faces cannot be called anything other than "merely economic." Apotex "produces more than 260 generic pharmaceuticals in approximately 4000 dosages and formats which, in Canada, are used to fill over 60 million prescriptions a year -- the largest amount of any pharmaceutical company in [Canada]." See http://www.apotex.com/CorporateInformation/Default.asp?flash=Yes (last visited Apr. 18, 2006). Moreover, Apotex reaps annual revenues that total approximately $ 700 million USD. Id. (boasting annual revenue of more than $ 800 million in Canadian currency). Under the circumstances, it hardly seems possible that a $ 9.9 million loss in sales over a year would cause extreme hardship, much less threaten the company's very existence, and Apotex has not established (or even contended) that it would.

Apotex's speculative sales loss thus remains an economic loss that does not meet the irreparable harm standard. So, too, its concerns about a lost market share fall well short of the serious, irretrievable damage to its business required to warrant a preliminary injunction, [*57] particularly when one considers that the actual relevant period for assessing harms is probably only a few months. And even assuming that Apotex has adequately established a cognizable irreparable injury, the Court cannot conclude that the balance of hardships tips decidedly in its favor because, as discussed below, each of the intervenor-defendants stands to lose a much greater sum if the launch of their generic products is delayed. Particularly where Apotex has made a very weak showing of likely success on the merits, that balance of harms is fatal to its request for emergency injunctive relief.

### III. Whether the Intervenor-Defendants Will Suffer Irreparable Harm if Emergency Injunctive Relief is Granted

In the event that Apotex receives the emergency injunctive relief that it seeks, the intervenor-defendants will be prevented from marketing their generic products on April 20, 2006. Both Teva and Ranbaxy are, the FDA has determined, entitled to enjoy a 180-day period of generic marketing exclusivity. Each company is prepared to launch on April 20, 2006, and estimates that it will suffer lost profits that far exceed the losses that Apotex allegedly faces over a longer [*58] period of time. Specifically, Teva contends that a delay as short as seven days could cost it "tens of millions of dollars," and Ranbaxy anticipates losses totaling fifteen to twenty million dollars within the first six months of marketing. See Teva Mem. Opp'n at 20; Ranbaxy Mem. Opp'n at 16. But unlike the harm that Apotex allegedly faces, the potential injury that the intervenor-defendants face is not "merely economic." Rather, they stand to lose [HN18] a statutory entitlement, which is a harm that has been recognized as sufficiently irreparable. See, e.g., *Mova, 140 F.3d at 1067 n. 6*. Once the statutory entitlement has been lost, it cannot be recaptured.

Moreover, although intervenor-defendants are entitled to an exclusivity period of 180 days under the statute, in reality they will only enjoy an exclusivity period of approximately sixty days. On June 23, 2006, the patent for a branded drug by the name of Zocor (R) will expire. Generic versions of that drug (simvastatin) will then enter the market. Simvastatin and pravastatin are in the same drug class, have very similar treatment indications, and are, for all practical purposes, interchangeable for many patients. [*59] According to some reports, Pravachol (R) users are currently being advised to switch to Zocor (R) in anticipation of the arrival of generic simvastatin. See Interv.-Def.'s (Ranbaxy) Exhs. C, D. Intervenor-defendants estimate, not unreasonably, that the launch of generic simvastatin will diminish the value of the 180-day exclusivity period for generic pravastatin. Additionally, the manufacturer of Pravachol (R), BMS, has already entered into agreements pursuant to which it will launch an "authorized generic" product on April 20, 2006. n11 This product will compete directly with the products marketed by intervenor-defendants. If intervenor-defendants are prevented from entering the market at the same time as the authorized generic, then they stand to lose a portion of the market that BMS will have already acquired. Hence, each day after April 20, 2006 that intervenor-defendants are foreclosed from marketing their generic pravastatin products will result in further erosion of the statutory entitlement and additional lost profits and market share. In light of the considerable economic injury facing intervenor-defendants, and the less substantial injury to Apotex, the balance of hardships [*60] clearly tips against granting Apotex the emergency injunctive relief that it seeks.

Case 1:06-cv-01890-RMC   Document 14-2   Filed 11/17/2006   Page 18 of 18
Case No. 06-1890 (RMC)
Attachment 1 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

n11 An "authorized generic" or "brand generic" is a generic version of the branded drug that is produced by, or in partnership with, the same company that manufactures the branded drug. See generally *Teva Pharms., 410 F.3d at 52-53.*

## IV. Where the Public Interest Lies

[HN19] Where, as here, the FDA is administering a statute that has been placed within its charge, and has no financial interest in the outcome, its interest is deemed to be aligned with that of the public. The public interest would not, as Apotex claims, be furthered by a court order preserving the alleged status quo. Such an order would effectively constitute a constructive extension of the brand manufacturer's patent (and period of pediatric exclusivity). That monopoly is set to end on April 20, 2006, and there are two pharmaceutical companies that are ready and willing to make generic alternatives to Pravachol (R) available to consumers [*61] on that date. The purpose of the relevant statutory provisions is to expedite and increase the availability of generic substitutes. If this Court were to grant Apotex's motion, then the public would be forced to wait until this litigation is completely resolved (at some unidentified point in the future) before it is able to benefit from low-cost versions and widespread availability of pravastatin. The fact that BMS, as the manufacturer of Pravachol (R), plans to release an authorized generic on that date does not indicate otherwise. To be sure, an authorized generic may provide some benefit to the public in the form of reduced costs and greater product availability. But, as Teva notes, those benefits are not likely to be as great as the ones that flow from real generic competition. The authorized generic faces no significant market pressure because the manufacturer is, essentially, competing with itself. Accordingly, it lacks a sufficiently strong incentive to undercut the pricing of the branded product. A third-party generic seeks to attract the consumers of the branded product, but the authorized generic naturally seeks (to a degree) to maintain a customer base for its more profitable [*62] branded product. Hence, the public interest is most directly furthered by the launch of generic pravastatin on April 20, 2006. n12

n12 Apotex claims that the public interest is furthered by "faithful application of the laws." This is undoubtedly true, but it is of little aid here. In the Court's opinion, the holding-on-the-merits approach adopted by the FDA is more faithful to the statutory language, preferable from a policy standpoint, and facilitates consistency and industry certainty -- all things that amount to a "faithful application of the law."

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a temporary restraining order and preliminary injunction is denied. Apotex has also sought an injunction pending appeal. The legal analysis that applies to a request for a stay or injunction pending appeal is identical to that for a temporary restraining order or preliminary injunction and, accordingly, Apotex has failed to establish that the balance of harms or its likelihood of success on [*63] the merits favors the issuance of such relief. Nevertheless, in order to allow the Court of Appeals, if so requested, to determine whether it will exercise its discretion to grant an injunction pending appeal, this Court will grant that injunction for a brief period, through 5:00 p.m. on April 21, 2006. A separate order has been issued on this date. n13

n13 FDA requested that this proceeding be consolidated, under *Fed. R. Civ. P. 65(a)(2)*, with a proceeding on the merits. The parties agreed to such a course of action with respect to the proceedings before this Court in Teva III. However, in light of the compressed time schedule with respect to the current proceedings, the Court is reluctant to do so in the absence of consent by all parties. Accordingly, the FDA's request is denied.

/s/ John D. Bates

United States District Judge

Dated: April 19, 2006

Westlaw.

--- F.3d ----                                                          Page 1
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)
**(Cite as: --- F.3d ----)**

**H**

Briefs and Other Related Documents

Ranbaxy        Laboratories      Ltd.      v.
LeavittC.A.D.C.,2006.Only the Westlaw citation is
currently available.

United States Court of Appeals,District of Columbia
Circuit.
RANBAXY LABORATORIES LIMITED, et al.,
Appellees
v.
Michael O. LEAVITT, Secretary of Health and
Human Services, et al., Appellants.
**No. 06-5154.**

Argued Sept. 12, 2006.
Decided Nov. 14, 2006.

**Background:** Generic drug manufacturer brought
action against Secretary of Health and Human
Services and Food and Drug Administration (FDA) to
challenge regulation after FDA delisted drug patent
and deprived manufacturer of period of market
exclusivity. The United States District Court for the
District of Columbia, Richard W. Roberts, J., entered
judgment in favor of manufacturer. FDA appealed.

**Holding:** The Court of Appeals, Ginsburg, Chief
Judge, held that FDA regulation making manufacturer
of generic drug ineligible for 180 days of market
exclusivity if the holder of the new drug application
seeks to delist the patent, rather than to litigate validity
or infringement, is unlawful.

Affirmed.

**[1] Federal Courts 170B** 🔑0

170B Federal Courts
The Court of Appeals reviews the Food and Drug
Administration's (FDA) interpretation of the Federal
Food, Drug, and Cosmetic Act (FDCA) it administers
under the two-step analysis in *Chevron*: (1) the Court
first asks whether the Congress has directly spoken to
the precise question at issue, and (2) if the statute is
silent or ambiguous with respect to the specific issue,
the question is whether the agency's answer is based
on a permissible construction of the statute. Federal
Food, Drug, and Cosmetic Act, § 1 et seq., 21

U.S.C.A. § 301 et seq.

**[2] Health 198H** 🔑0

198H Health
Food and Drug Administration (FDA) regulation
making manufacturer of generic drug ineligible for
180 days of market exclusivity if the holder of the new
drug application seeks to delist the patent, rather than
to litigate validity or infringement, is inconsistent with
statute giving the period of market exclusivity; the
statute does not require litigation to preserve a generic
applicant's eligibility for exclusivity, and by reducing
the certainty of receiving a period of marketing
exclusivity, the FDA's delisting policy diminishes the
incentive for a manufacturer of generic drugs to
challenge a patent listed in the Orange Book in the
hope of bringing to market a generic competitor for an
approved drug without waiting for the patent to expire.
Federal Food, Drug, and Cosmetic Act, §
505(j)(2)(A)(vii), (5)(B)(iii, iv); 21 U.S.C.A. §
355(j)(2)(A)(vii), (5)(B)(iii, iv); 21 C.F.R. §
314.94(a)(12)(viii)(B).

**[3] Health 198H** 🔑0

198H Health
The Food and Drug Administration (FDA) may not
change the incentive structure adopted by the
Congress, for the agency is bound not only by the
ultimate purposes Congress has selected, but by the
means it has deemed appropriate, and prescribed, for
the pursuit of those purposes.
West    CodenotesHeld    Invalid21    C.F.R.    §
314.94(a)(12)(viii)(B)

Appeal from the United States District Court for the
District of Columbia (No. 05cv01838).

Howard S. Scher, Attorney, U.S. Department of
Justice, argued the cause for appellants. With him on
the briefs were Peter D. Keisler, Assistant Attorney
General, Kenneth L. Wainstein, U.S. Attorney,
Douglas N. Letter, Attorney, and Eric M. Blumberg,
Deputy Chief Counsel, U.S. Department of Health and
Human Services. Drake S. Cutini, Attorney, U.S.
Department of Justice, entered an appearance.
Simon E. Dance was on the brief for amicus curiae
Blue Cross & Blue Shield Association, Inc. in support
of appellants.
Carmen M. Shepard argued the cause for appellees

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)
(Cite as: --- F.3d ----)

Ranbaxy Laboratories Limited, et al. With her on the brief were Kate C. Beardsley and William B. Schultz. Jay P. Lefkowitz argued the cause for appellee Teva Pharmaceuticals, USA, Inc. With him on the brief were John C. O'Quinn and Michael D. Shumsky.
Theodore Case Whitehouse was on the brief for amicus curiae Generic Pharmaceutical Association in support of appellees.

Before: GINSBURG, Chief Judge, and GRIFFITH and KAVANAUGH, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.GINSBURG, Chief Judge.

*1 The Hatch-Waxman Amendments to the Food, Drug, & Cosmetic Act provide a period of marketing exclusivity to the first drug manufacturer that either successfully challenges a patent listed by the Food and Drug Administration for an approved, branded drug and markets an approved generic version of that drug or prevails in litigation establishing that the patent is valid or not infringed. Ranbaxy Laboratories Limited and Ivax Pharmaceuticals, Inc., the latter since acquired by Teva Pharmaceuticals, USA, Inc., applied for approval of drugs to compete with an approved drug manufactured by Merck & Co. and challenged two patents covering it. Thereafter, at Merck's request, the FDA removed the challenged patents from the "Orange Book," its listing of patents covering approved drugs, thereby depriving the generic manufacturers of an opportunity to have a period of marketing exclusivity.

Ranbaxy and Teva each filed a "citizen petition" asking the FDA to relist the two patents. The FDA denied the petitions because Merck had not sued Ranbaxy or Teva for patent infringement. Ranbaxy and Teva then repaired to the district court, which entered a summary judgment for the plaintiffs, and the FDA appealed.

We hold the FDA's requirement that a generic manufacturer's patent challenge give rise to litigation as a condition of retaining exclusivity when a patent is delisted is inconsistent with the Act, which provides that the first generic manufacturer to file an approved application is entitled to exclusivity when it either begins commercially to market its generic drug or is successful in patent litigation. Accordingly, we affirm the judgment of the district court.

I. Background

Before marketing a new "branded" drug, the

manufacturer must file with the FDA a New Drug Application (NDA), including evidence the drug is safe and effective, and the identifying number and expiration date of any patent or patents covering the drug. 21 U.S.C. § 355(a)-(b)(1). When it approves the NDA, the FDA must publish the patent information, id. § 355(b)(1), (c)(2), which it does in *Approved Drug Products with Therapeutic Equivalence Evaluations,* better known as the Orange Book.

Before marketing a "generic drug," which is bioequivalent to a branded drug previously approved pursuant to an NDA, the manufacturer may submit an Abbreviated New Drug Application (ANDA). Unlike an NDA, an ANDA need not contain evidence of the drug's safety or efficacy. *See* 21 U.S.C. § 355(j)(2). Each ANDA, however, must contain:

a certification ... with respect to each patent which claims [a drug or a method of using a drug listed in the Orange Book] for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section-

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) [that] such patent will expire [on a specified date], or

*2 (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted[.]

*Id.* § 355(j)(2)(A)(vii). The Act rewards the first manufacturer to file an approved ANDA containing the certification in paragraph IV by giving it a 180-day period of marketing exclusivity, which begins with the earlier of the applicant's first commercial marketing of the generic drug or when the applicant prevails in a suit over infringement or the validity of the patents covering the branded drug. *Id.* § 355(j)(5)(B)(iii)-(iv).[FN*]

When a patent is removed from the Orange Book (or, in the parlance of the agency is "delisted"), the FDA by regulation requires the sponsor of the corresponding ANDA to delete its paragraph IV certification with respect to the delisted patent. 21 C .F.R. § 314.94(a)(12)(viii)(B).[FN*] If no patent covering the branded drug remains listed, then the generic applicant must file a paragraph I certification, and the FDA treats the ANDA as though it had never contained a paragraph IV certification. As a result, the generic applicant that was first to file an approved application does not get the 180-day period of exclusivity. *See id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-3    Filed 11/17/2006    Page 3 of 5
Case No. 06-1890 (RMC)
Attachment 2 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

--- F.3d ----
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)
(Cite as: --- F.3d ----)

Merck, which marketed simvastatin under the brand name Zocor® , submitted to the FDA information with respect to three patents covering the drug: U.S. Patent Nos. 4,444,784 (the 784 Patent), RE 36,481 (the 481 Patent), and RE 36,520 (the 520 Patent). Teva and Ranbaxy each filed an ANDA to market generic simvastatin. The two ANDAs-both of which were eligible for a 180-day period of marketing exclusivity because they involved different dosages-each contained a paragraph IV certification with respect to the 481 and 520 Patents. With respect to the 784 Patent, Ranbaxy and Teva each filed a paragraph III certification that it would expire in December 2005.

Merck, however, did not sue Ranbaxy or Teva for patent infringement based upon their paragraph IV certifications. Instead, before their ANDAs were approved, Merck asked the FDA to delist the 481 and 520 Patents from the Orange Book, which the agency did in 2004. Consequently, under 21 C.F.R. § 314.94(a)(12)(viii)(B), Ranbaxy and Teva were required to delete the paragraph IV certifications from their ANDAs and thereby lost their eligibility for a period of marketing exclusivity. Ranbaxy and Teva accordingly petitioned the FDA to relist the 481 and 520 Patents in the Orange Book, restore their period of exclusivity, and refrain from approving any other manufacturer's ANDA for generic simvastatin until their period of exclusivity expired.

In a letter ruling denying the petitions, the FDA said it had considered three possible methods of handling the request of a manufacturer with an approved NDA to delist a patent. First, the FDA could always delist the patent, but that could unfairly deny a period of marketing exclusivity to the generic manufacturer that would later be the first to file an approved ANDA by depriving it of the opportunity to prevail in patent litigation. Second, it could refuse to delist the patent only if a generic manufacturer had filed an ANDA containing a paragraph IV certification with respect to the patent, but the agency rejected that possibility on the ground that "eligibility for exclusivity does not vest with a patent challenge," that is, upon the filing of a paragraph IV certification. Finally, the FDA could delist a patent only if a generic manufacturer had filed an ANDA containing a paragraph IV certification with respect to the patent *and* the NDA holder had not filed a lawsuit to contest the certification. The FDA chose the last option on the ground that it best balanced, on the one hand, the pro-competitive effect of the incentive for a generic drug manufacturer to be the first to challenge a patent listed in the Orange Book and thereby introduce generic competition to a branded drug and, on the other, the loss of competition

among generic manufacturers caused by the 180-day period of marketing exclusivity for the first to file an approved ANDA containing a paragraph IV certification.

*3 Ranbaxy and Teva then brought this action in the district court, which held the FDA's delisting policy was inconsistent with the Act because, by requiring the first generic manufacturer that filed a paragraph IV certification to remove that certification before its ANDA could be approved, it deprived the generic applicant of the opportunity to obtain a period of exclusivity pursuant to 21 U.S.C. § 355(j)(5)(B)(iv)(I) by commercially marketing its drug. The court entered judgment for Ranbaxy and Teva and the FDA appealed.

## II. Analysis

[1] We review the FDA's interpretation of the Act it administers under the two-step analysis in *Chevron, U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Teva Pharm. Indus. Ltd. v. Crawford,* 410 F.3d 51, 53 (D.C.Cir.2005) (reviewing under *Chevron* FDA ruling on citizen petition). First, we ask whether the "Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question ... is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

[2] Ranbaxy and Teva claim this case can be resolved at *Chevron* step one. Ranbaxy argues that 21 U.S.C. § 355(j)(5)(B)(iv) on its face entitles the company to a period of marketing exclusivity, and Teva contends the FDA's distinction between filers of paragraph IV certifications that are sued and those that are not has no basis in the Act.

Under the rubric of *Chevron* step two, Ranbaxy and Teva argue the FDA's policy of delisting a patent in the absence of litigation is unreasonable for a variety of reasons. Upon examination, however, we believe their arguments are better considered at *Chevron* step one. More specifically, Teva contends the requirement of litigation is inconsistent with the text and structure of the statute and with its purpose, as elucidated in circuit precedent. Here it refers in particular to *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)
**(Cite as: --- F.3d ----)**

1069 (D.C.Cir.1998), in which we held 21 U.S.C. § 355(j)(5)(B)(iv) precludes the FDA from conditioning marketing exclusivity upon the first to file an ANDA prevailing in patent litigation, and to *Purepac Pharmaceutical Co. v. Friedman,* 162 F.3d 1201, 1204-05 (D.C.Cir.1998), in which we held the FDA reasonably gave a period of marketing exclusivity to the first generic drug manufacturer to file a paragraph IV certification even though it never litigated the infringement or validity of the patent. Based upon these cases, Teva argues that the Act precludes the FDA from predicating exclusivity upon a patent infringement suit being brought by the NDA holder. Ranbaxy suggests the FDA's policy is inconsistent with the Act for two other reasons: first, the policy diminishes the incentive the Congress provided for a generic manufacturer to challenge a patent by reducing the certainty of its getting a period of marketing exclusivity; and second, by balancing anew the costs and benefits of the exclusivity provided by the Congress, the policy exceeds the authority of the agency.

**\*4** In response, the FDA argues that its regulation requiring the filer of an ANDA to amend its certification when a patent is delisted, 21 C.F.R. § 314.94(a)(12)(viii)(B), is not inconsistent with the Act because 21 U.S.C. § 355(j)(5) is silent with regard to the withdrawal of patent information previously submitted for listing in the Orange Book. The FDA points out that a generic applicant's exclusivity does not vest upon the filing of a paragraph IV certification; otherwise, it asserts, the filer's eligibility for exclusivity would not be lost when, for example, the patent subject to the paragraph IV certification expires, *see Dr. Reddy's Labs., Inc. v. Thompson,* 302 F.Supp.2d 340, 354-55 (D.N.J.2003) (holding FDA reasonably interpreted 21 U.S.C. § 355(j)(5)(B)(iv) not to extend exclusivity to ANDA approved after patent had expired), or the generic applicant loses in patent litigation, *see Mylan Labs., Inc. v. Thompson,* 389 F.3d 1272, 1282-84, 1283 n. 10 (D.C.Cir.2004).

The FDA then argues its policy is reasonable because it allows an NDA holder to eliminate the patent as a barrier to approval of an ANDA when that patent does not cover the drug or method of use for which it was listed in the Orange Book. At the same time the policy preserves the ministerial nature of the FDA's role in maintaining the patent listings in the Orange Book because, when an NDA holder asks it to delist a patent, the agency need not determine whether the NDA holder is acting strategically to deny the generic applicant a period of marketing exclusivity or the patent actually does not cover the drug for which it

was submitted-the interpretation of patent listings being outside the agency's expertise.

The "precise question at issue" at *Chevron* step one is, in our view, whether the FDA may delist a patent upon the request of the NDA holder after a generic manufacturer has filed an ANDA containing a paragraph IV certification so that the effect of delisting is to deprive the applicant of a period of marketing exclusivity. The Congress unquestionably provided two ways in which a generic drug manufacturer may begin a 180-day period of exclusivity: (1) by marketing its drug commercially, or (2) by convincing a court that the patent subject to its paragraph IV certification is either invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv). When the NDA holder asks the FDA to delist the patent, however, the FDA's policy of acquiescence prevents the generic manufacturer that has filed an ANDA containing a paragraph IV certification from beginning its period of exclusivity.

We have previously rejected at *Chevron* step one the FDA's attempt to add to the statutory requirements for exclusivity by making it contingent upon success in litigation. In *Mova* we held the "successful defense" rule, which afforded exclusivity only to the generic applicant that both filed the first approved ANDA with a paragraph IV certification and successfully defended an infringement suit, was inconsistent with the text and structure of the Act because it permitted the FDA to approve a later ANDA before either the first to file began to market its drug commercially or a court held the subject patent invalid or not infringed; the rule thereby "[wrote] the commercial-marketing trigger out of the statute." 140 F.3d at 1069-70. Later we upheld as reasonable at *Chevron* step two the FDA's decision to grant a generic applicant a period of marketing exclusivity even though its paragraph IV certification did not result in litigation precisely because the FDA's approach "basically duplicat[ed] the statute." *Purepac,* 162 F.3d at 1204-05.

**\*5** Not only does the statute not require litigation to preserve a generic applicant's eligibility for exclusivity, as those precedents make clear; such a requirement is inconsistent with the structure of the statute because, if the patent is delisted before a pending ANDA is approved, then the generic manufacturer may not initiate a period of marketing exclusivity. The FDA's observation that the generic applicant's right to a period of marketing exclusivity does not vest upon its filing a paragraph IV certification is beside the point, which is that the Act makes the generic applicant eligible for exclusivity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 06-1890 (RMC)
Attachment 2 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

--- F.3d ----                                                                          Page 5
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)
(Cite as: --- F.3d ----)

while the FDA's policy makes it ineligible for exclusivity. <sup>FN*</sup>

[3] In addition, the FDA's policy allows an NDA holder, by delisting its patent, to deprive the generic applicant of a period of marketing exclusivity. By thus reducing the certainty of receiving a period of marketing exclusivity, the FDA's delisting policy diminishes the incentive for a manufacturer of generic drugs to challenge a patent listed in the Orange Book in the hope of bringing to market a generic competitor for an approved drug without waiting for the patent to expire. The FDA may not, however, change the incentive structure adopted by the Congress, for the agency is bound "not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecomms. Corp. v. AT & T Co.,* 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). Therefore, we hold unlawful the FDA's policy requiring that the first filer of a paragraph IV certification be sued in order to preserve its statutory exclusivity when the NDA holder seeks to delist the patent rather than to litigate.

III. Conclusion

In sum, the FDA's policy conditioning a generic applicant's period of marketing exclusivity upon the generic applicant being sued for patent infringement by the NDA holder is inconsistent with the text and structure of the Act and, because it diminishes the incentive the Congress gave manufacturers of generic drugs, is inconsistent with the purpose of the Act. Therefore, we conclude the FDA improperly denied Ranbaxy and Teva a period of marketing exclusivity by delisting Merck's patents. For the foregoing reasons, the judgment of the district court is

*Affirmed.*

FN* If the [ANDA] contains a certification described in [paragraph] (IV) ... and is for a drug for which a previous [ANDA] has been submitted under this subsection [containing] such a certification, the [ANDA] shall be made effective not earlier than one hundred and eighty days after-
(I) the date the Secretary receives notice from the applicant under the previous [ANDA] of the first commercial marketing of the drug under the previous [ANDA], or
(II) the date of a decision of a court in an

action ... holding the patent which is the subject of the certification to be invalid or not infringed,
whichever is earlier.
*Id.* § 355(j)(5)(B)(iv).
This provision was amended by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003(MMA), Pub.L. No. 108-173, tit. XI, § 1102(a)(2)(D)(i)(I)(bb)(CC), (a)(2)(D)(ii), 117 Stat.2066, 2457-59 (Dec. 8, 2003) (codified at 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(CC), (j)(5)(D)(ii) (2003)). The decisions of the FDA and of the district court were made pursuant to the Act as it stood before the MMA and, because the MMA was not made retroactive, § 1102(b)(1), 117 Stat. at 2460, this decision is also geared to the Act pre-MMA.

FN* If a patent is removed from the [Orange Book], any applicant ... who has made a certification with respect to such patent shall amend its certification. The applicant shall certify ... that no patents [required to be listed in the Orange Book] claim the drug or, if other relevant patents claim the drug, shall amend the certification to refer only to those relevant patents .... Once an amendment ... has been submitted, the application will no longer be considered to be one containing a [paragraph IV certification].
21 C.F.R. § 314.94(a)(12)(viii)(B).

FN* We need not address the question of patent expiration in this case. We note, however, as Ranbaxy and Teva acknowledged at oral argument, the text and structure of the statute suggest a distinction between expiration and delisting such that the first generic applicant may no longer retain exclusivity when the patent has expired. *See* 21 U.S.C. § 355(j)(5)(B)(i); *see also Dr. Reddy's Labs.,* 302 F.Supp.2d at 354-55.

C.A.D.C.,2006.
Ranbaxy Laboratories Ltd. v. Leavitt
--- F.3d ----, 2006 WL 3289050 (C.A.D.C.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1757180 (Appellate Brief) Brief for the Appellants (Jun. 21, 2006) Original Image of this Document with Appendix (PDF)
• 06-5154 (Docket) (May 25, 2006)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-4    Filed 11/17/2006    Page 1 of 3
Case No. 06-1890 (RMC)
Attachment 3 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

Westlaw.

254 F.3d 316                                                                                    Page 1
254 F.3d 316, 2000 WL 1838303 (C.A.D.C.), 349 U.S.App.D.C. 239
**(Cite as: 254 F.3d 316)**

**H**

Briefs and Other Related Documents
Teva Pharmaceuticals, USA, Inc. v. U.S. Food & Drug Admin. and TorpharmC.A.D.C.,2000.NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTADC Rule 28 and FI CTADC Rule 36 for rules regarding the publication and citation of unpublished opinions.)
United States Court of Appeals, District of Columbia Circuit.
TEVA PHARMACEUTICALS, USA, INC., et al.
Appellees,
v.
UNITED STATES FOOD & DRUG ADMINISTRATION AND TORPHARM, a Division of Apotex, Inc., Appellants.
**No. 99-5287.**
**Consolidated with Case No. 99-5342.**

Nov. 15, 2000.

Appeals from the United States District Court for the District of Columbia. (No. 99cv00067).

Before EDWARDS,<sup>FN*</sup> Chief Judge, GINSBURG and TATEL, Circuit Judges.

FN* Chief Judge Edwards concurs in part and dissents in part for the reasons set forth in the attached statement.

*JUDGMENT*
PER CURIAM.
**\*1** These causes came to be heard on the record on appeal from the United States District Court for the District of Columbia, and were briefed and argued by counsel. While the issues presented occasion no need for a published opinion, they have been accorded full consideration by the Court. See D.C.Cir. R. 36(b). On consideration thereof, it is

ORDERED and ADJUDGED, by this Court, that the judgment of the District Court appealed from in these cases is hereby affirmed.

In July 1999, this court reversed the District Court's denial of preliminary injunctive relief to Appellee

Teva Pharmaceuticals, USA, Inc. and remanded the case for further proceedings. *Teva Pharms., USA, Inc. v. FDA,* 182 F.3d 1003 (D.C.Cir.1999) ("*Teva I*" ). On remand, the District Court granted Teva's request for a permanent injunction requiring the Food and Drug Administration ("FDA") to make Teva's tentatively approved Abbreviated New Drug Application ("ANDA") effective immediately. Torpharm, a Division of Apotex, Inc., and the FDA appealed the decision.

As an initial matter, we reject the FDA's suggestion that the case is moot. The matter in dispute is "capable of repetition yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515 (1911).

In *Teva I,* we remanded the case to the District Court to afford the agency the opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement under [21 U.S.C.] § 355(j)(5)(B)(iv)(11)." *Teva I,* 182 F.3d at 1007; *see id.* at 1009. Specifically, the court asked how, under the existing statute, the agency could reasonably treat the subject matter jurisdiction dismissal at issue in this case differently than it treated a partial grant of summary judgment in *Granutec, Inc. v. Shalala,* Nos. 97-1873, 97-1874, 1998 WL 153410 (4th Cir. Apr. 3, 1998). Indeed, in *Teva I,* we tellingly observed that "the California dismissal supports estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec,*" *Teva I,* 182 F.2d at 1011.

The FDA did not meaningfully address this question on remand. Instead, the FDA repeated its claim that the California dismissal did not state on its face that the underlying patent was not infringed and that refusing to look beyond the face of the order served goals of administrative convenience. As the District Court noted in response to this claim:
While the FDA may take administrative convenience into account in developing an across-the-board policy for dealing with Paragraph IV ANDAs, *see, e.g., Clinton Mem'l Hosp. v. Shalala,* 10 F.3d 854, 860 (D.C.Cir.1993) (stating that "the Secretary certainly is allowed to take administrative convenience into account["] ), application of such a rule to the facts of this case under the FDA's present case-by-case approach is arbitrary and capricious. Some degree of legal analysis is unavoidable in the context of the court decision trigger. The FDA is certainly free to protect

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

254 F.3d 316                                                                                    Page 2
254 F.3d 316, 2000 WL 1838310 (C.A.D.C.), 349 U.S.App.D.C. 239
**(Cite as: 254 F.3d 316)**

itself from unreasonable administrative burdens, but the Court fails to see how the unique circumstances of the California dismissal present such a burden.... [A]ll [FDA officials] had to do in order to determine that the patent holder would be estopped from suing Teva for patent infringement was look at the order and Roche's concessionary letter. As a matter of black-letter patent law, these documents suffice to forever estop Roche from suing Teva for patent infringement.

**\*2** _Teva Pharms., USA, Inc. v. FDA,_ Civ. No. 99-67, 1999 WL 1042743, at *5 (D.D.C. Aug. 19, 1999).

In his separate statement, Chief Judge Edwards says that, while the patent law principles supporting estoppel may have been clear in this case, requiring the agency to undertake an approach that might embroil it in complex patent law determinations "would be unduly burdensome to the agency." As both this court in _Teva I_ and the District Court on remand repeatedly emphasized, however, here the FDA had obligated itself to undertake a case-by-case inquiry in applying the court decision trigger. Nor did the court in _Teva I_ open a back door to broad administrative concerns by way of its statement that "the FDA is likely correct that Teva's interpretation is not the only permissible construction of the 'court decision' requirement." _Teva I,_ 182 F.2d at 1012. Indeed, quoted in full that sentence states: "Although the FDA is likely correct that Teva's interpretation is not the only permissible construction of the 'court decision' requirement, Teva has demonstrated that the FDA's refusal to treat the California dismissal as a trigger was arbitrary and capricious in light of the FDA's response in another case." _Id._ at 1012.

Accordingly, we are constrained to conclude, on the record at hand, and for the reasons cited by the court in _Teva I_ and by the District Court in its decision on remand, that the judgment of the agency fails for want of reasoned decisionmaking. The judgment of the District Court must therefore be affirmed.

Nothing in this order, however, should be taken to express any view whatsoever on the FDA's current rulemaking proposal to establish an ANDA "triggering period." _See_ 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. 42,873 (1999) (to be codified at 21 C.F.R. pt. 314) (proposed Aug. 6, 1999). This rulemaking proposal is not before the court and it is not within the compass of this Judgment. It is

FURTHER ORDERED, by this Court, _sua sponte,_ that the Clerk shall withhold issuance of the mandate

herein until seven days after disposition of any timely petition for rehearing or petition for rehearing _en banc. See_ D.C.Cir. R. 41(a)(1). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.

EDWARDS, Chief Judge, concurring in part and dissenting in part.EDWARDS, Chief Judge.
I agree that this case is not moot. I also agree that nothing in this court's judgment today should be taken to express any view whatsoever on FDA's current rulemaking proposal to establish an ANDA "triggering period." I disagree, however, with the majority's conclusion that, in assessing the Paragraph IV "court decision" requirement, FDA is barred from distinguishing between a subject matter jurisdiction dismissal and a disposition pursuant to summary judgment on the merits.

**\*3** It is true that in _Teva Pharmaceuticals, USA, Inc. v. FDA,_ 182 F.3d 1003, 1007, 1009 (D.C.Cir.1999) _("Teva I"_ ), we remanded the case to the District Court to afford the agency an opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement under [21 U.S.C.] § 355(j)(5)(B)(iv)(II)." It is also evident that our decision in _Teva I_ recognized that Teva's declaratory judgment action "appear[ed] to meet the requirements of a triggering 'court decision.' " _Id._. at 1009. We did not, however, purport to render a final judgment on the disputed issue. Indeed, our decision makes it clear that "the FDA is likely correct that Teva's interpretation is not the only permissible construction of the 'court decision' requirement." _Id._ at 1012.

Against this backdrop, the record of the District Court on remand demonstrates that FDA did in fact respond to our instructions in _Teva I._ FDA, on remand, pressed a new point that we had not previously considered: In assessing the statutory "court decision" requirement, the agency would not look beyond the face of a court order, because to do so would be unduly burdensome to the agency.

It may be, as the District Court found, that it would have been relatively easy for FDA officials to look at _both_ the court order and Roche's concessionary letter in order to determine that the patent holder would be estopped from suing Teva for patent infringement. But FDA adequately and reasonably explained that adopting the look-behind-the-order approach advocated by Teva would "require FDA to analyze ... the patent-law ramifications of court decisions when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

254 F.3d 316                                                                                                Page 3
254 F.3d 316, 2000 WL 1838303 (C.A.D.C.), 349 U.S.App.D.C. 239
**(Cite as: 254 F.3d 316)**

those ramifications are not apparent on the face of the order or judgment." FDA's Memorandum in Opposition to Teva's Renewed Application for a Temporary Restraining Order and Motion for Preliminary Injunction at 2, *Teva Pharms., USA, Inc. v. FDA,* Civ. No. 99-67, 1999 WL 1042743 (D.D.C. Aug. 19, 1999), *reprinted in* Joint Appendix ("J.A.") 91. FDA further avowed that such an approach would embroil the agency in "determinations about complex patent law issues," that would unduly tax the agency's "scarce resources." *Id.* at 5, 6, *reprinted in* J.A. 94, 95. In short, the agency obviously and sensibly sought to avoid the burden of adjudicating the underlying reasons for a dismissal.

Not only did the agency offer a new position on remand-one which advanced a permissible construction of the statute-FDA also demonstrated that its refusal to treat the California dismissal as a triggering "court decision" was not arbitrary and capricious in light of FDA's treatment of the grant of partial summary judgment at issue in the cited *Granutec* case. It is clear from the face of the summary judgment order at issue in *Granutec* that the court there had issued a decision on the merits. The same was not true with respect to the order supporting the California dismissal involving Teva, for one must look at both the court's otherwise innocuous dismissal order (which merely dismisses for want of jurisdiction) *and* Roche's separate concessionary letter to Teva to be able to discern that the patent holder would be estopped from hereafter suing Teva for patent infringement. In other words, the two cases are quite different, so FDA's differing treatment of them was perfectly reasonable.

**\*4** Because FDA did what we asked for in *Teva I,* we have no business second-guessing the agency on this appeal. I respectfully dissent.

C.A.D.C.,2000.
Teva Pharmaceuticals, USA, Inc. v. U.S. Food & Drug Admin. and Torpharm
254 F.3d 316, 2000 WL 1838303 (C.A.D.C.), 349 U.S.App.D.C. 239

Briefs and Other Related Documents (Back to top)

• 99-5287 (Docket) (Aug. 19, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-5    Filed 11/17/2006    Page 1 of 9

Case No. 06-1890 (RMC)
Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

# Westlaw.

139 F.3d 889                                                                                    Page 1
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

▷

Briefs and Other Related Documents

Granutec, Inc. v. ShalalaC.A.4 (N.C.),1998.NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
GRANUTEC, INCORPORATED, Plaintiff-Appellee,
v.
DONNA E. SHALALA, Secretary of Health and Human Services; Michael Friedman, M.D.; Food & Drug Administration, Defendants,
andGENPHARM, INCORPORATED, Intervenor-Appellant.
BOEHRINGER INGELHEIM CORPORATION, Amicus Curiae.
GRANUTEC, INCORPORATED, Plaintiff-Appellee,
v.
DONNA E. SHALALA, Secretary of Health and Human Services; Michael Friedman, M.D.; Food & Drug Administration, Defendants-appellees,
andGENEVA PHARMACEUTICALS, INCORPORATED, Intervenor-Appellant.
BOEHRINGER INGELHEIM CORPORATION, Amicus Curiae.
**Nos. 97-1873, 97-1874.**

Argued October 1, 1997.
Decided April 3, 1998.

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, Chief District Judge. (CA-97-485-5-BO).

Richard Melvyn Cooper, WILLIAMS & CONNOLLY, Washington, D.C., for Appellant Genpharm.
Joel E. Hoffman, SUTHERLAND, ASBILL & BRENNAN, L.L.P., Washington, D.C., for Appellant Geneva.
Howard Stanley Scher, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert Fritz Green, LEYDIG, VOIT & MAYER, LTD., Chicago, Illinois, for Appellees.
George A. Borden, Dan S. Sokolov, WILLIAMS & CONNOLLY, Washington, D.C.; Robert W.

Spearman, Catharine B. Arrowood, Robert H. Tiller, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Raleigh, North Carolina, Edgar H. Haug, Barry S. White, James K. Stronski, FROMMER, LAWRENCE & HAUG, L.L.P., New York, New York, for Appellant Genpharm.
Hamilton P. Fox, III, Timothy J. Cooney, Kristen J. Indermark, Melina Zacharopoulos, SUTHERLAND, ASBILL & BRENNAN, L.L.P., Washington, D.C.; Steven J. Lee, Frederick H. Rein, Reem F. Jishi, KENYON & KENYON, New York, New York; Noel Allen, ALLEN & PINNIX, P.A., Raleigh, North Carolina, for Appellant Geneva.
Frank W. Hunger, Assistant Attorney General, Janice McKenzie Cole, United States Attorney, Douglas N. Letter, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Margaret Jane Porter, Chief Counsel, Elizabeth H. Dickinson, Catherine M. Cook, Office of the Chief Counsel, FOOD & DRUG ADMINISTRATION, Rockville, Maryland, for Federal Appellees.
John F. Fleder, David F. Weeda, Arthur Y. Tsien, OLSSON, FRANK & WEEDA, P.C., Washington, D.C.; John R. Wallace, WALLACE, CREECH & SARDA, L.L.P., Raleigh, North Carolina, for Appellee Granutec.
Barbara S. Wahl, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington, D.C.; Martin B. Pavane, Michael C. Stuart, COHEN, PONTANI, LIEBERMAN & PAVANE, New York, New York, for Amicus Curiae.

Before RUSSELL[FN*] and MOTZ, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

> FN* Judge Russell heard oral argument in this case but died prior to the time the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C.A. § 46(d) (West 1993).

## OPINION

PER CURIAM.
*1 This appeal concerns the Food and Drug Administration's enforcement of certain provisions of 21 U.S.C.A. § 355, part of the 1984 revision to the Food, Drug, and Cosmetic Act known collectively as the "Hatch-Waxman Amendments." *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585 (1984). The district court determined that the Food and Drug

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

139 F.3d 889                                                                                          Page 2
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

Administration (FDA) incorrectly declined to apply the terms of a regulation, promulgated pursuant to the Hatch-Waxman Amendments, that the District Court for the District of Columbia had all but held invalid in *Mova Pharmaceutical Corp. v. Shalala,* 955 F.Supp. 128 (D.D.C.1997).

At the time of the district court's decision in the present case, FDA had decided:
to acquiesce temporarily-pending an appellate decision overturning the district court decision or a favorable ruling on summary judgement-in the *Mova* preliminary injunction in order to promote administrative uniformity and to avoid forum shopping problems that would lead ... applicants back to the United States District Court for the District of Columbia where the *Mova* decision was rendered.

Brief of FDA at 11. Genpharm, Inc., and Geneva Pharmaceuticals, Inc., intervened in opposition to Granutec's motion for an injunction, with each cross-claiming that it was entitled to the 180-day exclusive marketing period Granutec sought to enjoin.

For the reasons set forth within, we conclude that the regulation Granutec seeks to enforce is invalid. Further, we hold that, as the first applicant under the statute, Genpharm was entitled to a 180-day exclusivity period measured from March 3, 1997, until August 29, 1997. We therefore reverse the judgment of the district court.

I.

A.

The provision of the Hatch-Waxman Amendments relevant to this appeal concerns the availability of a 180-day market exclusivity period to the first company that seeks, under certain circumstances, to market a generic form of a patented drug approved by the FDA. Under the Food, Drug, and Cosmetic Act generally, pioneer drug manufacturers must obtain FDA approval for any new drug by filing a New Drug Application (NDA), which requires the submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. All drug patent information is published by the FDA.

One of the primary innovations of the Hatch-Waxman Amendments is an additional provision that allows companies subsequently seeking to produce and market a generic form of a pioneer drug to avoid filing a full NDA. Instead, these companies may file only an Abbreviated New Drug Application (ANDA), in which they may rely on the findings of safety and effectiveness included in the original NDA. The only important new information that must be included in the ANDA regards the generic company's position *vis-a-vis* the original patent, and the company must make one of four certifications: I) that no patent for the pioneer drug has been filed; II) that the patent for the pioneer drug has expired; III) that the patent for the pioneer drug will expire on a particular date; or IV) that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic. *See* 21 U.S.C.A. § 355(j)(2)(A)(vii) (West Supp.1997). The last of these, commonly referred to as a "Paragraph IV" certification, is the certification at issue in this appeal.

**\*2** If a generic company chooses Paragraph IV certification, it must notify both the patent owner and the NDA holder of the ANDA application. That notification must include the basis for why the proposed generic does not infringe upon the patent, or why that patent is invalid. *See* 21 U.S.C.A. § 355(j)(2)(B) (West Supp.1997). After such notice, an action for patent infringement must be brought within 45 days, and if no such action is brought, FDA may approve the ANDA. If an infringement action is brought, FDA cannot approve the ANDA for 30 months, unless the matter is adjudicated in the ANDA applicant's favor or the court hearing the suit orders a shorter or longer waiting period. *See* 21 U.S.C.A. § 355(j)(4)(B)(iii) (West Supp.1997).

In addition, and here we reach the statutory provision contested in this appeal, the Hatch-Waxman Amendments also provide an incentive for companies to challenge patents and develop alternative forms of patented drugs by offering a 180-day period of market exclusivity to those who successfully make their Paragraph IV certifications. The relevant provision states:
 (iv) If the application [ANDA] contains a certification described in [Paragraph IV] ... and is for a drug for which a previous application has been submitted under this subsection continuing [sic: usually read as "containing"] such a certification, the application shall be made effective not earlier than one hundred and eighty days after-
(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
(II) the date of a decision of a court in an action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-5    Filed 11/17/2006    Page 3 of 9
Case No. 06-1890 (RMC)
Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

139 F.3d 889                                                                                                    Page 3
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,
whichever is earlier.

21 U.S.C.A. § 355(j)(4)(B)(iv) (West Supp.1997). Thus, the statute grants a 180-day period of exclusive marketing rights to the first generic manufacturer to file an ANDA containing a Paragraph IV certification, measuring from the date it decides to begin marketing after the 30-month stay has expired (presumably assuming the risk of liability for patent infringement) or from the date of a favorable patent infringement decision, whichever is earlier.

Further, pursuant to 21 U.S.C.A. § 371(a), FDA may promulgate regulations for the enforcement of the Food, Drug, and Cosmetic Act as a whole, and has done so with regard to the 180-day market exclusivity provision. See 21 U.S.C.A. § 371(a) (West 1972). That regulation, found at 21 C.F.R. § 314.107(c)(1), states that:
(1) If an abbreviated new drug application contains a certification that a relevant patent is invalid, unenforceable, or will not be infringed and the application is for a generic copy of the same listed drug for which one or more substantially complete abbreviated new drug applications were previously submitted containing a certification that the same patent was invalid, unenforceable, or would not be infringed and the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice submitted under § 314.95, approval of the subsequent abbreviated new drug application will be made effective no sooner than 180 days from whichever of the following dates is earlier:
**\*3** (i) The date the applicant submitting the first application first commences commercial marketing of its drug product; or
(ii) The date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed.

21 C.F.R. § 314.107(c)(1) (1997) (emphasis added). This provision, therefore, not only restates the statutory requirements for the 180-day exclusivity period, but additionally requires that "the applicant submitting the first application has successfully defended against a suit for patent infringement." *Id.*

B.

The regulation's addition to the requirements for the 180-day exclusivity period is commonly known as the "successful defense" requirement, and has been enforced since the regulation's adoption in 1994. Earlier, in 1989, an unwritten FDA interpretation of the statute requiring that the Paragraph IV applicant be sued in order to be eligible for the exclusivity period was challenged as unreasonable in *Inwood Laboratories, Inc. v. Young,* 723 F.Supp. 1523 (D.D.C.1989), *appeal dismissed,* 43 F.3d 712 (D.C.Cir.1989). There, a district court granted a motion for a preliminary injunction against FDA on the ground that, because 21 U.S.C. § 355(j)(4)(B)(iv) was clear on its face, a court should not "permit[ ] the FDA to read into [the statute] a requirement of a lawsuit which is simply not there." *Id.* at 1526.

Nevertheless, FDA promulgated a regulation containing an even more demanding interpretation of the statute-i.e., the "successful defense" requirement-in 1994. That regulation was itself challenged in an injunction context last year in *Mova,* where the District Court for the District of Columbia, while not declaring the regulation invalid, stated that the likelihood was "very high" that a challenge to the "successful defense" portion of the regulation as an impermissible addition to the relevant statute would succeed. *Mova,* 955 F.Supp. at 131. In so doing, the district court declared:
The language of the statute may be complex, and even cumbersome, but it is plain and unambiguous. It does not include a "successful defense" requirement, and indeed it does not even require the institution of patent litigation. It was Mova's first filing of an ANDA for micronized glyburide [the drug there in question] under paragraph IV, and not Upjohn's infringement suit, that required FDA to withhold approval from subsequent paragraph IV filers.... The operation of the statute on the facts of this case may appear to FDA to be unwise, and may appear ... to be an invitation for abuse, but their remedy lies with Congress, not this Court.

*Id.* at 130-31 (citing *Inwood,* 723 F.Supp. at 1526). Thus, *Mova* strongly implied that the regulation in question was not a permissible "interpretation" of the 180-day exclusivity provision in the statute.

C.

**\*4** In the present case, Granutec successfully persuaded the district court to enjoin FDA from granting the 180-day marketing exclusivity period to its competitor, Genpharm, for the production of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-5    Filed 11/17/2006    Page 4 of 9
Case No. 06-1890 (RMC)
Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

139 F.3d 889
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
(Cite as: 139 F.3d 889)

Page 4

generic form of Zantac, a medication for the treatment of ulcers and one of the largest-selling prescription drugs in the world. Granutec's argument in this regard was that, contrary to *Mova*, FDA erred in *not* applying the "successful defense" requirement. Granutec maintained that FDA's failure to follow its own regulation, which compelled the result that no ANDA applicant in this matter was entitled to 180-day exclusivity, was arbitrary and capricious. As stated above, FDA had adopted a position acquiescing in the *Mova* decision and its implications for the validity of the "successful defense" requirement. In granting the injunction, however, the district court cited the regulatory "successful defense" requirement, without further explanation.

Granutec's claim against Genpharm resulted from a series of efforts by various pharmaceutical companies to use the Paragraph IV certification to gain FDA approval for a generic form of Zantac. The original patents for the two operative forms of ranitidine hydrochloride (ranitidine), the active ingredient in Zantac, belonged to GlaxoWellcome, Inc. (Glaxo), the pioneer manufacturer of Zantac. The two forms of ranitidine, Forms 1 and 2, are considered equivalent by FDA, but are covered by different patents: Patent No. 4,521,431 (the 431 patent) covers Form 2 ranitidine, and will expire on June 4, 2002, and Patent No. 4,128, 658 (the 658 patent) covers Form 1, and expired on July 25, 1997. *See* Brief of FDA at 11, 34 & n.3.

The first company to challenge either patent was Genpharm, which, in February 1991, filed an ANDA for a generic ranitidine product, and included a Paragraph IV certification as to the 431 patent for Form 2 ranitidine. Later, Genpharm amended that application to include a Paragraph IV certification as to the 658 patent as well. Glaxo filed an infringement suit within the 45-day statutory period, and prevailed in October 1995. *See Glaxo, Inc. v. Genpharm Pharmaceuticals, Inc.,* C.A. Nos. K-92-1831 and K-93-4228 (D.Md. Oct. 23, 1995). In 1996, Genpharm filed a Paragraph IV certification under its ANDA alleging non-infringement of the 431 patent for Form 1 ranitidine, and again Glaxo sued. That case remained pending when this appeal was filed.

In January 1994, Geneva filed an ANDA for generic ranitidine, which included a Paragraph IV certification as to the 431 patent for a Form 1 product. Glaxo sued Geneva, and that case also remained pending as of the time this appeal was filed.

In April 1994, Granutec filed an ANDA for generic

ranitidine, which also included a Paragraph IV certification as to the 431 patent for a Form 1 product. Glaxo sued, and Granutec prevailed in July 1996; Glaxo appealed that decision and lost on appeal when the Federal Circuit affirmed on April 4, 1997. *See Glaxo, Inc. v. Novopharm, Ltd.,* 931 F.Supp. 1280 (E.D.N.C.1996), *aff'd,* 110 F.3d 1562 (Fed.Cir.1997). In the wake of this decision, Glaxo and Granutec entered into a licensing agreement regarding the 658 patent, which provided that, in exchange for a substantial monetary payment, Glaxo would allow Granutec to begin marketing generic Zantac on July 10, 1997, fifteen days before the scheduled expiration of the 658 patent.

*5 This case was instituted when Granutec, having entered into the 15-day licensing agreement with Glaxo for its generic version of Zantac, sought FDA approval of its ANDA effective July 10, 1997. FDA responded that it could not approve Granutec's ANDA effective as of July 10, 1997. Pursuant to its decision to acquiesce in *Mova* and that decision's implications for the "successful defense" requirement, FDA concluded that Genpharm was entitled to the 180-day marketing exclusivity period because Genpharm filed the first ANDA with a Paragraph IV certification for Zantac. FDA measured Genpharm's exclusivity period from March 3, 1997, the date that Glaxo's right to appeal expired in *Glaxo, Inc. v. Boehringer Ingelheim Corp.,* 954 F.Supp. 469 (D.Conn.1996), *judgment entered by* 962 F.Supp. 295 (D.Conn.1997), *aff'd,* No. 97-1283, 1997 WL 355339 (Fed.Cir. June 4, 1997), a wholly unrelated suit in which a district court determined that Boehringer Ingelheim's generic version of Form 1 ranitidine did not infringe upon Glaxo's 431 patent.

This judgment, FDA claimed, satisfied the requirement of 21 U.S.C.A. § 355(j)(4)(B)(iv) that, before the 180-day period of exclusivity can begin, there must be "*a* decision of *a* court in *an* action ... holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C.A. § 355(j)(4)(B)(iv)(II) (emphasis added). As FDA had decided to "acquiesce" in the *Mova* decision, it did not apply the additional "successful defense" requirement found in 21 C.F.R. § 314.107(c)(1).

On June 17, 1987, Granutec filed this action, seeking declaratory and injunctive relief against FDA, in the District Court for the Eastern District of North Carolina. Granutec alleged that no company was entitled to a 180-day exclusivity period and sought approval of its ANDA effective July 10, consistent with the terms of its license from Glaxo. Genpharm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

139 F.3d 889                                                                                              Page 5
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

and Geneva intervened and cross-claimed, and, on July 3, 1997, the district court dismissed the two cross-claims and, *sua sponte,* granted a permanent injunction against FDA.

This appeal followed. Although FDA was the party against whom the district court enforced the permanent injunction, on appeal the agency has realigned itself. FDA now asserts that the district court's injunction was proper and should be upheld.

On July 9, 1997, we entered a stay of the district court's injunction pending appeal. We also ordered Genpharm and Geneva each to post a five million dollar supersedeas bond to protect Granutec's stake in the event we ultimately affirmed the district court's order. Granutec thereafter executed an agreement with Genpharm wherein Genpharm waived any entitlement to exclusivity in favor of Granutec, but preserved Granutec's right to challenge Genpharm's claim to exclusivity. In the wake of this agreement, FDA approved Granutec's ANDA effective August 1, 1997, and Granutec has been marketing its generic version of Zantac since that date.

*6 On August 6, 1997, the District Court for the District of New Jersey dismissed with prejudice Glaxo's infringement claim against Geneva. *See Glaxo, Inc. v. Geneva Pharmaceuticals, Inc.,* C.A. Nos. 94-1921 and 94-4589 (D.N.J. Aug. 6, 1997). FDA thereafter approved Geneva's ANDA as of August 29, 1997. On August 15, 1997, Genpharm prevailed over Glaxo in its infringement suit. *See GlaxoWellcome, Inc. v. Genpharm, Inc.,* No. 96-CIV-6719 (S.D.N.Y. Aug. 15, 1997). FDA approved Genpharm's ANDA effective August 22, 1997, and Genpharm has marketed its generic since that date.

## II.

This case turns on a fundamental problem of administrative law: an agency's authority to interpret the statutes it is required to enforce.

## A.

Genpharm and Geneva allege that the district court incorrectly required FDA to adhere to the "successful defense" requirement-a requirement that both companies claim is invalid because it directly conflicts with the plain language of the statutory provision regarding the 180-day market exclusivity period. In support of this allegation, Genpharm and Geneva cite

*Mova,* and other cases holding that regulations, like the one here, that add to rather than elucidate a statutory requirement go beyond an agency's authority to interpret legislative grants of power. We agree with their argument.

As Judge Robertson stated in *Mova* when he examined the validity of the "successful defense" requirement, the language of 21 U.S.C.A. § 355(j)(4)(B)(iv) is "plain and unambiguous. It does not include a 'successful defense' requirement, and indeed it does not even require the institution of patent litigation." *Mova,* 955 F.Supp. at 130. In light of this plain and unambiguous language, FDA's interpretive authority with regard to the statutory provision is limited to the extent that Congress has already spoken directly to the issue addressed by the regulation. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Here, that issue involves the exact requirements a generic manufacturer must satisfy to qualify for the 180-day market exclusivity period. By expressly including certain requirements in the statute to the exclusion of all others, Congress presumably intended that the statutory requirements would comprise the full measure of eligibility. As we held in *Cabell Huntington Hospital, Inc. v. Shalala,* 101 F.3d 984, 990-91 (4th Cir.1996), an agency cannot issue regulations that alter the statute's requirements for benefits the agency administers. All that Congress required for the 180-day exclusivity period is: (1) the filing of the first ANDA that includes a Paragraph IV certification; and (2) either (a) the first commercial marketing of the drug (after no infringement suit has been filed within 45 days or no resolution to such a suit has been reached after the expiration of the 30-month stay), or (b) a decision that the patent in question is either invalid or not infringed. *See* 21 U.S.C.A. § 355(j)(4)(B)(iv).

*7 Demanding a "successful defense" neither interprets the statute nor fills a gap left by statutory silence. Rather, the "successful defense" requirement adds a requirement not contemplated in the statute, and, as Genpharm notes, renders superfluous 21 U.S.C.A. § 355(j)(4)(B)(iv)(I), which allows the 180-day period to begin at the time FDA receives notice of marketing of the drug, regardless of the outcome of any infringement suit. *See Foxglenn Investors L.P. v. Cisneros,* 35 F.3d 947, 950-51 (4th Cir.1994) (declaring invalid a regulatory interpretation that rendered a section of the applicable statute superfluous).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

139 F.3d 889                                                                Page 6
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

Both Granutec and FDA argue that the regulation in question merely elucidates rather than adds to the requirements for the 180-day exclusivity period. Further, Granutec painstakingly attempts to demonstrate that the regulation does not render 21 U.S.C. § 355(j)(4)(B)(iv)(I) superfluous. Granutec and FDA cite legislative history in support of their argument that the regulation is consistent with the statute. However, both are mistaken. *Chevron* clearly states that the determination of a regulation's validity under its enabling statute involves a two-stage process. Analysis of legislative history and policy goals occurs at the *second* stage, and is reached only if Congress, through the relevant statute, has not spoken directly to the issue in question. *See Chevron,* 467 U.S. at 842-43. If Congress has so spoken, "that is the end of the matter," *id.* at 842; a court simply does not undertake to assess the reasonableness of the agency's interpretation of the statute if Congress has spoken.

Our examination of the regulation's relation to the statute never reaches the second stage in this case. Congress has plainly laid out the requirements for the 180-day exclusivity period in the statute (albeit in tortured language), and, thus, our inquiry into Congressional intent must end there. Having found the exclusivity requirements embodied in the statutory language of 21 U.S.C.A. § 355(j)(4)(B)(iv) clear and conclusive, we are bound to hold invalid any attempt to alter the terms of that statute.

The "successful defense" requirement in 21 C.F.R. § 314.107(c)(1) amounts to such an alteration because it adds a requirement to 21 U.S.C.A. § 355(j)(4)(B)(iv) that Congress never contemplated. Further, the idea that any 180-day exclusivity period must be premised on the successful defense of an infringement suit results in the evisceration of 21 U.S.C.A. § 355(j)(4)(B)(iv)(I), which clearly contemplates an exclusivity period beginning-whether or not an infringement suit has come to resolution-on the date of first commercial marketing by the first ANDA filer.

Thus, we hold the "successful defense" requirement contained in 21 C.F.R. § 314.107(c)(1) to be an invalid addition to the statutory requirements for exclusivity. Genpharm, as the first ANDA filer, was therefore entitled to a period of exclusivity under the statute.[FN1]

> FN1. We reject Geneva's argument that Genpharm lost its place in line as the first ANDA applicant, and thus the only ANDA applicant, eligible for exclusivity. FDA

maintains that, although Genpharm did not make the Paragraph IV certification relevant to these proceedings until 1996, Genpharm qualifies as the first ANDA applicant for purposes of the exclusivity because the certification relates back to the date of its ANDA application. This interpretation does not clearly conflict with either the regulations or the statute, and thus we find no reason to substitute a contrary judgment on this matter for that of FDA. *See Chevron,* 467 U.S. at 843-45; *Pauley v. Beth Energy Mines, Inc.,* 501 U.S. 680, 696-98, 705-06, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991); *Mullins Coal Co. v. Director, OWCP,* 484 U.S. 135, 159, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987); *Lisa Lee Mines v. Director, OWCP,* 86 F.3d 1358, 1360-63 & n. 8 (4th Cir.1996).

B.

**\*8** Having concluded that the "successful defense" requirement imposed by 21 C.F.R. § 314.107(c)(1) is invalid, we turn now to determine how to measure Genpharm's period of exclusivity. This determination depends upon the interpretation given to the phrase "the date of a decision of a court" holding the patent invalid or not infringed, as used in 21 U.S.C.A. § 355(j)(4)(B)(iv)(II). The litigants (and amicus Boehringer Ingelheim Corp.) espouse multiple interpretations of the phrase, and, accordingly, suggest just as many different dates from which to measure exclusivity.

FDA has adopted alternative positions regarding how to interpret this provision, depending upon our decision with regard to the validity of the "successful defense" requirement. If we upheld the "successful defense" requirement found in 21 C.F.R. § 314.107(c)(1), FDA argued that, pursuant to the language of that regulation, we should conclude "*a* court" means "*the* court" that rendered the "successful defense" decision for the first ANDA applicant. Thus, no litigant would be entitled to exclusivity because the only litigant ever possibly entitled was Genpharm, and Genpharm had not successfully defended when Granutec sought approval of its ANDA effective July 10.

However, in the event that we found the "successful defense" requirement invalid, as we have, FDA adheres to the argument consistent with its original position in this suit, reflecting its acquiescence in *Mova.* That is, the "successful defense" requirement being invalid, FDA argues that "*a* court" means "*any*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court." By this reasoning, Genpharm's exclusivity began running at the date of a decision by the first court to hold the 431 patent not infringed, whether or not that decision involved Genpharm (the first ANDA applicant).

FDA then combines this reasoning with the terms of 21 C.F.R. § 314.107(e). "[F]or purposes of establishing the effective date of approval," that section defines "a decision of a court" in terms of a "final judgment from which no appeal can be or has been taken." Section 314.107(e) goes on to state that "the date of final decision" shall be, in the case of no appeal by the patent holder, "the date on which the right to appeal lapses," and, in the case of an appeal, "the date of the first decision or order by a higher court" affirming the district court's non-infringement decision. 21 C.F.R. § 314.107(e) (1997). Thus, FDA concludes that Genpharm's period of exclusivity ran from March 3, 1997-the date that Glaxo's right of appeal lapsed in the *Boehringer Ingelheim* suit [FN2]-and expired 180 days later on August 29, 1997.

> FN2. Genpharm contends that Glaxo did appeal the district court's order, and thus March 3, 1997, is an improper date to measure from even under FDA's analysis. We disagree. By order dated October 7, 1996, the district court in the *Boehringer* suit granted partial summary judgment to Boehringer on the basis of Glaxo's express concession that Boehringer's generic did not infringe the 431 patent. Thereafter, on November 18, 1996, the court entered partial summary judgment in Boehringer's favor on Glaxo's claim that Boehringer infringed Glaxo's patents by filing its ANDA. On January 30, 1997, the court entered final judgment with regard to both of these orders. *See Glaxo, Inc. v. Boehringer Ingelheim Corp.,* 962 F.Supp. 295 (D.Conn.1997). Glaxo appealed that judgment and lost, *see* 1997 WL 355339 (Fed.Cir. June 4, 1997); however, it appealed only with regard to the November 18 order, not the October 7 order that the district court entered on the basis of Glaxo's express concession of non-infringement. *See id.* at n. 1; *see also* Memorandum of Genpharm, Inc., in Support of its Mot. for an Inj. Pending Appeal, at Tab 4 (Aug. 18, 1997) (copy of letter from attorney for Glaxo to attorney for Boehringer Ingelheim declaring that "Glaxo is not appealing the Court's October 7, 1996

decision").

Although FDA's "successful defense" regulation was an invalid attempt to impose an additional requirement in derogation of the statutory scheme, FDA's reading of "the date of a decision of a court" simply interprets *ambiguous* statutory terminology. Despite the corporate litigants' arguments and protests to the contrary, this statutory language possesses no clear, definite meaning. For the purpose of measuring exclusivity under this statutory scheme, "the date of a decision" may mean the date of a district court decision, but it may also mean-without, contrary to Granutec's suggestion, doing harm to ordinary principles of finality and res judicata-the date appeal rights lapse or the date a higher court renders its first decision, as FDA's regulation contemplates. Similarly, " a court" may mean "the court," but it may just as well mean "any court." A fair reading of this statutory language does not clearly dictate a particular interpretation.

*9 Each version bears certain problems in relation to the statutory scheme. At first blush, FDA's preferred interpretation (if the "successful defense" requirement is invalid) achieves a seemingly anomalous result in that a first applicant (here, Genpharm) receives an entitlement to exclusivity during a period when, presuming the imposition of a 30-month stay under 21 U.S.C.A. § 355(j)(4)(B)(iii), that applicant may not be able to take advantage of its exclusive rights until the 30-month period ends or it receives a favorable noninfringement judgment. However, this interpretation seeks to thwart any attempt by pioneer drug manufacturers to capture the generic market, and to some degree achieves that goal. Furthermore, although FDA's interpretation subjects first applicants to the vagaries of timing and speed attributable to different courts, it does not strip exclusivity of all value. As Genpharm and Granutec have demonstrated, the ability to waive exclusivity in favor of another generic manufacturer can be quite lucrative.

By contrast, Genpharm and Geneva contend that "a court" must mean "the court," and thus each maintains that the period of exclusivity cannot begin to run until the generic manufacturer entitled to exclusivity begins marketing or wins a patent infringement suit brought against it by the pioneer manufacturer. This interpretation preserves exclusivity for the first applicant until it prevails in litigation, or at least until it begins marketing while assuming the risk of losing the litigation. However, it clears the way for generic capture.

Case 1:06-cv-01890-RMC    Document 14-5    Filed 11/17/2006    Page 8 of 9

Case No. 06-1890 (RMC)
Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

139 F.3d 889                                                                      Page 8
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

Such a result would be antithetical to the very purpose of the exclusivity incentive and the entire ANDA regime. As the legislative history of the Hatch-Waxman amendments indicates, the ANDA scheme purports to "make available more low cost generic drugs." H.R.Rep. No. 98-857, pt. 1, 98th Cong., 2d Sess., at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647. A situation where no generic can come to market because the pioneer has imposed a stranglehold by gaining entitlement to an exclusive marketing period for its captured generic, yet never exercises that right, could not have been contemplated by Congress. [FN3]

> FN3. We recognize that even under FDA's interpretation a pioneer could place a stranglehold on the generic market, although we think it is less likely. For example, a pioneer in control of a captured generic could file the first ANDA with a Paragraph IV certification. As long as the pioneer prevents its captured generic from going to market and at the same time does not file an infringement suit against *any* generic manufacturer (captured or non-captured), the captured generic's exclusivity period would never begin to run, and no generic could begin to sell pursuant to a Paragraph IV certification. The "successful defense" requirement would solve this problem, were it valid. But this problem, like many others, arises from the manner in which Congress drafted the exclusivity mechanism, and, as such, the remedy lies with Congress.

Given the complicated and sensitive nature of the statutory drug approval mechanism, we choose to defer to the interpretation posited by the agency charged by Congress with administering the statutory scheme. FDA's interpretation of the statutory language and its own regulations is a permissible, reasonable interpretation of a complicated legislative framework that reflects a considered balance of competing statutory goals. We recognize that positions adopted by an agency solely for litigation do not deserve the deference of this Court. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). However, we are not faced with such a situation here. FDA did not adopt its current position in anticipation of this litigation, but in response to the *Mova* decision, which suggested the probable invalidity of the "successful defense" requirement. It made its position known to all ANDA applicants seeking approval in the wake of *Mova,* seeking to avoid any forum shopping that might result. Indeed, it was FDA's adherence to its post-*Mova* position that precipitated this lawsuit by Granutec. In such a situation, the concerns that caution against deference to an agency's litigation position do not exist because the position reflects the thoughtful judgment of the agency, not just the posture of litigation counsel. *See National Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1129 (D.C.Cir.1997) (citing *Auer v. Robbins,* 519 U.S. 452, ----, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997)); *Herman v. NationsBank Trust Co.,* 126 F.3d 1354, 1363 (11th Cir.1997); *Appalachian States Low-Level Radioactive Waste Comm'n v. Pena,* 126 F.3d 193, 198-99 (3rd Cir.1997); *Monongahela Power Co. v. Reilly,* 980 F.2d 272, 279 & n. 7 (4th Cir.1993).

C.

**\*10** Both Genpharm and Geneva also assert jurisdictional and procedural grounds for reversal of the district court-namely, that the district court lacked subject matter jurisdiction over this case and failed to give the intervenors the proper notice and hearing before dismissing the cross-claims and granting, *sua sponte,* a permanent injunction.

We would have jurisdiction if the district court lacked it, and thus all appellants have received the remedy they seek-a full hearing and decision on the merits in the Court of Appeals. In addition, if we held that the district court failed to provide proper notice and hearing to the parties, the remedy would be to remand to the district court for largely the same proceedings that we have conducted.

For these reasons, we reject these allegations of procedural shortcomings on the part of the district court.

III.

In sum, then, we hold that the "successful defense" requirement imposed by 21 C.F.R. § 314.107(c)(1) is invalid. Further, we hold that, under the interpretation of the statutory scheme adopted by the FDA in contemplation of such a decision, Genpharm was entitled to a period of exclusivity that ran from March 3, 1997, until August 29, 1997. Because Genpharm waived its exclusivity with regard to Granutec, and FDA approved Geneva's ANDA as of August 29,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01890-RMC    Document 14-5    Filed 11/17/2006    Page 9 of 9
Case No. 06-1890 (RMC)
Attachment 4 to DRL's Memorandum of Law in Opposition to Apotex's Motion for Preliminary Injunction/TRO

139 F.3d 889                                                                  Page 9
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398
**(Cite as: 139 F.3d 889)**

1997, no party has violated Genpharm's period of exclusivity. Granutec was never entitled to begin marketing on July 25, 1997, so its agreement with Glaxo to begin marketing on July 10, 1997, was based on an erroneous premise. The supersedeas bonds shall be returned, along with accrued interest, to Genpharm and Geneva.

We understand this opinion will not satisfy any party to this suit. In cases involving complicated regulatory schemes such as this, we seek to give full effect to the plain language of a statute while simultaneously deferring to reasonable interpretations offered by the relevant federal agency. The complex legislative scheme and the awkwardly drafted statute at issue here do not lend themselves to simple solutions, particularly when further complicated by secondary licensing arrangements, a stay pending appeal, and multi-million dollar bonds. In accordance with this opinion, the judgment of the district court is hereby

*REVERSED.*

C.A.4 (N.C.),1998.
Granutec, Inc. v. Shalala
139 F.3d 889, 1998 WL 153410 (C.A.4 (N.C.)), 46 U.S.P.Q.2d 1398

Briefs and Other Related Documents (Back to top)

• 97-1874 (Docket) (Jul. 03, 1997)
• 97-1873 (Docket) (Jul. 03, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| APOTEX INC. | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case No. 06-1890 (RMC) |
| | ) |
| FOOD & DRUG ADMINISTRATION, et al, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DR. REDDY'S LABORATORIES, LTD. and | ) |
| DR. REDDY'S LABORATORIES, INC., | ) |
| | ) |
| Intervenors-Defendants. | ) |

## DECLARATION OF AMIT M. PATEL

I, Amit M. Patel, declare as follows:

1.    Dr. Reddy's Laboratories, Ltd. is an Indian pharmaceutical company.  Dr. Reddy's Laboratories, Inc. is a wholly-owned subsidiary of Dr. Reddy's Laboratories, Ltd, with an office in Bridgewater, New Jersey. Dr. Reddy's Laboratories, Inc. is the FDA regulatory agent and marketing arm of Dr. Reddy's Laboratories, Ltd. in the United States. I will refer collectively to the two corporate entities here as "DRL."

2.    I am the Vice President, Corporate Development & Strategic Planning for DRL. In that capacity I am responsible for business development, long-term business planning, investments, and specific operational oversight in North America for DRL's Brand and Generic businesses. I am familiar with the marketing of drug products in general and with the marketing of generic drugs in particular. I hold an MBA from Harvard Business School. This

620805

document is based on my personal knowledge and records retained by DRL in the ordinary course of business.

3.    DRL was the first ANDA applicant to seek approval to market ondansetron 4 mg, 8 mg and 24 mg tablets. DRL was the first ANDA applicant to file a paragraph IV certification regarding U.S. Patent No. 5,344,658 ("the '658 patent") and the first to give notice to the innovator. GSK did not sue DRL for infringement of its '658 patent, presumably because DRL successfully designed around that patent.

4.    Because DRL was the first to file an ANDA for ondansetron 4 mg, 8 mg and 24 mg tablets, DRL believes it is entitled to a 180-day exclusivity regarding the '658 patent and is prepared to begin to market ondansetron 4 mg, 8 mg and 24 mg tablets upon approval following the expiration of the pediatric exclusivity for GSK's U.S. Patent No. 4,753,789 ("the '789 patent").

5.    I have been asked to explain the financial nature of the harm which would be suffered by DRL if it were to lose exclusivity and to contrast that harm with the financial harm Apotex claims it will suffer if it loses its pending motion. There is really no comparison. DRL's financial harm if it is not permitted to exercise its 180-day exclusivity after the expiration of GSK's '789 patent will be very significant while Apotex's financial "harm" if it does not obtain this injunction will be relatively minor.

6.    There are a number of considerations relevant to why a loss of exclusivity by DRL would be irreparable – some of which I am advised are identified in Apotex's own submissions. It is not my purpose to address these factors or harms – or other non-financial injury – since all that I have been asked to provide is a general discussion of relative financial harms, not the irreparable nature of DRL's harm.

620805                                          2

7.    According to IMS Health, GSK's sales of ondansetron 4 mg, 8 mg and 24 mg tablets in the United States in 2005 were approximately $604 million (or approximately $300 million for 6 months). As the sole generic company having an exclusivity for this drug, DRL would expect to earn a significant portion of these sales during its 180-day exclusivity, and continue to enjoy a position superior to other generic companies with respect to this drug after that exclusivity ends.

8.    Typically, generic product would capture up to 90% of the brand's sales (or $270 million of the $300 million) during the 180-day exclusivity period. If DRL actually launched alone, it would capture those sales although its price would be discounted to the brand and thus its loss would not be that entire sum. If GSK authorized a generic to compete with DRL, DRL would expect to capture more or less half the sales. The dollar value would of course still be very significant.

9.    Exclusivity would also provide the opportunity to forge early relationships with customers, which would assist in DRL's ability to retain market share after the expiration of exclusivity. By way of contrast, if Apotex were to lose, its loss is minimal.

10.    If Apotex were to overturn the FDA's decision, on December 24, 2006 the ondansetron market would open not only to Apotex, but to all other generic companies. Apotex's submissions indicate there are ten generic companies seeking approval to enter the market for ondansetron 4 mg, 8 mg and 24 mg tablets on December 24, 2006. In recent product launches with half a dozen or more sellers the generic price at launch has fallen to 2 or 3% of then-current branded price. Here, that would mean that the entire generic market for ondansetron 4 mg, 8 mg and 24 mg tablets for the 180-day exclusivity period would be approximately $5.4-8.1 million (.02 or .03 x 270M). This market would then be split among

the ten generic competitors projected by Apotex. Thus, Apotex's expected sales in the first six months after its launch (and the launch of the other generic companies) might not be substantially more than $1 million.

11.    Importantly, Apotex is not here claiming that *it* is entitled to exclusivity. Apotex may enter the market six months earlier if it wins this case, but whenever it enters it will do so with numerous competitors. Thus, *regardless of the outcome of this case*, Apotex's harm is relatively insignificant and certainly pales in comparison to DRL's harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of November 2006.

Amit M. Patel

620805

620805

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

|  |  |  |
|---|---|---|
| APOTEX INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 06-1890 (RMC) |
| | ) | |
| FOOD & DRUG ADMINISTRATION, et al, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DR. REDDY'S LABORATORIES, LTD., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DR. REDDY'S LABORATORIES, INC. | ) | |
| | ) | |
| Intervenors-Defendants. | ) | |

———————————————————————

## DECLARATION OF BRIAN K. McCALMON

I, BRIAN K. McCALMON, declare as follows:

1.      I am a partner in the law firm of PRESTON GATES ELLIS & ROUVELAS MEEDS LLP, counsel for Intervenors-Defendants Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively "DRL").

2.      I am a practicing attorney and member in good standing of the Bars of the District of Columbia and Maryland, and am admitted to practice before the United States District Courts for the District of Columbia and the District of Maryland.

3.      I submit this Declaration in support of DRL's Opposition to Apotex, Inc.'s Motion for a Temporary Restraining Order And/Or Preliminary Injunction.

4.    I have personal knowledge of the facts stated in this Declaration.

5.    Attached as Exhibit 1 is a true and correct copy of FDA's November 3, 2006 letter to Christine J. Siwik and William A. Rakoczy.

6.    Attached as Exhibit 2 is a true and correct copy of FDA's April 11, 2006 letter to Tammy McIntire of Apotex, Inc.

7.    Attached as Exhibit 3 is a true and correct copy of the Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41 entered in *Glaxo Group Limited v. Apotex, Inc*., Civil Action No. 05-307(JLL) in the United States District Court for the District of New Jersey.

8.    Attached as Exhibit 4 is a true and correct copy of United States Patent No. 5,344,658.

9.    Attached as Exhibit 5 is a true and correct copy of the Declaration of Tammy McIntire, dated November 6, 2006, submitted in Support of Apotex, Inc.'s Motion for Temporary Restraining Order And/Or Preliminary Injunction in this matter.

10.    Attached as Exhibit 6 is a true and correct copy of the Declaration of Tammy McIntire, dated April 14, 2006, submitted in support of Apotex, Inc.'s Motion for a Temporary Restraining Order And/Or Preliminary Injunction in the pravastatin case, *Apotex, Inc. v. FDA*, Civil Action No. 06-0627 (JDB) (*Apotex I*).

11.    Attached as Exhibit 7 is a true and correct copy of the Civil Docket for Case #: 205-cv-00307-JLL-RJH, *Glaxo Group Limited et al. v. Apotex, Inc.*, in the United States District Court for the District of New Jersey.

12.    Attached as Exhibit 8 is a true and correct copy of a New York Times article dated August 9, 2006, entitled "Marketers of Plavix Outfoxed on a Deal," by Stephanie Saul.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of November 2006.


_____/s/ Brian K. McCalmon_____
BRIAN K. McCALMON



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville, MD 20857

ANDA 77-306

'NOV 0 3 2006

Rakoczy Molino Mazzochi Siwik, LLP
Attention: Christine J. Siwik and William A. Rakoczy
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Dear Mr. Rakoczy and Ms. Siwik:

This responds to your letter dated August 29, 2006, in which you request on behalf of Apotex
Corporation that the Food and Drug Administration (FDA) consider the start of 180-day
exclusivity for ondansetron hydrochloride tablets 4 mg and 8 mg (ondansetron) to have been
triggered by the dismissal of a patent infringement suit.

As you are aware, FDA interpreted the relevant statutory provision in a letter dated April 11,
2006 (FDA letter decision) (attached).  FDA's letter decision expressly states that the dismissal
of a patent suit in and of itself is not sufficient to trigger the start of a 180-day exclusivity period;
rather a court order must reflect a holding on the merits by the court that the patent at issue is
invalid, not infringed, or unenforceable ("holding-on-the-merits" standard).  The FDA letter
decision explains in detail the legal grounds and policy justifications for the holding-on-the-
merits standard.  Apotex sued the agency, challenging the FDA letter decision as arbitrary and
capricious, and the District of Columbia Circuit Court of Appeals ruled in the agency's favor,
summarily affirming the district court's denial of Apotex's motion for a preliminary injunction.
See Apotex, Inc. v. FDA, 449 F.3d 1249, 1253 (D.C. Cir. 2006).  Apotex petitioned for a
rehearing *en banc* by the court, which the court denied on August 17, 2006.  On October 3, 2006,
Apotex entered into a stipulation of dismissal ending the litigation.

In accordance with the FDA letter decision, we deny your request for the reasons detailed briefly
below, and refer you to that decision for further guidance on this matter.

    I.    Apotex's request.

Apotex now asks the FDA to confirm that: "(1) Apotex will, subject to all other substantive
requirements for approval, receive final approval of its ondansetron ANDA [abbreviated new
drug application] upon expiration of U.S. Patent No. 4,753,789 ("the '789 patent"); (2) Apotex's
final approval will not be delayed by any unexpired 180-day exclusivity associated with U.S.
Patent No. 5,344,658 ("the '658 patent"); and (3) any 180-day exclusivity associated with the
'658 patent was triggered by the May 25, 2005 Order dismissing Glaxo Group Limited's and
SmithKline Beecham Corporation's (collectively, "GSK") patent infringement action against
Apotex Inc. [for infringement of the '658 patent]." In essence, you argue that the dismissal of the
GSK lawsuit triggered any 180-day exclusivity arising from the '658 patent with respect to
ondansetron, that any such 180-day exclusivity has now expired and, therefore, no unexpired
180-day exclusivity arising from the '658 patent could delay approval of Apotex's ANDA upon
expiration of the '789 patent.

II.     The May 25, 2005 Order.

Apotex's ANDA for ondansetron includes a "paragraph IV" certification[1] in which Apotex
alleges that the '658 patent is not infringed and/or is not valid.  Having received notice of this
paragraph IV certification in December 2004, GSK sued Apotex for infringement of the '658
patent in January 2005.  You enclosed with your August 31, 2005 letter a copy of "the stipulation
of dismissal pursuant to Fed. R. Civ. P. 41" filed May 25, 2005, dismissing the GSK suit
(stipulation of dismissal).

The stipulation of dismissal states that the plaintiffs (GSK)

    ... stipulate and agree that the ondansetron hydrochloride tablets that are the subject of
and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported,
manufactured, used, sold, or offered for sale in the United States would not infringe, any
claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

    ... [have] represented that [they] will not sue Apotex for infringement of the '658 patent
based on the importation, manufacture, use, sale or offer for sale of ondansetron
hydrochloride tablets that are the subject of and described in ANDA No. 77-306;

and the parties

    ... stipulate and agree to dismissal of the parties' respective claims and counterclaims
with prejudice ....

The stipulation is signed on behalf of GSK and Apotex, and is signed as "so ordered" by the
court.

---

[1] An NDA applicant must notify FDA of patents the applicant believes claim the drug or an approved use of the
drug.  21 U.S.C. §§ 355(b)(1), 355(c)(2).  FDA relies on these notifications to post information on these patents in
*Approved Drug Products with Therapeutic Equivalence Evaluations* (informally referred to as the Orange Book).
21 U.S.C. §§ 355(b)(1), 355(c)(2), 355(j)(7)(A)(iii).  An ANDA applicant must then make one of four certifications
with respect to each patent that claims the drug or any use of the drug for which the ANDA applicant is seeking
approval.  These  certifications are commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii)
establishing them:

- a "paragraph I" certification that patent information has not been filed;
- a "paragraph II" certification that the patent has expired;
- a "paragraph III" certification of the date the patent will expire; or
- a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable.

21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12)(i)(A).  A paragraph I or II certification indicates that the
applicant believes that the patent does not bar immediate approval of the ANDA.  A paragraph III certification
indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is
seeking ANDA approval only after the patent expires.  A paragraph IV certification indicates that the ANDA
applicant disputes the applicability or validity of that patent.  If an ANDA applicant makes a paragraph IV
certification, the applicant must the notify the holder of the approved NDA and the patent owner.  21 U.S.C.
§ 355(j)(2)(B).

Case No. 06-1890 (RMC)
Exhibit 1 to the Declaration of Brian K. McCalmon
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 3 of 20

III.    180-day exclusivity and FDA letter decision.

Section 505(j)(5)(B)(iv) of the Act establishes 180-day exclusivity. This exclusivity provides a potential reward to the first ANDA applicant to submit a paragraph IV certification to a patent pursuant to section 505(j)(2)(A)(vii)(IV) of the Federal Food, Drug, and Cosmetic Act and thus to expose itself to the risk of being sued for infringing the patent.

Section 505(j)(5)(B)(iv)(II) provides that the start of 180-day exclusivity can be triggered as of "the date of a *decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed.*"[2] (Emphasis added.) This mechanism for initiating 180-day exclusivity is commonly referred to as the "court decision trigger."

The FDA letter decision announced the holding-on-the-merits standard to assess whether an action of a court qualifies as a court decision trigger to start the running of 180-day exclusivity. As the introduction to that letter states (and the body of that letter explains in detail):

> FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. . . . FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

FDA letter decision at 2.[3] FDA adopted this bright-line standard to provide clarity, reduce the likelihood of litigation over whether a court action triggers 180-day exclusivity, and promote greater marketplace certainty.

---

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). None of the amendments pertaining to 180-day exclusivity enacted through the MMA bear upon the determination of whether the stipulation of dismissal for the GSK suit triggered 180-day exclusivity for ondansetron, however, because the earliest ANDA containing a paragraph IV certification for this drug was submitted before the December 8, 2003, enactment date of the MMA. *See id.* § 1102(b)(1).

[3] Provisions of the MMA inapplicable to the 180-day exclusivity determination for ondansetron (*see* MMA § 1102(b)(1)) eliminated the court-decision trigger provision, but provided for forfeiture of exclusivity in certain circumstances. One event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2006). The holding-on-the-merits standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 4 of 20
Exhibit 1 to the Declaration of Brian K. McCalmon

## IV.        Analysis

The GSK suit was dismissed by an agreement between the parties; the court never issued a holding on the merits of the patent claim. It is clear, therefore, that this dismissal does not constitute a court decision trigger under the holding-on-the-merits standard. *See Apotex*, 449 F.3d at 1253.[4]

You assert that the stipulation of dismissal satisfies the holding-on-the-merits standard because, *inter alia*, it expressly reflects GSK's judgment that the patent at issue is not infringed and GSK's commitment not to sue. Your conclusion is not correct. It is not enough that the order reflects the views and commitments of the parties. The court itself has to have made a substantive determination on the merits of the patent claim. As its title ("Stipulation of Dismissal Pursuant to Fed. R. Civ. P. 41") reflects, the stipulation of dismissal was the mechanism by which the parties sought and received dismissal of the case because, in their view, there was nothing left for the court to decide. The court was not asked to resolve the dispute on the merits and did not do so. In short, the stipulation of dismissal does not reflect a holding by the court on the merits of the patent claim.[5]

---

[4] Although the holding-on-the-merits standard was announced in relation to a declaratory judgment action, the standard is equally applicable to affirmative patent infringement suits, such as the GSK suit at issue here. The standard looks to whether the court has made a holding on the merits of the patent claim; it does not consider the manner by which the dispute came before the court.

This letter does not address the arguments made in your prior letter of August 31, 2005, to support your claim that the GSK stipulation of dismissal satisfies an estoppel-based interpretation of the court decision trigger. As explained in greater detail in the FDA letter decision, the agency has rejected this standard in favor of the holding-on-the-merits standard. Accordingly, this letter addresses only the arguments you made in your letter dated August 29, 2006, that the GSK stipulation of dismissal satisfies the holding-on-the-merits standard.

[5] We note that you raised additional arguments in telephone conversations with the agency that you chose not to submit in writing. These arguments relate to FDA's decision in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), as well as whether FDA's interpretation of section 505(j)(5)(B)(iii) is consistent with its interpretation of section 505(j)(5)(B)(iv). In this letter, however, we are only addressing the question that Apotex set forth in writing, *i.e.*, whether the ondansetron dismissal constitutes a court decision trigger under FDA's "holding-on-the-merits" standard. We do not believe that the additional arguments not submitted in writing are pertinent to making that determination, which simply looks to whether the court has held on the merits of a patent claim.

4

Case No. 06-1890 (RMC)
Exhibit 1 to the Declaration of Brian K. McCalmon
Case 1:06-cv-01890-RMC     Document 14-8     Filed 11/17/2006     Page 5 of 20

### V.   Conclusion

The stipulation of dismissal did not trigger any 180-day exclusivity for ondansetron that may arise from another ANDA applicant's paragraph IV certification to the '658 patent.  The agency is not aware of any judicial action to date qualifying as a court decision trigger of 180-day exclusivity for ondansetron.  Accordingly, 180-day exclusivity may delay approval of Apotex's ANDA for ondansetron hydrochloride tablets 4 mg and 8 mg upon expiration of the '789 patent.[6]

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

Enclosure

cc:     Elizabeth Dickinson, Office of Chief Counsel
        Applicants with Pending ANDAs for Ondansetron HCl Tablets, 4 mg and 8 mg

---

[6] FDA does not make its exclusivity determinations until an ANDA is ready for final approval, which will not occur for ondansetron until at least December 24, 2006, when the pediatric exclusivity associated with the '789 patent will expire.  Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations.  It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied.  21·U.S.C. § 355a.  Apotex assumes that another ANDA applicant will be entitled to 180-day exclusivity for ondansetron, which the agency neither confirms nor denies.

5



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

ANDA 76-341                                              Food and Drug Administration
                                                         Rockville MD 20857

APR 11 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

    This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2923 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

    Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.    Statutory and Procedural Background

    A.    180-Day Exclusivity and the Court Decision Trigger

Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 8 of 20
Exhibit I to the Declaration of Brian K. McCalmon

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after -
>
> (I)     the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "containing" reflects a typographical error and should be "containing." See, e.g., Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. See The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L., No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the paravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

3

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC     Document 14-8     Filed 11/17/2006     Page 9 of 20
Exhibit 1 to the Declaration of Brian K. McCalmon

NOV. 3. 2006  3:28PM     CDER/OGD/IO                    NO. 1387   P. 10

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II).  Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii).  In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

### B.     The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.*  On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

4

C.    FDA's June 28, 2005 Decision.

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[9] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc.* v. *Bristol-Myers Squibb Co.* (No. '04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[9] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharm. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision of the court holding the relevant patent invalid, unenforceable, or not infringed*.") (emphasis added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I*'s discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

_____

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and [by regulation] "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 1 of 20
Exhibit 1 to the Declaration of Brian K. McCalmon

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g. Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

8

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 14 of 20
Exhibit I to the Declaration of Brian K. McCalmon

NOV. 3. 2006  3:29PM    CDER/OGD/10                    NO. 1387  P. 15

(1) misleading conduct by the patentee indicating that it will not enforce its patent;
(2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer, if
the patentee is allowed to proceed with its claim. Such determinations are often quite
subjective, dependent on an infinite variety of factual contexts, and provide scant basis
for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to
uncertainty. Experience has shown, for example, that declaratory judgment actions may
be dismissed for a variety of reasons, not all of which concern representations with
preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva
Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S.
Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter
jurisdiction despite the patentee's refusal to provide assurance that it would not sue).
Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the
difficulty of applying an estoppel-based standard that requires the agency to evaluate the
underlying reasons for a dismissal — and the very low likelihood of industry certainty
under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether
certain statements or actions of a company in litigation to which FDA is not a party may
estop that company from enforcing its patent. FDA's interpretation of the court decision
trigger provision as requiring a holding on the merits will enable the agency to rely on the
face of the court's decision to determine whether there has been a holding that a patent is
invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-
based approach inexorably spawns subsequent litigations concerning FDA's estoppel
determinations — litigations that can be avoided under a clearer, textually-based
standard.

2.    FDA's Interpretation is Consistent with its Regulation, which
      Includes Unenforceability as a Separate Basis for a Court Decision
      Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-
Syntex dismissal was not a court decision trigger was consistent with FDA's regulation
including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I*
suggested that FDA's position was "absurd" because FDA's regulation included
unenforceability, but FDA refused to acknowledge a dismissal that had the apparent
effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from
suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6
(finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension
from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated
assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(e)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. See 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., supra, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the apparent effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a holding of unenforceability must result from a court's consideration of that issue on the merits, rather than FDA's evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.    FDA's Interpretation is Consistent with the FDA's 180-day Exclusivity Guidance and the Granutec Decision

Teva I also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, 180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in Granutec, Inc. v. Shalala, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. Id. at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. See 180-day exclusivity guidance. Teva I suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

10

Case No. 06-1890 (RMC)
Exhibit I to the Declaration of Brian K. McCalmon
Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 16 of 20

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate to withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra*. FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7]  It bears noting that one event that can trigger forfeiture under the MMA is a "a settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (see note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

11

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel affect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe, *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[4] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

   B.   **FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty**

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[4] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(J)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

12

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. See, e.g., Teva, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original Teva litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. See, e.g., Teva Pharms, USA, Inc. v. FDA, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as Amicus Curiae, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in Teva I. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

___

[9] The agency's brief on appeal to the Teva III court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court .

13

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.    Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

---

held a hearing, and the like ... bear no relationship either to whether the decision "hold[s] the patent ... to be invalid or not infringed" ....

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

14

Case 1:06-cv-01890-RMC    Document 14-8    Filed 11/17/2006    Page 20 of 20
Case No. 06-1890 (RMC)
Exhibit I to the Declaration of Brian K. McCalmon

III.    Conclusion

    FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability.  The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding.  FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

                    Sincerely,

                    Gary Buehler
                    Director
                    Office of Generic Drugs
                    Center for Drug Evaluation and Research

_____

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

15



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

---

ANDA 76-341                                              Food and Drug Administration
                                                        Rockville MD 20857

APR 1 1 2006

Apotex Corp.
U.S. Agent for Apotex Inc.
Attention: Tammy McIntire
2400 North Commerce Parkway, Suite 400
Weston, FL 33326

Sent Via Facsimile and U.S. Mail

Dear Ms. McIntire:

This letter is prompted by the March 16, 2006, opinion of the District of
Columbia Circuit Court of Appeals, *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-
5401 & 05-5460, 2006 U.S. App. LEXIS 6384 (D.C. Cir. Mar. 16, 2006) ("*Teva III*").
We are amending our response to the letter submitted by Apotex Inc. on September 7,
2004. Apotex sought a determination that a dismissal of a declaratory judgment action
brought by Apotex against Bristol-Myers Squibb Company ("Bristol"), *Apotex Inc. v.
Bristol-Myers Squibb Co.*, No. 04-2922 (Jul. 23, 2004 stipulation and order), constituted a
"court decision trigger" beginning the 180-day period of marketing exclusivity for the
first abbreviated new drug application ("ANDA") applicant to make a "paragraph IV"
certification challenging a patent for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg.,
and 80 mg. ("pravastatin"). FDA previously determined in a letter dated June 28, 2005,
that the dismissal constituted a court decision trigger, based on an interpretation of the
court decision trigger provision, Section 505(j)(5)(B)(iv)(II) of the Federal Food, Drug,
and Cosmetic Act ("FDCA" or the "Act") (21 U.S.C. § 355(j)(5)(B)(iv)(II)), that the
agency believed itself compelled to apply as a result of two decisions of the D.C. Circuit:
*Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva
Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov.
15, 2000) ("*Teva II*"). Specifically, FDA believed that *Teva I* and *II* required the agency
to treat a dismissal of a declaratory judgment action for lack of jurisdiction as a court
decision trigger if the patentee is estopped from enforcing its patent against the
declaratory plaintiff.

Teva Pharmaceuticals USA, Inc. challenged FDA's June 28, 2005 decision in
district court. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176 (D.D.C. 2005). On
appeal, the *Teva III* court vacated the judgment of the district court with instructions to
vacate the FDA's decision and remand to the agency for further proceedings. The court
held that FDA's decision was arbitrary and capricious because "[t]he FDA mistakenly
thought itself bound by our decisions in *Teva I* and *Teva II*." *Teva III*, 2006 U.S. App.
LEXIS 6384, at *12. In the court's view, the *Teva I* and *Teva II* decisions had been
decided purely on procedural grounds and "left the final decision" of statutory
interpretation to FDA. *Id.* at *9.

FDA has therefore undertaken to interpret the statute in light of the *Teva III* court's direction "'to bring its experience and expertise to bear in light of competing interests at stake' and make a reasonable policy choice." *Id.* at *13 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)). As explained in greater detail below, FDA interprets the language of the court decision trigger provision, "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed," to require a court decision with an actual "holding" on the merits that the patent is invalid, not infringed, or unenforceable. The holding must be evidenced by language on the face of the court's decision showing that the determination of invalidity, noninfringement, or unenforceability has been made by the court. FDA's experience in making court decision trigger determinations bears out the difficulty in implementing a broader, estoppel-based standard that requires the agency to evaluate whether the patentee is estopped from suing for infringement. FDA's "holding-on-the-merits" interpretation adheres closely to the language of the statute, and will provide a bright line that is more easily administrable by FDA and that will enable industry to make appropriate business planning decisions.

Applying FDA's interpretation to the facts of this case, FDA has determined that the July 23, 2004, Apotex-Bristol dismissal does not constitute a court decision trigger of 180-day exclusivity for pravastatin because there is no language on the face of the dismissal evidencing that the court held on the merits that any of the subject patents were invalid, not infringed, or unenforceable.

I.     Statutory and Procedural Background

    A.     180-Day Exclusivity and the Court Decision Trigger

Under section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (commonly referred to by the four sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to certain patents, claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid, not infringed, or not enforceable. 21 C.F.R. § 314.94(a)(12)(i)(A).

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent.

An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been

2.

filed and describing why the patent is invalid, will not be infringed, or is unenforceable. 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.94(a)(12)(i)(A). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 day of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)). The FDCA provides that an ANDA applicant cannot bring an action for declaratory judgment unless this 45-day period has expired, neither the NDA holder nor the patent owner has sued the ANDA applicant for patent infringement before the expiration of that period, and, as applicable, the ANDA applicant has offered these parties confidential access to its application for the purpose of determining whether to bring a patent infringement suit. 21 U.S.C. § 355(j)(5)(C)(i) (2005).

Section 505(j)(5)(B)(iv) of the Act governs FDA's 180-day exclusivity determinations. The statute provides 180 days of marketing exclusivity as an additional incentive and reward to the first ANDA applicant to expose itself to the risk of being sued for infringing a patent that is the subject of the paragraph IV certification. It does so by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event. The applicable version of the statute reads as follows:

> If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][1] such a certification, the application shall be made effective not earlier than one hundred and eighty days after –
>
> (I)    the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[2] Under this provision, either of two events can

---

[1] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." See, e.g., Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[2] Congress amended 21 U.S.C. § 355(j) in late 2003. See The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA"). The majority of the amendments pertaining to 180-day exclusivity do not apply to the exclusivity determinations for the pravastatin ANDAs because the earliest ANDA containing a paragraph IV certification was submitted before the December 8, 2003, enactment date

trigger the start of the exclusivity period: (1) the commercial marketing of the drug product as set forth in subparagraph (I); or (2) an applicable court decision as set forth in subparagraph (II). Subparagraph (II) is commonly referred to as the "court decision trigger."

By regulation, FDA has long interpreted the court decision trigger to be satisfied not only by a decision of a court holding the patent invalid or not infringed, but also by a decision holding the patent unenforceable. 21 C.F.R. § 314.107(c)(1)(ii). In the preamble to the 1994 final rule implementing the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Amendments" to the FDCA), the agency explained that references in section 505 to patent invalidity and noninfringement should be interpreted to embrace unenforceability so as to be consistent with "Congress' obvious intent in allowing patent challenges under section 505," and to avoid absurd results. 59 Fed. Reg. at 50,339 (citing *Merck v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989)).

B.    The *Teva* Cases

In the *Teva* cases, FDA was asked to determine whether the dismissal of a declaratory judgment action for lack of subject matter jurisdiction in a patent case between Teva and Syntex constituted a court decision trigger of exclusivity for Apotex (then Torpharm) for the drug ticlopidine. *Teva I*, 182 F.3d at 1006-07. FDA determined that the Teva-Syntex dismissal was not a "decision of a court" or a "holding," as required by the statute. *Id.* On appeal, the D.C. Circuit concluded that FDA's determination that there had been no court decision trigger was arbitrary and capricious. *Id.* at 1007-10. The court remanded to the agency for an explanation of, *inter alia*, why FDA did not recognize that a dismissal based on representations that estopped the patentee from suing for infringement constituted a court decision trigger. *Id.*

On remand, FDA attempted to explain its decision, but the district court, Judge Kollar-Kotelly, rejected the agency's explanation. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *22-23 (Aug. 19, 1999) ("The FDA is bound by the Court of Appeals' determination that the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant."). The D.C. Circuit affirmed the district court's decision in an unpublished decision stating that "for the reasons cited . . . in *Teva I* and by the District Court, the judgment of the agency fails for want of reasoned decision-making." *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Following the *Teva II* decision, FDA has believed that it was bound to apply an estoppel-based standard when making court decision trigger determinations, and initially applied this standard with respect to the pravastatin products at issue here.

---

of the MMA. *See id.* § 1102(b)(1). The MMA does, however, apply to the court decision trigger determination at issue insofar as it defines a "decision of a court" as a final judgment from which no appeal can be or has been taken. *See* MMA § 1102(b)(3) (defining "decision of a court" for drugs for which a paragraph IV certification was filed before enactment of the MMA and for which there has been no triggering court decision as of the date of enactment, December 8, 2003).

C.    FDA's June 28, 2005 Decision

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol. Pravachol is approved for the primary and secondary prevention of coronary events and for treating hyperlipidemia. Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent"). Several ANDA applicants, including Apotex and Teva, have submitted ANDAs containing paragraph IV certifications to the '447, '589, and '985 patents. The '227 patent and its pediatric exclusivity expires on April 20, 2006.[3] Any applicant that has submitted a paragraph III certification to the '227 patent is thus precluded from marketing the drug at least until that date.

Apotex notified Bristol of its paragraph IV certifications to the '447, '589, and '985 patents, but Bristol declined to sue Apotex for infringement. Apotex then sued Bristol in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of those patents. The case was dismissed by a stipulation and order issued on July 23, 2004.

The order recited that Bristol had "repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement." Apotex stipulated to dismissal of the case for lack of subject matter jurisdiction based on those "pre-Complaint representations." Both parties signed the stipulation and order, which the court endorsed as "so ordered."

By letter dated September 7, 2004, Apotex requested a determination from FDA that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action constituted a "decision of a court" under section 505(j)(5)(B)(iv)(II) that triggered any 180-day exclusivity for pravastatin. In view of the *Teva* cases, FDA believed itself obliged to apply an estoppel-based standard in determining whether the July 23, 2004 order qualified as a court decision trigger. In its June 28, 2005 decision, the agency determined that Bristol's assurances to Apotex that it would not sue for infringement estopped Bristol from suing Apotex for infringement. Thus, under the estoppel-based standard FDA believed *Teva I* mandated, FDA found that the dismissal qualified as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, '589, and '985 patents.

---

[3] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the agency on the use of drugs in pediatric populations. It is a six-month exclusivity that attaches to any listed patent or exclusivity for the drug studied. 21 U.S.C. § 355a.

D.    *Teva III*

On July 26, 2005, Teva sued FDA, arguing that FDA's June 28, 2005 decision was based on the agency's erroneous belief that *Teva I* and *Teva II* required the agency to apply an estoppel-based standard. Alternatively, Teva argued that even if the *Teva* decisions did impose an estoppel-based standard for the court decision trigger, Bristol's assurances to Apotex were insufficient to effect a complete estoppel. Teva additionally argued that the dismissal had been made effective not by the court but by the parties under Federal Rule of Civil Procedure 41(a)(1)(ii), and as such lacked sufficient judicial involvement to constitute a "decision" or a "holding" of the court.

The district court agreed with Teva that the dismissal had been made effective under Rule 41(a)(1)(ii) and lacked sufficient "judicial imprimatur" to constitute a court decision trigger of 180-day exclusivity. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 190 (D.D.C. 2005) (Bates, J.). The court stated, however, that Bristol's statements to Apotex were sufficient to preclude Bristol from suing for infringement, concluding that "[t]his case thus embodies the peculiar circumstance in which the words of [Bristol] are preclusive, but they are not part of a 'decision' or 'holding' within the meaning of the Hatch-Waxman Act." *Id.* at 192 n.6. The district court did not reach the question of whether *Teva I* and *Teva II* had established a substantive rule binding upon FDA.

On appeal, the D.C. Circuit determined that "[t]he FDA mistakenly thought itself bound by our decision in *Teva I* and *Teva II*," and held that "[t]his error renders [the agency's] decision arbitrary and capricious." *Teva III*, 2006 U.S. App. LEXIS 6384, at *12. The court explained that it had never established a requirement to apply the estoppel standard as an interpretation of the court decision trigger. *Id.* at *8-10. Rather, *Teva III* held that *Teva I* had simply found FDA's reasoning inadequate for the reasons discussed in that decision. *Id.* at *9; *see also* section II.A., *infra*. Concluding that "FDA still has not answered the questions put to it by the *Teva I* court," *id.* at *13 n.5, the court vacated the district court's judgment and directed the district court to remand to the agency to interpret the court decision trigger provision in view of the agency's own expertise and appropriate policy considerations. *Id.* at *13.

II.    FDA's Interpretation of the Court Decision Trigger Provision

In accordance with the *Teva III* court's determination that FDA is not bound to apply the estoppel-based standard discussed in *Teva I*, FDA has brought its experience to bear and now makes an independent interpretation of the statute. FDA has determined that it is most appropriate to interpret the statute consistently with its plain language. Thus, the agency is interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable. This interpretation follows most readily from the statutory language and FDA's long-standing regulation including unenforceability as a separate basis for a court decision trigger. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of a *decision* of a *court* . . . *holding* the patent which is the subject of the certification to be invalid or not infringed") (emphasis added); *see also* 21 C.F.R. § 314.107(c)(1)(ii) ("The date of a

6

*decision* of the *court holding the relevant patent invalid, unenforceable, or not infringed.*") (emphases added).[4]

A "holding" is generally defined to mean "[a] court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision." Black's Law Dictionary at 737 (7th ed. 1999). The statute's express requirement of a "holding" that the patent is "invalid" or "not infringed" indicates that the court must resolve the issues of invalidity, noninfringement, and unenforceability (pursuant to FDA's regulation) on the merits. *See id.* at 1003 (defining "merits" as referring to "[t]he elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points, esp. of procedure"). Under the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability.

A.    FDA's Response to *Teva I*

In reaching this interpretation, FDA is mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism. FDA addresses the specific issues raised in *Teva I* below.

1.    FDA's Interpretation is Consistent with the Purpose of the Statute and Will Promote Industry Certainty and Administrative Workability

FDA acknowledges the *Teva I* court's discussion of broader definitions of "decision" and "holding" as potentially including dismissals with preclusive effect. *Teva I*, 182 F.3d at 1008. However, the *Teva III* court has determined that *Teva I's* discussion is not binding upon the agency. *Teva III*, 2006 U.S. App. LEXIS 6384, at *12.

*Teva I* further suggested that estoppel was a relevant consideration for the court decision trigger because a different view would allow the patent holder to manipulate the system and delay generic competition by stating that it would not enforce its patent. *Teva I*, 182 F.3d at 1009. That result, in the court's view, would be contrary to the purpose of the statute. *Id.* FDA does not believe, however, that a narrower, textually-based approach is contrary to the purpose of the statute. The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The

---

[4] The D.C. Circuit has found that the court decision trigger provision is ambiguous. *See Teva I*, 182 F.3d at 1007-08 (noting that the terms "holding" and "decision" are subject to interpretation); *see also Teva III*, 2006 U.S. App. LEXIS 6384 at *12 (assuming, in accordance with *Teva I*, that the statute is ambiguous). To the extent that there is ambiguity in any of the terms, such as "decision," "holding," "invalid," "not infringed," and (by regulation) "unenforceable," FDA's interpretation is permissible and hews more closely to the language of the statute than the estoppel-based approach that the agency believed was compelled by *Teva I* and *Teva II*.

agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." The estoppel-based standard, by contrast, has the anomalous result of substituting the agency's subsequent determination of preclusive effect for a court's holding on the merits.

Elsewhere, the D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.* FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger. The estoppel-based approach, by contrast, renders the terms "decision," "holding," and "invalid or not infringed" superfluous, in contravention of accepted canons of statutory construction. *See, e.g, Bailey v. United States*, 516 U.S. 137, 146 (1995) (superseded by statute on other grounds) ("We assume that Congress used [the] terms because it intended each term to have a particular, nonsuperfluous meaning."). Indeed, pre-*Teva I*, the D.C. Circuit suggested that a proper interpretation of the court decision trigger should give substantive effect to the terms that Congress chose. *See Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1205 n.6 (D.C. Cir. 1998) ("Suppose further that a first applicant is sued but that the suit does not result in a judicial decision finding the patent not infringed or invalid, so that the judicial decision trigger in § 355(j)(5)(B)(iv) is not activated. This could happen if, for instance, the suit is dropped or settled.").

Further, the law on estoppel relevant in the court decision trigger context is not well developed. In fact, the Federal Circuit law to which the D.C. Circuit looked in *Teva I* to determine whether a particular representation has estoppel effect generally addresses whether there is sufficient reasonable apprehension of suit to support a declaratory judgment action, and not, as in the *Teva I* court's inquiry, whether the patentee is ultimately estopped from suing for infringement.[5] In short, applying the estoppel standard articulated by the *Teva I* court would often require FDA to resolve factually intensive questions with little guidance from the courts on how to apply the facts to the law.

Estoppel can be raised in different contexts, and the agency foresees that an estoppel-based approach could require FDA to make determinations based on a host of factors regarding whether a patentee may be equitably estopped from suing a particular ANDA applicant. *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc) (noting factors relevant to equitable estoppel:

---

[5] *See Teva I*, 182 F.3d at 1008-08 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).

(1) misleading conduct by the patentee indicating that it will not enforce its patent;
(2) reliance by the alleged infringer; and (3) material prejudice to the alleged infringer if
the patentee is allowed to proceed with its claim). Such determinations are often quite
subjective, dependent on an infinite variety of factual contexts, and provide scant basis
for predictability to the regulated industry.

In addition, the estoppel-based approach has been difficult to apply and has led to
uncertainty. Experience has shown, for example, that declaratory judgment actions may
be dismissed for a variety of reasons, not all of which concern representations with
preclusive effect that can then serve as a proxy for a finding of estoppel. *See, e.g., Teva
Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S.
Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter
jurisdiction despite the patentee's refusal to provide assurance that it would not sue).
Indeed, *Teva I* and *Teva II*, as well as the instant pravastatin case, demonstrate the
difficulty of applying an estoppel-based standard that requires the agency to evaluate the
underlying reasons for a dismissal — and the very low likelihood of industry certainty
under such a standard.[6]

FDA is ill-equipped to make fact-based determinations concerning whether
certain statements or actions of a company in litigation to which FDA is not a party may
estop that company from enforcing its patent. FDA's interpretation of the court decision
trigger provision as requiring a holding on the merits will enable the agency to rely on the
face of the court's decision to determine whether there has been a holding that a patent is
invalid, not infringed, or unenforceable. As *Teva I* and *Teva II* demonstrate, an estoppel-
based approach inexorably spawns subsequent litigations concerning FDA's estoppel
determinations — litigations that can be avoided under a clearer, textually-based
standard.

      2.    FDA's Interpretation is Consistent with its Regulation, which
          Includes Unenforceability as a Separate Basis for a Court Decision
          Trigger

The *Teva I* court requested that FDA explain how FDA's decision that the Teva-
Syntex dismissal was not a court decision trigger was consistent with FDA's regulation
including unenforceability as a basis for the court decision trigger. *Id.* at 1009-10. *Teva I*
suggested that FDA's position was "absurd" because FDA's regulation included
unenforceability, but FDA refused to acknowledge a dismissal that had the apparent
effect of unenforceability as a court decision trigger. *Id.*

---

[6] In the pravastatin case, for example, the district court agreed with FDA that Bristol was estopped from
suing Apotex for infringement, but for different reasons. *Compare Teva*, 398 F. Supp. 2d at 192 n.6
(finding preclusion based on Bristol's representations having "prevent[ed] any reasonable apprehension
from arising"); *with* FDA's June 28, 2005 letter at 4 (finding preclusion based on Bristol's repeated
assurances that it had no intention to sue Apotex for infringement).

FDA's regulation interpreting the court decision trigger states that the trigger occurs on: "[t]he date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed." 21 C.F.R. § 314.107(c)(1). FDA's inclusion of "unenforceable" in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability. *See* 59 Fed. Reg. at 50,339. The regulation, consistent with the statute, expressly requires that there be a court "decision" and a "holding" of unenforceability.

FDA does not believe that a patentee's statements concerning its intentions not to enforce a patent, even if reflected in the dismissal, constitute a court's "decision . . . "holding" a patent unenforceable. As explained in section II.A.1., *supra*, FDA rejects an estoppel-based interpretation of the statute based on a patentee's representations. As noted, a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect. Even if a patentee's representations have the *apparent* effect of rendering a patent unenforceable vis-à-vis a particular ANDA applicant, in the agency's view, a *holding* of unenforceability must result from a *court's* consideration of that issue on the merits, rather than *FDA's* evaluation of the effect of a patentee's statement. The estoppel-based approach turns the statutory language on its head, by compelling FDA — rather than a court, as the statute seemingly requires — to effectively make a "decision" and a "holding" of unenforceability. Such patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions. FDA's statutory and regulatory interpretation is not "absurd" because it is narrower than the estoppel-based standard. The agency's interpretation gives full effect to each word of the statute and regulation and will provide greater certainty than the estoppel-based standard.

3.    FDA's Interpretation is Consistent with the FDA's 180-day
Exclusivity Guidance and the *Granutec* Decision

*Teva I* also concluded that FDA had not adequately explained its position on the Teva-Syntex dismissal with regard to (a) FDA's "case-by-case" approach to exclusivity set forth in a guidance document, *180-Day Generic Drug Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* (June 1998) (180-day exclusivity guidance); or (b) why the agency recognized a grant of partial summary judgment of noninfringement based on a patent holder's admission as a court decision trigger in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) (unpublished opinion), but did not consider the Teva-Syntex dismissal for lack of subject matter jurisdiction a court decision trigger even though it too arose from statements made by the innovator. *Id.* at 1010-11.

The regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger. At that time, FDA was undertaking rulemaking and regulating directly from the statute in the interim, using a "case-by-case" approach to make its exclusivity determinations. *See* 180-day exclusivity guidance. *Teva I* suggested that FDA had failed to adopt any particular interpretation of the statute, and also had not "abide[d] by the commitments it

made in the 'Guidance for Industry' as to how it would proceed until a new rulemaking was completed." *Id.*

Just a few days after the *Teva I* decision, in proposing a rule, FDA rejected a suggestion that a dismissal for lack of jurisdiction based on a lack of case or controversy should constitute a court decision trigger. 180-Day Generic Drug Exclusivity in Abbreviated New Drug Applications, 64 Fed. Reg. 42,873, 42,881 (Aug. 6, 1999) (proposed rule). Rather, the agency proposed a 180-day "triggering period," during which there would have to be either a favorable court decision or commercial marketing of the drug. *Id.* at 42,877. If neither of those events occurred, the first ANDA applicant would lose its eligibility for exclusivity. *Id.* Under the "triggering period" approach, subsequent applicants would not be blocked indefinitely from approval, and would thus presumably have no need to seek to trigger exclusivity by bringing declaratory judgment actions and thereby raising the myriad issues that arose in the *Teva* litigations. *Id.* at 42,881.

FDA withdrew that proposed rule in 2002, however, in part due to its belief that the *Teva I* "holding was directly at odds with the approach the agency proposed in the August 1999 proposed rule to deal with dismissals of declaratory judgment actions." 180-Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed. Reg. 66,593, 66,594 (Nov. 1, 2002) (withdrawal of proposed rule) ("After careful consideration of the comments on the August 1999 proposed rule and multiple court decisions affecting the agency's interpretation of the provisions of the act relating to 180-day exclusivity and ANDA approvals, FDA has concluded that it is appropriate *to* withdraw the August 1999 proposed rule at this time."). Following FDA's withdrawal of its proposed rule, Congress substantially amended the 180-day exclusivity provision in the MMA. *See* note 2, *supra.* FDA determined not to expend its resources crafting a regulation that would be vulnerable to challenge if it diverged from *Teva I* and would in any event become less relevant in the near future due to Congress's substantial revision of the 180-day exclusivity provision, which ultimately eliminated the court-decision trigger provision (but provided for forfeiture of exclusivity in certain circumstances).[7]

Now, however, FDA is independently interpreting the statute in accordance with the direction of the *Teva III* court. For all of the reasons explained above, FDA's interpretation here is fully consistent with the statutory language and the extensive regulatory and judicial history concerning the agency's treatment of the court decision trigger issue.

---

[7] It bears noting that one event that can trigger forfeiture under the MMA is a "settlement or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed." 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). As explained above, the MMA amendments do not apply to pravastatin except in one respect (*see* note 2, *supra*) and are not at issue in this decision. The agency's determination to apply the "holding-on-the-merits" standard under the pre-MMA statute does not reflect an agency view as to the proper scope or interpretation of this forfeiture provision or any other forfeiture provision in the MMA.

*Teva I* also suggested that the Teva-Syntex dismissal should satisfy the court decision trigger requirement because it "support[ed] estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec*." *Teva I*, 182 F.3d at 1011. For the reasons explained in section II.A.1, *supra*, however, FDA does not believe that the court decision trigger provision should be interpreted to embrace dismissals based on underlying statements that have estoppel effect unless the decision evidences a court holding on the merits of the patent claims. Applying the "holding-on-the-merits" interpretation, it is clear that the Teva-Syntex dismissal was materially distinguishable from the decision at issue in *Granutec*.

The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe. *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision). The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.[8] *See* Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In contrast, the Teva-Syntex case was dismissed on jurisdictional grounds based on Teva's lack of a reasonable apprehension of suit. *See Teva I*, 182 F.3d at 1004. Once the court recognized that it lacked jurisdiction, it appropriately refused to decide the merits of the case and granted Syntex's motion to dismiss. Thus, FDA's textually-based interpretation is entirely consistent with its determination that there was a court decision trigger in *Granutec*, but not in the Teva-Syntex case.

B.   FDA's Interpretation is Most Facially Supportable and is Consistent with Important Policy Goals of Regulatory Clarity and Certainty

The legislative history for the Hatch-Waxman amendments clearly reflects a congressional intent to expedite approval of generic drugs and promote competition in the drug marketplace. H.R. Rep. No. 98-857, Pt. 1, 98th Cong., 2d Sess. at 14-15, *reprinted in* 1984 U.S.C.C.A.N. 2647-48. However, to achieve these policy goals, Congress established a regime that depends on ANDA applicants to challenge drug patents to enable earlier approval of generic drugs and, thereby, promote competition. Congress clearly believed that ANDA applicants needed an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents. This Congressional belief is manifested in the statutory provision for 180-day exclusivity under section 505(j)(5)(B)(iv).

---

[8] Consistent with its decision in the *Granutec* case, FDA's interpretation does not demand, and the agency does not intend to limit its scope to, court decisions following a full trial. The statutory language "decision of a court" in section 505(j)(5)(B)(iv)(II) does not require such a narrow reading; nor does the legislative history appear to indicate Congressional intent for the language to be read in such a manner.

A relatively broad interpretation of the court decision trigger, such as the estoppel standard, makes it easier to trigger 180-day exclusivity. In any specific case, this may speed approval of subsequent ANDA applicants and, therefore, competition in the marketplace. However, a relatively broad trigger for 180-day exclusivity could diminish the value of 180-day exclusivity to ANDA applicants, and thus it might also reduce the incentive for ANDA applicants to challenge an innovator's patents. A relatively narrow interpretation, such as the "holding-on-the-merits" standard, may slow approval of subsequent ANDAs and competition in a specific case. It could, however, make exclusivity more valuable, and thus make patent challenges more common overall. In any event, the legislative history offers little if any guidance as to which interpretation Congress might have preferred, and thus it is appropriate to apply the interpretation most consistent with the plain language of the provision. *See, e.g., Teva*, 410 F.3d at 54.

In the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance. Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. This dynamic is demonstrated with remarkable clarity by Apotex's and Teva's having taken legal positions with respect to the Apotex-Bristol dismissal that are diametrically opposed to their positions in the original *Teva* litigation during 1999 and 2000. This change of positions is not surprising because their roles are reversed: with respect to pravastatin, they each occupy the seat the other occupied with respect to ticlopidine. Indeed, the parties' (as well as the Generic Pharmaceutical Association's) disparate policy arguments for and against easier triggering at different times underscores that there may be no clearly preferable position from a policy perspective. *See, e.g., Teva Pharms. USA, Inc. v. FDA*, No. 05-1469 (D.D.C.) (Opp. of Intervenor-Defendant Apotex Inc. to Mot. of Generic Pharmaceutical Ass'n for Leave to File Brief as *Amicus Curiae*, at 2-4, filed Sept. 9, 2005) (noting that the Generic Pharmaceutical Association has made policy arguments both for and against a broad interpretation of the court decision trigger in different cases).

The stipulated order dismissing the Apotex-Bristol case could reasonably be viewed as an effort to tailor a dismissal order to satisfy the estoppel standard discussed in *Teva I*. It includes a statement on its face that Bristol had committed not to sue Apotex for patent infringement. It expressly states that the case is dismissed for lack of subject matter jurisdiction on the basis of Bristol's assurances. Nevertheless, Teva challenged the agency's determination on multiple grounds, including whether Bristol's statements had estoppel effect and whether the order constituted a decision of a court as a matter of federal civil procedure law.[9]

---

[9] The agency's brief on appeal to the *Teva III* court indicates the potentially myriad complexities of attempting to apply an estoppel-based standard:

The considerations that the district court's decision make crucial -- whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court

FDA's experience suggests that drug companies will continue to litigate over exclusivity issues whenever the potential financial rewards are sufficiently high. Were FDA to adopt a standard less objective and clear than the "holding-on-the-merits" standard, the opportunities for disputes regarding the tripping of the court decision trigger would increase. Further, it seems reasonable to assume that applicants are more likely to conclude that their chances of success in court are better in cases concerning patentee estoppel because of FDA's lack of expertise on this issue.

It is in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered. Encouraging highly-interested and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. It offers no guarantee of more rapid generic drug approvals, only a high likelihood of delay due to litigation, and the prospect that this area of law will remain unnecessarily unstable, thus undermining marketplace certainty and interfering with business planning and investment.

C.     Application of FDA's Interpretation to the Apotex-Bristol Dismissal

Under FDA's interpretation, it is clear that the July 23, 2004, stipulated order dismissing the Apotex-Bristol declaratory judgment action is not a court decision "holding" that the subject patents are invalid, not infringed, or unenforceable. Nowhere on the face of the order is there such a determination by the court regarding any of the patents at issue. Even if Bristol's assurances to Apotex, incorporated into the dismissal order, were later determined by a court to estop Bristol from suing Apotex for infringement, the July 23, 2004 dismissal itself does not contain a holding on the merits of patent invalidity, noninfringement, or unenforceability — the issues specified by Congress in the statute (and FDA by regulation). Indeed, the dismissal order makes clear that the case was dismissed for procedural reasons (lack of subject matter jurisdiction) based on Bristol's representations without a holding on the merits of Apotex's declaratory judgment patent claims.

FDA has thus concluded that 180-day exclusivity for pravastatin was not triggered by the July 23, 2004 dismissal. Absent a material change in circumstances, FDA intends to approve only those ANDAs eligible for 180-day exclusivity for pravastatin when the '227 patent (including its period of pediatric exclusivity) expires on April 20, 2006. Approvals of all other pravastatin ANDAs will be delayed for 180 days after exclusivity has been triggered.[10]

─────────────────────

held a hearing, and the like . . . bear no relationship either to whether the decision "hold[s] the patent . . . to be invalid or not infringed" . . . .

Br. for the Federal Appellants at 54 (filed Dec. 22, 2005).

[10] Apotex asserted that the Apotex-Bristol dismissal applied to the 10 mg, 20 mg, 40 mg, and 80 mg strengths of pravastatin. Because FDA has determined that the Apotex-Bristol dismissal does not qualify

III.    Conclusion

FDA interprets the court decision trigger provision to require a decision of a court that on its face evidences a holding on the merits of patent noninfringement, invalidity, or unenforceability. The July 23, 2004, Apotex-Bristol dismissal does not contain such a holding. FDA therefore denies Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and run.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

---

as a court decision trigger for any strength of pravastatin, FDA need not decide (and this decision should not be construed as deciding) whether the dismissal order encompassed all four strengths.

Case 1:06-cv-01890-RMC    Document 14-10    Filed 11/17/2006    Page 1 of 3
Case 2:05-cv-00307-JLL-RJH    Document 24    Filed 05/25/2005    Page 1 of 3
Case 2:05-cv-00307-JLL-RJH    Document 23    Filed 05/18/2005    Page 1 of 3

Case No. 06-1890 (RMC)
Exhibit 3 to the Declaration of Brian K. McCalmon

**CLOSED**

MORGAN, LEWIS & BOCKIUS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
(609) 919-6600
Robert A. White (RW-6063)
rwhite@morganlewis.com

AND

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Dennis J. Mondolino
dmondolino@morganlewis.com
Lisa M. Ferri
lferri@morganlewis.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLAXO GROUP LIMITED, and SMITHKLINE BEECHAM CORPORATION <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX, INC., <br><br> Defendant. | Civil Action No. 05-307 (JLL) <br><br> Honorable Jose L. Linares, U.S.D.J. <br> Honorable Ronald J. Hedges, U.S.M.J. |

### STIPULATION OF DISMISSAL PURSUANT TO FED.R.CIV.P. 41

Pursuant to the parties' Covenant Not to Sue and Stipulation of Non-infringement (the "Agreement"), incorporated by reference herein, the parties, by their undersigned attorneys, stipulate and agree to the dismissal of this action with prejudice, as follows:

Case 1:06-cv-01890-RMC    Document 14-10    Filed 11/17/2006    Page 2 of 3
Case 2:05-cv-00307-JLL-RJH    Document 24    Filed 05/25/2005    Page 2 of 3
Case 2:05-cv-00307-JLL-RJH    Document 23    Filed 05/18/2005    Page 2 of 3

Case No. 06-1890 (RMC)
Exhibit 3 to the Declaration of Brian K. McCalmon

WHEREAS, pursuant to the Agreement, Plaintiffs Glaxo Group Limited and SmithKline Beecham Corporation (collectively "GlaxoSmithKline") stipulate and agree that the ondansetron hydrochloride tablets that are the subject of and described in Apotex Inc.'s ANDA No. 77-306 do not infringe, and if imported, manufactured, used, sold or offered for sale in the United States would not infringe, any claim of GlaxoSmithKline's U.S. Patent No. 5,344,658 ("the '658 patent"); and

WHEREAS, GlaxoSmithKline has represented that it will not sue Apotex for infringement of the '658 patent based on the importation, manufacture, use, sale or offer for sale of ondansetron hydrochloride tablets that are the subject of and described in ANDA No. 77-306; and

WHEREAS, Apotex agrees that it will not seek a declaratory judgment declaring claims of the '658 patent to be invalid unless GlaxoSmithKline asserts a claim against Apotex for allegedly infringing one or more claims of the '658 patent, in which case Apotex retains the right to assert any and all invalidity defenses and claims it has with respect to the '658 patent, as well as its right to raise this Agreement as a defense in response to any such infringement action by GlaxoSmithKline;

THEREFORE, based on the referenced Agreement, the parties, by their undersigned attorneys, hereby stipulate and agree to the dismissal of the parties' respective claims and counterclaims with prejudice. Each party shall bear its own costs, expenses and attorneys' fees.

Dated: May 18, 2005

Robert A. White (RW-6063)
MORGAN, LEWIS & BOCKIUS, LLP

Dated: May 16, 2005

John Holsinger (JH-0281)
Vanessa R. Elliott (VE-4752)

2

SO ORDERED:
DATED:                    2/24/13

Case 1:06-cv-01890-RMC    Document 14-10    Filed 11/17/2006    Page 3 of 3
Case 2:05-cv-00307-JLL-RJH    Document 24    Filed 05/25/2005    Page 3 of 3
Case 2:05-cv-00307-JLL-RJH    Document 23    Filed 05/18/2005    Page 3 of 3

Case No. 06-1890 (RMC)
Exhibit 3 to the Declaration of Brian K. McCalmon

(A Pennsylvania Limited Liability
Partnership)
502 Carnegie Center
Princeton, New Jersey 08540
(609) 919-6600

Dennis J. Mondolino
Lisa M. Ferri
MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Attorneys for Plaintiffs and
Counterdefendants
Glaxo Group Limited & SmithKline
Beecham Corporation

David L. Blank (DB-1671)
BEATTIE PADOVANO LLC
50 Chestnut Ridge Road
Montvale, NJ 07645
(201) 799-2120

William A. Rakoczy
Christine J. Siwik
Jane J. Jaang
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street
Chicago, IL 60610
(312) 222-6301
Attorneys for Defendant and Counter-Plaintiff
Apotex Inc.

3



# United States Patent [19]

## Collin

[11] Patent Number: **5,344,658**

[45] Date of Patent: **Sep. 6, 1994**

[54] **PROCESS AND COMPOSITION USING ONDANSETRON**

[75] Inventor: **David T. Collin, Ware, England**

[73] Assignee: **Glaxo Group Limited, London, England**

[21] Appl. No.: **5,736**

[22] Filed: **Jan. 19, 1993**

### Related U.S. Application Data

[63] Continuation of Ser. No. 755,736, Sep. 6, 1991, abandoned, which is a continuation of Ser. No. 544,644, Jun. 27, 1990, abandoned.

[30] **Foreign Application Priority Data**

Jun. 28, 1989 [GB] United Kingdom ............... 89148043

[51] Int. Cl.⁵ ................................................. A61K 9/14
[52] U.S. Cl. .................................... 424/489; 424/484; 424/464; 424/465
[58] Field of Search ................. 424/484, 464, 465, 489

[56] **References Cited**

### PUBLICATIONS

Sekiguchi et al., Chem. Pharm. Bull., 16(12), 2495–2502, 1968.
Pikal et al., Chemical Abstracts, 100:144884x, 1984.
Shirotani et al., Chemical Abstracts, 96:57633v, 1982.

*Primary Examiner*—Paul R. Michl
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Bacon & Thomas

[57] **ABSTRACT**

The invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent to a size which is suitable for effective distribution in a tablet blend, in particular 100% less that 250 μm. The ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated.

**10 Claims, No Drawings**

5,344,658

**1**

## PROCESS AND COMPOSITION USING ONDANSETRON

This application is a continuation of application Ser. No. 07/755,736, filed Sep. 6, 1991 now abandoned, which is a continuation of application Ser. No. 07/544,644, filed Jun. 27, 1990, now abandoned.

This invention relates to a process for reducing the crystal size of ondansetron hydrochloride dihydrate. More particularly the process involves desolvation and resolution.

Reduction of crystal size through solvation and desolvation has been described previously, for instance for the compound griseofulvin (K. Sekiguchi et al., Chem. Pharm. Bull., 1968, 16, 2495–2502). Various techniques may be employed to effect desolvation such as drying at an elevated temperature and under vacuum, drying at an elevated temperature and at atmospheric pressure, drying at ambient temperature under a high vacuum, freeze-drying, or drying over a desiccant. However, the precise conditions of desolvation considerably affect the efficiency of the reduction in crystal size.

Ondansetron, the approved name for 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one, is a highly selective and potent antagonist of 5-hydroxytryptamine (5-HT) at 5-HT$_3$ recaptots. Ondansetron, together with its physiologically acceptable salts and solvetea, is described and claimed in British Patent No. 2153821B, and may be used in the treatment of a variety of conditions, including the nausea and vomiting induced by cancer chemotherapy and radiotherapy (as described, for example, in European Patent Specification No. 226266A).

The preferred form of ondansetron for pharmaceutical formulation is the hydrochloride dihydrate. Ondansetron hydrochloride dihydrate may be presented in a variety of formulations, one of which is as tablets for oral administration, when particularly suitable unit doses of the drug substance for the treatment of emesis are 5 mg and 10 mg.

In the tablet manufacturing process, ondansetron hydrochloride dihydrate is blended with suitable excipients, and the blend is then compressed into tablets.

Since a low dose of drug substance per tablet is required, for example, 5 mg of ondansetron hydrochloride dihydrate in a tablet of 125 mg compression weight, the distribution of the drug substance in the blend is critical in obtaining individual tablets with the correct drug content. Uniform drug distribution in the tablet blend may be achieved using drug substance of appropriate particle size. However, the ondansetron hydrochloride dihydrate obtained by methods described in the art, i.e. that obtained by simple crystallisation from an aqueous solvent mixture with subsequent drying at ambient temperature and pressure contains particles which are too large (i.e. >250 μm) to give an homogeneous distribution of the drug substance in the tablet blend. Indeed if crystalline ondansetron hydrochloride dihydrate produced by such conventional methods were used in tablet manufacture, the tablets so produced would not possess an acceptable drug content which, for a 5 mg tablet, is 5 mg±0.25 mg of ondansetron hydrochloride dihydrate.

Attempts to mill crystals of ondansetron hydrochloride dihydrate to reduce their particle size have proved unsuccessful, for example, comminution milling of on-

**2**

dansetron hydrochloride dihydrate caused screen blockage of coarse and fine screens. Furthermore, although ondansetron hydrochloride dihydrate of particle size <250 μm can be obtained by passing the substance through a 60 mesh sieve (as described, for example, in UK Patent No. 2153821B), this method is not commercially viable.

We have now found e process which reduces the crystal size of ondansetron hydrochloride dihydrate produced by simple crystallisation from solvent (more particularly aqueous solvent mixtures) to a size which is suitable for effective distribution of the drug substance in the tablet blend.

Thus the invention provides a process for reducing the crystal size of ondansetron hydrochloride dihydrate obtained by simple crystallisation from solvent, more particularly an aqueous solvent mixture, to a size which is suitable for effective distribution in a tablet blend, which comprises desolvating the said drug substance by drying at an elevated temperature and reduced or atmospheric pressure, and then rehydrating the ondansetron hydrochloride so formed.

It is possible by means of the process according to the invention to reduce the crystal size of ondansetron hydrochloride dihydrate to the extent that the entire drug substance consists of particles of a sufficiently small size (i.e. less than 250 μm, of which typically about 80% by weight ere less than 63 μm) to give an homogeneous distribution of the drug substance in the tablet blend.

Preferably, the ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at a temperature greater then 40° C. (e.g. 50° C.) and at reduced pressure (e.g. 200 tort or less) for more than 8 hours. Alternatively, the ondansetron hydrochloride dihydrate obtained by crystallisation may be desolvated at ambient pressure by heating at a temperature of 50° C. or above (more preferably 100° C.).

Most preferably, ondansetron hydrochloride dihydrate obtained by crystallisation is desolvated by heating at 50° C. at a pressure of 100 tort for 24 hours.

The desolvation process may be carried out with or without mechanical agitation.

The resultant ondansetron hydrochloride of reduced crystal size is then rehydrated, for example, by placing it in a humidified atmosphere of, for example, air or nitrogen, at ambient temperature. Rehydration will generally be continued until there is no further gain in weight.

According to another aspect, the invention provides crystalline ondansetron hydrochloride dehydrate characterised in that 100% of the crystals have a size of less than 250μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis).

According to a yet further aspect, the invention provides a pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient characterised in that 100% of the ondansetron hydrochloride dihydrate crystals have a size less than 250 μm and at least 80% by weight of the crystals have a crystal size of less than 63 μm (as measured by air-jet sieve analysis). Generally the composition will contain at least one physiologically acceptable carrier or excipient.

The invention is illustrated by the following examples. Temperatures are in ° C. Crystal size was measured by air-jet sieve analysis.

5,344,658

## 3

### EXAMPLE 1

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 μm

A solution of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidezol-1-yl)methyl]-4H-carbazol-4-one (147 g) in a mixture of isopropanol (670 mʟ), water (250 mʟ) and glacial acetic acid (76 mʟ) at ca. 60° was clarified by filtration and diluted with more water (61 mʟ) and isopropanol (650 mʟ). The solution was treated at 70° with 36% w/w hydrochloric acid (46 mʟ) and cooled to ca. 5°. The resulting suspension was filtered and the filtered solid was washed by displacement with isopropanol (600 mʟ) to give a solvent wet solid (269 g). A portion of this solid (91 g) was dried at ca. 50° and 200 torr for ca. 16h to give a solid (55 g).

A portion of the dried solid (26 g) was placed in a current of humidified air at ambient temperature until there was no further gain in weight and the title compound (29 g) was obtained.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 43.4 |
| 63 | 83.7 |
| 90 | 97.6 |
| 125 | 98.4 |
| 180 | 99.6 |
| 250 | 100.0 |

### EXAMPLE 2

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 250 μm

The previous preparation was repeated except that after collection by filtration the solid was dried at ambient temperature and pressure to give large crystals (>45% by weight of crystals larger than 250 μm) of 1,2,3,9-tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate.

Particle Size Distribution of "Large Crystals"

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 5.8 |
| 63 | 9.8 |
| 90 | 20.8 |
| 125 | 26.7 |
| 180 | 37.8 |
| 250 | 50.6 |
| 355 | 71.5 |
| 500 | 90.9 |
| 710 | 98.4 |
| 1000 | 98.6 |

A sample of this solid (26.9 g) was dried at ambient pressure and 100° for ca. 17 h during which period the weight of the sample was reduced to 24.3 g. The sample was then exposed to ambient temperatures and humidities until it had regained its original weight to afford the title compound.

Particle Size Distribution of Title Compound

## 4

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 47.6 |
| 63 | 94.8 |
| 90 | 100.0 |

### EXAMPLE 3

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dehydrate wherein the crystals are less than 250 μm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 52° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize (by weight) |
|---|---|
| 45 | 44.3 |
| 63 | 83.2 |
| 90 | 97.0 |
| 125 | 98.8 |
| 180 | 99.8 |
| 250 | 100.0 |

### EXAMPLE 4

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate wherein the crystals are less than 90 μm

1,2,3,9-Tetrahydro-9-methyl-3-[(2-methyl-1H-imidazol-1-yl)methyl]-4H-carbazol-4-one hydrochloride dihydrate obtained by crystallisation from a solvent was dried at 48° and 100 torr for 24 h and then rehydrated to give the title compound.

Particle Size Distribution of Title Compound

| Size (μm) | Cumulative % Undersize |
|---|---|
| 45 | 49.0 |
| 63 | 92.4 |
| 90 | 100.0 |

I claim:

1. A process for reducing the crystal size of ondansetron hydrochloride dihydrate produced by crystallisation from solvent, in which said ondansetron hydrochloride dihydrate is desolvated by drying at elevated temperature and reduced or atmospheric pressure and is then rehydrated, wherein the resulting crystals are suitable for homogeneous distribution in a tablet blend, and wherein 100% of the resulting crystals have a size of less than 250 μm and at least about 80% by weight of the crystals have a size of less than 63 μm.

2. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is prepared by crystallisation from an aqueous solvent mixture.

3. A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature greater than 40° C. and at reduced pressure for more than 8 hours.

4. A process according to claim 3, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of about 50° C. at a pressure of about 100 torr for about 24 hours.

Case No. 06-1890 (RMC)
Case 1:06-cv-01890-RMC    Document 14    Filed 11/17/2006    Page 4 of 4
Exhibit 4 to the Declaration of Brian K. McCalmon

5,344,658

| 5 | 6 |
|---|---|

**5.** A process according to claim 1, in which said ondansetron hydrochloride dihydrate is desolvated by heating at a temperature of 50° C. or above at ambient pressure.

**6.** A process according to claim 5, in which said temperature is about 100° C.

**7.** A process according to claim 1, in which said ondansetron hydrochloride dihydrate is rehydrated in a humidified atmosphere at ambient temperature.

**8.** Crystalline ondansetron hydrochloride dihydrate in which 100% of the crystals have a size of less than 250 $\mu$m and at least about 80% by weight of the crystals have a size of less than 63 $\mu$m.

**9.** A pharmaceutical composition in the form of tablets containing crystalline ondansetron hydrochloride dihydrate as active ingredient, in which 100% of said ondansetron hydrochloride dihydrate crystals have a size less than 250 $\mu$m and at least about 80% by weight of said crystals have a size less than 63 $\mu$m.

**10.** A pharmaceutical composition according to claim 9, in which each tablet has a nominal content of active ingredient which is 5 mg or 10 mg.

\* \* \* \* \*

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 1 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| APOTEX INC. | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) | Case No. _____ |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF TAMMY MCINTIRE

I, TAMMY MCINTIRE, declare as follows:

1.    I am the President of Apotex Corp., which is located in Weston, Florida. Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures affordable generic medicines. For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Declaration as "Apotex."

2.    I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.    I submit this Declaration in support of Apotex's motion for temporary restraining order and/or preliminary injunction.

4.    In my current position, I am personally involved in the introduction and promotion of new generic drug products for the United States market. I am familiar with the considerable benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180

days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5.    I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company. These losses include, but are not limited to:  significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6.    In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage. That is precisely the irreparable harm that Apotex will suffer if Doctor Reddy's Laboratories ("DRL") or another applicant is able to launch its ondansetron product before this dispute is decided and thus enjoy a period of exclusivity to which it may not be entitled.

### Zofran® (ondansetron hydrochloride)

7.    GlaxoSmithKline ("GSK") currently markets Zofran® (ondansetron hydrochloride) tablets, in 4 mg, 8 mg, and 24 mg strengths, in the United States for the prevention of nausea and vomiting associated with chemotherapy.

8.    Zofran® is a very lucrative drug for GSK, with worldwide sales from September 2004 to September 2005 exceeding $712 million (USD). According to IMS Health, an industry-recognized source in the pharmaceutical market, GSK's total Zofran® sales for 2005 in the United States alone were $630,359,000 (USD).

2

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 3 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

### Apotex's Ondansetron Tablet ANDA

9.      Apotex has spent considerable sums developing a generic ondansetron hydrochloride tablet product for eventual sale in the United States, including compiling the information required to submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA"). Apotex's ANDA contains a "Paragraph IV" certification, stating that Apotex's product will not infringe GSK's U.S. Patent No. 5,344,658, or that the patent is invalid or unenforceable. It is my understanding that Apotex has manufactured and/or purchased ondansetron active pharmaceutical ingredient ("API") for a commercial launch of its product. It is also my understanding that Apotex has already manufactured ondansetron tablets in anticipation of a commercial launch of its product.

### Other Generic Ondansetron Tablet ANDAs

10.      Based on publicly available information, it is my understanding at least eight (8) other companies have filed ANDAs seeking approval to market a generic versions of Zofran$^{®}$ tablets. It is also my understanding that at least two (2) of these companies, including Apotex and DRL, have filed ANDAs containing a Paragraph IV certification to the '658 patent. To date, FDA has not approved any generic ondansetron tablet ANDAs.

11.      It is my understanding that DRL or another applicant claims to have 180-day exclusivity as to ondansetron tablets arising out of a Paragraph IV certification to the '658 patent. It further is my understanding that FDA cannot grant final approval of any ondansetron tablet ANDA until at least December 24, 2006, when the pediatric exclusivity for GSK's U.S. Patent No. 4,753,789 expires.

12.      GSK sued Apotex for infringement of the '658 patent in the U.S. District Court for the District of New Jersey. It is my understanding that on May 25, 2005, the Court issued a

3

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 4 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

decision dismissing the case with prejudice based on GSK's concession that Apotex's ANDA product would not infringe the '658 patent.

    13.    It also is my understanding that Apotex contacted FDA to confirm that this decision triggered any generic exclusivity that would be awarded for ondansetron tablets, and that Apotex's ANDA would be eligible for final approval when the pediatric exclusivity expires for the '789 patent expires on December 24, 2006. I further understand that, by letter dated November 3, 2006, FDA denied Apotex's request, stating that the May 25, 2005 order did not trigger any 180-day exclusivity for ondansetron that may arise from another ANDA applicant's paragraph IV certification to the '658 patent.

    14.    It is my understanding that, according to FDA's decision, if another Paragraph IV applicant receives generic exclusivity, Apotex will not be eligible for approval when the pediatric exclusivity expires for the '789 patent on December 24, 2006.

<strong>Irreparable Harm to Apotex</strong>

    15.    As an initial matter, if Apotex is delayed and DRL or another applicant is permitted to launch its product with 180-day exclusivity, the long-term financial losses to Apotex will be substantial and unrecoverable, even if Apotex is successful on the merits of this litigation.

    16.    My experience with other drug products has shown that there are considerable—often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market. The first-mover (such as DRL, here) establishes market dominance that is nearly impossible for other, subsequent entrants like Apotex to overcome. The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products. Conversely, subsequent entrants to the market, like Apotex here, find it difficult to find

4

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 5 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

prospective customers, much less recoup product investments and obtain any significant market share.

17.    I have analyzed the potential market share for generic ondansetron tablets during the first 12 months of competition with Zofran® based on IMS data showing Zofran®'s U.S. sales from 2004 and 2005.  If Apotex were allowed to launch as soon as the period of pediatric exclusivity expires on December 24, 2006, Apotex projects that it will earn at least $12.28 million in net sales in the first 12 months of generic ondansetron competition, assuming a simultaneous launch by the other tentatively approved applicants.

18.    On the other hand, if DRL or another applicant is allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex projects that it will earn no more than approximately $486,679 in net sales in the first 12 months of generic ondansetron competition.  This translates into a total and unrecoverable loss of at least $ 11.7 million in net sales.

19.    Apotex Inc. already has ordered ondansetron API in order to produce and formulate the necessary amount of ondansetron tablets required for a product launch.  In the event DRL or another applicant is allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex would not recoup its development and API investments and costs associated with the product.

20.    It is my understanding that Apotex has no remedy against FDA to recover Apotex's losses, including Apotex's investments and projected lost sales, if another applicant is allowed to commercially launch with exclusivity while this litigation is still pending.  This is true even if Apotex prevails on the merits.

5

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 6 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

21.    Furthermore, the effects of an exclusive launch extends well beyond the unrecoverable loss of sales, market share, profits, and investments. This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-approved generic product. This occurs because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with most, if not all, of the major customers. In other words, if DRL or another applicant is first to hit the market alone, it will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss of access to major customers would still foreclose Apotex from effectively competing in the ondansetron tablet market.

22.    Apart from the lost opportunity for ondansetron tablet sales (at least $ 11.7 million during the first year of generic ondansetron sales alone) and decreased access to major customers, Apotex also would lose sales across all of its other generic product lines. When companies have the opportunity to exclusively launch a unique blockbuster drug such as a generic equivalent to Zofran® tablets, they have significant leverage to sell other products that they manufacture. The presence of an exclusive blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines. Conversely, subsequent entrants to the market like Apotex have no such leverage. This leads to a loss of market share across all products, which is also irreparable.

23.    Apotex's ondansetron tablet products are significant not only for Apotex, but for its customers. Apotex's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important medicines, such as ondansetron tablets, to the market. If Apotex is forced to delay the sale of its

6

Case 1:06-cv-01890-RMC    Document 14-12    Filed 11/17/2006    Page 7 of 8
Case No. 06-1890 (RMC)
Exhibit 5 to the Declaration of Brian K. McCalmon

ondansetron tablet products, Apotex would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Apotex sells to its customers today and in the future.

24.    It is also imperative that Apotex obtain the relief it seeks as soon as possible. It is my understanding that other applicants who claim to have exclusivity are already pre-selling and marketing their generic products to major customers on the basis that they will be the only available generic products on December 24, 2006. Apotex, too, needs to be able top pre-sell and pre-market its products as well before all major customers and distribution channels are tied up, and there is no appreciable market share left.

### Conclusion

25.    In sum, if an applicant exclusively launches its ondansetron tablet product before this dispute is decided, Apotex will irreparably lose sales of at least $ 11.7 million, significant market share for this and other products, and indeed its entire ondansetron investment, as well as customer goodwill and access to major customers. It would also irreparably damage Apotex's ability to compete in the ultra-competitive U.S. market.

Dated: November 6, 2006

7

I, TAMMY MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_____
TAMMY MCINTIRE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.                            ) | |
|           Plaintiff,             ) | |
|          v.                    ) | Case No. 06-627 (JDB) |
| FOOD AND DRUG ADMINISTRATION, *et al.*   ) | |
|          Defendants.       ) | |

## DECLARATION OF TAMMY L. MCINTIRE

I, TAMMY L. MCINTIRE, declare as follows:

1.     I am the President of Apotex Corp., which is located in Weston, Florida. Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures affordable generic medicines. For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Declaration as "Apotex."

2.     I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.     I submit this Declaration in support of Apotex's motion for temporary restraining order and/or preliminary injunction.

4.     In my current position, I am personally involved in the introduction and promotion of new generic drug products for the United States market. I am familiar with the considerable benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180

Case 1:06-cv-01890-RMC    Document 14-13    Filed 11/17/2006    Page 2 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5.      I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company. These losses include, but are not limited to: significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6.      In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage. That is precisely the irreparable harm that Apotex will suffer if Teva and Ranbaxy are allowed to launch their pravastatin sodium products before this dispute is decided and thus enjoy a period of exclusivity to which neither may be entitled.

**Pravachol® (Pravastatin Sodium)**

7.      Bristol-Myers Squibb Company ("BMS") currently markets Pravachol® (pravastatin sodium) tablets, in 10 mg, 20 mg, 40 mg, and 80 mg strengths, in the United States for the treatment of heart disease.

8.      Pravachol® is a very lucrative drug for BMS, with worldwide sales in 2005 exceeding $2.25 billion (USD). According to IMS Health, an industry-recognized source in the pharmaceutical market, BMS's total Pravachol® sales for 2005 in the United States alone were $1.7 billion (USD).

2

Case 1:06-cv-01890-RMC     Document 14-13     Filed 11/17/2006     Page 3 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

### Apotex's Pravastatin ANDA

9.     Apotex has spent considerable sums developing a generic pravastatin tablet product for eventual sale in the United States, including compiling the information required to submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA"). To date, it is my understanding that Apotex has manufactured over 2000 kilograms of pravastatin active pharmaceutical ingredient ("API"), with an estimated worth of over $6 million, for a commercial launch of its product.

### Other Generic Pravastatin ANDAs

10.     Based on publicly available information, at least seven other companies, including Teva and Ranbaxy, have filed ANDAs with FDA seeking approval to market generic versions of Pravachol®. To date, FDA has not approved any generic pravastatin ANDAs.

11.     It is my understanding that, on April 11, 2006, FDA issued an administrative ruling determining that one or more parties is entitled to 180-day exclusivity for pravastatin tablets, thus preventing Apotex and all other later-filers from going to market for at least six months after such first-filers launch. It is my understanding that Teva may have exclusivity as to pravastatin 10 mg, 20 mg and 40 mg tablets, and that Ranbaxy claims to have exclusivity as to the 80 mg product. It further is my understanding that FDA intends to approve Teva's and Ranbaxy's ANDAs, and that both companies intend to commercially launch their generic products, on April 20, 2006. Apotex has challenged FDA's administrative ruling and exclusivity determination in this lawsuit. Unless the Court grants injunctive relief, Teva and Ranbaxy could enjoy an exclusivity to which neither is entitled. Such a result would unlawfully deny Apotex and others access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails.

### Irreparable Harm to Apotex

12.     As an initial matter, if Apotex is delayed and Teva and Ranbaxy are permitted to launch their products with 180-day exclusivity, the long-term financial losses to Apotex will be substantial and unrecoverable, even if Apotex is successful on the merits of this litigation.

13.     My experience with other drug products has shown that there are considerable—often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market. The first-mover (such as Teva and Ranbaxy, here) establishes market dominance that is nearly impossible for other, subsequent entrants like Apotex to overcome. The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products. Conversely, subsequent entrants to the market, like Apotex here, find it difficult to find prospective customers, much less recoup product investments and obtain any significant market share.

14.     I have analyzed the potential market share for generic pravastatin during the first 12 months of competition with Pravachol® based on IMS data showing Pravachol®'s U.S. sales from 2004 and 2005. If Apotex were allowed to launch as soon as the period of pediatric exclusivity expires on April 20, 2006, Apotex projects that it will earn at least $10.5 million in the first 12 months of generic pravastatin competition, assuming a simultaneous launch by all other seven approvable ANDA applicants as well as the authorized generic product. In my experience, however, it is more likely that one or more tentatively-approved applicants will be unable to launch at that time. Under such circumstances, it is likely that Apotex would actually earn substantially more than its projections, and possibly even several times more than that.

4

Case 1:06-cv-01890-RMC    Document 14-13    Filed 11/17/2006    Page 5 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

15.    On the other hand, if Teva and Ranbaxy are allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex projects that it will earn no more than approximately $600,000 in the first 12 months of generic pravastatin competition.    This translates into a total and unrecoverable loss of at least $9.9 million in sales.

16.    Moreover, in reliance on FDA's June 28, 2005 administrative ruling, in which the Agency determined that no party was eligible for 180-day exclusivity for pravastatin, Apotex's fermentation facility already has manufactured, and Apotex Inc. already has ordered, over $6 million worth of pravastatin API in order to produce and formulate the necessary amount of pravastatin tablets required for a product launch.    In the event Teva and Ranbaxy are allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex would not recoup its development and API investments and costs associated with the product.

17.    It is my understanding that Apotex has no remedy against FDA to recover Apotex's losses, including Apotex's investments and projected lost sales, if Teva and Ranbaxy are allowed to commercially launch with exclusivity while this litigation is still pending.    This is true even if Apotex prevails on the merits.

18.    Furthermore, the effects of an exclusive launch by Teva and Ranbaxy extend well beyond the unrecoverable loss of sales, market share, profits, and investments.    This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-approved generic product.    This occurs because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with most, if not all, of the major customers.    In other words, if Teva and Ranbaxy are first to hit the market alone, they will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss

5

Case 1:06-cv-01890-RMC    Document 14-13    Filed 11/17/2006    Page 6 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

of access to major customers would still foreclose Apotex from effectively competing in the pravastatin market.

19.    Apart from the lost opportunity for pravastatin sales (at least $9.9 million during the first year of generic pravastatin sales alone) and decreased access to major customers, Apotex also would lose sales across all of its other generic product lines.  When companies like Teva and Ranbaxy have the opportunity to exclusively launch a unique blockbuster drug such as a generic equivalent to Pravachol® tablets, they have significant leverage to sell other products that they manufacture.  The presence of an exclusive blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines.  Conversely, subsequent entrants to the market like Apotex have no such leverage.  This leads to a loss of market share across all products, which is also irreparable.

20.    Apotex's pravastatin products are significant not only for Apotex, but for its customers.  Apotex's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important medicines, such as pravastatin, to the market.  If Apotex is forced to delay the sale of its pravastatin products, Apotex would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Apotex sells to its customers today and in the future.

Case 1:06-cv-01890-RMC    Document 14-13    Filed 11/17/2006    Page 7 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

### No Harm To Teva or Ranbaxy

21.    It is my understanding that Teva has suggested that it would be harmed by any short delay in approval due to another brand product that will be genericized in a matter of a few months. It is my understanding that the drug product to which Teva is referring is simvastatin, marketed under the brand-name Zocor®, which loses patent protection on June 23, 2006. However, simvastatin is a completely different drug product that is not equivalent to pravastatin, nor can it be automatically substituted for pravastatin by qualified dispensers and pharmacists. There is thus no reason to believe that Teva or Ranbaxy are at risk of losing any significant sales of their proposed pravastatin products due to the sale of a competing simvastatin product—especially given that simvastatin will not enter the market for at least another two months.

22.    It also is my understanding that Teva has suggested that it would be harmed by any short delay in approval due to the launch of an "authorized generic" pravastatin product. An "authorized generic" product is the brand drug product itself, manufactured by the brand company and approved under the brand's NDA, but sold under a generic label. In this case, it is my understanding that BMS's authorized generic arrangement has been publicly known since at least February 2006. Notably, however, there is no reason to believe that an authorized generic version of Pravachol® will enter the market before Teva or Ranbaxy enter the market. It has been my experience that brand companies will permit the launch of an authorized generic version of their products only after, or at the same time, that the first ANDA generic enters the market. The reasoning is simple. The brand company, such as BMS here, has every incentive to wait until the first ANDA generic enters the market before launching its authorized generic product in order to preserve the market as long as it can for its higher-priced brand-name product. There is

7

Case 1:06-cv-01890-RMC    Document 14-13    Filed 11/17/2006    Page 8 of 9
Case No. 06-1890 (RMC)
Exhibit 6 to the Declaration of Brian K. McCalmon

simply no reason to believe, or evidence to suggest, that BMS will act any differently with respect to its authorized generic Pravachol® products.

## Conclusion

23.    In sum, if Teva and Ranbaxy exclusively launch their pravastatin products before this dispute is decided, Apotex will irreparably lose sales of at least $9.9 million, significant market share for this and other products, and indeed its entire pravastatin investment, as well as customer goodwill and access to major customers. It would also irreparably damage Apotex's ability to compete in the ultra-competitive U.S. market.

Dated: April 14, 2006

I, TAMMY L. MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_Tammy L. McIntire_
TAMMY L. MCINTIRE

Case No. 06-1890 (RMC)

CM/ECF LIVE U.S. District Court for the District of New Jersey - Docket Report Exhibit 7 to the Declaration of Brian K. McCalmon Page 1 of 4

CLOSED

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:05-cv-00307-JLL-RJH

GLAXO GROUP LIMITED et al v. APOTEX, INC.
Assigned to: Judge Jose L. Linares
Referred to: Magistrate Judge Ronald J. Hedges
Cause: 28:1332 Diversity-Breach of Contract

Date Filed: 01/14/2005
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**GLAXO GROUP LIMITED**

represented by **ROBERT ALAN WHITE**
MORGAN, LEWIS & BOCKIUS, LLP
502 CARNEGIE CENTER
PRINCETON, NJ 08540
(609) 919-6600
Email: rwhite@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SMITHKLINE BEECHAM CORPORATION**

represented by **ROBERT ALAN WHITE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**APOTEX, INC.**

represented by **MARGARET M. RAYMOND-FLOOD**
NORRIS, MCLAUGHLIN & MARCUS, PA
721 ROUTE 202-206
BRIDGEWATER, NJ 08807
(908) 722-0700
Email: mrflood@nmmlaw.com
*TERMINATED: 03/30/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**VANESSA R. ELLIOTT**
BEATTIE PADOVANO LLC
50 CHESTNUT RIDGE ROAD

Case No. 06-1890 (RMC)

CM/ECF LIVE - U.S. District Court for the District of New Jersey - Docket Report Exhibit 7 to the Declaration of Brian K. McCalmon Page 2 of 4  Page 2 of 4

MONTVALE, NJ 07645
(201) 799-2120
Email: velliott@beattielaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**APOTEX, INC.**                      represented by **VANESSA R. ELLIOTT**
                                      (See above for address)
                                      *LEAD ATTORNEY*

V.

**Counter Defendant**

**GLAXO GROUP LIMITED**              represented by **ROBERT ALAN WHITE**
                                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

**Counter Defendant**

**SMITHKLINE BEECHAM**               represented by **ROBERT ALAN WHITE**
**CORPORATION**                      (See above for address)
                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/14/2005 | 1 | COMPLAINT against APOTEX, INC. ( Filing fee $ 150 receipt number 328622.) , filed by GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION.(dr, ) (Entered: 01/19/2005) |
| 01/19/2005 | | Summons Issued as to APOTEX, INC..Days Due - 20.Mld to Counsel (dr, ) (Entered: 01/19/2005) |
| 02/24/2005 | 2 | SUMMONS Returned Executed by GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION. APOTEX, INC. served on 2/15/2005, answer due 3/7/2005. (WHITE, ROBERT) (Entered: 02/24/2005) |
| 03/04/2005 | 3 | Application and Proposed Order for Clerk's Order to extend time to answer as to Apotex Inc.. Attorney MARGARET M. RAYMOND-FLOOD and MARGARET M. RAYMOND-FLOOD for APOTEX, INC. added. (RAYMOND-FLOOD, MARGARET) (Entered: 03/04/2005) |
| 03/07/2005 | | Application for an extension of time is granted as to deft Apotex. Answer Due 3/22/05 as to Apotex, Inc. (jd, ) (Entered: 03/07/2005) |
| 03/22/2005 | 4 | ANSWER to Complaint with Jury Demand, COUNTERCLAIM against all plaintiffs by APOTEX, INC..(ELLIOTT, VANESSA) (Entered: 03/22/2005) |

| 03/22/2005 | 5 | STATEMENT by APOTEX, INC.. (ELLIOTT, VANESSA) (Entered: 03/22/2005) |
|---|---|---|
| 03/22/2005 | 6 | APPLICATION/PETITION for by APOTEX, INC.. (Attachments: # 1 Certification of local counsel Holsinger in support of application to admit out-of-state counsel pro hac vice# 2 Certification of out-of-state attorney Rakoczy in support of application to admit counsel pro hac vice# 3 Statement of out-of-state attorney Siwik in support of application to be admitted pro hac vice# 4 Certification of out-of-state attorney Jaang in support of application to be admitted pro hac vice# 5 Text of Proposed Order admitting counsel pro hac vice)(ELLIOTT, VANESSA) (Entered: 03/22/2005) |
| 03/28/2005 | 7 | ORDER granting pro hac vice admission as to William a. Rakoczy, Christine J. Siwik and Jane J. Jaang on behalf of Apotex, Inc. . Signed by Judge Ronald J. Hedges on 3/24/05. (jd, ) (Entered: 03/28/2005) |
| 03/30/2005 | 8 | Substitution of Attorney - Attorney VANESSA R. ELLIOTT and VANESSA R. ELLIOTT for APOTEX, INC. and APOTEX, INC. added. Attorney MARGARET M. RAYMOND-FLOOD terminated.. (ELLIOTT, VANESSA) (Entered: 03/30/2005) |
| 04/04/2005 | 9 | ORDER Initial Conference set for 5/24/2005 02:00 PM in Newark - Courtroom 2C before Magistrate Judge Ronald J. Hedges.. Signed by Judge Ronald J. Hedges on 4/4/05. (nm, ) (Entered: 04/04/2005) |
| 04/11/2005 | 10 | *REPLY TO* ANSWER to Counterclaim by GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION, GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION.(WHITE, ROBERT) (Entered: 04/11/2005) |
| 04/25/2005 | 11 | ORDER granting Brian W. Nolan admission pro hac vice on behalf of pltfs. Signed by Judge Ronald J. Hedges on 4/25/05. (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 12 | ORDER granting Richard C. Pettus admission pro hac vice on behalf of pltfs. Signed by Judge Ronald J. Hedges on 4/25/05. (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 13 | ORDER granting Lisa M. Ferri admission pro hac vice on behalf of pltfs. Signed by Judge Ronald J. Hedges on 4/25/05. (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 14 | ORDER granting Dennis J. Mondolino admission pro hac vice on behalf of pltfs. Signed by Judge Ronald J. Hedges on 4/25/05. (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 15 | Certification of Dennis J. Mondolino on behalf of GLAXO GROUP, etal re: admission pro hac vice (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 16 | Certification of Robert A. White on behalf of GLAXO GROUP LIMITED, etal re: admission pro hac vice of Dennis J. Mondolino (jd, ) (Entered: 04/25/2005) |

Case No. 06-1890 (RMC)

CM/ECF LIVE - U.S. District Court for the District of New Jersey - Docket Report Exhibit 7 to the Declaration of Brian K. McCalmon Page 4 of 4

| 04/25/2005 | 17 | Certification of Lisa M. Ferri on behalf of GLAXO GROUP LIMITED, etal Re: admission pro hac vice (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 18 | Certification of Robert A. White on behalf of GLAXO GROUP LIMITED, etal (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 19 | Certification of Richard C. Pettus on behalf of GLAXO GROUP LIMITED, etal re: admission pro hac vice (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 20 | Certification of Robert A. White on behalf of GLAXO GROUP LIMITED, etal (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 21 | Certification of Brian W. Nolan on behalf of GLAXO GROUP LIMITED, etal re: admission pro hac vice (jd, ) (Entered: 04/25/2005) |
| 04/25/2005 | 22 | Certification of Robert A. White on behalf of GLAXO GROUP LIMITED, etal(jd, ) (Entered: 04/25/2005) |
| 05/18/2005 | 23 | STIPULATION of Dismissal by GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION, GLAXO GROUP LIMITED, SMITHKLINE BEECHAM CORPORATION. (WHITE, ROBERT) (Entered: 05/18/2005) |
| 05/25/2005 | 24 | Stipulation and ORDER of DISMISSAL w/prejudice. Signed by Judge Jose L. Linares on 5/24/05. (jd, ) (Entered: 05/25/2005) |

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


August 9, 2006

# Marketers of Plavix Outfoxed on a Deal

By STEPHANIE SAUL

The generic drug maker Apotex yesterday began shipping a cheaper form of Plavix, the anticlotting agent that is one of the world's best-selling drugs, in an embarrassing setback for the drug's brand-name marketers, Sanofi-Aventis and Bristol-Myers Squibb.

A year ago, analysts had predicted that the companies had a better than 60 percent chance of winning a patent dispute with Apotex. But an attempt by the companies to settle the dispute has backfired, opening the way for Apotex to enter the market.

"It looks like a much smaller generic private company completely outmaneuvered two of the giants of the pharmaceutical industry," said Gbola Amusa, European pharmaceutical analyst for Sanford C. Bernstein & Company. "It's not clear how or why that happened. The reaction from investors and analysts has ranged from shock to outright anger."

The generic version, called clopidogrel, is expected to be available in the United States beginning today at prices about 30 percent below the $4-a-day retail price for Plavix. The drug, used for preventing heart attacks and strokes, had sales of more than $6 billion last year.

Shares of Bristol-Myers, which gets nearly one-fifth of its revenue from Plavix, were down 6.85 percent yesterday on the prospect of a major erosion of those sales. The American depository receipts of Sanofi, a French company that sells Plavix outside the United States, were off by nearly 1 percent.

Barry Sherman, Apotex's chief executive, predicted that clopidogrel, the biggest-selling drug ever to go generic, would mark the "largest and most successful launch" of a generic drug in history. Apotex's move into the market follows the government's recent rejection of the proposed patent settlement, which Bristol-Myers and Sanofi had hoped would keep the generic drug off the market until 2011.

Despite the government's rejection of the deal, some terms of that agreement remain in effect. And they hold at least two significant disadvantages for Bristol and Sanofi. Under the terms, the companies must wait five business days before seeking a federal injunction against Apotex's shipments, giving the generic company an opportunity to potentially flood the market with its generic drug before a court can step in.

The big companies also negotiated away their rights under federal law to seek triple financial damages if they eventually win the patent dispute in court. That proviso removed one of the major deterrents to a generic competitor's entering the market while a drug is still under patent.

Analysts said the developments raised doubts about the leadership of Bristol-Myers and Sanofi and the wisdom of the concessions they had made to Apotex. And because the abortive patent settlement is also now the subject of a federal criminal inquiry, some analysts raised questions about whether Peter R. Dolan, Bristol-Myers's chief executive, can survive.

"On the surface, it doesn't look good," said Jami Rubin, a Morgan Stanley analyst. "Credibility, I think, has been severely set back."

In a letter to employees yesterday, Mr. Dolan warned that there would be negative news accounts of the generic introduction, but he defended the company's efforts to protect its intellectual property rights.

A Bristol-Myers spokesman, Tony Plohoros, said the company was evaluating its legal and commercial options. Those could include a decision by the company to drastically lower the price of Plavix or to introduce its own generic equivalent.

In a statement, the French company Sanofi said it was also evaluating possible remedies against Apotex, which a lawyer for Bristol-Myers accused in court of intentionally sabotaging the deal.

Mr. Sherman, in a telephone interview, all but ridiculed his two big rivals, saying they had naïvely agreed to conditions that allowed his company to bring its product to market even though the deal was rejected by regulators.

"I think they acted foolishly in a number of ways," said Mr. Sherman, a Toronto billionaire who amassed his fortune in the generic drug business.

Mr. Sherman said that he had never expected the American government to approve the deal, but that he had conducted the negotiations in a way to let him push the Apotex drug onto the market.

Mr. Sherman said Apotex was engaged in an "all-out launch" and has already shipped most of its inventory while manufacturing continues.

Some analysts predicted yesterday that by the time a federal judge in New York could rule on the big companies' request to block the drug's sale, based on their patent that runs until late 2011, Apotex could have up to $1 billion of its product on the market. The decision could take weeks, analysts said.

Jennifer Luddy, a spokeswoman for Medco Health Solutions, which operates employee-sponsored prescription

drug plans, said it would begin sending the drug today to customers who receive mail-order Plavix unless their doctor specified the brand-name drug.

The advent of generic Plavix raises questions among analysts as to whether Bristol-Myers will be forced to cut its hefty dividend of $1.12 a year, or 5.28 percent. Mr. Plohoros declined to predict yesterday.

Shares of Bristol-Myers fell $1.56, to $21.21. The stock is now down 18 percent since the company disclosed last month that the Apotex deal was the target of a Justice Department investigation.

American depository receipts of Sanofi fell 44 cents, to $44.45.

As part of the federal investigation, the F.B.I. recently searched the offices of Mr. Dolan and Dr. Andrew Bodnar, his close adviser. Dr. Bodnar visited Mr. Sherman's Toronto office twice to personally negotiate part of the deal, according to Mr. Sherman.

The Justice Department is believed to be investigating whether Bristol and Sanofi tried to conceal a so-called side deal with Apotex that would not have passed regulatory muster. Both companies have denied doing anything improper.

"Bodnar kept saying that he was in contact with Peter Dolan and Dolan was 100 percent behind whatever he was negotiating," Mr. Sherman said yesterday. "Whatever he was doing, whether or not there were side deals that were not reported to the F.T.C, I cannot comment on."

The one-on-one negotiations between Mr. Sherman and Dr. Bodnar, and the search of Bristol-Myers's corporate offices on July 26, were elements of the corporate intrigue discussed in court transcripts that were unsealed yesterday by United States District Judge Sidney H. Stein in New York. Judge Stein is overseeing the patent dispute, which is now expected to go to trial next year.

In the transcripts of discussions that have taken place before the judge during the past week, a lawyer for Bristol-Myers accused Apotex of generating the criminal investigation — and thereby sabotaging the deal — by providing false information to the federal government.

"The best evidence we have, the best information we have, is that that occurred as a result of something that Apotex said to the government, which we believe to be untrue," Evan Chesler, a lawyer for Bristol-Myers, said during the court proceedings.

In the telephone interview yesterday, Mr. Sherman declined to comment on what Apotex had or had not told the government. But he said he never expected the deal to clear regulatory review and went along with it simply to position his company to enter the market with its generic. Mr. Sherman said he viewed efforts by brand-name companies to extend monopolies through settlement negotiations as "outrageous."

"Our focus was to get the concession that would enable us to launch, when the F.T.C. turned us down," Mr. Sherman said.

The decision by Apotex to sell generic Plavix follows several years of patent litigation among the companies. In January, with that litigation continuing, the <u>Food and Drug Administration</u> approved Apotex's formulation of generic Plavix.

In March, the parties announced they had reached an agreement. Apotex was given the right to sell the generic drug in September 2011, several months before the patent was set to expire, and Bristol-Myers and Sanofi agreed to pay the company $40 million. The bigger companies also agreed not to issue their own generic version until six months after Apotex began marketing it.

The agreement was revised after objections by antitrust regulators, including state attorneys general and the Federal Trade Commission. Notably, the revised agreement that was submitted to regulators allowed Apotex to begin marketing in June 2011 and omitted the provision that Bristol-Myers and Sanofi would not market their own generic during the first six months Apotex was on the market.

The two big companies also agreed to honor the concessions — the five-day delay in a request for an injunction and the waiver of triple damages — even if the government rejected the deal. "They were so intent on extending their monopoly out for five years and ultimately blind to the idea" that government officials would turn it down, Mr. Sherman said.

"What they should have done, if they were smart," he said, "they should have said, 'We'll stand on our rights. We'll fight in court.' That's what they should have said."

Copyright 2006 The New York Times Company